E-FILED
Monday, 13 February, 2012 06:58:51 PM
ALYSON MORRIS
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION


PATRICK HAHN and ERIK
REDWOOD, Administrator of
the Estate of JANET LOUISE
HAHN, Deceased,

                              No. 09-2145
          Plaintiffs,

     vs.

DANIEL WALKER, DEPUTY
MATTHEW MCCALLISTER, JENNA
THODE, KAREE VOGES, JEFFREY
SHUMATE, ARNOLD MATHEWS,
CARL BROWN, HEALTH
PROFESSIONALS, LTD., an
Illinois Corporation, NURSE
SUSAN SWAIN, COUNTY OF
CHAMPAIGN, ILLINOIS, SYLVIA
MORGAN, MATTHEW BAIN, ANGELA
MENOCCI, CITY OF URBANA,
ILLINOIS, a Municipal
Corporation,

          Defendants.

          DEPOSITION OF ALYSON MORRIS
                 09/30/2011
          Heyl, Royster, Voelker & Allen
                Urbana, Illinois
                   1:00 p.m.

     Barbara A. Glover: CSR #084-001223

   Area Wide Reporting and Video Conferencing
             301 West White Street
           Champaign, Illinois    61820

             (800) 747-6789

**EXHIBIT 3**

AREA WIDE REPORTING & VIDEO CONFERENCING

ALYSON MORRIS

2

1  APPEARANCES:

2

Appearing for Plaintiffs:

3

        Redwood Law Office
4       Jude Redwood
        P. O. Box 864
5       St. Joseph, Illinois   61873
        (217) 469-9194

6

7

Appearing for Defendants Walsh, Health
8  Professionals, Ltd., and County of Champaign,
   Illinois:

9

10        Heyl, Royster, Voelker & Allen
          Keith Fruehling
11        102 East Main Street, Suite 300
          Urbana, Illinois   61803-0129
12        (217) 344-0060

13

14  Appearing for Defendants Morgan, Bain, Menocci,
    and City of Urbana, Illinois:

15

16        Law Office of Small & Freeman, Ltd.
          Howard W. Small
17        41 East University Avenue, Suite 3D
          P. O. Box 1337
18        Champaign, Illinois   61824-1337
          (217) 954-0635

19

20

21

22

23

24

3

1                          I N D E X

2

3      EXAMINATION CONDUCTED BY:                    PAGE

4

            By:  Ms. Redwood                   5
5           By:  Mr. Fruehling                61
            By:  Ms. Redwood                  69

6

7                        E X H I B I T S

8

9   EXHIBIT                                      PAGE

10
   Morris Exhibit No. 1                        30
11 Morris Exhibit No. 2                        32
   Morris Exhibit No. 3                        35
12 Morris Exhibit No. 4                        46
   Morris Exhibit No. 5                        49
13 Morris Exhibit No. 6                        56
   Morris Exhibit No. 7                        57

14

15

16

17

18

19

20

21

22

23

24

ALYSON MORRIS

4

1                    STIPULATION

2

3        IT IS HEREBY EXPRESSLY STIPULATED AND

4    AGREED by and between the parties that the

5    deposition of ALYSON MORRIS, may be taken on

6    September 29, 2011, at Heyl, Royster, Voelker &

7    Allen, Urbana, Illinois, pursuant to the Rules of

8    the Federal Court and the Rules of Federal

9    Procedure governing said depositions.

10        IT IS FURTHER STIPULATED that the

11    necessity for calling the Court Reporter for

12    impeachment purposes is waived.

13

14

15

16

17

18

19

20

21

22

23

24

5

```
1                    1:11 p.m.

2                  ALYSON MORRIS

3    the deponent herein, called as a witness, after

4    having been first duly sworn, was examined and

5    testified as follows:

6

7         EXAMINATION CONDUCTED

8         BY:  MS. REDWOOD

9

10        Q.   My name is Jude Redwood.  I represent

11   the plaintiffs in this case.  I'll be asking you

12   questions which you are going to answer under

13   oath.  There's a few rules here.  If I -- when I

14   start to ask a question, wait for me to finish

15   the whole question before you start the answer,

16   and when you're answering, I'll wait for you to

17   answer before I start another question.  That way

18   the court reporter can get down a good sequence

19   of question and answer.  If I ask you a question

20   and you don't understand what I'm asking, if it's

21   confusing, if I ask two in one, just ask me to

22   rephase, and I'll be happy to do that or tell me

23   you don't understand.

24             If you answer the question, I'll
```

ALYSON MORRIS

6

1  assume that you understood the question I was

2  asking and that you're answering the question

3  that I asked.  If you don't remember something

4  and -- you can just say I don't remember, but if

5  later on you remember it, you can always tell me,

6  hey, I just remembered something from before, a

7  different question, and we can go back and talk

8  about that a little bit.

9        I'm only asking you for what you know,

10 what you remember, or your opinions.  I'm not

11 asking you to speculate or guess or say something

12 that you don't really remember about.

13        If you need to take a break at any

14 time, just let Mr. Fruehling know.  You can take

15 a break at any time.  You can talk about anything

16 in the world during the break, but you can't talk

17 about your deposition testimony that we're here

18 for today.

19        Please state your name.

20    A.   Alyson Morris.

21    Q.   What is your address?

22    A.   ████████       Thomasboro.   Redacted

23    Q.   What is your age?

24    A.   Forty-one.

7

1       Q.   What's your marital status?

2       A.   Married.

3       Q.   Did you read over any notes, reports,

4   statements, or anything else to prepare for this

5   deposition today?

6       A.   Yes.

7       Q.   What did you read over?

8       A.   The mental health assessment, e-mails,

9   transcripts from two depositions.

10       Q.   Did you have a talk or a discussion or

11   a consultation with anyone in preparation for

12   this deposition?

13       A.   Yes, my attorney.

14       Q.   Do you have any private notes, a

15   diary, any kind of records involving Janet Hahn

16   that had not been turned over to either the

17   attorneys or Champaign County Sheriff's Office?

18       A.   No.

19       Q.   What is your profession?

20       A.   I'm a mental health clinician.

21       Q.   Where did you go to school for that?

22       A.   University of Illinois, Springfield.

23   At the time that I went to school there it was

24   Sangamon State.

ALYSON MORRIS

8

1     Q.   Starting post high school, what was
2  the -- what education have you received?
3     A.   I have a bachelor's degree in
4  sociology from SIU.
5     Q.   Do you have any other degrees?
6     A.   Yes, I have a master's degree from
7  Sangamon State counseling.
8     Q.   And it's in counseling, you said?
9     A.   Yes.
10    Q.   Do you have any other degrees?
11    A.   No.
12    Q.   When did you receive your bachelor's?
13  The year is fine.
14    A.   1990.
15    Q.   And when did you receive your
16  master's?
17    A.   1992.
18    Q.   Do you hold any licenses in the state
19  of Illinois?
20    A.   I currently hold a CWEL license.
21    Q.   Would you say that again?
22    A.   CWEL, Child Welfare Employee License.
23    Q.   C -- so it's CWELL?
24    A.   Correct.

ALYSON MORRIS

9

```
 1        Q.    Child Welfare Employee --
 2        A.    CWEL.
 3        Q.    Just one L.  Okay.
 4              MR. FRUEHLING:  If you would just show
 5  my objection to the form of the question.  You
 6  also have a private driver's license too.  Right?
 7              THE WITNESS:  Correct.
 8  BY MS. REDWOOD:
 9        Q.    And when did you get your Child
10  Welfare Employee License?
11        A.    January of 2011.
12        Q.    Besides your CWEL license, do you hold
13  any other professional licenses that relate to
14  your employment or your education in regards to
15  counseling?
16              MR. FRUEHLING:  Objection.  Form.
17              THE WITNESS:  No.
18  BY MS. REDWOOD:
19        Q.    And prior to January 2011, did you
20  hold any professional licenses in relation to
21  your employment?
22              MR. FRUEHLING:  Same objection.
23  BY MS. REDWOOD:
24        Q.    I'm excluding like your driver's
```

ALYSON MORRIS

10

1   license.  I'm talking about professional

2   licenses.

3       A.    When you say employment, do you mean

4   employment at any point during the course of my

5   career since I graduated from college?

6       Q.    Any kind of professional license that

7   you've held, yes, before this one that you've

8   testified to in 2011.

9       A.    No.

10      Q.    And have you ever been licensed in any

11  other state in a professional capacity?

12      A.    No.

13      Q.    Are you currently employed by HPL,

14  Health Professionals, Limited?

15      A.    No.

16      Q.    Where do you work now?

17      A.    Catholic Charities.

18      Q.    What is the position of your -- the

19  title of your position?

20      A.    Foster Care Supervisor.

21      Q.    When did you begin working at Catholic

22  Charities?

23      A.    January of 2011.

24      Q.    Did you -- were you previously

11

1   employed by HPL?

2        A.    Yes.

3        Q.    What were the dates of your employment

4   with HPL?

5        A.    2005 to 2010.

6        Q.    Did you previously work at the

7   Champaign County Sheriff's Office at either one

8   of the jails?

9        A.    Yes.

10        Q.    When did you work at Champaign County

11   Sheriff's Office, the years?

12        A.    The years that I worked at the jail

13   were 2005 to 2010.

14        Q.    Was all of your work at the Champaign

15   County Sheriff's Office through HPL?

16        A.    Are you asking if I ever worked in any

17   other facilities for HPL?

18        Q.    No, at the sheriff's department --

19   what I'm specifically asking is when you worked

20   at the sheriff's department and the jails were

21   you working for HPL, or had you at any point in

22   time worked for an outfit called Wexford Health?

23        A.    I was never employed by Wexford, only

24   by HPL.

ALYSON MORRIS

12

1     Q.   Okay.  And besides working at the
2  Champaign County jails through HPL, have you ever
3  done any work at any other Champaign County
4  facilities?
5     A.   No.
6     Q.   Did you work at the Juvenile Detention
7  Center?
8     A.   No.
9     Q.   Where did you work prior to your
10 employment with HPL?
11    A.   Canterbury Ridge.
12    Q.   And what was your job or position
13 there?
14    A.   I was the Alzheimer's unit director.
15    Q.   What was the reason that you stopped
16 working for HPL?
17         MR. FRUEHLING:  Objection.  Relevance.
18         THE WITNESS:  I wanted to seek other
19 employment using my professional skills in
20 another environment.
21 BY MS. REDWOOD:
22    Q.   So did you give notice and quit?
23    A.   Yes, I left there voluntarily.
24    Q.   Did you have any employment after your

ALYSON MORRIS

13

1   employment with HPL but before your employment

2   with Catholic Charities?

3          A.   No.

4          Q.   When you worked for HPL were you an

5   hourly wage employee, or were you on salary?

6               MR. FRUEHLING:  Objection.  Relevance.

7               THE WITNESS:  Salary.

8   BY MS. REDWOOD:

9          Q.   When you began working for HPL, did

10  you have any prior experience working in a jail

11  setting in any capacity?

12         A.   Yes.

13         Q.   What prior experience did you have?

14         A.   As a crisis clinician in Vermilion

15  County Jail.

16         Q.   And besides what you've already

17  testified to, did you have any other experience

18  working in a jail setting?

19         A.   No.

20         Q.   What training, if any, did you receive

21  from HPL for your employment at the Champaign

22  County jail system?

23         A.   Are you asking did I receive training

24  prior to my starting there or just during the

ALYSON MORRIS

14

1  course of my working at the jail for HPL?

2      Q.  Well, starting at the beginning of

3  your employment with HPL, first of all, did they

4  give you any training for what your job was going

5  to be?

6      A.  Yes.

7      Q.  And that initial training, let's call

8  it the initial training, where did you receive

9  the initial training?

10         MR. FRUEHLING:  Objection.  Form.

11 BY MS. REDWOOD:

12     Q.  Was that in Peoria or right at the

13 Champaign County jail?

14     A.  No.  It was at Brookens.

15     Q.  Who conducted that initial training?

16     A.  Dr. Elizabeth Falcon.

17     Q.  What was she a doctor of?

18     A.  She's a licensed psychologist.  She

19 has a Ph.D.

20     Q.  And at the time that you received the

21 training from Dr. Falcon was she a psychiatrist?

22     A.  No.

23     Q.  How long was that initial training

24 that you had from Dr. Falcon at the Brookens

ALYSON MORRIS

15

1  building?

2          MR. FRUEHLING:  Objection.  Form.

3          THE WITNESS:  I believe it was a

4  two-day training.  The training was conducted

5  over two days.

6  BY MS. REDWOOD:

7      Q.   Okay.  What type of topics did you

8  cover in the training?

9      A.   Suicide prevention in a correctional

10  environment.

11      Q.   Anything else?

12      A.   Risk factors related to suicide in a

13  correctional environment.

14      Q.   Anything else?

15      A.   No.

16      Q.   After that initial two-day training at

17  Brookens, what other or further training did you

18  receive from HPL for your employment at Champaign

19  County Sheriff's Office?

20          MR. FRUEHLING:  Objection to form.

21          THE WITNESS:  There were annual

22  refresher courses related to the topics that I

23  named in your previous question.

24

ALYSON MORRIS

16

1  BY MS. REDWOOD:

2      Q.   When you began working for HPL at the

3  Champaign County Sheriff's Office what was your

4  title or designation?

5      A.   Mental health clinician.

6      Q.   And did your title or designation stay

7  the same throughout your tenure working for HPL?

8      A.   It was promoted in 2009.  My title

9  changed to mental health supervisor.

10     Q.   Besides what you've already testified

11 to, did you have any kind of training at the

12 Champaign County Sheriff's Office, say, conducted

13 by the sheriff's department itself?

14          MR. FRUEHLING:  Objection.  Form.

15          THE WITNESS:  No.

16 BY MS. REDWOOD:

17     Q.   I'm calling your attention to your --

18 the year 2007.  Were you working in 2007 as a

19 mental health clinician at Champaign County

20 Sheriff's Office?

21     A.   Yes.

22     Q.   What were your hours of employment?

23          MR. FRUEHLING:  Objection.  Form.

24          THE WITNESS:  You're asking the hours

ALYSON MORRIS

17

1    that I -- hours that I worked, my regular

2    schedule?

3    BY MS. REDWOOD:

4         Q.    Did you have a regular schedule?

5         A.    Yes.

6         Q.    What was the regular schedule that you

7    had?

8         A.    I worked 9:00 a.m. to 7:00 p.m.

9    Tuesday through Saturday.

10        Q.    And did you have hours that you were

11   on call?

12        A.    Yes.

13        Q.    Was that a regular schedule of on call

14   hours?

15        A.    No.  It was not a regular schedule.

16        Q.    How many other mental health

17   clinicians were working at the Champaign County

18   Sheriff's Office in June 2007?

19        A.    Two.

20        Q.    And besides the three mental health

21   clinicians, was there any other mental health

22   personnel who were working at the Champaign

23   County Sheriff's Office in June 2007?

24        A.    My supervisor.

ALYSON MORRIS

18

1         Q.    Who was your supervisor?

2         A.    Greg Wicker.

3         Q.    Was Greg Wicker a psychiatrist?

4         A.    No.

5         Q.    In your training by HPL for your work

6    at the Champaign County Sheriff's Office did you

7    have any classes that dealt particularly with

8    problems associated with mentally ill inmates who

9    also had serious medical problems?

10        A.    No.

11        Q.    In your training through HPL did you

12   have any classes about diabetes?

13        A.    No.

14        Q.    Are you a diabetic?

15        A.    No.

16             MR. FRUEHLING:  Objection.  Relevance.

17   BY MS. REDWOOD:

18        Q.    Do you have a family member or close

19   friend who is a diabetic?

20             MR. FRUEHLING:  Same objection.

21             THE WITNESS:  No.

22   BY MS. REDWOOD:

23        Q.    Did you have any training for your job

24   at Champaign County Sheriff's Office regarding

ALYSON MORRIS

19

1   drug withdrawal in inmates?

2       A.   Yes.

3       Q.   What kind of training did you have

4   regarding drug withdrawal?

5       A.   We discussed the various types of

6   withdrawal, most obvious signs and symptoms.

7       Q.   So you were trained to identify drug

8   withdrawal, was that what I'm hearing?

9           MR. FRUEHLING:  Objection.  Asked and

10  answered.

11          THE WITNESS:  We were trained to

12  recognize it.

13  BY MS. REDWOOD:

14      Q.   Okay.  What were you trained to do if

15  you did recognize an inmate was going through

16  drug withdrawal?

17          MR. FRUEHLING:  Objection.  Relevance.

18          THE WITNESS:  Communicate with the

19  medical staff.

20  BY MS. REDWOOD:

21      Q.   In June 2007 was there a psychiatrist

22  who was on call for you as a mental health

23  clinician to call and discuss a particular

24  inmate?

ALYSON MORRIS

20

1          MR. FRUEHLING:  Objection.  Relevance.

2          THE WITNESS:  Yes, there was a

3  psychiatrist that I could consult with.

4  BY MS. REDWOOD:

5      Q.   Who was that?

6      A.   Dr. Okuleye.

7      Q.   And can you spell that name?

8      A.   O-k-u-l-e-y-e.

9      Q.   In June 2007 did you ever call

10 Dr. Okuleye in regards to a patient named Janet

11 Hahn?

12     A.   No.

13     Q.   In 2006 to 2007 did you provide mental

14 health training to correctional officers at

15 Champaign County Sheriff's Office?

16     A.   No, I didn't start to provide training

17 for the officers until 2008.

18     Q.   In 2007 under HPL policy how often was

19 a mental health worker required to make personal

20 contact with an inmate who was on suicide watch

21 or dressed in green?

22          MR. FRUEHLING:  Objection.  Form.

23 Foundation.

24          THE WITNESS:  It's at the discretion

ALYSON MORRIS

21

1   of the clinician.

2   BY MS. REDWOOD:

3        Q.   So there was not a policy?

4             MR. FRUEHLING:  Objection.  Asked and

5   answered.  Mischaracterizes evidence.

6             THE WITNESS:  I can't cite the

7   policies word for word.  I have familiarity with

8   it, but I'm no longer employed by HPL, and I

9   don't recall exactly what the policy states.

10  BY MS. REDWOOD:

11       Q.   In 2007 were there rules at Champaign

12  County Sheriff's Office to -- that were

13  instituted to protect the safety of inmates on

14  suicide watch?

15            MR. FRUEHLING:  Objection.  Form.

16            THE WITNESS:  I wouldn't characterize

17  them as rules.  There's obviously procedures in

18  place to address suicidal inmates.

19  BY MS. REDWOOD:

20       Q.   What procedures were in place?

21       A.   There was a suicide prevention

22  protocol.

23       Q.   Please describe the suicide prevention

24  protocol that was in place in June 2007.

ALYSON MORRIS

22

1         A.    As I stated, I'm no longer employed by

2    HPL, so as to the exact statement with the

3    protocol, I can't quote that, but I can give you

4    a basic idea of what it said.

5              The suicide prevention protocol was

6    put in place to put inmates on suicide watch that

7    were uncooperative and would not answer any

8    mental health questions and also to put inmates

9    on suicide watch that indicated that they may

10   harm themselves.

11        Q.    What was the protocol that was in

12   place?

13        A.    That they would be put on suicide

14   watch, and they would be checked on every 15

15   minutes.

16        Q.    Besides being checked on every 15

17   minutes, were there other requirements for an

18   inmate on suicide watch?

19              MR. FRUEHLING:  Objection.  Form.

20              THE WITNESS:  Are you asking me what

21   took place when an inmate went on suicide watch?

22   I'm really not sure what you want to know.

23   BY MS. REDWOOD:

24        Q.    Okay.  What things could an inmate on

ALYSON MORRIS

23

1  suicide watch have or not have?

2          MR. FRUEHLING:  Objection.  Form.

3          THE WITNESS:  They were provided a

4  green gown and a green blanket that were

5  considered suicide proof, and they had no other

6  items in their cell.

7  BY MS. REDWOOD:

8      Q.   Was that an HPL policy?

9      A.   Yes.

10     Q.   In 2007 was there an HPL policy in

11 place to prevent a diabetic inmate from

12 committing suicide by diabetes?

13         MR. FRUEHLING:  Objection.  Form and

14 foundation.

15         THE WITNESS:  I've never heard of such

16 a thing as suicide by diabetes.

17 BY MS. REDWOOD:

18     Q.   In 2007 was there an HPL policy in

19 place to prevent suicide by diabetes?

20         MR. FRUEHLING:  Objection.  Asked and

21 answered.

22         THE WITNESS:  Again, I've never heard

23 of such a thing, so there couldn't be a policy in

24 place for something that I don't even know

24

1  exists.

2  BY MS. REDWOOD:

3        Q.    In 2007 or prior to 2007 were you

4  trained by HPL that a Type 1 diabetic could

5  commit suicide by refusing food and medication?

6        A.    The idea of a Type 1 diabetic

7  committing suicide by doing those things was

8  not -- is not even part of the mental health

9  training that we -- we wouldn't -- that's not

10 something that we would even take a look at.

11 That's not something I even considered until you

12 brought it up.

13       Q.    After Janet Hahn died, was that

14 brought up by HPL or to HPL?

15            MR. FRUEHLING:  Objection.  Form and

16 foundation.  If you know.

17            THE WITNESS:  I don't know.  I

18 wouldn't have been privy to that information.

19 BY MS. REDWOOD:

20       Q.    After Janet Hahn died, did HPL

21 institute any kind of new procedures to deal with

22 inmates who might be committing suicide by

23 refusing medical attention?

24       A.    Not that I'm aware of.

ALYSON MORRIS

25

1        Q.   In June 2007 was it your job to notice

2   that Janet Hahn who was a Type 1 diabetic and on

3   suicide watch was not eating and not getting

4   insulin?

5             MR. FRUEHLING:  Objection.  Form,

6   foundation.

7             THE WITNESS:  Are you asking me were

8   those my specific tasks, to just monitor those

9   two items, or was I assessing her mental health?

10  BY MS. REDWOOD:

11       Q.   Was that something that it was your

12  job to notice?  That's what I'm asking.

13            MR. FRUEHLING:  Objection to form and

14  foundation.  That assumes that she was not

15  getting insulin and that she was not getting food

16  at the time.  We know that at least one of those

17  isn't true.

18            THE WITNESS:  It was my responsibility

19  to assess her mental health.

20  BY MS. REDWOOD:

21       Q.   When you assessed an inmate's mental

22  health in June of 2007, did that include personal

23  visits?

24            MR. FRUEHLING:  Objection to the form

ALYSON MORRIS

26

1   of the question.

2           THE WITNESS:  Are you asking did I see

3   the inmates in person?

4   BY MS. REDWOOD:

5       Q.   Right.  Personal visit with the

6   inmate, was that included in your mental health

7   assessment?

8       A.   Yes.

9       Q.   And was there any policy in June

10  of 2007 for you as a mental health clinician to

11  follow when an inmate who was on suicide watch

12  appeared to be sleeping when you went to check on

13  that inmate?

14          MR. FRUEHLING:  Objection.  Form,

15  foundation, improper hypothetical.

16          THE WITNESS:  That's at the discretion

17  of the clinician.

18  BY MS. REDWOOD:

19      Q.   In June 2007 were you aware that Janet

20  Hahn had been involuntarily committed to the

21  psychiatric ward at Provena Hospital three times

22  in 2007 prior to her incarceration?

23      A.   No.

24      Q.   How many times are you aware of that

ALYSON MORRIS

27

1  Janet Hahn was in the Champaign County jail in

2  2007?

3           MR. FRUEHLING:  Objection.  Form and

4  foundation.

5           THE WITNESS:  At least one that I'm

6  aware of.

7  BY MS. REDWOOD:

8      Q.   And are you talking about June 2007?

9      A.   Yes.

10      Q.   In June 2007 you had some dealings

11  with Janet Hahn.  Correct?

12      A.   Correct.

13      Q.   And in June of 2007 did you remember

14  Janet Hahn from any prior incarcerations?

15           MR. FRUEHLING:  Objection.  Asked and

16  answered.

17           THE WITNESS:  Not that I recall.

18  BY MS. REDWOOD:

19      Q.   In 2007 what was the HPL policy on

20  keeping mental health records of inmates from

21  prior incarcerations?

22      A.   I can't cite to you the specific

23  policy.  Our practice was to maintain mental

24  health assessments each time the inmate came in,

ALYSON MORRIS

28

1  and we maintained those files in the mental

2  health office.

3      Q.   When an inmate came in who was

4  referred to mental health in 2007, was it your

5  practice to check mental health records from any

6  prior incarcerations for that inmate?

7      A.   We would if the information was

8  available.

9      Q.   And when you say if the information

10 was available, what kind of situations would the

11 information not be available?

12          MR. FRUEHLING:  Objection.  Form,

13 foundation.  They weren't there.  Right?

14          THE WITNESS:  If the file was not

15 in -- where we kept our mental health files, then

16 I wouldn't have a record to reference.

17 BY MS. REDWOOD:

18     Q.   Okay.  In 2007 what was the policy and

19 procedure on the length of time to keep these

20 mental health files at the Champaign County jail?

21     A.   Again, I can't cite the specific

22 policy, but it was my understanding that the

23 records were ultimately the property of the

24 county, and the county would maintain those

29

1   records if and when HPL was no longer contracted

2   with the county.

3        Q.   Did you, yourself, ever go to check

4   back on some inmate's prior mental health

5   records?

6             MR. FRUEHLING:  Objection.  Relevance.

7             THE WITNESS:  I'm sure that I did,

8   although I couldn't recall specific details

9   related to that.

10  BY MS. REDWOOD:

11       Q.   In June 2007 did you check Janet

12  Hahn's prior mental health records from May of

13  2007?

14       A.   I don't recall that I was aware there

15  was a previous record.

16       Q.   In June 2007 did you know that Janet

17  Hahn was an insulin dependent diabetic?

18       A.   Yes.

19       Q.   Where were you working on June 15th,

20  2007?  That was a Friday, the day that Janet Hahn

21  was booked in.

22            MR. FRUEHLING:  Objection to the form

23  of the question.

24            THE WITNESS:  I don't specifically

ALYSON MORRIS

30

1  recall if I worked exactly, you know, on that

2  date.  That's been a few years ago.

3          MS. REDWOOD:  Please mark this as

4  No. 1.

5          (At this point the court reporter

6           marked Morris Exhibit No. 1 for

7           purposes of identification.)

8  BY MS. REDWOOD:

9      Q.  You've been handed a document that is

10 labelled Exhibit No. 1, and it purports to be the

11 initial classification listing for Janet Louise

12 Hahn dated June the 15th, 2007.  It's Bates

13 marked in the lower right-hand corner 579, 580,

14 581, and 582.  Do you remember ever having seen

15 this document before?

16         MR. FRUEHLING:  Objection.  Form.

17         THE WITNESS:  I don't recall.

18 BY MS. REDWOOD:

19     Q.  Do you recognize the name Chad

20 Schweighart that's listed on there as the

21 examiner?

22     A.  Yes.

23     Q.  And do you remember ever talking with

24 Chad Schweighart in regard to Janet Louise Hahn

ALYSON MORRIS

31

1   in June of 2007?

2        A.   Not that I recall.

3        Q.   And do you see the third box down

4   where there's some handwriting on this form?

5        A.   Yes.

6        Q.   Do you see where it says, "Patient has

7   develop retardation?"

8        A.   Uh-huh.  Yes.

9        Q.   Do you remember talking with any

10  person about that entry, that the person has

11  develop retardation?

12           MR. FRUEHLING:  Objection.  Asked and

13  answered.  She already indicated she doesn't

14  remember seeing the document.

15           THE WITNESS:  I don't recall.

16  BY MS. REDWOOD:

17       Q.   Do you remember talking with Nurse

18  Swain about Janet Hahn's mental condition?

19           MR. FRUEHLING:  Objection.  Form,

20  foundation as to time.

21           THE WITNESS:  I can't recall any

22  specific conversation that we had related to

23  that.

24

32

1  BY MS. REDWOOD:

2      Q.   Okay.  When I say Nurse Susan Swain,

3  do you know who I'm talking about?

4      A.   Yes, I do.

5      Q.   And do you recall talking with Nurse

6  Swain anytime in June of 2007 about Janet Hahn?

7      A.   Again, I cannot recall a specific

8  conversation, but I think it's a possibility we

9  may have spoken about that.

10         MS. REDWOOD:  Okay.  Please mark that

11  No. 2.

12             (At this point the court reporter

13             marked Morris Exhibit No. 2 for

14             purposes of identification.)

15  BY MS. REDWOOD:

16      Q.   You've been handed a document that's

17  labeled Exhibit 2.  It's Bates marked 303, and it

18  purports to be suicide watch, inmate name Janet

19  Hahn.  Do you recognize this document?

20      A.   Yes.

21      Q.   And do you recognize your handwriting

22  anywhere on this document?

23      A.   Yes.

24      Q.   What do you recognize as your

33

1  handwriting on this document?

2       A.    Inmate name, date placed on suicide

3  watch, initial assessment day, and day one.

4       Q.    On the initial assessment day,

5  6/15/07, would you please read aloud the note

6  that you have there and explain how you made the

7  decision to write that note there.

8       A.    "Placed in green by officer,

9  uncooperative.  Positive suicidal ideation upon

10  intake."

11       Q.    And would you explain what that means?

12       A.    She was placed in green, which was

13  suicide watch, by the officers, and according to

14  the information that was presented by the

15  officers, she was uncooperative, expressed

16  suicidal ideations.

17       Q.    When you made that entry to 6/15/07

18  had you had any conversation with Janet Hahn yet?

19            MR. FRUEHLING:  Objection to the form

20  and foundation of the question, and it assumes

21  facts not into evidence.

22            THE WITNESS:  Not that I recall.

23  BY MS. REDWOOD:

24       Q.    And then see the next box there where

ALYSON MORRIS

34

1  it says day one?

2      A.   Yes.

3      Q.   And the date is -- I'm not sure what

4  the date is on it.  Can you tell what the date is

5  on that?

6      A.   The 16th.

7      Q.   Okay.  And do you see how it's crossed

8  out sort of or written over?

9      A.   Yes.

10     Q.   Are you the person who wrote over

11 that?

12     A.   Yes.

13     Q.   Please read what the note says and how

14 you got the information.

15     A.   Angry, quote, no reason to live.  See

16 note.

17     Q.   And what did you mean by that?

18     A.   I don't recall the specifics of my

19 interaction with her, but at some point I had

20 interacted with her, and that was my observation,

21 and I quoted what she said to me.

22     Q.   Okay.  What note is -- what note are

23 you referencing when you say "see note?"

24     A.   That would be the initial clinician's

35

1   note.

2              MS. REDWOOD:  Okay.  Please mark that

3   No. 3.

4              (At this point the court reporter

5              marked Morris Exhibit No. 3 for

6              purposes of identification.)

7   BY MS. REDWOOD:

8       Q.   You've been handed a document that's

9   labeled Exhibit No. 3 which purports to be

10  Champaign County Sheriff's Office initial mental

11  health screening and assessment.  It's a

12  three-paged document that's Bates marked 44, 45,

13  and 46.  Would you please read through that and

14  tell me first do you recognize this form?

15      A.   Yes, I recognize it.

16      Q.   And is that a form that was provided

17  by the Champaign County Sheriff's Office?

18      A.   Yes.

19      Q.   So would it be true this is not an HPL

20  form?

21      A.   No.

22      Q.   I'm sorry.  Would it be true that it's

23  not an HPL form?

24      A.   Yes, it's true that it's not an HPL

36

 1  form.

 2       Q.   Okay.   Thank you.   And you testified

 3  as to Exhibit 2, see note.   Is there anyplace in

 4  this three-paged document that the note you

 5  referenced on Exhibit 2 is copied?

 6       A.   Page 3.

 7       Q.   And I'm going to ask you to read

 8  through the note here that you wrote and then

 9  explain how you got the information first.

10       A.   Do you want me to explain first how I

11  obtained the information?

12       Q.   That would be fine.   Yeah.

13       A.    I don't recall all the specifics of my

14  conversation with Ms. Hahn, but this note is

15  based on an in person assessment that I

16  conducted.   Do you want me to read the note now?

17       Q.   Yes, please.

18       A.    MHP note:   Mental health assessment.

19  Alert and oriented times three.   Speech concrete.

20  Lisp noted.   Mood -- nodded head.   Positive for

21  suicidal ideation; quote, no reason to live.

22  Negative for homicidal ideation.   Negative for

23  flight of ideas.   LOA, loss of loose

24  associations.

37

1              Inmate is mild to moderately retarded

2      and is questionable historian.  Reports mental

3      health treatment at Provena.  Last hospital

4      admission in April.  Reports she goes to mental

5      health center and is on Seroquel.

6              She identifies her husband as her

7      primary support but is unable to have contact

8      with him due to aggravated domestic battery.  She

9      stabbed him.  Insight judgment limited due to MR,

10     mental retardation.

11             Then my diagnosis, mild to moderate

12     retardation, and finally the plan:  Remain

13     level 2 suicide watch.  Reassess 24 to 48 hours.

14         Q.   Who, if anyone, did you inform about

15     this diagnosis of Janet Hahn as mild to moderate

16     mental retardation?

17         A.   I didn't inform anyone.

18         Q.   You didn't inform any supervisor?

19             MR. FRUEHLING:  Objection.  Asked and

20     answered.

21             THE WITNESS:  I wouldn't have informed

22     my supervisor.  It was my responsibility to

23     complete the mental health assessment and give a

24     diagnostic impression.

ALYSON MORRIS

38

1   BY MS. REDWOOD:

2       Q.   The first two pages of this initial

3   mental health screening and assessment report

4   you've got sort of like fill in the blanks type

5   of answers.  Did you receive the answers to this

6   by talking with Janet Hahn?

7       A.   Yes.

8       Q.   And was she cooperative with you in

9   giving the answers?

10      A.   I don't recall all the specifics of

11  our conversation.  She did provide me some

12  information.

13      Q.   At the bottom of the first page, which

14  was Bates marked 44, the question, "Does the

15  arresting officer believe that the detainee may

16  be suicidal," and that's marked no, where did you

17  get the information to mark that no?

18      A.   That's provided from the initial

19  intake, and the arresting officer didn't indicate

20  that he believed her to be suicidal, so that's

21  why it's checked no.

22      Q.   Okay.  So did you talk with the

23  arresting officer?

24      A.   No.  That's the information that the

ALYSON MORRIS

39

1   arresting officer provides to the booking

2   officer.

3       Q.   Okay.  And see question No. 10 where

4   it says, "Have you ever attempted suicide," and

5   that's checked no.  Where did you get that

6   information?

7       A.   That would have been a question I

8   asked, and, as I said, I don't recall all the

9   specifics of our conversation, but that would

10  have been the answer I would have -- that I would

11  have checked, because that's what I was told.

12      Q.   Okay.  And the question 11, "Do you

13  feel like killing yourself now?"  That's checked

14  yes.  And then down below it says, "What is he or

15  she reporting," and I think it says stated to

16  something there she wanted to kill herself.

17          Would you explain that question 11?

18      A.   It says, "Stated to officer she wanted

19  to kill herself."

20      Q.   Okay.

21      A.   I included that information, because

22  that was what the booking officer had reported.

23      Q.   And then on the question, "Do you feel

24  like killing yourself now," do you remember if

ALYSON MORRIS

40

1  you actually asked Janet Hahn that question and
2  that she responded yes?
3      A.   I don't specifically recall asking her
4  that question, but it would be likely that I did,
5  because I went on to answer the rest of the
6  questions about suicide related to questions 12
7  and 13.
8      Q.   Okay.  Do you remember whether Janet
9  Hahn told you she was not going to eat?
10     A.   I don't recall that she said that to
11 me.
12     Q.   And is there a place on this form that
13 you would have noted it if she had said something
14 like that?
15     A.   It would be likely that I would quote
16 that somewhere on the form.
17     Q.   You have -- you have a notation here
18 on No. 7, the question is, "Do you have a history
19 of sleep disturbance," and that's checked yes,
20 and it says, "Only when I'm away from him."
21         Do you remember what that was about?
22     A.   I don't recall all the specifics of
23 our conversation, but I believe she was
24 referencing her husband.

ALYSON MORRIS

41

1      Q.   Do you recall that she was disturbed,
2  because she had been -- because she had been
3  accused of stabbing him, and she wasn't going to
4  have any contact with him?
5           MR. FRUEHLING:  Objection.  Leading.
6           THE WITNESS:  I don't recall what she
7  specifically said to me about that, but it did
8  seem that she was disturbed by that.
9  BY MS. REDWOOD:
10     Q.   On the top block of identifying
11 information you've written in there DCFS took
12 kids.  What, if anything, do you recall about
13 that comment?
14     A.   Nothing specific.  It was information
15 I received from Ms. Hahn.
16     Q.   Do you remember if she was going on
17 and on about it or blaming anyone?
18     A.   Not that I recall.
19     Q.   You see in the first block where it
20 says last incarceration, and above that it says
21 mild MR?
22     A.   Uh-huh, yes.
23     Q.   Does that mild MR relate to the last
24 incarceration?

42

1      A.   No, it doesn't.  I put mild MR in

2  relation to the line above it where I indicated

3  special education.

4      Q.   Okay.  On the second page which is

5  Bates marked 45 the second box marked

6  observation, those were observations that you

7  made of Janet Hahn as you were having the

8  conversation.  Is that correct?

9      A.   Yes.

10     Q.   And you've got crying marked yes.  Do

11  you -- was she crying during the entire

12  interview?

13     A.   I don't recall if she was crying

14  during the entire interview.

15     Q.   Do you see the answer to No. 17 it

16  says, "Worried about a major problem other than

17  legal situation, describe," and would you read

18  your answer and explain what that means?

19     A.   "Being with my husband."  I don't

20  recall the specifics of what she told me, but my

21  documentation indicates that being away from her

22  husband was a concern for her.

23     Q.   Besides anything that you've already

24  testified to, does this document refresh your

43

1  recollection about anything else that you noticed
2  or observed about Janet Hahn in June 2007?
3         MR. FRUEHLING:  Objection to the form
4  of the question.  Foundation.
5         THE WITNESS:  No.
6  BY MS. REDWOOD:
7     Q.   On the first page in the middle block
8  where it says mental health history, question
9  No. 3 that answers, "Yes, she's been taking some
10 psychotropic medication called Seroquel," are you
11 aware whether Janet Hahn had any of that
12 medication with her?
13    A.   I don't recall.
14    Q.   And what type of symptoms is Seroquel
15 supposed to address?
16        MR. FRUEHLING:  Objection.  Form and
17 foundation.
18        THE WITNESS:  Seroquel is often
19 prescribed for sleep disturbances.  It can also
20 be prescribed as an atypical antipsychotic.
21 BY MS. REDWOOD:
22    Q.   Based on the information from Janet
23 Hahn that she had been prescribed Seroquel, did
24 you request any doctor to give her a prescription

44

1  for that?

2       A.   No.

3       Q.   And based on this information that she

4  had been prescribed Seroquel, did you request any

5  doctor to give her a prescription for any drug at

6  all?

7       A.   No.

8       Q.   Is Seroquel a drug that was approved

9  for use at the Champaign County jail in 2007 if

10 prescribed by a doctor?

11           MR. FRUEHLING:  Objection to form and

12 foundation.

13           THE WITNESS:  Use of any psychotropic

14 medication was at the discretion of the

15 psychiatrist.

16 BY MS. REDWOOD:

17      Q.   Okay.  So it's -- if the psychiatrist

18 had prescribed it, it was one that would be

19 approved for use in a jail setting.  Is that what

20 you're saying?

21      A.   Yes.

22      Q.   And the mental health history block

23 No. 2 where it says -- asked if you are receiving

24 any psychiatric treatment, and it says MHC,

45

1  Becky, Dr. Yang, would you explain what that

2  means?

3          MR. FRUEHLING:  Objection to the form

4  of the question.  I believe that the full

5  statement is outpatient psychiatric treatment.

6  BY MS. REDWOOD:

7      Q.   Correct.

8      A.   This was a summary of information I

9  received about her outpatient mental health

10 treatment, mental health center.  Becky is the

11 case manager, and, of course, Dr. Yang is the

12 psychiatrist.

13 BY MS. REDWOOD:

14     Q.   Based on that information, did you at

15 any time in June 2007 attempt to contact Becky or

16 Dr. Yang at the Mental Health Center regarding

17 Janet Hahn?

18     A.   No.

19     Q.   In the approximate middle section of

20 page 44, the first page, there's some handwriting

21 on the left-hand side that's kind of cut off of

22 this copy.  Do you recognize that as your

23 handwriting?

24     A.   Yes.

46

1        Q.    And do you know what that says?

2        A.    I can't read it, so I can't be certain

3   of what it says.

4        Q.    Okay.  Do you remember what it says or

5   what you wrote there?

6             MR. FRUEHLING:  Objection.  Asked and

7   answered.  I think she just said she couldn't be

8   certain of what she said.

9             THE WITNESS:  I don't specifically

10  recall, and since I'm unable to read it, I'm not

11  certain what it says.

12            MS. REDWOOD:  Okay.  Please mark this

13  as No. 4.

14            (At this point the court reporter

15             marked Morris Exhibit No. 4 for

16             purposes of identification.)

17  BY MS. REDWOOD:

18       Q.    You've been handed a document that's

19  labeled Exhibit No. 4.  It's Bates marked 002553

20  and purports to be two e-mails.  The one e-mail

21  says it's from Alyson Morris.  Is that you?

22       A.    Yes.

23       Q.    And do you remember that you sent this

24  e-mail?

ALYSON MORRIS

47

1          A.   I don't recall writing the e-mail,

2     but it's -- of course, it's likely that I sent

3     this from my e-mail, yes.

4          Q.   All right.  And it's dated as sent on

5     Saturday, June 16th, 2007, 9:59 a.m.  Do you

6     believe that the times on the e-mails were

7     correct?

8          A.   Yes.

9          Q.   Is this the first e-mail that you

10    wrote about Janet Hahn?

11          MR. FRUEHLING:  Objection.  Form and

12    foundation.  By the way, what exhibit is this?

13    I'm sorry.

14    BY MS. REDWOOD:

15          Q.   Four.

16          A.   I don't recall writing any other

17    e-mail before that.

18          Q.   Okay.  And did you write this after

19    the mental health assessment?

20          A.   I don't think I wrote it after the

21    assessment.  I think I wrote this e-mail after a

22    brief interaction with Ms. Hahn.

23          Q.   Okay.  And see where it says, "MH has

24    a file on her, and she has been in green before."

ALYSON MORRIS

48

1        A.    Yes.

2        Q.    Does that refresh your recollection

3   whether you checked on a previous file on Janet

4   Hahn?

5        A.    I don't recall if I looked for a

6   previous file.

7        Q.    On June 16th, 2007, when you made the

8   diagnosis that Janet Hahn was mild to moderate

9   mentally retarded and the recommendation that she

10  would remain in green for at least 72 hours, had

11  you talked with any psychiatrist about the

12  diagnosis, first of all, and, second of all, the

13  remaining in green?

14            MR. FRUEHLING:  Objection.  Asked and

15  answered.

16            THE WITNESS:  It would not have been

17  my practice to speak with a psychiatrist either

18  about the diagnosis or about remaining in green

19  for the 72 hours.  Those were all standard

20  practices that as a mental health clinician I

21  could do on my own.  I didn't need to consult.

22            MR. FRUEHLING:  I'm sorry.  Would you

23  read back the question that was asked?

24

ALYSON MORRIS

49

1              (At this point the court reporter read

2               aloud the requested portion of the

3               transcript.)

4              MR. FRUEHLING:  Okay.  Thank you.

5  BY MS. REDWOOD:

6       Q.   If you had talked to any psychiatrist

7  about Janet Hahn, was there a place in either the

8  mental health screening and assessment or the

9  suicide watch or the progress notes that you

10  would have noted that down?

11       A.   It would have been noted in the

12  progress notes.

13              MR. FRUEHLING:  I'm sorry.  Would you

14  read that question back again, please?

15              (At this point the court reporter read

16               aloud the requested portion of the

17               transcript.)

18              MR. FRUEHLING:  Thank you.

19              MS. REDWOOD:  Please mark that No. 5.

20              (At this point the court reporter

21               marked Morris Exhibit No. 5 for

22               purposes of identification.)

23  BY MS. REDWOOD:

24       Q.   You've been handed a document that's

50

1 labeled Exhibit No. 5 which is Bates marked 00254

2 and purports to be an e-mail from Alyson Morris

3 sent on Saturday, June 16th, 2007, at 2:09 p.m.

4 Do you recognize that e-mail?

5        A.   I don't recall sending the e-mail, but

6 it is from my e-mail.

7        Q.   Okay.  And you see where it says to

8 corrections?

9        A.   Yes.

10        Q.   Who did that go to?

11        A.   Are you asking me who the e-mail goes

12 to when it goes to corrections?

13        Q.   Right.

14        A.   Corrections includes all of the

15 officers and I believe jail administration, but

16 I'm not certain of that.

17        Q.   Okay.  Do you see the sentence where

18 it says, "She has very poor judgment and no

19 insight into her current situation?"

20        A.   Yes.

21        Q.   Please explain what you meant by that.

22        A.   I indicated she had poor judgment,

23 because she had stuffed her green gown into the

24 toilet and flooded her cell.  She had been

51

1  uncooperative, and that indicated to me that her

2  judgment was poor.

3          I indicated that she had no insight

4  into her current situation, because she -- she

5  talked about wanting to go home and asked when

6  she could leave despite the fact that she was

7  there on aggravated domestic battery and hadn't

8  even been to court yet.

9      Q.   Do you remember if she went to bond

10  court on that Saturday, June 16, 2007?

11     A.   I don't recall.

12     Q.   See where it says on Exhibit No. 5,

13  "MH will reassess in 24 to 48 hours?"

14     A.   Yes.

15     Q.   And was that an order by you that she

16  has to be reassessed in 24 to 48 hours?

17     A.   It was not an order.

18     Q.   What is that?

19          MR. FRUEHLING:  Objection to the form

20  of the question.  Are you asking what a sequence

21  in an e-mail is?

22          MS. REDWOOD:  If it's not in order,

23  what is it?

24          MR. FRUEHLING:  Objection to the form,

52

1  foundation of the question.  I don't understand.

2              THE WITNESS:  I was simply passing

3  along information to corrections that mental

4  health would see her again.

5  BY MS. REDWOOD:

6      Q.   Okay.  Did the 24 to 48 hours indicate

7  any kind of a definite timeline as opposed to a

8  suggested time?

9              MR. FRUEHLING:  Objection to the form

10  and foundation of the question.

11             THE WITNESS:  I'm not sure what you're

12  asking me.  It says 24 to 48 hours.  That's a

13  time frame.

14  BY MS. REDWOOD:

15     Q.   Okay.  So you're saying that you or

16  somebody else would come back either between 24

17  and 48 hours?

18             MR. FRUEHLING:  Objection.  Asked and

19  answered.

20             THE WITNESS:  Someone from mental

21  health would assess within that time frame.

22  BY MS. REDWOOD:

23     Q.   What's included in a reassessment?

24     A.   Mental health status is reevaluated.

ALYSON MORRIS

53

1          Q.   At a reassessment would the mental

2    health worker then be required to fill out the

3    Champaign County Sheriff's Office initial mental

4    health screening and assessment sheet which was

5    Exhibit 3 again, fill that out again?

6          A.   No.

7          Q.   Ask the same kind of questions?

8               MR. FRUEHLING:   Objection to the form

9    of the question.

10              THE WITNESS:   There would be similar

11   questions.

12   BY MS. REDWOOD:

13         Q.   Was there a form that either the

14   sheriff's office or HPL had for the mental health

15   worker that listed down the questions to ask in

16   the reassessment?

17         A.   No, there wasn't a form.  We were

18   trained to...

19              MR. FRUEHLING:   The question was

20   whether there is a form, and the answer is no.

21   There's no other pending question.

22   BY MS. REDWOOD:

23         Q.   How were you trained to conduct a

24   reassessment?

ALYSON MORRIS

54

1      A.   We were trained on what to look for

2  when reevaluating a suicidal inmate.

3      Q.   And I'm calling your attention to

4  Exhibit No. 2 which is the suicide watch.  Is

5  this third entry in there with the initials JN,

6  is that the reassessment?

7      A.   I didn't document that, so I can't

8  absolutely say that it was a reassessment, but

9  obviously it was some kind of contact.

10     Q.   Does a reassessment require actual

11 verbal contact with the inmate?

12         MR. FRUEHLING:  Objection to the form

13 of the question and foundation.

14         THE WITNESS:  It depends on the

15 circumstances.

16 BY MS. REDWOOD:

17     Q.   Let's say, for instance, if the mental

18 health worker went to the booking area where the

19 inmate was kept and looked in and saw that the

20 inmate appeared to be sleeping.  Would that be

21 counted as a reassessment if the mental health

22 worker just noted down the person was sleeping?

23         MR. FRUEHLING:  Objection.  Form,

24 foundation, improper hypothetical.

ALYSON MORRIS

55

1           THE WITNESS:  There would be

2    documentation that -- what the mental health

3    clinician observed.

4    BY MS. REDWOOD:

5        Q.   Would that be a reassessment?

6           MR. FRUEHLING:  Objection.  Form and

7    foundation.

8           THE WITNESS:  No.

9    BY MS. REDWOOD:

10       Q.   Would a reassessment necessarily

11   include some kind of communication with the

12   inmate?

13          MR. FRUEHLING:  Objection.  Asked and

14   answered.

15          THE WITNESS:  It depends on the

16   circumstances.

17   BY MS. REDWOOD:

18       Q.   After June 16th, 2007, did you ever

19   reassess Janet Hahn?

20          MR. FRUEHLING:  Objection to the form,

21   objection, foundation.

22          THE WITNESS:  No.

23          MR. FRUEHLING:  Before we move on,

24   would you read the last question back to me?

56

1           (At this point the court reporter read

2            aloud the requested portion of the

3            transcript.)

4           MR. FRUEHLING:  Thank you.

5           MS. REDWOOD:  Please mark that No. 6.

6           (At this point the court reporter

7            marked Morris Exhibit No. 6 for

8            purposes of identification.)

9  BY MS. REDWOOD:

10      Q.   You've been handed a document that's

11  labeled Exhibit 6.  It's Bates stamped 53.  It

12  purports to be Champaign County Sheriff's Office

13  mental health/medical special watch sheet

14  booking.  Do you recognize this format?

15      A.   Yes.

16      Q.   And do you see where it says Janet

17  Hahn in the second row there?

18      A.   Yes.

19      Q.   Over under reason it says med 2 which

20  is classified in the chart below as drug

21  withdrawal.  Did you have any input into the

22  entry of that diagnosis as med 2 under the

23  reason?

24      A.   No.

ALYSON MORRIS

57

1      Q.   And see in comments for Janet Hahn

2  where it says green gown/drug withdrawal?

3      A.   Yes.

4      Q.   Did you talk to anyone or give anyone

5  information telling them you thought that drug

6  withdrawal should be entered on this form which

7  is Exhibit No. 6?

8      A.   No.

9      Q.   Have you seen this particular document

10  anywhere with Janet Hahn's name on there?

11          MR. FRUEHLING:  Objection to the form

12  and foundation as to when.

13          THE WITNESS:  Yes.

14  BY MS. REDWOOD:

15      Q.   Do you have any information why in

16  June of 2007 Janet Hahn was marked down as med 2,

17  drug withdrawal?

18      A.   No.

19          MS. REDWOOD:  Please mark this as

20  No. 7.

21          (At this point the court reporter

22           marked Morris Exhibit No. 7 for

23           purposes of identification.)

24

58

1  BY MS. REDWOOD:

2      Q.   You've been handed a document that's

3  labeled Exhibit 7 which purports to be the

4  Champaign County Correctional Center segregation

5  log, and it's Bates marked 57.  Do you recognize

6  this document?

7      A.   Yes.

8      Q.   Do you see your initials or a number

9  on that page anywhere?

10     A.   Yes.

11     Q.   And would that be the a.m. that's

12  under medical, MH for the date of June 16th on

13  the 8:00 to 4:00 shift?

14     A.   Yes.

15     Q.   Does that document then your visit

16  with Janet Hahn where you talked with her and

17  went through the initial mental health screening

18  and assessment?

19     A.   Yes.

20     Q.   As a mental health worker was it the

21  policy or the procedure for you and other mental

22  health workers to document that they had visited

23  an inmate on this segregation log as you did?

24     A.   I don't recall that it was a policy,

59

1  but it was our practice to put our initials on

2  the sheet.

3      Q.   Okay.  And over on the comments

4  section -- first of all, do you see your

5  handwriting over there anywhere?

6      A.   No.

7      Q.   Were you able to put any comments or

8  notes on this seg log if you wanted to?

9      A.   I suppose we could have.

10      Q.   Okay.  In 2007 under HPL policy how

11  often was a mental health worker required to make

12  some kind of personal contact with an inmate who

13  was on suicide watch?

14      A.   I don't recall the specifics of the

15  policy.  It was our practice to see someone at

16  least every 48 hours based on the circumstances.

17      Q.   In June 2007 were there regular

18  meetings between the mental health staff and the

19  medical staff for the purpose of discussing a

20  particular inmate's problems or issues?

21          MR. FRUEHLING:  Objection to the form

22  of the question.

23          THE WITNESS:  Yes.

24

ALYSON MORRIS

60

1  BY MS. REDWOOD:

2      Q.   Do you recall ever having a meeting

3  with anyone from the medical staff in regard to

4  Janet Hahn in June 2007?

5          MR. FRUEHLING:  Objection.  Asked and

6  answered.

7          THE WITNESS:  I don't recall a

8  meeting.  I think it's highly likely that Sue

9  Swain and I had a conversation.

10 BY MS. REDWOOD:

11     Q.   If you had a conversation, would that

12 have been documented anywhere?

13     A.   In the progress notes.

14     Q.   Okay.  Let me -- and when you say the

15 progress notes, are you referring to Bates marked

16 No. 46 from Exhibit 3?

17     A.   Yes.  That's a progress note.

18     Q.   Okay.  And was that the HPL policy, if

19 you had some conversation about an inmate to mark

20 it down in a progress note?

21     A.   I don't recall that it was a policy.

22     Q.   What problems, if any, can you

23 identify from Janet Hahn's June 2007

24 incarceration that were related to her mental

61

1   retardation or mental health disabilities?

2           MR. FRUEHLING:  Objection to the form

3   of the question.  Terminology.  If you understand

4   what she means by problems.

5           THE WITNESS:  I'm not -- I'm not sure

6   what you mean.  I'm not sure what you're asking

7   me.

8   BY MS. REDWOOD:

9       Q.   Okay.  Is it your understanding that

10  Janet Hahn's mental retardation or mental

11  disability somehow affected her medical treatment

12  at the Champaign County jail?

13      A.   No, that is not my understanding.

14      Q.   Did Janet Hahn ever indicate to you at

15  any time after this initial assessment that we've

16  already talked about that she was going to refuse

17  medical care?

18      A.   Not that I recall.

19          MS. REDWOOD:  I have no other

20  questions.

21        EXAMINATION CONDUCTED

22        BY:  MR. FRUEHLING

23      Q.   What I'll try to do is just run

24  backwards through time.  There was a question

ALYSON MORRIS

62

1   Ms. Redwood asked you about if you had had
2   communication with Nurse Swain on the 16th of
3   June of 2007.  Do you remember those questions?
4        A.   Yes.
5        Q.   And you indicated that you didn't have
6   an independent recollection of it now, but you
7   thought that given the circumstances it was
8   likely that you would have.  Do you remember
9   that?
10        A.   Yes.
11        Q.   And then she asked you a follow-up
12   question without specific reference then, said if
13   there had been a discussion, would it have been
14   noted in the -- in some way, and I think you
15   indicated that you thought that it would have
16   been noted in the progress notes.  Do you
17   remember that?
18        A.   Yes.
19        Q.   Is it possible that you would have had
20   the conversation with Sue Swain and not put it in
21   the progress notes?
22        A.   Yes.
23        Q.   If you have -- there was a question
24   regarding what was the practice of the mental

ALYSON MORRIS

63

1  health counselors back in June of 2007 regarding

2  how frequently you would see someone who is on --

3  I think it was a suicide watch, and you indicated

4  that the practice was to see someone a minimum

5  of 48 hours -- at least a minimum of every 48

6  hours.  Do you remember that?

7        A.   Yes.

8        Q.   Those circumstances would be for all

9  people who would ever be on suicide watch,

10  including whatever their duration of

11  incarceration.  Correct?  In other words, that

12  was a general rule?

13        A.   Correct.

14        Q.   Okay.  Now, you said but it would be

15  based on the circumstances.  Do you remember

16  saying that?

17        A.   Yes.

18        Q.   So that if the circumstances presented

19  where the mental health counselors needed to see

20  an inmate more frequently, they would see them

21  more frequently.  True?

22        A.   Yes.

23        Q.   Ms. Redwood was asking you some

24  questions about reassessment, and would it be

64

1  fair to say that when you indicated in the e-mail

2  that she was asking you -- when she asked you

3  about reassessment that -- well, strike that.

4  Let me ask it a different way.

5              Anytime that you have contact with an

6  inmate for purposes -- professional, as opposed

7  to some other contact, I'm not sure what it would

8  be, but if you have a professional contact with

9  an inmate in your capacity as a mental health

10 clinician, that contact is a form of assessment.

11 Correct?

12      A.    Yes.

13      Q.    And if it's not your initial

14 assessment, then it is in some context a

15 reassessment.  Correct?

16      A.    Yes.

17      Q.    Okay.  And so you might have contact

18 with an inmate over the course of that inmate's

19 incarceration multiple times.  Correct?

20      A.    Yes.

21      Q.    And that those individual contacts,

22 although they constitute individual

23 reassessments, may not be a formal reassessment

24 of the inmate that you were referring to in the

ALYSON MORRIS

65

1  e-mail.  Correct?

2       A.   Yes.

3       Q.   What you were referring to in the

4  e-mail is where you would go back and sit down

5  with the inmate and actually spend some

6  additional time with them to see where they're at

7  at that moment as opposed to just a chance

8  encounter.  Correct?

9       A.   Yes.

10       Q.   In Exhibit No. -- in Exhibit No. 3,

11  Ms. Redwood was asking you some questions about

12  the second page which is Bates 45 and the second

13  category of questions called observation.  In

14  particular I'm focussing your attention to

15  No. 17.  You interpreted your writing -- strike

16  that.

17            You stated that was your writing.

18  Correct?

19       A.   Yes.

20       Q.   And you interpreted that as saying

21  being with my husband, correct, but that was a

22  concern of hers, right, a major problem, right?

23  I think the language is a major problem other

24  than a legal situation.  Right?

ALYSON MORRIS

66

1         A.    Yes.

2         Q.    And you wrote, "Being with my

3    husband."  Okay.  And then Ms. Redwood asked you

4    some additional questions about what you thought

5    you meant about that, and you said that you

6    didn't have a specific recollection as you sat

7    there, but you thought that it might be that she

8    was concerned about being away from her husband

9    as opposed to being with her husband.

10            Do you remember saying that?

11        A.    Yes.

12        Q.    Okay.  If I was to suggest to you that

13   perhaps the -- well, not perhaps, she had just

14   stabbed her husband.  Right?  You were aware of

15   that?

16        A.    Yes.

17        Q.    Is it possible that she didn't -- she

18   wasn't concerned when she was conveying that to

19   you of being away from her husband, but she was

20   concerned with actually having to be with him?

21   Is it possible that that's what she was conveying

22   to you?

23        A.    It's possible.

24        Q.    In other words, if she was concerned

67

1  about being away from him, is it possible that

2  you would have used the word "away" instead of a

3  form that indicated "with"?

4       A.   Yes.

5       Q.   Okay.  Just with respect to time and

6  their independent recollection, you don't

7  remember which way one way or the other.  True?

8       A.   True.

9       Q.   Ms. Redwood was asking you some

10 questions about whether at the time of the June

11 2007 incarceration of Ms. Hahn and your

12 interaction with her on June 16th, 2007, if you

13 had an independent recollection of reviewing the

14 file for prior incarcerations.  Would it be fair

15 to say that as you sit here today you don't

16 remember one way or the other whether you

17 reviewed it?

18      A.   Correct.

19      Q.   Ms. Redwood had asked you about a

20 policy in 2007 with respect to whether there was

21 a policy that existed or that you were trained

22 specifically with respect to an inmate who was a

23 Type 1 insulin diabetic and that they could

24 refuse meds and insulin.  Do you remember her

ALYSON MORRIS

68

1  asking you that question, if there's a policy

2  relating to that specific circumstance?

3      A.   Yes.

4      Q.   Would it be true that the way that you

5  answered the question that there wasn't one is

6  based on the way that she described that question

7  and that policy?

8      A.   Yes.

9          MS. REDWOOD:  Would you read back the

10 last question, please?

11         (At this point the court reporter read

12          aloud the requested portion of the

13          transcript.)

14 BY MR. FRUEHLING:

15     Q.   Earlier Ms. Redwood asked you a

16 question regarding the training that you had at

17 the Brookens Center.  Do you remember that series

18 of questions?

19     A.   Yes.

20     Q.   And you described a few things over

21 the course -- that you learned over the course of

22 that two-day period in sort of large groups,

23 suicide prevention in correctional center

24 settings, risk factors related to suicide.

69

1              Would it be fair to say that as you

2   sit here today you don't remember the entire

3   curriculum or agenda that was presented to you

4   over that two-day period?

5        A.   That's correct.

6             MR. FRUEHLING:  That's all I have.

7             MR. SMALL:  I don't have any

8   questions.

9           REEXAMINATION CONDUCTED

10          BY:  MS. REDWOOD

11       Q.   I just asked the court reporter to

12   read back a question that Mr. Fruehling asked in

13   regards to a policy for a Type 1 diabetic

14   refusing medications and insulin, and you agreed

15   that you answered the way that you did because of

16   the way I asked the question.

17             What did you mean by that?

18       A.   The question that you asked was very

19   specific to a Type 1 diabetic refusing, I

20   believe, medication -- insulin and food.

21   Although I can't cite policy and procedure

22   specifically, it's not my recollection that we

23   had any policy that was that specific.  Policies

24   tend to be a bit more general and cover a broader

ALYSON MORRIS

70

1   area.

2       Q.   What kind of policies then were in

3   place to address a situation where a person who

4   was under the care of mental health was also

5   refusing medical care?

6           MR. FRUEHLING:  Objection to the form

7   of the question and foundation.

8           THE WITNESS:  I'm sorry.  Ask me that

9   question again, please.

10          MS. REDWOOD:  Please read it back.

11          (At this point the court reporter read

12           aloud the requested portion of the

13           transcript.)

14          THE WITNESS:  I can't recite the

15   policy exactly as it's stated.  Mental health

16   treatment when someone is on suicide watch and

17   refusing medical treatment is based on each

18   individual situation.

19   BY MS. REDWOOD:

20      Q.   At what point in time were the mental

21   health clinicians required to call the

22   psychiatrist if they identified an inmate what

23   was on suicide watch and who had been diagnosed

24   as mentally retarded and the inmate was not

71

1    cooperating in their medical care to the extent

2    that it could affect their health and life?

3              MR. FRUEHLING:  Objection.  Form and

4    foundation.

5              THE WITNESS:  That is at the

6    discretion of the clinician, and it's based --

7    that would be based on a number of different

8    factors and consultation with -- since I am not a

9    nurse or a doctor, consultation with medical

10   staff would be necessary.

11   BY MS. REDWOOD:

12       Q.   Mr. Fruehling asked you about the

13   information on the second page of Exhibit No. 3,

14   question 17, worried about a major problem other

15   than a legal situation, and you described, "Being

16   with my husband," and you agreed with

17   Mr. Fruehling that that might have meant that

18   being with her husband was a problem.  You agreed

19   with him.  Right?

20       A.   Yes.

21       Q.   However, when you -- when I first

22   asked you in an open-ended way, what did that

23   mean, it was your call that being without her

24   husband was a problem for her.  Isn't that true?

72

1           MR. FRUEHLING:  Objection to the form

2     of the question.  I think it mischaracterizes

3     testimony.  I think she said that she didn't have

4     an independent recollection.  Go ahead.

5           THE WITNESS:  I don't specifically

6     recall everything that she said to me during that

7     interview or specifically what she said in

8     relation to that question.  What I've documented

9     is obviously a characterization of some of what

10    she said to me.

11    BY MS. REDWOOD:

12       Q.   Okay.  And it's true, isn't it, that

13    you documented on the third page of Exhibit No. 3

14    which is Bates stamped 46 that Janet Hahn

15    identified her husband as her primary support,

16    but she was unable to have contact with him due

17    to the aggravated battery.  Correct?

18       A.   Yes.

19       Q.   And in the e-mail that you authored on

20    the same date, June 16th, which is Exhibit No. 5,

21    you also wrote that her husband was her primary

22    support, and she will not be having any contact

23    with him, so I anticipate she will be emotionally

24    unstable for a while.  Correct?

73

1       A.   Yes.

2       Q.   And those notations in your records

3    were based on your discussions with Janet Hahn at

4    the time and your understanding of her concerns.

5    Is that true?

6       A.   Yes.

7            MS. REDWOOD:  I have no other

8    questions.

9            MR. SMALL:  Nothing.

10           MR. FRUEHLING:  None here.  We can go

11   off the record.

12           (At this point there was an off the

13            record discussion.)

14           MR. FRUEHLING:  You'll waive?

15           THE WITNESS:  Yes.

16           (Deponent is excused at 2:51 p.m.)

17

18

19

20

21

22

23

24

ALYSON MORRIS

74

1                    CERTIFICATE

2

3          I, BARBARA A. GLOVER, Certified
Shorthand Reporter, do hereby certify that ALYSON
4  MORRIS, the deponent herein, was by me first duly
sworn to tell the truth, the whole truth and
5  nothing but the truth in the aforementioned cause
of action.
6          That the foregoing deposition was
taken on behalf of the Plaintiff on September 30,
7  2011; that said deposition was taken down in
stenograph notes and afterwards reduced to
8  typewriting under my instruction and said
transcription is a true record of the testimony
9  given; and that it was agreed by and between the
witness and attorneys that said signature on said
10  deposition would be waived.
           I do hereby certify that I am a
11  disinterested person in this cause of action;
that I am not a relative of any party or any
12  attorney of record in this cause, or an attorney
for any party herein, or otherwise interested in
13  the event of this action, and am not in the
employ of the attorneys for either party.
14          Dated this 11th day of October, 2011.

15

16          _____
           Barbara A. Glover, CSR, RPR
17         CRR, CCR

18

19

20

21

22

23

24

## A

**able** 59:7
**absolutely** 54:8
**accused** 41:3
**action** 74:5,11,13
**actual** 54:10
**additional** 65:6 66:4
**address** 6:21 21:18
43:15 70:3
**administration** 50:15
**Administrator** 1:6
**admission** 37:4
**affect** 71:2
**aforementioned** 74:5
**age** 6:23
**agenda** 69:3
**aggravated** 37:8 51:7
72:17
**ago** 30:2
**agreed** 4:4 69:14
71:16,18 74:9
**ahead** 72:4
**Alert** 36:19
**Allen** 1:19 2:10 4:7
aloud 33:5 49:2,16
56:2 68:12 70:12
**Alyson** 1:18 4:5 5:2
6:20 46:21 50:2
74:3
**Alzheimer's** 12:14
**ANGELA** 1:14
**Angry** 34:15
**annual** 15:21
**answer** 5:12,15,17,19
5:24 22:7 39:10
40:5 42:15,18 53:20
**answered** 19:10 21:5
23:21 27:16 31:13
37:20 46:7 48:15
52:19 55:14 60:6
68:5 69:15
**answering** 5:16 6:2
**answers** 38:5,5,9 43:9
**anticipate** 72:23
**antipsychotic** 43:20
**anyplace** 36:3

**anytime** 32:6 64:5
**APPEARANCES** 2:1
**appeared** 26:12
54:20
**Appearing** 2:2,7,14
**approved** 44:8,19
**approximate** 45:19
**April** 37:4
**area** 1:22 54:18 70:1
**ARNOLD** 1:11
**arresting** 38:15,19,23
39:1
**asked** 6:3 19:9 21:4
23:20 27:15 31:12
37:19 39:8 40:1
44:23 46:6 48:14,23
51:5 52:18 55:13
60:5 62:1,11 64:2
66:3 67:19 68:15
69:11,12,16,18
71:12,22
**asking** 5:11,20 6:2,9
6:11 11:16,19 13:23
16:24 22:20 25:7,12
26:2 40:3 50:11
51:20 52:12 61:6
63:23 64:2 65:11
67:9 68:1
**assess** 25:19 52:21
**assessed** 25:21
**assessing** 25:9
**assessment** 7:8 26:7
33:3,4 35:11 36:15
36:18 37:23 38:3
47:19,21 49:8 53:4
58:18 61:15 64:10
64:14
**assessments** 27:24
**associated** 18:8
**associations** 36:24
**assume** 6:1
**assumes** 25:14 33:20
**attempt** 45:15
**attempted** 39:4
**attention** 16:17 24:23
54:3 65:14

**attorney** 7:13 74:12
74:12
**attorneys** 7:17 74:9
74:13
**atypical** 43:20
**authored** 72:19
**available** 28:8,10,11
**Avenue** 2:17
**aware** 24:24 26:19,24
27:6 29:14 43:11
66:14
**a.m** 17:8 47:5 58:11

## B

**B** 3:7
**bachelor's** 8:3,12
**back** 6:7 29:4 48:23
49:14 52:16 55:24
63:1 65:4 68:9
69:12 70:10
**backwards** 61:24
**Bain** 1:14 2:14
**Barbara** 1:21 74:3,16
**based** 36:15 43:22
44:3 45:14 59:16
63:15 68:6 70:17
71:6,7 73:3
**basic** 22:4
**Bates** 30:12 32:17
35:12 38:14 42:5
46:19 50:1 56:11
58:5 60:15 65:12
72:14
**battery** 37:8 51:7
72:17
**Becky** 45:1,10,15
**began** 13:9 16:2
**beginning** 14:2
**behalf** 74:6
**believe** 15:3 38:15
40:23 45:4 47:6
50:15 69:20
**believed** 38:20
**bit** 6:8 69:24
**blaming** 41:17
**blanket** 23:4
**blanks** 38:4

**block** 41:10,19 43:7
44:22
**bond** 51:9
**booked** 29:21
**booking** 39:1,22
54:18 56:14
**bottom** 38:13
**box** 2:4,17 31:3 33:24
42:5
**break** 6:13,15,16
**brief** 47:22
**broader** 69:24
**Brookens** 14:14,24
15:17 68:17
**brought** 24:12,14
**BROWN** 1:12
**building** 15:1

## C

**C** 8:23
**call** 14:7 17:11,13
19:22,23 20:9 70:21
71:23
**called** 5:3 11:22
43:10 65:13
**calling** 4:11 16:17
54:3
**Canterbury** 12:11
**capacity** 10:11 13:11
64:9
**care** 10:20 61:17 70:4
70:5 71:1
**career** 10:5
**CARL** 1:12
**case** 5:11 45:11
**category** 65:13
**Catholic** 10:17,21
13:2
**cause** 74:5,11,12
**CCR** 74:17
**cell** 23:6 50:24
**center** 12:7 37:5
45:10,16 58:4 68:17
68:23
**CENTRAL** 1:2
**certain** 46:2,8,11
50:16

CERTIFICATE 74:1
Certified 74:3
certify 74:3,10
Chad 30:19,24
Champaign 1:14,23
  2:8,18 7:17 11:7,10
  11:14 12:2,3 13:21
  14:13 15:18 16:3,12
  16:19 17:17,22 18:6
  18:24 20:15 21:11
  27:1 28:20 35:10,17
  44:9 53:3 56:12
  58:4 61:12
chance 65:7
changed 16:9
characterization 72:9
characterize 21:16
Charities 10:17,22
  13:2
chart 56:20
check 26:12 28:5
  29:3,11
checked 22:14,16
  38:21 39:5,11,13
  40:19 48:3
Child 8:22 9:1,9
circumstance 68:2
circumstances 54:15
  55:16 59:16 62:7
  63:8,15,18
cite 21:6 27:22 28:21
  69:21
City 1:15 2:14
classes 18:7,12
classification 30:11
classified 56:20
clinician 7:20 13:14
  16:5,19 19:23 21:1
  26:10,17 48:20 55:3
  64:10 71:6
clinicians 17:17,21
  70:21
clinician's 34:24
close 18:18
college 10:5
come 52:16

comment 41:13
comments 57:1 59:3
  59:7
commit 24:5
committed 26:20
committing 23:12
  24:7,22
Communicate 19:18
communication
  55:11 62:2
complete 37:23
concern 42:22 65:22
concerned 66:8,18,20
  66:24
concerns 73:4
concrete 36:19
condition 31:18
conduct 53:23
conducted 3:3 5:7
  14:15 15:4 16:12
  36:16 61:21 69:9
Conferencing 1:22
confusing 5:21
considered 23:5
  24:11
constitute 64:22
consult 20:3 48:21
consultation 7:11
  71:8,9
contact 20:20 37:7
  41:4 45:15 54:9,11
  59:12 64:5,7,8,10
  64:17 72:16,22
contacts 64:21
context 64:14
contracted 29:1
conversation 31:22
  32:8 33:18 36:14
  38:11 39:9 40:23
  42:8 60:9,11,19
  62:20
conveying 66:18,21
cooperating 71:1
cooperative 38:8
copied 36:5
copy 45:22

corner 30:13
Corporation 1:13,16
correct 8:24 9:7
  27:11,12 42:8 45:7
  47:7 63:11,13 64:11
  64:15,19 65:1,8,18
  65:21 67:18 69:5
  72:17,24
correctional 15:9,13
  20:14 58:4 68:23
corrections 50:8,12
  50:14 52:3
counseling 8:7,8 9:15
counselors 63:1,19
counted 54:21
county 1:13 2:8 7:17
  11:7,10,15 12:2,3
  13:15,22 14:13
  15:19 16:3,12,19
  17:17,23 18:6,24
  20:15 21:12 27:1
  28:20,24,24 29:2
  35:10,17 44:9 53:3
  56:12 58:4 61:12
course 10:4 14:1
  45:11 47:2 64:18
  68:21,21
courses 15:22
court 1:1 4:8,11 5:18
  30:5 32:12 35:4
  46:14 49:1,15,20
  51:8,10 56:1,6
  57:21 68:11 69:11
  70:11
cover 15:8 69:24
crisis 13:14
crossed 34:7
CRR 74:17
crying 42:10,11,13
CSR 1:21 74:16
current 50:19 51:4
currently 8:20 10:13
curriculum 69:3
cut 45:21
CWEL 8:20,22 9:2
  9:12

CWELL 8:23

D

D 3:1
DANIEL 1:10
date 30:2 33:2 34:3,4
  34:4 58:12 72:20
dated 30:12 47:4
  74:14
dates 11:3
day 29:20 33:3,3,4
  34:1 74:14
days 15:5
DCFS 41:11
deal 24:21
dealings 27:10
dealt 18:7
Deceased 1:7
decision 33:7
Defendants 1:17 2:7
  2:14
definite 52:7
degree 8:3,6
degrees 8:5,10
department 11:18,20
  16:13
dependent 29:17
depends 54:14 55:15
deponent 5:3 73:16
  74:4
deposition 1:18 4:5
  6:17 7:5,12 74:6,7
  74:10
depositions 4:9 7:9
DEPUTY 1:10
describe 21:23 42:17
described 68:6,20
  71:15
designation 16:4,6
despite 51:6
details 29:8
detainee 38:15
Detention 12:6
develop 31:7,11
diabetes 18:12 23:12
  23:16,19
diabetic 18:14,19

23:11 24:4,6 25:2
29:17 67:23 69:13
69:19
**diagnosed** 70:23
**diagnosis** 37:11,15
48:8,12,18 56:22
**diagnostic** 37:24
**diary** 7:15
**died** 24:13,20
**different** 6:7 64:4
71:7
**director** 12:14
**disabilities** 61:1
**disability** 61:11
**discretion** 20:24
26:16 44:14 71:6
**discuss** 19:23
**discussed** 19:5
**discussing** 59:19
**discussion** 7:10 62:13
73:13
**discussions** 73:3
**disinterested** 74:11
**DISTRICT** 1:1,2
**disturbance** 40:19
**disturbances** 43:19
**disturbed** 41:1,8
**DIVISION** 1:3
**doctor** 14:17 43:24
44:5,10 71:9
**document** 30:9,15
31:14 32:16,19,22
33:1 35:8,12 36:4
42:24 46:18 49:24
54:7 56:10 57:9
58:2,6,15,22
**documentation** 42:21
55:2
**documented** 60:12
72:8,13
**doing** 24:7
**domestic** 37:8 51:7
**Dr** 14:16,21,24 20:6
20:10 45:1,11,16
**dressed** 20:21
**driver's** 9:6,24

**drug** 19:1,4,7,16 44:5
44:8 56:20 57:5,17
**due** 37:8,9 72:16
**duly** 5:4 74:4
**duration** 63:10

**E**

**E** 3:1,7
**Earlier** 68:15
**East** 2:11,17
**eat** 40:9
**eating** 25:3
**education** 8:2 9:14
42:3
**either** 7:16 11:7
48:17 49:7 52:16
53:13 74:13
**Elizabeth** 14:16
**emotionally** 72:23
**employ** 74:13
**employed** 10:13 11:1
11:23 21:8 22:1
**employee** 8:22 9:1,10
13:5
**employment** 9:14,21
10:3,4 11:3 12:10
12:19,24 13:1,1,21
14:3 15:18 16:22
**encounter** 65:8
**entered** 57:6
**entire** 42:11,14 69:2
**entry** 31:10 33:17
54:5 56:22
**environment** 12:20
15:10,13
**ERIK** 1:5
**Estate** 1:6
**event** 74:13
**evidence** 21:5 33:21
**exact** 22:2
**exactly** 21:9 30:1
70:15
**EXAMINATION** 3:3
5:7 61:21
**examined** 5:4
**examiner** 30:21
**excluding** 9:24

**excused** 73:16
**exhibit** 3:9,10,11,11
3:12,12,13,13 30:6
30:10 32:13,17 35:5
35:9 36:3,5 46:15
46:19 47:12 49:21
50:1 51:12 53:5
54:4 56:7,11 57:7
57:22 58:3 60:16
65:10,10 71:13
72:13,20
**existed** 67:21
**exists** 24:1
**experience** 13:10,13
13:17
**explain** 33:6,11 36:9
36:10 39:17 42:18
45:1 50:21
**expressed** 33:15
**EXPRESSLY** 4:3
**extent** 71:1
**e-mail** 46:20,24 47:1
47:3,9,17,21 50:2,4
50:5,6,11 51:21
64:1 65:1,4 72:19
**e-mails** 7:8 46:20
47:6

**F**

**facilities** 11:17 12:4
**fact** 51:6
**factors** 15:12 68:24
71:8
**facts** 33:21
**fair** 64:1 67:14 69:1
**Falcon** 14:16,21,24
**familiarity** 21:7
**family** 18:18
**Federal** 4:8,8
**feel** 39:13,23
**file** 28:14 47:24 48:3
48:6 67:14
**files** 28:1,15,20
**fill** 38:4 53:2,5
**finally** 37:12
**fine** 8:13 36:12
**finish** 5:14

**first** 5:4 14:3 35:14
36:9,10 38:2,13
41:19 43:7 45:20
47:9 48:12 59:4
71:21 74:4
**flight** 36:23
**flooded** 50:24
**focussing** 65:14
**follow** 26:11
**follows** 5:5
**follow-up** 62:11
**food** 24:5 25:15 69:20
**foregoing** 74:6
**form** 9:5,16 14:10
15:2,20 16:14,23
20:22 21:15 22:19
23:2,13 24:15 25:5
25:13,24 26:14 27:3
28:12 29:22 30:16
31:4,19 33:19 35:14
35:16,20,23 36:1
40:12,16 43:3,16
44:11 45:3 47:11
51:19,24 52:9 53:8
53:13,17,20 54:12
54:23 55:6,20 57:6
57:11 59:21 61:2
64:10 67:3 70:6
71:3 72:1
**formal** 64:23
**format** 56:14
**Forty-one** 6:24
**Foster** 10:20
**foundation** 20:23
23:14 24:16 25:6,14
26:15 27:4 28:13
31:20 33:20 43:4,17
44:12 47:12 52:1,10
54:13,24 55:7,21
57:12 70:7 71:4
**Four** 47:15
**frame** 52:13,21
**Freeman** 2:16
**frequently** 63:2,20,21
**Friday** 29:20
**friend** 18:19

**Fruehling** 2:10 3:5
6:14 9:4,16,22
12:17 13:6 14:10
15:2,20 16:14,23
18:16,20 19:9,17
20:1,22 21:4,15
22:19 23:2,13,20
24:15 25:5,13,24
26:14 27:3,15 28:12
29:6,22 30:16 31:12
31:19 33:19 37:19
41:5 43:3,16 44:11
45:3 46:6 47:11
48:14,22 49:4,13,18
51:19,24 52:9,18
53:8,19 54:12,23
55:6,13,20,23 56:4
57:11 59:21 60:5
61:2,22 68:14 69:6
69:12 70:6 71:3,12
71:17 72:1 73:10,14
**full** 45:4
**further** 4:10 15:17

**G**

**general** 63:12 69:24
**getting** 25:3,15,15
**give** 12:22 14:4 22:3
37:23 43:24 44:5
57:4
**given** 62:7 74:9
**giving** 38:9
**Glover** 1:21 74:3,16
**go** 6:7 7:21 29:3
50:10 51:5 65:4
72:4 73:10
**goes** 37:4 50:11,12
**going** 5:12 14:4 19:15
36:7 40:9 41:3,16
61:16
**good** 5:18
**governing** 4:9
**gown** 23:4 50:23
**gown/drug** 57:2
**graduated** 10:5
**green** 20:21 23:4,4
33:8,12 47:24 48:10

48:13,18 50:23 57:2
**Greg** 18:2,3
**groups** 68:22
**guess** 6:11

**H**

**H** 3:7
**Hahn** 1:5,7 7:15
20:11 24:13,20 25:2
26:20 27:1,11,14
29:17,20 30:12,24
32:6,19 33:18 36:14
37:15 38:6 40:1,9
41:15 42:7 43:2,11
43:23 45:17 47:10
47:22 48:4,8 49:7
55:19 56:17 57:1,16
58:16 60:4 61:14
67:11 72:14 73:3
**Hahn's** 29:12 31:18
57:10 60:23 61:10
**handed** 30:9 32:16
35:8 46:18 49:24
56:10 58:2
**handwriting** 31:4
32:21 33:1 45:20,23
59:5
**happy** 5:22
**harm** 22:10
**head** 36:20
**health** 1:12 2:7 7:8
7:20 10:14 11:22
16:5,9,19 17:16,20
17:21 19:22 20:14
20:19 22:8 24:8
25:9,19,22 26:6,10
27:20,24 28:2,4,5
28:15,20 29:4,12
35:11 36:18 37:3,5
37:23 38:3 43:8
44:22 45:9,10,16
47:19 48:20 49:8
52:4,21,24 53:2,4
53:14 54:18,21 55:2
58:17,20,22 59:11
59:18 61:1 63:1,19
64:9 70:4,15,21

71:2
**health/medical** 56:13
**heard** 23:15,22
**hearing** 19:8
**held** 10:7
**hey** 6:6
**Heyl** 1:19 2:10 4:6
**high** 8:1
**highly** 60:8
**historian** 37:2
**history** 40:18 43:8
44:22
**hold** 8:18,20 9:12,20
**home** 51:5
**homicidal** 36:22
**hospital** 26:21 37:3
**hourly** 13:5
**hours** 16:22,24 17:1
17:10,14 37:13
48:10,19 51:13,16
52:6,12,17 59:16
63:5,6
**Howard** 2:16
**HPL** 10:13 11:1,4,15
11:17,21,24 12:2,10
12:16 13:1,4,9,21
14:1,3 15:18 16:2,7
18:5,11 20:18 21:8
22:2 23:8,10,18
24:4,14,14,20 27:19
29:1 35:19,23,24
53:14 59:10 60:18
**husband** 37:6 40:24
42:19,22 65:21 66:3
66:8,9,14,19 71:16
71:18,24 72:15,21
**hypothetical** 26:15
54:24

**I**

**idea** 22:4 24:6
**ideas** 36:23
**ideation** 33:9 36:21
36:22
**ideations** 33:16
**identification** 30:7
32:14 35:6 46:16

49:22 56:8 57:23
**identified** 70:22
72:15
**identifies** 37:6
**identify** 19:7 60:23
**identifying** 41:10
**ill** 18:8
**Illinois** 1:2,13,14,15
1:19,23 2:5,8,11,14
2:18 4:7 7:22 8:19
**impeachment** 4:12
**impression** 37:24
**improper** 26:15
54:24
**incarceration** 26:22
41:20,24 60:24
63:11 64:19 67:11
**incarcerations** 27:14
27:21 28:6 67:14
**include** 25:22 55:11
**included** 26:6 39:21
52:23
**includes** 50:14
**including** 63:10
**independent** 62:6
67:6,13 72:4
**indicate** 38:19 52:6
61:14
**indicated** 22:9 31:13
42:2 50:22 51:1,3
62:5,15 63:3 64:1
67:3
**indicates** 42:21
**individual** 64:21,22
70:18
**inform** 37:14,17,18
**information** 24:18
28:7,9,11 33:14
34:14 36:9,11 38:12
38:17,24 39:6,21
41:11,14 43:22 44:3
45:8,14 52:3 57:5
57:15 71:13
**informed** 37:21
**initial** 14:7,8,9,15,23
15:16 30:11 33:3,4

34:24 35:10 38:2,18
53:3 58:17 61:15
64:13
**initials** 54:5 58:8 59:1
**inmate** 19:15,24
20:20 22:18,21,24
23:11 26:6,11,13
27:24 28:3,6 32:18
33:2 37:1 54:2,11
54:19,20 55:12
58:23 59:12 60:19
63:20 64:6,9,18,24
65:5 67:22 70:22,24
**inmates** 18:8 19:1
21:13,18 22:6,8
24:22 26:3 27:20
**inmate's** 25:21 29:4
59:20 64:18
**input** 56:21
**insight** 37:9 50:19
51:3
**instance** 54:17
**institute** 24:21
**instituted** 21:13
**instruction** 74:8
**insulin** 25:4,15 29:17
67:23,24 69:14,20
**intake** 33:10 38:19
**interacted** 34:20
**interaction** 34:19
47:22 67:12
**interested** 74:12
**interpreted** 65:15,20
**interview** 42:12,14
72:7
**involuntarily** 26:20
**involving** 7:15
**issues** 59:20
**items** 23:6 25:9

**J**

**jail** 11:12 13:10,15,18
13:22 14:1,13 27:1
28:20 44:9,19 50:15
61:12
**jails** 11:8,20 12:2
**Janet** 1:6 7:15 20:10

24:13,20 25:2 26:19
27:1,11,14 29:11,16
29:20 30:11,24
31:18 32:6,18 33:18
37:15 38:6 40:1,8
42:7 43:2,11,22
45:17 47:10 48:3,8
49:7 55:19 56:16
57:1,10,16 58:16
60:4,23 61:10,14
72:14 73:3
**January** 9:11,19
10:23
**JEFFREY** 1:11
**JENNA** 1:10
**JN** 54:5
**job** 12:12 14:4 18:23
25:1,12
**Joseph** 2:5
**Jude** 2:4 5:10
**judgment** 37:9 50:18
50:22 51:2
**June** 17:18,23 19:21
20:9 21:24 25:1,22
26:9,19 27:8,10,13
29:11,16,19 30:12
31:1 32:6 43:2
45:15 47:5 48:7
50:3 51:10 55:18
57:16 58:12 59:17
60:4,23 62:3 63:1
67:10,12 72:20
**Juvenile** 12:6

**K**

**KAREE** 1:11
**keep** 28:19
**keeping** 27:20
**Keith** 2:10
**kept** 28:15 54:19
**kids** 41:12
**kill** 39:16,19
**killing** 39:13,24
**kind** 7:15 10:6 16:11
19:3 24:21 28:10
45:21 52:7 53:7
54:9 55:11 59:12

70:2
**know** 6:9,14 22:22
23:24 24:16,17
25:16 29:16 30:1
32:3 46:1

**L**

**L** 9:3
**labeled** 32:17 35:9
46:19 50:1 56:11
58:3
**labelled** 30:10
**language** 65:23
**large** 68:22
**Law** 2:3,16
**Leading** 41:5
**learned** 68:21
**leave** 51:6
**left** 12:23
**left-hand** 45:21
**legal** 42:17 65:24
71:15
**length** 28:19
**let's** 14:7 54:17
**level** 37:13
**license** 8:20,22 9:6,10
9:12 10:1,6
**licensed** 10:10 14:18
**licenses** 8:18 9:13,20
10:2
**life** 71:2
**limited** 10:14 37:9
**line** 42:2
**Lisp** 36:20
**listed** 30:20 53:15
**listing** 30:11
**little** 6:8
**live** 34:15 36:21
**LOA** 36:23
**log** 58:5,23 59:8
**long** 14:23
**longer** 21:8 22:1 29:1
**look** 24:10 54:1
**looked** 48:5 54:19
**loose** 36:23
**loss** 36:23
**Louise** 1:6 30:11,24

**lower** 30:13

**M**

**Main** 2:11
**maintain** 27:23 28:24
**maintained** 28:1
**major** 42:16 65:22,23
71:14
**manager** 45:11
**marital** 7:1
**mark** 30:3 32:10 35:2
38:17 46:12 49:19
56:5 57:19 60:19
**marked** 30:6,13
32:13,17 35:5,12
38:14,16 42:5,5,10
46:15,19 49:21 50:1
56:7 57:16,22 58:5
60:15
**Married** 7:2
**master's** 8:6,16
**MATHEWS** 1:11
**MATTHEW** 1:10,14
**MCCALLISTER**
1:10
**mean** 10:3 34:17 61:6
69:17 71:23
**means** 33:11 42:18
45:2 61:4
**meant** 50:21 66:5
71:17
**med** 56:19,22 57:16
**medical** 18:9 19:19
24:23 58:12 59:19
60:3 61:11,17 70:5
70:17 71:1,9
**medication** 24:5
43:10,12 44:14
69:20
**medications** 69:14
**meds** 67:24
**meeting** 60:2,8
**meetings** 59:18
**member** 18:18
**Menocci** 1:15 2:14
**mental** 7:8,20 16:5,9
16:19 17:16,20,21

19:22 20:13,19 22:8
24:8 25:9,19,21
26:6,10 27:20,23
28:1,4,5,15,20 29:4
29:12 31:18 35:10
36:18 37:2,4,10,16
37:23 38:3 43:8
44:22 45:9,10,16
47:19 48:20 49:8
52:3,20,24 53:1,3
53:14 54:17,21 55:2
56:13 58:17,20,21
59:11,18 60:24 61:1
61:10,10 62:24
63:19 64:9 70:4,15
70:20
**mentally** 18:8 48:9
70:24
**MH** 47:23 51:13
58:12
**MHC** 44:24
**MHP** 36:18
**middle** 43:7 45:19
**mild** 37:1,11,15
41:21,23 42:1 48:8
**minimum** 63:4,5
**minutes** 22:15,17
**mischaracterizes**
21:5 72:2
**moderate** 37:11,15
48:8
**moderately** 37:1
**moment** 65:7
**monitor** 25:8
**Mood** 36:20
**Morgan** 1:14 2:14
**Morris** 1:18 3:10,11
3:11,12,12,13,13
4:5 5:2 6:20 30:6
32:13 35:5 46:15,21
49:21 50:2 56:7
57:22 74:4
**move** 55:23
**multiple** 64:19
**Municipal** 1:15

**N**

**N** 3:1
**name** 5:10 6:19 20:7
30:19 32:18 33:2
57:10
**named** 15:23 20:10
**necessarily** 55:10
**necessary** 71:10
**necessity** 4:11
**need** 6:13 48:21
**needed** 63:19
**Negative** 36:22,22
**never** 11:23 23:15,22
**new** 24:21
**nodded** 36:20
**notation** 40:17
**notations** 73:2
**note** 33:5,7 34:13,16
34:22,22,23 35:1
36:3,4,8,14,16,18
60:17,20
**noted** 36:20 40:13
49:10,11 54:22
62:14,16
**notes** 7:3,14 49:9,12
59:8 60:13,15 62:16
62:21 74:7
**notice** 12:22 25:1,12
**noticed** 43:1
**number** 58:8 71:7
**nurse** 1:13 31:17 32:2
32:5 62:2 71:9

**O**

**O** 2:4,17
**oath** 5:13
**objection** 9:5,16,22
12:17 13:6 14:10
15:2,20 16:14,23
18:16,20 19:9,17
20:1,22 21:4,15
22:19 23:2,13,20
24:15 25:5,13,24
26:14 27:3,15 28:12
29:6,22 30:16 31:12
31:19 33:19 37:19
41:5 43:3,16 44:11
45:3 46:6 47:11

48:14 51:19,24 52:9
52:18 53:8 54:12,23
55:6,13,20,21 57:11
59:21 60:5 61:2
70:6 71:3 72:1
**observation** 34:20
42:6 65:13
**observations** 42:6
**observed** 43:2 55:3
**obtained** 36:11
**obvious** 19:6
**obviously** 21:17 54:9
72:9
**October** 74:14
**office** 2:3,16 7:17
11:7,11,15 15:19
16:3,12,20 17:18,23
18:6,24 20:15 21:12
28:2 35:10,17 53:3
53:14 56:12
**officer** 33:8 38:15,19
38:23 39:1,2,18,22
**officers** 20:14,17
33:13,15 50:15
**Okay** 9:3 12:1 15:7
19:14 22:24 28:18
32:2,10 34:7,22
35:2 36:2 38:22
39:3,12,20 40:8
42:4 44:17 46:4,12
47:18,23 49:4 50:7
50:17 52:6,15 59:3
59:10 60:14,18 61:9
63:14 64:17 66:3,12
67:5 72:12
**Okuleye** 20:6,10
**open-ended** 71:22
**opinions** 6:10
**opposed** 52:7 64:6
65:7 66:9
**order** 51:15,17,22
**oriented** 36:19
**outfit** 11:22
**outpatient** 45:5,9
**O-k-u-l-e-y-e** 20:8

**P**

**P** 2:4,17
**page** 3:3,9 36:6 38:13
42:4 43:7 45:20,20
58:9 65:12 71:13
72:13
**pages** 38:2
**Park** 6:22
**part** 24:8
**particular** 19:23 57:9
59:20 65:14
**particularly** 18:7
**parties** 4:4
**party** 74:11,12,13
**passing** 52:2
**patient** 20:10 31:6
**PATRICK** 1:5
**pending** 53:21
**people** 63:9
**Peoria** 14:12
**period** 68:22 69:4
**person** 26:3 31:10,10
34:10 36:15 54:22
70:3 74:11
**personal** 20:19 25:22
26:5 59:12
**personnel** 17:22
**Ph.D** 14:19
**place** 21:18,20,24
22:6,12,21 23:11,19
23:24 40:12 49:7
70:3
**placed** 33:2,8,12
**Plaintiff** 74:6
**plaintiffs** 1:8 2:2 5:11
**plan** 37:12
**please** 6:19 21:23
30:3 32:10 33:5
34:13 35:2,13 36:17
46:12 49:14,19
50:21 56:5 57:19
68:10 70:9,10
**point** 10:4 11:21 30:5
32:12 34:19 35:4
46:14 49:1,15,20
56:1,6 57:21 68:11
70:11,20 73:12

policies 21:7 69:23
  70:2
policy 20:18 21:3,9
  23:8,10,18,23 26:9
  27:19,23 28:18,22
  58:21,24 59:10,15
  60:18,21 67:20,21
  68:1,7 69:13,21,23
  70:15
poor 50:18,22 51:2
portion 49:2,16 56:2
  68:12 70:12
position 10:18,19
  12:12
Positive 33:9 36:20
possibility 32:8
possible 62:19 66:17
  66:21,23 67:1
post 8:1
practice 27:23 28:5
  48:17 59:1,15 62:24
  63:4
practices 48:20
preparation 7:11
prepare 7:4
prescribed 43:19,20
  43:23 44:4,10,18
prescription 43:24
  44:5
presented 33:14
  63:18 69:3
prevent 23:11,19
prevention 15:9
  21:21,23 22:5 68:23
previous 15:23 29:15
  48:3,6
previously 10:24 11:6
primary 37:7 72:15
  72:21
prior 9:19 12:9 13:10
  13:13,24 24:3 26:22
  27:14,21 28:6 29:4
  29:12 67:14
private 7:14 9:6
privy 24:18
problem 42:16 65:22

65:23 71:14,18,24
problems 18:8,9
  59:20 60:22 61:4
procedure 4:9 28:19
  58:21 69:21
procedures 21:17,20
  24:21
profession 7:19
professional 9:13,20
  10:1,6,11 12:19
  64:6,8
Professionals 1:12
  2:8 10:14
progress 49:9,12
  60:13,15,17,20
  62:16,21
promoted 16:8
proof 23:5
property 28:23
protect 21:13
protocol 21:22,24
  22:3,5,11
Provena 26:21 37:3
provide 20:13,16
  38:11
provided 23:3 35:16
  38:18
provides 39:1
psychiatric 26:21
  44:24 45:5
psychiatrist 14:21
  18:3 19:21 20:3
  44:15,17 45:12
  48:11,17 49:6 70:22
psychologist 14:18
psychotropic 43:10
  44:13
purports 30:10 32:18
  35:9 46:20 50:2
  56:12 58:3
purpose 59:19
purposes 4:12 30:7
  32:14 35:6 46:16
  49:22 56:8 57:23
  64:6
pursuant 4:7

put 22:6,6,8,13 42:1
  59:1,7 62:20
p.m 1:20 5:1 17:8
  50:3 73:16

Q
question 5:14,15,17
  5:19,19,24 6:1,2,7
  9:5 15:23 26:1
  29:23 33:20 38:14
  39:3,7,12,17,23
  40:1,4,18 43:4,8
  45:4 48:23 49:14
  51:20 52:1,10 53:9
  53:19,21 54:13
  55:24 59:22 61:3,24
  62:12,23 68:1,5,6
  68:10,16 69:12,16
  69:18 70:7,9 71:14
  72:2,8
questionable 37:2
questions 5:12 22:8
  40:6,6 53:7,11,15
  61:20 62:3 63:24
  65:11,13 66:4 67:10
  68:18 69:8 73:8
quit 12:22
quote 22:3 34:15
  36:21 40:15
quoted 34:21

R
read 7:3,7 33:5 34:13
  35:13 36:7,16 42:17
  46:2,10 48:23 49:1
  49:14,15 55:24 56:1
  68:9,11 69:12 70:10
  70:11
really 6:12 22:22
reason 12:15 34:15
  36:21 56:19,23
reassess 37:13 51:13
  55:19
reassessed 51:16
reassessment 52:23
  53:1,16,24 54:6,8
  54:10,21 55:5,10

63:24 64:3,15,23
reassessments 64:23
recall 21:9 27:17 29:8
  29:14 30:1,17 31:2
  31:15,21 32:5,7
  33:22 34:18 36:13
  38:10 39:8 40:3,10
  40:22 41:1,6,12,18
  42:13,20 43:13
  46:10 47:1,16 48:5
  50:5 51:11 58:24
  59:14 60:2,7,21
  61:18 72:6
receive 8:12,15 13:20
  13:23 14:8 15:18
  38:5
received 8:2 14:20
  41:15 45:9
receiving 44:23
recite 70:14
recognize 19:12,15
  30:19 32:19,21,24
  35:14,15 45:22 50:4
  56:14 58:5
recollection 43:1 48:2
  62:6 66:6 67:6,13
  69:22 72:4
recommendation
  48:9
record 28:16 29:15
  73:11,13 74:8,12
records 7:15 27:20
  28:5,23 29:1,5,12
  73:2
reduced 74:7
Redwood 1:6 2:3,4
  3:4,5 5:8,10 9:8,18
  9:23 12:21 13:8
  14:11 15:6 16:1,16
  17:3 18:17,22 19:13
  19:20 20:4 21:2,10
  21:19 22:23 23:7,17
  24:2,19 25:10,20
  26:4,18 27:7,18
  28:17 29:10 30:3,8
  30:18 31:16 32:1,10

32:15 33:23 35:2,7
38:1 41:9 43:6,21
44:16 45:6,13 46:12
46:17 47:14 49:5,19
49:23 51:22 52:5,14
52:22 53:12,22
54:16 55:4,9,17
56:5,9 57:14,19
58:1 60:1,10 61:8
61:19 62:1 63:23
65:11 66:3 67:9,19
68:9,15 69:10 70:10
70:19 71:11 72:11
73:7
**reevaluated** 52:24
**reevaluating** 54:2
**REEXAMINATION**
69:9
**reference** 28:16 62:12
**referenced** 36:5
**referencing** 34:23
40:24
**referred** 28:4
**referring** 60:15 64:24
65:3
**refresh** 42:24 48:2
**refresher** 15:22
**refuse** 61:16 67:24
**refusing** 24:5,23
69:14,19 70:5,17
**regard** 30:24 60:3
**regarding** 18:24 19:4
45:16 62:24 63:1
68:16
**regards** 9:14 20:10
69:13
**regular** 17:1,4,6,13
17:15 59:17
**relate** 9:13 41:23
**related** 15:12,22 29:9
31:22 40:6 60:24
68:24
**relating** 68:2
**relation** 9:20 42:2
72:8
**relative** 74:11

**Relevance** 12:17 13:6
18:16 19:17 20:1
29:6
**remain** 37:12 48:10
**remaining** 48:13,18
**remember** 6:3,4,5,10
6:12 27:13 30:14,23
31:9,14,17 39:24
40:8,21 41:16 46:4
46:23 51:9 62:3,8
62:17 63:6,15 66:10
67:7,16,24 68:17
69:2
**remembered** 6:6
**rephase** 5:22
**report** 38:3
**reported** 39:22
**reporter** 4:11 5:18
30:5 32:12 35:4
46:14 49:1,15,20
56:1,6 57:21 68:11
69:11 70:11 74:3
**reporting** 1:22 39:15
**reports** 7:3 37:2,4
**represent** 5:10
**request** 43:24 44:4
**requested** 49:2,16
56:2 68:12 70:12
**require** 5:10
**required** 20:19 53:2
59:11 70:21
**requirements** 22:17
**respect** 67:5,20,22
**responded** 40:2
**responsibility** 25:18
37:22
**rest** 40:5
**retardation** 31:7,11
37:10,12,16 61:1,10
**retarded** 37:1 48:9
70:24
**reviewed** 67:17
**reviewing** 67:13
**Ridge** 12:11
**right** 9:6 14:12 26:5
28:13 47:4 50:13

65:22,22,24 66:14
71:19
**right-hand** 30:13
**risk** 15:12 68:24
**row** 56:17
**Royster** 1:19 2:10 4:6
**RPR** 74:16
**rule** 63:12
**rules** 4:7,8 5:13 21:11
21:17
**run** 61:23

---

## S

**S** 3:7
**safety** 21:13
**salary** 13:5,7
**Sangamon** 7:24 8:7
**sat** 66:6
**Saturday** 17:9 47:5
50:3 51:10
**saw** 54:19
**saying** 44:20 52:15
63:16 65:20 66:10
**says** 31:6 34:1,13
39:4,14,15,18 40:20
41:20,20 42:16 43:8
44:23,24 46:1,3,4
46:11,21 47:23 50:7
50:18 51:12 52:12
56:16,19 57:2
**schedule** 17:2,4,6,13
17:15
**school** 7:21,23 8:1
**Schweighart** 30:20
30:24
**screening** 35:11 38:3
49:8 53:4 58:17
**second** 42:4,5 48:12
56:17 65:12,12
71:13
**section** 45:19 59:4
**see** 26:2 31:3,6 33:24
34:7,15,23 36:3
39:3 41:19 42:15
47:23 50:7,17 51:12
52:4 56:16 57:1
58:8 59:4,15 63:2,4

63:19,20 65:6
**seeing** 31:14
**seek** 12:18
**seen** 30:14 57:9
**seg** 59:8
**segregation** 58:4,23
**sending** 50:5
**sent** 46:23 47:2,4
50:3
**sentence** 50:17
**September** 4:6 74:6
**sequence** 5:18 51:20
**series** 68:17
**serious** 18:9
**Seroquel** 37:5 43:10
43:14,18,23 44:4,8
**setting** 13:11,18
44:19
**settings** 68:24
**sheet** 53:4 56:13 59:2
**sheriff's** 7:17 11:7,11
11:15,18,20 15:19
16:3,12,13,20 17:18
17:23 18:6,24 20:15
21:12 35:10,17 53:3
53:14 56:12
**shift** 58:13
**Shorthand** 74:3
**show** 9:4
**SHUMATE** 1:11
**side** 45:21
**signature** 74:9
**signs** 19:6
**similar** 53:10
**simply** 52:2
**sit** 65:4 67:15 69:2
**situation** 42:17 50:19
51:4 65:24 70:3,18
71:15
**situations** 28:10
**SIU** 8:4
**skills** 12:19
**sleep** 40:19 43:19
**sleeping** 26:12 54:20
54:22
**Small** 2:16,16 69:7

73:9
**sociology** 8:4
**somebody** 52:16
**sorry** 35:22 47:13
    48:22 49:13 70:8
**sort** 34:8 38:4 68:22
**speak** 48:17
**special** 42:3 56:13
**specific** 25:8 27:22
    28:21 29:8 31:22
    32:7 41:14 62:12
    66:6 68:2 69:19,23
**specifically** 11:19
    29:24 40:3 41:7
    46:9 67:22 69:22
    72:5,7
**specifics** 34:18 36:13
    38:10 39:9 40:22
    42:20 59:14
**speculate** 6:11
**Speech** 36:19
**spell** 20:7
**spend** 65:5
**spoken** 32:9
**Springfield** 7:22
**St** 2:5
**stabbed** 37:9 66:14
**stabbing** 41:3
**staff** 19:19 59:18,19
    60:3 71:10
**stamped** 56:11 72:14
**standard** 48:19
**start** 5:14,15,17
    20:16
**starting** 8:1 13:24
    14:2
**state** 6:19 7:24 8:7,18
    10:11
**stated** 22:1 39:15,18
    65:17 70:15
**statement** 22:2 45:5
**statements** 7:4
**states** 1:1 21:9
**status** 7:1 52:24
**stay** 16:6
**stenograph** 74:7

**STIPULATED** 4:3
    4:10
**STIPULATION** 4:1
**stopped** 12:15
**Street** 1:22 2:11
**strike** 64:3 65:15
**stuffed** 50:23
**Sue** 60:8 62:20
**suggest** 66:12
**suggested** 52:8
**suicidal** 21:18 33:9
    33:16 36:21 38:16
    38:20 54:2
**suicide** 15:9,12 20:20
    21:14,21,23 22:5,6
    22:9,13,18,21 23:1
    23:5,12,16,19 24:5
    24:7,22 25:3 26:11
    32:18 33:2,13 37:13
    39:4 40:6 49:9 54:4
    59:13 63:3,9 68:23
    68:24 70:16,23
**Suite** 2:11,17
**summary** 45:8
**supervisor** 10:20
    16:9 17:24 18:1
    37:18,22
**support** 37:7 72:15
    72:22
**suppose** 59:9
**supposed** 43:15
**sure** 22:22 29:7 34:3
    52:11 61:5,6 64:7
**Susan** 1:13 32:2
**Swain** 1:13 31:18
    32:2,6 60:9 62:2,20
**sworn** 5:4 74:4
**SYLVIA** 1:14
**symptoms** 19:6 43:14
**system** 13:22

—————————————
**T**
**T** 3:7
**take** 6:13,14 24:10
**taken** 4:5 74:6,7
**talk** 6:7,15,16 7:10
    38:22 57:4

**talked** 48:11 49:6
    51:5 58:16 61:16
**talking** 10:1 27:8
    30:23 31:9,17 32:3
    32:5 38:6
**tasks** 25:8
**tell** 5:22 6:5 34:4
    35:14 74:4
**telling** 57:5
**tend** 69:24
**tenure** 16:7
**Terminology** 61:3
**testified** 5:5 10:8
    13:17 16:10 36:2
    42:24
**testimony** 6:17 72:3
    74:8
**Thank** 36:2 49:4,18
    56:4
**thing** 23:16,23
**things** 22:24 24:7
    68:20
**think** 32:8 39:15 46:7
    47:20,21 60:8 62:14
    63:3 65:23 72:2,3
**third** 31:3 54:5 72:13
**THODE** 1:11
**Thomasboro** 6:22
**thought** 57:5 62:7,15
    66:4,7
**three** 17:20 26:21
    36:19
**three-paged** 35:12
    36:4
**time** 6:14,15 7:23
    11:22 14:20 25:16
    27:24 28:19 31:20
    45:15 52:8,13,21
    61:15,24 65:6 67:5
    67:10 70:20 73:4
**timeline** 52:7
**times** 26:21,24 36:19
    47:6 64:19
**title** 10:19 16:4,6,8
**today** 6:18 7:5 67:15
    69:2

**toilet** 50:24
**told** 39:11 40:9 42:20
**top** 41:10
**topics** 15:7,22
**trained** 19:7,11,14
    24:4 53:18,23 54:1
    67:21
**training** 13:20,23
    14:4,7,8,9,15,21,23
    15:4,4,8,16,17
    16:11 18:5,11,23
    19:3 20:14,16 24:9
    68:16
**transcript** 49:3,17
    56:3 68:13 70:13
**transcription** 74:8
**transcripts** 7:9
**treatment** 37:3 44:24
    45:5,10 61:11 70:16
    70:17
**true** 25:17 35:19,22
    35:24 63:21 67:7,8
    68:4 71:24 72:12
    73:5 74:8
**truth** 74:4,4,5
**try** 61:23
**Tuesday** 17:9
**turned** 7:16
**two** 5:21 7:9 15:5
    17:19 25:9 38:2
    46:20
**two-day** 15:4,16
    68:22 69:4
**type** 15:7 24:4,6 25:2
    38:4 43:14 67:23
    69:13,19
**types** 19:5
**typewriting** 74:8

—————————————
**U**
**Uh-huh** 31:8 41:22
**ultimately** 28:23
**unable** 37:7 46:10
    72:16
**uncooperative** 22:7
    33:9,15 51:1
**understand** 5:20,23

52:1 61:3
**understanding** 28:22
  61:9,13 73:4
**understood** 6:1
**unit** 12:14
**UNITED** 1:1
**University** 2:17 7:22
**unstable** 72:24
**Urbana** 1:3,15,19
  2:11,14 4:7
**use** 44:9,13,19

### V

**various** 19:5
**verbal** 54:11
**Vermilion** 13:14
**Video** 1:22
**visit** 26:5 58:15
**visited** 58:22
**visits** 25:23
**Voelker** 1:19 2:10 4:6
**VOGES** 1:11
**voluntarily** 12:23
**vs** 1:9

### W

**W** 2:16
**wage** 13:5
**wait** 5:14,16
**waive** 73:14
**waived** 4:12 74:10
**WALKER** 1:10
**Walsh** 2:7
**want** 22:22 36:10,16
**wanted** 12:18 39:16
  39:18 59:8
**wanting** 51:5
**ward** 26:21
**wasn't** 41:3 53:17
  66:18 68:5
**watch** 20:20 21:14
  22:6,9,14,18,21
  23:1 25:3 26:11
  32:18 33:3,13 37:13
  49:9 54:4 56:13
  59:13 63:3,9 70:16
  70:23

**way** 5:17 47:12 62:14
  64:4 67:7,7,16 68:4
  68:6 69:15,16 71:22
**Welfare** 8:22 9:1,10
**went** 7:23 22:21
  26:12 40:5 51:9
  54:18 58:17
**weren't** 28:13
**West** 1:22 6:22
**Wexford** 11:22,23
**we're** 6:17
**we've** 61:15
**White** 1:22
**Wicker** 18:2,3
**Wide** 1:22
**withdrawal** 19:1,4,6
  19:8,16 56:21 57:2
  57:6,17
**witness** 5:3 9:7,17
  12:18 13:7 15:3,21
  16:15,24 18:21
  19:11,18 20:2,24
  21:6,16 22:20 23:3
  23:15,22 24:17 25:7
  25:18 26:2,16 27:5
  27:17 28:14 29:7,24
  30:17 31:15,21
  33:22 37:21 41:6
  43:5,18 44:13 46:9
  48:16 52:2,11,20
  53:10 54:14 55:1,8
  55:15,22 57:13
  59:23 60:7 61:5
  70:8,14 71:5 72:5
  73:15 74:9
**word** 21:7,7 67:2
**words** 63:11 66:24
**work** 10:16 11:6,10
  11:14 12:3,6,9 18:5
**worked** 11:12,16,19
  11:22 13:4 17:1,8
  30:1
**worker** 20:19 53:2,15
  54:18,22 58:20
  59:11
**workers** 58:22

**working** 10:21 11:21
  12:1,16 13:9,10,18
  14:1 16:2,7,18
  17:17,22 29:19
**world** 6:16
**worried** 42:16 71:14
**wouldn't** 21:16 24:9
  24:18 28:16 37:21
**write** 33:7 47:18
**writing** 47:1,16 65:15
  65:17
**written** 34:8 41:11
**wrote** 34:10 36:8
  46:5 47:10,20,21
  66:2 72:21

### X

**X** 3:1,7

### Y

**Yang** 45:1,11,16
**Yeah** 36:12
**year** 8:13 16:18
**years** 11:11,12 30:2

### #

**#084-001223** 1:21

### 0

**00254** 50:1
**002553** 46:19
**09-2145** 1:7
**09/30/2011** 1:18

### 1

**1** 3:10 24:4,6 25:2
  30:4,6,10 67:23
  69:13,19
**1:00** 1:20
**1:11** 5:1
**10** 39:3
**102** 2:11
**11** 39:12,17
**11th** 74:14
**12** 40:6
**13** 40:7
**1337** 2:17

**15** 22:14,16
**15th** 29:19 30:12
**16** 51:10
**16th** 34:6 47:5 48:7
  50:3 55:18 58:12
  62:2 67:12 72:20
**17** 42:15 65:15 71:14
**1990** 8:14
**1992** 8:17

### 2

**2** 3:11 32:11,13,17
  36:3,5 37:13 44:23
  54:4 56:19,22 57:16
**2:09** 50:3
**2:51** 73:16
**2005** 11:5,13
**2006** 20:13
**2007** 16:18,18 17:18
  17:23 19:21 20:9,13
  20:18 21:11,24
  23:10,18 24:3,3
  25:1,22 26:10,19,22
  27:2,8,10,13,19
  28:4,18 29:11,13,16
  29:20 30:12 31:1
  32:6 43:2 44:9
  45:15 47:5 48:7
  50:3 51:10 55:18
  57:16 59:10,17 60:4
  60:23 62:3 63:1
  67:11,12,20
**2008** 20:17
**2009** 16:8
**2010** 11:5,13
**2011** 4:6 9:11,19 10:8
  10:23 74:7,14
**217** 2:5,12,18
**24** 37:13 51:13,16
  52:6,12,16
**29** 4:6

### 3

**3** 3:11 35:3,5,9 36:6
  43:9 53:5 60:16
  65:10 71:13 72:13
**3D** 2:17

**30** 3:10 74:6
**300** 2:11
**301** 1:22
**303** 32:17
**32** 3:11
**344-0060** 2:12
**35** 3:11

**4**

**4** 3:12 46:13,15,19
**4:00** 58:13
**41** 2:17
**44** 35:12 38:14 45:20
**45** 35:12 42:5 65:12
**46** 3:12 35:13 60:16
   72:14
**469-9194** 2:5
**48** 37:13 51:13,16
   52:6,12,17 59:16
   63:5,5
**49** 3:12

**5**

**5** 3:4,12 49:19,21
   50:1 51:12 72:20
**505** 6:22
**53** 56:11
**56** 3:13
**57** 3:13 58:5
**579** 30:13
**580** 30:13
**581** 30:14
**582** 30:14

**6**

**6** 3:13 56:5,7,11 57:7
**6/15/07** 33:5,17
**61** 3:5
**61803-0129** 2:11
**61820** 1:23
**61824-1337** 2:18
**61873** 2:5
**69** 3:5

**7**

**7** 3:13 40:18 57:20,22
   58:3

**7:00** 17:8
**72** 48:10,19
**747-6789** 1:24

**8**

**8:00** 58:13
**800** 1:24
**864** 2:4

**9**

**9:00** 17:8
**9:59** 47:5
**954-0635** 2:18



# CHAMPAIGN COUNTY SHERIFF'S OFFICE
## INITIAL MENTAL HEALTH SCREENING AND ASSESSMENT

**EXHIBIT**

*Morris #3*

## IDENTIFYING INFORMATION

Hahn — LAST NAME

Janet — FIRST NAME

MIDDLE NAME

redacted — DATE OF BIRTH

JACKET#

W — RACE

F — GENDER

Married — MARITAL STATUS

CURRENTLY EMPLOYED: ☐ YES  ☒ NO

TYPE OF WORK

CHARGE: Agg Dom Batt  10,000 bond

HIGHEST COMPLETED EDUCATION LEVEL: Spec Ed  Mild MR

HAVE YOU BEEN IN CHAMPAIGN COUNTY JAIL BEFORE? ☒ YES  ☐ NO

LAST INCARCERATION:

## MENTAL HEALTH HISTORY

1. HAVE YOU EVER BEEN HOSPITALIZED FOR PSYCHIATRIC TREATMENT? ☒ YES  ☐ No
   NUMBER OF HOSPITALIZATIONS: Several   MOST RECENT HOSPITALIZATION: April
   LOCATION OF LAST HOSPITALIZATION: Pronna   REASON OF LAST HOSPITALIZATION:

2. ARE YOU CURRENTLY RECEIVING OUTPATIENT PSYCHIATRIC TREATMENT? ☒ YES  ☐ No
   LOCATION OF TREATMENT: MHC - Becky Dr Vang   MOST RECENT VISIT: last mo

3. HAVE YOU TAKEN OR ARE YOU TAKING PSYCHOTROPIC MEDICATION? ☒ YES  ☐ No
   TYPE OF MEDICATION: Siroquel - taking for a few months

4. ARE YOU USING DRUGS OR ETOH? ☒ YES  ☐ No
   KIND OF DRUG USED: EtOH   FREQUENCY: "once in a blue moon"
   DURATION:   PREVIOUS TREATMENT

5. ARE YOU CURRENTLY EXPERIENCING AUDITORY / VISUAL HALLUCINATIONS? ☐ YES  ☒ No
   AUDIO, VISUAL OR TACTILE HALLUCINATIONS:   PLEASE DESCRIBE:

6. IS THE DETAINEE EXPERIENCING WITHDRAWALS? ☐ YES  ☒ No

7. DO YOU HAVE A HISTORY OF SLEEP DISTRUBANCE? (FOR EXAMPLE, INSOMNIA OR WAKING UP OFTEN DURING SLEEP?) ☒ YES  ☐ No
   "only when I'm away from him"
   HOW OFTEN IS YOUR SLEEP DISTRUBED? 1-3 NIGHTS PER WEEK? ☐ YES / 4-7 NIGHTS PER WEEK? ☐ YES

*(left margin handwritten)* don't PP know DK my  yes"

## SUICIDAL SCREENING POTENTIAL

8. DOES THE ARRESTING OFFICER BELIEVE THAT THE DETAINEE MAY BE SUICIDAL? ☐ YES  ☒ No  ☐ N/A
   IS THE DETAINEE INCOHERENT? ☐ YES  ☒ No

9. DOES THE BOOKING OFFICER BELIEVE THAT THE DETAINEE MAY BE SUICIDAL? ☒ YES  ☐ No  ☐ N/A
   IS THE DETAINEE INCOHERENT? ☐ YES  ☒ No

10. HAVE YOU EVER ATTEMPTED SUICIDE? ☐ YES  ☒ No   IF YES, WHEN?
    HOW?   HOW MANY TIMES:   MOST RECENT:

11. DO YOU FEEL LIKE KILLING YOURSELF NOW? ☒ YES  ☐ No
    WHAT IS HE/SHE REPORTING? Stated to ofc she wanted to kill herself

-44-

07-170376F

## SUICIDAL SCREENING POTENTIAL (CONTINUED)

12. DOES HE/SHE HAVE A PLAN?  ☐ YES ☒ NO
    WHAT IS HIS/HER PLAN? _____
    WELL PLANNED/HIGHLY LETHAL ATTEMPT/SERIOUS IDEATIONS?  ☐ YES ☒ NO

13. DO YOU HAVE FRIENDS AND FAMILY THAT SUPPORT YOU?  ☐ YES ☒ NO  only my H
    HAVE ANY OF YOUR FRIENDS/FAMILY COMMITTED SUICIDE?  ☐ YES ☒ NO

14. ARE YOU FEELING HOPELESSNESS/HELPLESSNESS?  ☒ YES ☐ NO  no reason to live
    HAVE YOU HAD ANY RECENT REJECTION OR LOSS IN LAST 6/MO?  ☐ YES ☒ NO
    ARE YOU FEELING OF GUILT/WORTHLESSNESS?  ☒ YES ☐ NO  stabbed (H)
    HAVE YOU RECENTLY GAINED/LOSSED A SIGNIFICANT AMOUNT OF WEIGHT?  ☐ YES ☒ NO  EXPLAIN:

## OBSERVATION

15. DOES THE DETAINEE SHOW SIGNS OF DEPRESSION?  ☐ YES ☒ NO     CRYING? ☒ YES ☐ NO
    EMOTIONAL FLATNESS?  ☐ YES ☒ NO     ANXIETY? ☐ YES ☒ NO

16. IS THE DETAINEE ACTING IN A STRANGE MANNER?  ☐ YES ☐ NO  DESCRIBE: stuffed gown & flooded blanket in toilet cell

17. WORRIED ABOUT A MAJOR PROBLEM OTHER THAN LEGAL SITUATION (TERMINAL ILLNESS)?  ☒ YES ☐ NO
    DESCRIBE?  being w my (H)

## CURRENT MSE

| ORIENTATION | | AFFECT | | MOOD | |
|---|---|---|---|---|---|
| ☐ DISORIENTED | | ☒ NORMAL | | ☐ DEPRESSED | |
| ☒ ORIENTED X3 | | ☐ BLUNTED | | ☐ HAPPY | Angry |
| | | ☐ FLAT | | ☒ OTHER | |

| APPEARANCE | | SPEECH | | ATTITUDE TOWARD EXAMINER | |
|---|---|---|---|---|---|
| ☐ NEAT/CLEAN | | ☒ NORMAL | | ☐ COOPERATIVE | |
| ☐ DIRTY | | ☐ SLURRED | | ☒ UNCOOPERATIVE | |
| ☒ DISHEVELED | | ☐ PRESSURED | | ☐ GUARDED | |

| THOUGHT CONTENT | |
|---|---|
| ☒ APPROPRIATE | |
| ☐ SUSPICIOUS/PARANOID | |
| ☐ DELUSIONAL | |

## DISPOSITION

1. IF DETAINTE ANSWERS NO TO ALL OF THE ABOVE; OR IF INTERVIEWER OBSERVES DETAINEE TO HAVE NO MENTAL HEALTH ISSUES, THEN DETAINEE IS OKAY TO GO TO GENERAL POPULATION.

2. IF DETAINEE ANSWERS YES TO ONE OR A COMBINATION OF THE FOLLOWING QUESTION(S), 1, 2, 3, 5, 6, 7, 8, 9 (IF MOST RECENT IS WITHIN ONE AND A HALF YEARS), 10 AND 11, 13, 14, 15, 16; PLEASE REFER TO MENTAL HEALTH.

3. IF THE DETAINEE ANSWERS YES TO QUESTION #10, OR IF THE BOOKING OR ARRESTING OFFICER BELIEVES THAT THE DETAINEE MAY BE SUICIDAL, OR IS IN A SEVERE EMOTIONAL CRISIS DO TO DEPRRESSION, PLEASE PUT IN FULL SUICIDAL STATUS AND IMMEDIATELY CALL MENTAL HEALTH.
   *NOTE: FOR THIS PLEASE MARK URGENT ON MENTAL HEALTH REFERRAL.

GENERAL POPULATION (EXPLAIN):  L-2  S.W.
MENTAL HEALTH REFERRAL:

-45-

07-14854 CP

Health Professionals, LTD
Champaign County Jail

## COUNTY JAIL PROGRESS NOTES

INMATE'S NAME: Hachel, Janet
ID NUMBER:

| Date / Time | SOA | Plan |
|---|---|---|
| 6/16/06 | MHP Note: | P: Remain 1-2 |
| | S: MH Assessment | S.L. Precaus |
| | O: A&Ox3, speech | 24-48 hrs. |
| | Concrete, lisp noted | |
| | Mod-molded head. | ☆ Morris QMHP |
| | +S.I. "no reason | |
| | to live" -H.I. | |
| | -I.O.R., I.O.A. I/M | |
| | is mild-mod MR | |
| | ot is questionable | |
| | history. Reports | |
| | MH tx @ Provena | |
| | last hosp admin. | |
| | April. Reports she | |
| | goes to MHC ot | |
| | g/o Seroquel. | |
| | She identifies her 6 | |
| | as her primary | |
| | support, but unable | |
| | to have contact | |
| | to him d/t can you | |
| | b/c she stabbed | |
| | him. Insight/judgment | |
| | limited d/t | |
| | MR | |
| | A: mild-mod MR | |

**Nicole Bolt**

| | |
|---|---|
| From: | Michael Johnson |
| Sent: | Thursday, October 14, 2010 8:48 AM |
| To: | Teresa Schleinz |
| Subject: | FW: Hahn,Janet |

**From:** Alyson Morris
**Sent:** Saturday, June 16, 2007 9:59 AM
**To:** Michael Johnson
**Cc:** Greg Whicker; Jennifer Nicholas
**Subject:** Hahn,Janet

As of this writing she is still uncooperative and quite angry. MH has a file on her and she has been in green before. I will attempt to assess before I leave today; however, she will remain in green for at least 72 hrs. Thanks.

**From:** Michael Johnson
**Sent:** Friday, June 15, 2007 11:29 PM
**To:** Fran Workman; Kendra Adams; Susan Swain
**Cc:** Greg Whicker; Audrey Jerrolds; Alyson Morris; Jennifer Nicholas
**Subject:** Hahn,Janet

This individual is in booking and needs to be seen by MH and Medical. She stabbed her husband tonight. She has a cut and stitches on her left hand. The bandage was removed due to her making statements of self harm. She has meds that were dropped off by the Arresting Agency. These are in the drawer in booking. She is a Psych patient and is very unpredictable. She flooded the booking area by placing her gown and blanket in the toilet. She then remained naked for a period of time until Officer Lewis and I were able to convince her to stay dressed. Her B/S was checked and the log is in the infirmary. Her B/S was 160 and she was not given anything at this time. Thanks for your time.

Sgt. Michael K. Johnson


EXHIBIT
Morris #4