E-FILED
Monday, 13 February, 2013 06:58:51 PM
Clerk, U.S. District Court, ILCD

1

```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
                    URBANA DIVISION


PATRICK HAHN and ERIK REDWOOD,      )
Administrator of the Estate of      )
JANET LOUISE HAHN, Deceased,        )
                                    )
              Plaintiffs,           )
                                    )
         vs.                        )    No. 09-2145
                                    )
DANIEL WALSH, et al.,               )
                                    )
              Defendants.           )
```

```
              DEPOSITION OF MICHAEL JOHNSON
                    URBANA, ILLINOIS
                 SEPTEMBER 29TH, 2011
                      9:00 A.M.



       Jill Nicole Stevens:  CSR # 084-004212

    Area Wide Reporting and Video Conferencing
             301 West White Street
           Champaign, Illinois  61820
                (800) 747-6789
```

**EXHIBIT 6**

MICHAEL JOHNSON

2

1                             INDEX

2    APPEARANCES:

3    For the Plaintiffs:
              Jude Redwood
4             REDWOOD LAW OFFICE
              Attorneys at Law
5             P.O. Box 864
              St. Joseph, Illinois  61873-0864
6             (217) 469-9194
              redwoodlaw42@hotmail.com
7
     For the Defendants, Champaign County, Sheriff Dan
8    Walsh and HPL:
              Brian M. Smith
9             HEYL, ROYSTER, VOELKER & ALLEN
              Attorneys at Law
10            102 East Main Street, Suite 300
              Urbana, Illinois  61803-0129
11            (217) 344-0060
              bsmith@heylroyster.com
12
     For the Defendants, City of Urbana and Urbana
13   Police:
              Howard W. Small
14            LAW OFFICES OF SMALL & FREEMAN
              Attorneys at Law
15            41 East University Avenue, Suite 3D
              Champaign, Illinois  61824-1337
16            (217) 954-0635
              hws@smallandfreeman.com
17

18

19

20

21

22

23

24

MICHAEL JOHNSON

3

1                    INDEX - CONTINUED

2

3   EXAMINATION BY:                              PAGE

4   Ms. Redwood                                    5
    Mr. Small                                     66
5   Mr. Smith                                     67
    Ms. Redwood                                   74

6

7   EXHIBITS:
    #              DESCRIPTION                    PAGE
8
    1              Activity Log Maintenance        16
9   2              6/15/07 & 6/16/07 E-Mails       20
    3              5/6/07 E-Mail from Susan Swain  23
10  4              Inmate Housing History Report   28
    5              Blood Sugar & Insulin Tracking  31
11                 Sheet
    6              Segregation Log                 36
12  7              CCSO Mental Health/Medical      38
                   Special Watch Sheet Booking
13  8              Aegis Public Safety System      58
                   Questionnaire Listing
14  9              American Diabetes Association   64
                   Warning Signs

4

1                           STIPULATION

2

3              IT IS HEREBY EXPRESSLY STIPULATED AND

4   AGREED by and between the parties that the

5   deposition of MICHAEL JOHNSON may be taken on

6   SEPTEMBER 29TH, 2011, at the Law Offices of Heyl,

7   Royster, Voelker & Allen, 102 East Main Street,

8   Suite 300, Urbana, Illinois, pursuant to the Rules

9   of the Federal Court and the Rules of Federal

10  Procedure governing said depositions.

11

12             IT IS FURTHER STIPULATED that the

13  necessity for calling the Court Reporter for

14  impeachment purposes is waived.

15

16

17

18

19

20

21

22

23

24

5

1                    9:20 a.m.

2                 MICHAEL JOHNSON,

3   having first been duly sworn, testified as follows:

4                    EXAMINATION

5   BY MS. REDWOOD:

6        Q.   My name is Jude Redwood; I represent the

7   Plaintiffs in this case.  There's a few rules for

8   depositions and I'll just run through those quickly.

9             I'll be asking you questions that you'll

10  answer under oath.  If I ask you a question and you

11  don't understand what I'm asking or it's confusing,

12  just ask me to rephrase it, let me know you don't

13  understand, I'll be happy to.  If I ask two

14  questions in one or if I run on, mention that and

15  I'll break it down so you're answering one question

16  at a time.

17            If you answer the question, I'll assume

18  that you understood the question I was asking and

19  you're answering the question that I'm asking.

20            It's important to wait until I finish the

21  question before you begin your answer because the

22  reporter has trouble taking down two people at once

23  and it makes a confusing record.  If you want to say

24  yes, say yes; if you want to say no, say no, but

6

1    your answers do have to be out loud.  We can't use

2    uh-huhs or huh-uhs, which makes a confusing record

3    also.

4              If you need to take a break during the

5    deposition, you can take a break at any time; just

6    let your counsel know.  You can talk about anything

7    in the world during the break, but you can't talk

8    about your deposition testimony here today.  Please

9    state your name.

10        A.    Michael Johnson.

11        Q.    What is your age?

12        A.    46.

13        Q.    What is your marital status?

14        A.    Married.

15        Q.    Are you a diabetic?

16        A.    No, ma'am.

17        Q.    Do you have a family member or close

18   friend who is a diabetic?

19        A.    Yes.

20        Q.    Who is that?

21        A.    My grandmother.

22        Q.    And have you learned for the care of

23   diabetics through your relationship with your

24   grandmother?

7

1    A.    No.

2    Q.    Have you ever been a regular caretaker of

3  your grandmother in regards to her diabetes?

4    A.    No.

5    Q.    And what type of diabetes did your

6  grandmother have?

7    A.    Type I.

8    Q.    Did you read over any notes, reports,

9  statements or anything else to prepare for this

10  deposition?

11    A.    Yes.

12    Q.    What did you read over?

13    A.    The deposition of Sue Swain and the

14  deposition of Arnold Mathews.

15    Q.    Did you have a talk or a discussion,

16  consultation with any person or persons in

17  preparation for this deposition?

18    A.    Keith and Brian.

19    Q.    Did you make any personal notes, notes in

20  a diary or any kind of notations at all about Janet

21  Hahn that you have not turned over either to the

22  sheriff's department or the attorneys?

23    A.    No.

24    Q.    Where are you employed?

MICHAEL JOHNSON

8

1      A.    Champaign County Sheriff's Office.

2      Q.    How long have you been so employed?

3      A.    I'm in my 12th year.

4      Q.    What positions have you held at the

5  sheriff's department?

6      A.    Correctional officer, sergeant and now I'm

7  a lieutenant.

8      Q.    What's your badge number?

9      A.    5345.

10     Q.    So, on in-house jail documents, would you

11 use the three digits 3-4-5?

12     A.    345, yes.

13     Q.    Where were you employed before the

14 Champaign County Sheriff's Office?

15     A.    I was a self-employed contractor.

16     Q.    Have you been in the military?

17     A.    Yes, ma'am.

18     Q.    What branch were you in?

19     A.    Marine Corps.

20     Q.    And what dates?

21     A.    January of 1984 to January of 1990.

22     Q.    What were -- what kind of duties did you

23 have while you were in the military?  And that can

24 be just pretty generally.

MICHAEL JOHNSON

9

1      A.    I was involved in communications.

2      Q.    Did you have any medical training for your

3  employment in the military?

4      A.    Yes.

5      Q.    What kind of medical training did you

6  have?

7      A.    Basic first aid.

8      Q.    Did you have any kind of medical training

9  in regards to your self employment as a contractor?

10     A.    No, ma'am.

11     Q.    Besides what you've already testified to,

12  did you have any medical training before you started

13  working at the Champaign County Sheriff's Office?

14     A.    Yes.

15     Q.    What kind of medical training did you

16  have?

17     A.    I was on a volunteer fire department and I

18  was licensed as an EMT.

19     Q.    What were the dates that you were licensed

20  as an EMT?  Years is fine.

21     A.    Yeah, I think '98 to 2002.  That's a

22  guess.

23     Q.    Okay.  Do you know what level of EMT you

24  were licensed as?

10

1      A.   B, basic.

2      Q.   Basic, okay.  After 2002, did your license

3 as an EMT then lapse?

4      A.   Yes, I was no longer on the fire

5 department.  I was working at the sheriff's office.

6      Q.   Did you receive training for your

7 employment as a correction officer?

8      A.   Yes.

9      Q.   Where did you get your initial training?

10     A.   St. Clair County.

11     Q.   And was that at the PTI?

12     A.   Yes, ma'am.

13     Q.   Did that training include any medical

14 training?

15     A.   I believe it did.

16     Q.   Do you know what kind of medical training

17 that included?

18     A.   Basic first aid, first responder level.

19     Q.   Did you have any follow-up training at the

20 sheriff's office?

21     A.   We have annual training for medical.

22     Q.   Did the annual training for medical start

23 when you first started working at the sheriff's

24 department and then continue every year?

MICHAEL JOHNSON

11

1    A.   Yes.

2    Q.   Have you had any training at the sheriff's

3  department regarding how to care for and monitor

4  diabetics?

5    A.   Yes.

6    Q.   From your training at the Champaign County

7  Sheriff's Office, describe the signs and symptoms of

8  hypoglycemia in a Type I diabetic.

9    A.   Pale, disoriented, dizzy, loss of

10  consciousness.

11    Q.   From your training at the Champaign County

12  Sheriff's Office, describe the signs and symptoms of

13  hyperglycemia in a Type I diabetic.

14    A.   Red skin, loss of consciousness, cramping.

15  I can't really think of too many more.

16    Q.   From your training at Champaign County

17  Sheriff's Office, describe the difference or

18  differences between a Type I diabetic and Type II

19  diabetic.

20    A.   A Type I is insulin-dependent and Type II

21  is oral medication.

22    Q.   When you say insulin-dependent, how often

23  does a Type I diabetic need to get insulin from your

24  training?

MICHAEL JOHNSON

12

1          MR. SMITH:  Objection to foundation.  You

2    can answer.

3          THE WITNESS:  Oh.  We do blood sugar twice

4    a day.

5    BY MS. REDWOOD:

6       Q.   From your training, do you know what

7    ketoacidosis is?

8       A.   I have heard the term.  I don't know the

9    definition.

10      Q.   From your Champaign County Sheriff's

11   Office training, can you describe the warning signs

12   of a diabetic emergency.

13      A.   I believe it would be the signs and

14   symptoms if something -- if somebody is showing

15   signs and symptoms of physical or mental distress,

16   as I said before, sweating, dizziness, paleness,

17   redness, loss of consciousness, depending on whether

18   it's hypo or hyper.

19      Q.   From your training at Champaign County

20   Sheriff's Office, describe what a Type I diabetic

21   needs on a daily basis.

22          MR. SMITH:  I'm sorry, can you repeat that

23   question.

24          (At this point in the proceedings, the

MICHAEL JOHNSON

13

1          Court Reporter read aloud the aforesaid

2          question.)

3          MR. SMITH:  Objection to foundation.  You

4     can answer.

5          THE WITNESS:  A Type I diabetic would need

6     their insulin; they would need to eat; they would

7     need to stay hydrated.

8     BY MS. REDWOOD:

9          Q.   From your training at Champaign County

10    Sheriff's Department, when are you supposed to call

11    911 for a Type I diabetic?

12         A.   As a supervisor, we call 911 in case of

13    any emergency.

14         Q.   And if it's a Type I diabetic and there's

15    an emergency, how do you recognize that?

16         MR. SMITH:  Asked and answered.  You can

17    answer again.

18         THE WITNESS:  By the signs and symptoms.

19    BY MS. REDWOOD:

20         Q.   From your training at Champaign County

21    Sheriff's Office, describe what could happen to a

22    Type I diabetic that refuses to eat their meals.

23         A.   Their blood sugar could escalate.

24         Q.   As a supervisor, what's the jail's

14

1    procedure for you to follow when a Type I diabetic

2    fails or refuses to have his or her blood sugar

3    checked with the Accu-Chek as ordered by medical?

4         A.    We report it to medical.

5         Q.    How do you report that to medical?

6         A.    Either verbally or through an e-mail.

7         Q.    Did your medical training at the Champaign

8    County Sheriff's Office include training related to

9    special problems that are associated with the care

10   of inmates who have mental retardation or medical --

11   mental disabilities?

12            MR. SMITH:  Objection to the form of the

13   question.  You can answer.

14            THE WITNESS:  Yes.

15   BY MS. REDWOOD:

16        Q.    What kind of training did you get to deal

17   with people with mental or intellectual

18   disabilities?

19        A.    We have annual training on mental health.

20        Q.    And did that training include anything

21   about getting people who have mental retardation to

22   cooperate in their own medical care?

23        A.    I don't recall.

24        Q.    Does your training in mental health that

MICHAEL JOHNSON

15

1  you've gotten -- and I'm going to talk prior to June

2  of 2007 -- let me rephrase that question.

3        Prior to June 2007, did your training in

4  mental health at the Champaign County Sheriff's

5  Office teach you how to recognize signs of mental

6  disabilities?

7     A.   I don't recall.

8     Q.   Prior to June of 2007, did your training

9  from Champaign County Sheriff's Office in regards to

10 mental health issues teach you how to deal with

11 people who have mental disabilities?

12    A.   I don't recall if the training at that

13 time dealt with those issues.

14    Q.   What, if anything, do you recall about

15 your yearly training before June of 2007 that you

16 got on dealing with mental health issues?

17        MR. SMITH:  Objection to the form of the

18 question.

19        THE WITNESS:  I honestly don't recall what

20 the training would have entailed in 2007 or before.

21 BY MS. REDWOOD:

22    Q.   Before June of 2007, did you have any

23 training at Champaign County Sheriff's Office about

24 what you should do as a supervisor when an inmate

16

1  who has got mental retardation refuses to cooperate

2  in their own medical care?

3      A.   Yes.

4      Q.   And what were you supposed to do as a

5  supervisor in that situation?

6      A.   We reported it to the mental health

7  professionals.

8          MS. REDWOOD:  Number 1, please.

9          (At this point in the proceedings, Johnson

10         Exhibit Number 1 was marked for purposes

11         of identification.)

12  BY MS. REDWOOD:

13      Q.   You've been handed a document that's

14  labeled as Exhibit Number 1, which is Bates

15  Stamped 280 and purports to be Activity Log

16  Maintenance for the date of June 15th, 2007.  Do you

17  recognize this document?

18      A.   Yes, ma'am.

19      Q.   What's that document?

20      A.   This is a pass-on entry from June 15th of

21  2007 on our computer log.

22      Q.   Are you the person that authored the

23  information on this document?

24      A.   Yes, ma'am.

17

1      Q.    Is everything on there true and correct to

2   your best recollection?

3      A.    Yes, ma'am.

4      Q.    And is this a way that you passed

5   information on to mental health about the inmate,

6   Janet Hahn?

7      A.    No.

8      Q.    Who is it that would have received this

9   information?

10     A.    The officers and supervisors that worked

11   the floor.

12     Q.    Is this information that would be

13   available to the officers on the shift when you

14   authored it?

15     A.    They use it at the next shift briefing.

16     Q.    Okay.  And would it also be used at the

17   subsequent shift briefings?

18     A.    Until the date falls off, yes.

19     Q.    And --

20     A.    It's not postdated to a future date, so we

21   print a new one each day.

22     Q.    Okay.

23     A.    So this one is dated the 15th, so it would

24   print on the 15th.

MICHAEL JOHNSON

18

1      Q.    Would it be available still on the

2  computer say on the 16th for someone to look at?

3      A.    It's a permanent record, yes.

4      Q.    Okay.  So, an officer who came on on

5  June 15th or June 16th or June 17th would be able to

6  access this on the computer if they wanted to?

7      A.    Yes.

8      Q.    What shift were you working on June 15th,

9  2007?

10      A.    The 4:00-to-midnight shift.

11      Q.    And were you the supervisor?

12      A.    You said on the 15th, correct?

13      Q.    Yes.

14      A.    Yes, on the 15th I was the supervisor.

15      Q.    Were you in the -- you had mentioned in

16  this e-mail or pass-on log -- is it an e-mail or --

17      A.    This is the pass-on log.

18      Q.    Okay.  You mentioned in the pass-on log

19  that Janet Hahn flooded the booking area by stuffing

20  her green gown in the toilet along with the green

21  blanket.  Do you see that there?

22      A.    Yes, ma'am.

23      Q.    Were you in the booking area when that

24  occurred?

19

1      A.    Yes.

2      Q.    And how much of the area got flooded?

3      A.    I don't recall.

4      Q.    Do you know how deep the water was?

5      A.    No, I can't say.

6      Q.    Did you have to call in a cleanup crew?

7      A.    No.

8      Q.    And what was the result of her flooding

9   the cell?

10          MR. SMITH:  Objection to form.

11          THE WITNESS:  The water in the cell was

12   shut off.

13   BY MS. REDWOOD:

14      Q.    How long did the water in the cell remain

15   off?

16      A.    I don't recall.

17      Q.    Did you work the 4:00-to-midnight shift on

18   June 16th of '07?

19      A.    No, ma'am.

20      Q.    Did you work any shift on June 16th, '07?

21      A.    No, ma'am.

22      Q.    Was that your regular day off?

23      A.    I don't believe so.

24      Q.    Did you work at a different facility on

20

1    that day?

2          A.    No.

3          Q.    Do you know why you weren't working?

4          A.    I can only assume I was on benefit time,

5    vacation or comp time.  I know I didn't work those

6    two days.

7          Q.    And did you work any shift on June 17th of

8    '07?

9          A.    No, ma'am.

10               MS. REDWOOD:  Let's mark this Number 2.

11               (At this point in the proceedings, Johnson

12               Exhibit Number 2 was marked for purposes

13               of identification.)

14    BY MS. REDWOOD:

15          Q.    You've been handed a document that's

16    marked Exhibit 2, which is Bates Marked 002553; it

17    purports to be two e-mails and has your name on

18    there.  Would you please take a few moments to read

19    that to yourself.

20          A.    Okay.

21          Q.    On the second e-mail where it says, "From

22    Michael Johnson," and it's sent Friday, June 15th,

23    2007, 11:29 p.m., are you the person who sent this?

24          A.    Yes, ma'am.

21

1    Q.   And is this the e-mail that you indicated

2  in your testimony that you had notified mental

3  health?

4    A.   Yes.

5    Q.   Besides the e-mail which is the second

6  part of Exhibit 2 here, was there any other way that

7  you notified mental health about Janet Hahn on

8  June 15th, 2007?

9    A.   Can you repeat the question, please.

10       MS. REDWOOD:  Yeah.  Would you read it

11  back.

12       (At this point in the proceedings, the

13       Court Reporter read aloud the aforesaid

14       question.)

15       THE WITNESS:  No, ma'am.

16  BY MS. REDWOOD:

17    Q.   And would it be true that where it says

18  Fran Workman, Kendra Adams, Susan Swain, that those

19  are nurses?

20    A.   Correct.

21    Q.   And then the carbon copy, "Greg Whicker,

22  Audrey Jerrolds, Alyson Morris, Jennifer Nicholas,"

23  were those the mental health workers?

24    A.   Yes, ma'am.

MICHAEL JOHNSON

22

1      Q.   On June 15th, 2007, did you speak

2  personally, either face to face or by telephone,

3  with any of those individuals?

4      A.   Yes.

5      Q.   Who was it?

6      A.   Kendra Adams.

7      Q.   Was she on duty?

8      A.   She was on call.

9      Q.   And what did you speak to Kendra Adams

10  about?

11      A.   Ms. Hahn.

12      Q.   What did you say?

13      A.   I was talking to her about Ms. Hahn

14  checking her blood sugar.  Ms. Hahn was refusing to

15  check her blood sugar and I talked to her

16  extensively and I was able to convince her to take

17  her blood sugar, but she wanted me to take it.

18          We have previously been told we cannot

19  force medication on inmates, so I called the nurse

20  to make sure that if she offered her finger to be

21  stuck that it was okay for us to take her blood

22  sugar for her.

23      Q.   Okay.  So, you talked to Janet Hahn about

24  taking her blood sugar?

MICHAEL JOHNSON

23

1      A.    Yes, ma'am.

2      Q.    Why didn't she want to take her own blood

3  sugar?

4      A.    I think she was just angry about being in

5  jail.

6      Q.    Did she present herself as angry?

7      A.    She was very angry.

8      Q.    In the e-mail, it says here, "The bandage

9  was removed" -- I'm sorry, let me start again.  It

10 says, "She has a cut and stitches on her left hand.

11 The bandage was removed due to her making statements

12 of self harm."  Why was the bandage removed?

13     A.    Inmates can use bandages for items to tie

14 around their neck to, you know, strangle themselves,

15 so we take bandages from them so that they can't use

16 them for further self harm.

17     Q.    So, was that a bandage like a gauze-type

18 strip bandage?

19     A.    A gauze wrap as far as I can recall, yes.

20           MS. REDWOOD:  Okay.  Number 3, please.

21           (At this point in the proceedings, Johnson

22           Exhibit Number 3 was marked for purposes

23           of identification.)

24 BY MS. REDWOOD:

MICHAEL JOHNSON

24

1    Q.    You've been handed a document that's

2   labeled Exhibit 3; it's Bates Marked 002448 and

3   purports to be an e-mail sent May 6th, 2007 from

4   Susan Swain.  Please take a few moments to read that

5   to yourself.

6    A.    Okay.

7    Q.    Do you see where it's sent to corrections?

8    A.    Yes, ma'am.

9    Q.    In your capacity in May of '07 at the

10  sheriff's department, is that an e-mail that would

11  have been sent to you as corrections?

12   A.    Yes.

13   Q.    As you sit here today, do you recall

14  having received that e-mail?

15   A.    No, I do not.

16   Q.    In June of 2007, when you realized that

17  Janet Hahn was in the -- booked into the jail, had

18  you -- did you have any recall of this e-mail on

19  that date?

20   A.    No, ma'am.

21   Q.    When you saw Janet Hahn or saw her name in

22  June of 2007, did you remember her from any previous

23  incarcerations?

24   A.    Yes, ma'am.

MICHAEL JOHNSON

25

1      Q.   Do you know when she had previously been
2  incarcerated?

3      A.   I wouldn't know the dates, no.

4      Q.   Okay.  Do you believe it might have been
5  that same year, 2007?

6      A.   Yes, ma'am.

7      Q.   What kind of problems, if any, did you
8  remember having with Janet Hahn from her previous
9  incarceration?

10         MR. SMITH:  Objection to form.  You can
11  answer.

12         THE WITNESS:  I don't recall dealing with
13  her during her first incarceration.

14  BY MS. REDWOOD:

15     Q.   Okay.  What is it that you remembered
16  about her?

17     A.   I just remembered her name and that people
18  had, you know, brought her name up.

19     Q.   Okay.  When Janet Hahn got booked in in
20  June of 2007, what, if anything, did any other
21  people at the jail say to you about her?

22     A.   We just knew that she had -- people
23  mentioned she had been a problem when she had been
24  there before as far as being uncooperative.

MICHAEL JOHNSON

26

1     Q.   Okay.  Did you know that she was

2  uncooperative with cooperating in her own diabetes

3  care?

4     A.   I don't recall that.

5     Q.   You testified that you talked with Janet

6  Hahn on June 15th, 2007.  Did she tell you that she

7  was a diabetic?

8     A.   Yes, ma'am.

9     Q.   Did she ask you to see her doctor?

10    A.   No.

11    Q.   What do you remember her telling you or

12  saying to you?

13    A.   She was upset about being in jail.  I

14  talked her into taking her blood sugar.  She didn't

15  want to.  I explained to her that, you know, it's in

16  her best interest to take her blood sugar.

17          I don't recall verbatim what the

18  conversation was, but I do recall the conversation

19  that after talking to her for a while, she agreed to

20  check it, but she didn't want to do it herself, so

21  that's when I broke away from her, called the nurse

22  and got permission to actually check her blood sugar

23  for her.

24    Q.   On June 15th of '07, when you worked the

27

1  4:00-to-midnight shift, did you have a supervisor's

2  office that was someplace other than in the booking

3  area?

4      A.   No.

5      Q.   Were you -- you were situated in the

6  booking area during that shift?

7      A.   The supervisor's office is in the booking

8  area, yes.

9      Q.   Okay.  And did some other officer call you

10  to talk to Janet Hahn?

11          MR. SMITH:  Objection to form.

12          THE WITNESS:  I was called out to intake

13  when Ms. Hahn was brought in, yes.

14  BY MS. REDWOOD:

15      Q.   Is that because she was being

16  uncooperative?

17      A.   Yes, ma'am.

18      Q.   And when you say "intake," is that the

19  time when the person is -- the inmate is asked

20  questions and they're put down on a form?  That's

21  intake?

22      A.   Yes, ma'am.

23          MS. REDWOOD:  Okay.  Please mark that.

24  Oh, it has a note on here.  I can't use that as an

MICHAEL JOHNSON

28

1  exhibit I don't think.  I won't use it.  Yeah, I

2  want it back.

3          MR. SMALL:  Oh, you do?

4          THE WITNESS:  Uh-huh.

5          MR. SMALL:  I already saw it.

6          MS. REDWOOD:  Yeah, well, okay.  We don't

7  have a whole lot of surprises at this point in the

8  litigation anyway.  Let's go with a different one

9  then.

10          (At this point in the proceedings, Johnson

11          Exhibit Number 4 was marked for purposes

12          of identification.)

13  BY MS. REDWOOD:

14     Q.   You have been handed an exhibit that is

15  labeled Exhibit Number 4; this is a two-page

16  document Bates Stamped 002709 to 002710 and it

17  purports to be an Inmate Housing History Report.

18  Have you seen this particular report before?

19          MR. SMITH:  Are you asking him if he's

20  seen this Bates-stamped page?

21          MS. REDWOOD:  This particular report for

22  Janet Hahn.

23          THE WITNESS:  Yes.

24  BY MS. REDWOOD:

29

1      Q.    Okay.  And are you the person who entered

2  the information on this first page, which is marked

3  Bates Number 002709?

4      A.    No.

5      Q.    Who is the person that entered that

6  information?

7      A.    I can't tell from this document.

8      Q.    And who typically would enter the housing

9  information on a form like this?

10     A.    Whichever officer did the housing.

11     Q.    And you see where she -- you see on the

12  second page there --

13     A.    Uh-huh.

14     Q.    -- which is 2710 where she was housed in

15  Block H-5 in Cell H-5?

16     A.    Correct.

17     Q.    Is that where Janet Hahn was housed when

18  you went and talked to her about her diabetes?

19     A.    No.

20     Q.    Is Cell H-5 in booking?

21     A.    Yes, ma'am.

22     Q.    Is Cell H-5 the one where Janet Hahn

23  flooded the cell of the booking area?

24     A.    No, ma'am.

MICHAEL JOHNSON

30

1      Q.   You see where it says "Release Reason" on

2  that second sheet that's marked 2710 where it says

3  s-e-n-t, "Sent," and then "IDOC," where it says

4  that?

5      A.   Yes, ma'am.

6      Q.   What does that mean there?

7      A.   That's a release code, means that a person

8  is sentenced to IDOC.

9      Q.   Do you have any knowledge why that was

10  marked on the release code there?

11      A.   She was still in custody, so I would say

12  no.

13      Q.   Did you enter that information on this

14  form?

15      A.   No, ma'am.

16      Q.   And then if you look at the first page of

17  the document where it says Block F-1, Cell F-1, is

18  that the cell that Janet Hahn was housed in when you

19  actually had a conversation with her?

20      A.   Yes, ma'am.

21      Q.   Is that the cell where she stuffed the

22  suicide gown in the toilet?

23      A.   Yes, ma'am.

24         MS. REDWOOD:  Would you mark that

31

1    Number 5, please.

2              (At this point in the proceedings, Johnson

3              Exhibit Number 5 was marked for purposes

4              of identification.)

5    BY MS. REDWOOD:

6         Q.   You've been handed a document labeled

7    Exhibit Number 5, which is Bates Stamped 58, and

8    purports to be a Blood Sugar and Insulin Tracking

9    Sheet for patient named Janet Hahn.  Do you

10   recognize this document?

11        A.   Yes, ma'am.

12        Q.   Are your initials or badge number anywhere

13   on this document?

14        A.   Yes, ma'am.

15        Q.   And where is that?

16        A.   Line 1.

17        Q.   And is that the blood sugar reading that

18   you took that you've already testified to?

19        A.   Yes, ma'am.

20        Q.   Is 2140 hours the time -- the usual time

21   during your shift that blood sugar readings were

22   taken on diabetic inmates?

23             MR. SMITH:  Objection to foundation.  You

24   can answer.

32

1            THE WITNESS:  No.

2    BY MS. REDWOOD:

3        Q.   What would be the normal or usual times

4    that blood sugar readings were taken on your shift,

5    if at all?

6        A.   Right when the shift starts at 1600 to

7    1630.

8        Q.   What were the times -- you testified

9    earlier that on diabetics blood sugar was taken

10   twice a day.

11       A.   Yes, ma'am.

12       Q.   What times were those generally done or

13   supposed to be done?

14       A.   6:00 to 6:30 in the morning before

15   breakfast and 4:00 to 4:30 at night before dinner.

16       Q.   Besides marking down on this sheet and

17   documenting when blood sugar was taken, did you have

18   any duty in June of 2007 as a supervisor to check

19   this Blood Sugar and Insulin Tracking Sheet for any

20   particular inmate who was diabetic to make sure that

21   the blood sugar had been taken at the right, proper

22   times?

23       A.   No.

24            MR. SMITH:  Objection to form, but --

MICHAEL JOHNSON

33

1          THE WITNESS:  No.

2          MR. SMITH:  -- the answer stands.

3  BY MS. REDWOOD:

4     Q.   Okay.  And to your understanding, in June

5  of 2007, whose job, if anybody, was it to check the

6  Blood Sugar and Insulin Tracking Sheet for any given

7  inmate who was diabetic to make sure that these

8  blood sugar checks had been done as required?

9          MR. SMITH:  Objection to foundation -- not

10  foundation but form.

11          THE WITNESS:  Medical staff.

12  BY MS. REDWOOD:

13     Q.   In June 2007, if one of the correction

14  officers who you were supervising had tried to take

15  a blood sugar reading and it read error, what was

16  the proper procedure for that officer to do in

17  regard to this Blood Sugar and Insulin Tracking

18  Sheet?

19          MR. SMITH:  Objection, foundation.

20          THE WITNESS:  They should try it again

21  with that same device.  If they get an error reading

22  twice, then they should contact the medical staff.

23  BY MS. REDWOOD:

24     Q.   And is the error reading supposed to be

MICHAEL JOHNSON

34

1  documented by the correction officer on this form,

2  which is labeled Exhibit 5?

3      A.    Yes.

4      Q.    If one of your correction officers who you

5  supervised in June of 2007 took the inmate to get

6  their blood sugar read and the inmate just flat out

7  refused to have their blood sugar read, was the

8  officer supposed to document that refusal on this

9  form?

10     A.    Yes.

11     Q.    And what was it supposed to say, I mean?

12     A.    They should write "refused" where the

13  blood sugar box is at.

14     Q.    In June 2007, if one of your officers who

15  you were supervising ran into either one of those

16  two problems we just discussed, Number 1, either a

17  refusal of an inmate to take blood sugar or,

18  Number 2, an error of the machine, was that officer

19  also supposed to report that to you as supervising

20  officer?

21     A.    Yes.

22     Q.    And was there a place at the Champaign

23  County Sheriff's Office at that time that that

24  report to you as supervisor should be documented?

MICHAEL JOHNSON

35

1     A.    No.

2     Q.    Could that be a verbal report to you?

3     A.    Yes, ma'am.

4     Q.    In June 2007, did you as supervisor have a

5  place where you wrote down all of the reports from

6  different officers about the problems or situations

7  they encountered?

8     A.    No.

9     Q.    So, in other words, you didn't have a

10  computer program, a notebook, a logbook, something

11  where it said officer, badge number, whatever, came

12  to me with this problem or issue and then jot it

13  down?

14     A.    No, ma'am.

15     Q.    In June -- on June 15th, 2007, was there

16  an officer who was superior to you that you were to

17  report problems that you felt you needed additional

18  guidance?

19     A.    Yes, ma'am.

20     Q.    And was that a person who was on -- in the

21  facility or on call?

22     A.    On call.

23     Q.    Who would that have been?

24     A.    I believe it was Lieutenant Sanders, if I

36

1  recall correctly, in '07.

2      Q.   On June 15th, 2007, did you ever call

3  Lieutenant Sanders or any other superior officer in

4  regard to the inmate Janet Hahn?

5      A.   No, ma'am.

6      Q.   What kind of training did you receive at

7  Champaign County Sheriff's Office to be a

8  supervisor?

9          MR. SMITH:  Objection to form.

10         THE WITNESS:  Just on-the-job training.

11 BY MS. REDWOOD:

12     Q.   Did your training to become a supervisor

13 include any additional medical training other than

14 what you've already testified to?

15     A.   No, ma'am.

16         MS. REDWOOD:  Would you please mark that

17 Number 6.

18         (At this point in the proceedings, Johnson

19         Exhibit Number 6 was marked for purposes

20         of identification.)

21 BY MS. REDWOOD:

22     Q.   You've been handed a document that's

23 labeled as Exhibit Number 6, which is the

24 Champaign County Correctional Center Segregation Log

MICHAEL JOHNSON

37

1  and Bates Marked 57.  Do you recognize that format?

2      A.    Yes, ma'am.

3      Q.    Have you seen this segregation log for the

4  prisoner named Janet Hahn before?

5      A.    Yes, ma'am.

6      Q.    Do you recognize your handwriting on this

7  document anywhere?

8      A.    Yes, I do.

9      Q.    What is your handwriting?

10     A.    The top line, her name, her location, the

11 date started and then my authorization at the bottom

12 and that she was placed in a green gown on Level 2

13 watch.

14     Q.    Are you the person who wrote the dates on

15 the left-hand column under date?

16     A.    It appears that I wrote at least the first

17 couple.  I can't guarantee that I wrote all of them.

18     Q.    Do you see your badge number anywhere on

19 there?

20     A.    Just at the bottom.

21     Q.    What does green gown Level 2 mean?

22     A.    They're on suicide precautions; Level 2

23 means that they are a suicide risk.

24     Q.    Where did you get the information to put

38

1  in the comments there for green gown and Level 2?

2          MR. SMITH:  Objection to the form of the

3  question.  You can answer if you can.

4          THE WITNESS:  From our watch sheet.  It's

5  a standard -- we have three different levels,

6  Level 1, Level 2 and Level 3.

7  BY MS. REDWOOD:

8      Q.  Did you talk to a mental health

9  professional --

10     A.  No, ma'am.

11         MS. REDWOOD:  Please mark that as

12  Number 6.

13         THE WITNESS:  That would be Number 7.

14         MS. REDWOOD:  Is it Number 7?

15         (At this point in the proceedings, Johnson

16         Exhibit Number 7 was marked for purposes

17         of identification.)

18  BY MS. REDWOOD:

19     Q.  You've been handed a document that's

20  labeled Exhibit 7; it's Bates Marked 53; it purports

21  to be a Champaign County Sheriff's Office Mental

22  Health/Medical Special Watch Sheet Booking; it's

23  dated 6/18 of '07.  Do you recognize this format?

24     A.  Yes, ma'am.

39

1        Q.    Do you see where the -- on the date where

2    it says 6/18/07, the number below is crossed out and

3    the 18 is written above?

4        A.    Yes, ma'am.

5        Q.    Did you cross that number out?

6        A.    No.  These forms are printed on

7    4:00-to-12:00 shift for the midnight shift and the

8    date is created by the computer, so when they create

9    the date on the 17th, they have to cross out the

10   17th and put the 18th so that it's used for the next

11   day.

12       Q.    Okay.  On June 15th, 2007, was there a

13   sheet like this for Janet Hahn?  Strike that,

14   please.  On June 15th, 2007, was there a Mental

15   Health/Medical Special Watch Sheet in the booking

16   area?

17       A.    Yes, ma'am.

18       Q.    And do you recall whether on your shift

19   Janet Hahn's name was on there?

20       A.    I don't recall.

21       Q.    See where it says under reason for Janet

22   Hahn "Level 2, Med 2"?

23       A.    Yes, ma'am.

24       Q.    Did you have any input into someone

40

1  entering that information for the reason?

2          MR. SMITH:  Objection to the form of the

3  question.

4          THE WITNESS:  No.

5  BY MS. REDWOOD:

6      Q.  And see under comments where it says

7  "Green Gown/Drug Withdrawal"?

8      A.  Yes, ma'am.

9      Q.  Did you have any information on June 15th,

10  2007 that Janet Hahn was or may be going through

11  drug withdrawal?

12     A.  No.

13     Q.  Did you on June 15th, 2007 believe that

14  Janet Hahn was going through drug withdrawal?

15     A.  I had no knowledge.

16     Q.  Did you have any input into entering this

17  information about drug withdrawal on this sheet,

18  which is Exhibit Number 7?

19     A.  No.

20     Q.  What person or persons in June of 2007 had

21  input into entering the information on the special

22  watch sheet, which is Exhibit 7?

23     A.  The intake officer.

24     Q.  I would like to call your attention back

41

1   to Exhibit Number 6, which is the segregation log.

2   Are the nurses required to put their initials on

3   that segregation log if they come to the booking

4   area to see a prisoner?

5           MR. SMITH:  Objection to foundation.

6           THE WITNESS:  I don't know if that's their

7   policy or not.

8   BY MS. REDWOOD:

9       Q.   In June of 2007, was it the policy at the

10  jail for the nurses to put either their initials or

11  their identifying number somewhere in that column

12  that says "Nurse"?

13          MR. SMITH:  Objection, asked and answered.

14          THE WITNESS:  I don't recall a policy, no.

15  BY MS. REDWOOD:

16      Q.   You testified that you started this

17  segregation log for Janet Hahn.  Was this -- was the

18  segregation log started for every inmate who is in

19  the booking area?

20      A.   No.

21      Q.   What was the reason that you started the

22  segregation log for Janet Hahn on June 15th, 2007?

23      A.   She was housed alone on suicide watch.

24      Q.   Was it the policy of the jail to start a

42

1   segregation log for every inmate who was on suicide

2   watch?

3       A.   Yes, ma'am.

4       Q.   And was it the policy in June 2007 to

5   start a segregation log for every inmate that was

6   housed alone in booking area?

7       A.   No.

8       Q.   What other reasons, if any, would there --

9   were there in June of 2007 for starting the

10  segregation log for an inmate?

11      A.   Someone who is on disciplinary protective

12  custody, have separation issues.

13      Q.   What do you mean by separation issues?

14      A.   Enemies in the jail, co-defendants.

15      Q.   What is administrative segregation?

16      A.   Administrative seg is a classification

17  that we have; it just means that they are in there

18  for other than disciplinary.

19      Q.   Okay.  So, the administrative segregation

20  would include medical issues; is that right?

21      A.   Yes, ma'am.

22      Q.   And would that also include mental health

23  issues?

24      A.   Yes, ma'am.

43

1      Q.   If an inmate refuses their meals, is

2 that -- would that be a reason to start a

3 segregation log?

4      A.   No.

5      Q.   Do you recall if Janet Hahn ate any meal

6 on June 15th, 2007 during your shift?

7      A.   No.

8      Q.   Did you offer her a meal or snack or any

9 type of food?

10     A.   Personally, no.

11     Q.   Do you know if anyone on your shift

12 offered her food or a snack or a meal?

13     A.   No.

14     Q.   Did you explain to Janet Hahn on

15 June 15th, 2007 why the water was shut off to her

16 cell?

17     A.   Yes.

18     Q.   What, if anything, did she respond?

19     A.   I don't recall.

20     Q.   On June 15th, 2007, did you give any water

21 to Janet Hahn for drinking?

22     A.   No.

23     Q.   On June 15th, 2007, did Janet Hahn convey

24 to you that she was having her menstrual period?

MICHAEL JOHNSON

44

1    A.    No.

2    Q.    Did you have any indication that was

3 happening?

4    A.    No.

5    Q.    You've testified already about the pass-on

6 log that you passed on to the next shift that Janet

7 Hahn flooded her cell.  Did you pass on that the

8 water in her cell had been shut off?

9    A.    Yes, ma'am.

10    Q.    And if it's not on this written pass-on

11 log, how is that passed on?

12    A.    Verbally to the next shift.

13    Q.    Why is it not on the pass-on log?

14    A.    I don't recall.

15    Q.    On June 15th, 2007, was there some place

16 on Janet Hahn's -- on or around Janet Hahn's cell

17 that you wrote down or alerted other officers that

18 the water was shut off to the cell?

19    A.    No, ma'am.

20    Q.    Was there some kind of a policy when the

21 water is shut off to a cell for whatever reason that

22 you put a card up there or something that says

23 "water off"?

24    A.    No, ma'am.  The water is shut off and then

MICHAEL JOHNSON

45

1  officers are advised that it's off so that they can

2  turn the water on periodically for the inmates to

3  get a drink and flush the toilet if necessary to

4  prevent them from further flooding.

5      Q.   Okay.  And who verbally did you pass on

6  that the water was off?

7      A.   To the next shift supervisor.

8      Q.   Who was the next shift supervisor?

9      A.   I don't recall.  From here, it looks like

10 Sergeant Scott on Exhibit 6.

11     Q.   And are you getting that information

12 because of the badge number?

13     A.   Yes, ma'am.

14     Q.   And is that 354?

15     A.   Yes, ma'am.

16     Q.   Do you have any way of knowing from any of

17 these exhibits that are in front of you whether the

18 information that Janet Hahn's water to her cell was

19 shut off was passed on to subsequent shifts besides

20 what you've already testified to?

21          MR. SMITH:  You're asking from the

22 documents you've put in front of him?

23 BY MS. REDWOOD:

24     Q.   From the documents in front of you, is

MICHAEL JOHNSON

46

1  there any way that that was documented on any of

2  these?

3        A.    No, ma'am.

4        Q.    And besides what you've already testified

5  to, that you passed it on to the next shift, do you

6  have any information that the information that Janet

7  Hahn's water was shut off was passed on to a

8  subsequent shift after you were not working?

9        A.    No, ma'am.

10        Q.    Besides passing the information on

11  verbally to the next shift supervisor that Janet

12  Hahn's water was shut off, was there a procedure at

13  the jail for you to pass that information on to any

14  higher supervisors or authority?

15            MR. SMITH:  Objection to form.

16            THE WITNESS:  The pass-on log showed that

17  she had flooded the cell and our standard practice

18  was to shut the water off when inmates flooded.

19  BY MS. REDWOOD:

20        Q.    And was there any document in place in

21  June of 2007 where you had to -- where you were

22  required as a supervisor to document every time you

23  shut the water off to a cell?

24        A.    No, ma'am.

MICHAEL JOHNSON

47

1      Q.   In June 2007, what was the policy at the
2    jail for you as a supervisor to be able to call the
3    HPL doctor directly if you thought an inmate needed
4    to see a doctor?
5            MR. SMITH:  Objection to foundation.
6            THE WITNESS:  We never called the doctor.
7    BY MS. REDWOOD:
8      Q.   Was there a place where the doctor's phone
9    number was available to you if you thought you
10   needed to call the doctor?
11     A.   No, ma'am.
12     Q.   If you had any medical concerns about an
13   inmate, what were you as a supervisor required to do
14   about those medical concerns?
15     A.   We call the on-call nurse.
16     Q.   Prior to June of 2007, did you have any
17   medical training through the sheriff's office
18   informing you that a Type I diabetic could develop
19   ketoacidosis and die in a couple of days without a
20   proper diabetic regimen of food, water and insulin?
21           MR. SMITH:  Objection to form.
22           THE WITNESS:  I don't recall that
23   specifically.
24   BY MS. REDWOOD:

48

1      Q.   How many times before June 15th, 2007 were

2  you aware that Janet Hahn had been incarcerated at

3  the Champaign County Jail before?

4            MR. SMITH:  I'm sorry, can you repeat that

5  question?

6            MS. REDWOOD:  That was a little confusing.

7  BY MS. REDWOOD:

8      Q.   On June 15th, 2007, were you aware of how

9  many times Janet Hahn had been incarcerated at the

10  Champaign County Jail prior to that date?

11      A.   No.

12      Q.   Was Janet Hahn booked in during your shift

13  on June 15th, 2007?

14      A.   No.

15      Q.   And what shift was Janet Hahn booked in

16  on?

17      A.   I don't have that information.

18      Q.   Was Janet Hahn's photograph and

19  fingerprints taken during your shift on June 15th,

20  2007?

21      A.   I don't believe so.

22      Q.   On June 15th, 2007, was there some file,

23  either a paper file or a computer-generated file,

24  that you as a supervisor could access if you wanted

49

1  that gave you information about Janet Hahn's medical

2  condition from previous incarcerations?

3      A.   Yes.

4      Q.   And what kind of file was that?

5      A.   New World that we use has a permanent

6  database, so her previous intake sheets would be

7  stored in there.

8      Q.   Was New World a system that was in use in

9  2007?

10     A.   I believe so.

11     Q.   And would the New World database also have

12 information about her mental health evaluations at

13 the jail, if any?

14     A.   No.

15     Q.   Was there a place that you as a supervisor

16 would be able to access records about an inmate's

17 mental health if you needed to look at that?

18          MR. SMITH:  Objection to relevance.

19          THE WITNESS:  No.

20 BY MS. REDWOOD:

21     Q.   You've testified about any conversations

22 that you had with Janet Hahn on June 15th, 2007.

23 Did you observe Janet Hahn have any conversations or

24 interactions with any other correction officers on

50

1  June 15th, 2007?

2      A.   Yes.

3      Q.   And who else did you observe Janet Hahn

4  communicating with?

5      A.   Officer Lewis.

6      Q.   What did you observe?

7      A.   Officer Lewis was the female officer that

8  assisted us in moving her from the initial intake,

9  Cell H-5, to F-1 and eventually convinced Janet to

10  keep her green gown on so she wasn't in the cell

11  naked.

12      Q.   And when you observed that, was Janet

13  being argumentative or cooperative with

14  Officer Lewis?

15      A.   Argumentative.

16      Q.   Besides the interaction with

17  Officer Lewis, did you observe Janet Hahn

18  interacting with any other correction officer on

19  that date during your shift?

20      A.   Officer Schweighart.

21      Q.   And what did you observe?

22      A.   He was the initial intake officer and she

23  refused to answer his questions.

24      Q.   Did Officer Schweighart report to you as

MICHAEL JOHNSON

51

1   the commanding officer that she had refused to

2   answer questions?

3        A.   Yes.

4        Q.   What was the policy or procedure for you

5   to do as the supervising officer when an inmate

6   refuses to answer questions on intake?

7        A.   If they refuse to answer the mental health

8   questions and the medical questions, then they're

9   immediately placed on a watch status since we can't

10  determine whether they're, you know, in a self-harm

11  state or, you know, what their status is.

12       Q.   What happens when an inmate is placed on

13  watch status?  What --

14       A.   They're placed in the green gown.

15       Q.   Okay.  Does watch status mean suicide?

16       A.   We have different watch statuses.

17       Q.   Okay.  So, a green gown from your

18  testimony would indicate something besides only

19  suicide; is that correct?

20       A.   No, green gown means self-harming

21  behavior.

22       Q.   All right.  And what does -- how is an

23  inmate identified that they're on watch status?

24       A.   They could be on watch for numerous

52

1  things, alcohol withdrawal, drug withdrawal,

2  medical, if they had, you know, a cast on their arm,

3  different things like that.

4      Q.   Okay.  And if an inmate is placed on watch

5  status, is that documented somewhere in the booking

6  area so other officers would know that person is on

7  watch status?

8      A.   It's on the Mental Health/Medical Special

9  Watch Sheet that you provided me, Exhibit 7.

10     Q.   Okay.  So, if they're on watch, they're

11  placed on that sheet; is that correct?

12     A.   Yes, ma'am.

13     Q.   Is it your testimony that just because --

14  strike that.  Is it your testimony that an inmate

15  who is placed on watch could be on watch but not in

16  a green gown?

17     A.   Yes.

18     Q.   And when I say the booking board, do you

19  know what I'm talking about?

20     A.   Yes, ma'am.

21     Q.   What is the booking board?

22     A.   It's where we keep the housing cards; each

23  individual cell is listed and then the tags for each

24  inmate are on that board, either a tag with their

53

1   name or a picture once they're processed.

2        Q.   Is there a tag up there that identifies an

3   inmate as being on watch?

4        A.   No.  No, strike that.  Yes.

5        Q.   All right.  And is that the -- is that the

6   booking sheet that's Exhibit Number 7 here?

7        A.   Yes.  If they're on a watch status in a

8   green gown, then we put green Post-It flags on their

9   card.

10       Q.   Was Janet Hahn on watch because of medical

11   on June 15th, 2007?

12       A.   On June 15th?

13       Q.   Right, when you worked.

14       A.   Yes.

15       Q.   And was that for her diabetes?

16       A.   Yes.

17       Q.   Was that marked somehow on the booking

18   board?

19       A.   On the booking board where the photos are

20   at?  Is that the question you're asking?

21       Q.   Right.

22       A.   Not that I recall.

23       Q.   Besides what you've already testified to,

24   did you make any documentation anywhere in the

MICHAEL JOHNSON

54

1  booking area that Janet Hahn was a diabetic?

2      A.   Not that I recall.

3      Q.   On June 15th, 2007, did you observe Janet

4  Hahn having any conversations or interactions with

5  other inmates?

6      A.   No.

7      Q.   During your interactions with Janet Hahn,

8  did you notice anything about Janet Hahn's speech or

9  behaviors that indicated to you that Janet Hahn had

10 a mental deficiency or was retarded in any way?

11          MR. SMITH:  Objection to foundation, form.

12 Go ahead.

13          THE WITNESS:  She spoke a little slower

14 than normal people, but I didn't notice anything out

15 of the ordinary.

16 BY MS. REDWOOD:

17     Q.   What was the reason or reasons that you

18 notified mental health for Janet Hahn on June 15th,

19 2007?

20     A.   She had made statements to the arresting

21 officer on the way to the jail that she was

22 suicidal.

23     Q.   You testified earlier that when you spoke

24 with Janet Hahn, she was very angry.  After you were

MICHAEL JOHNSON

55

1  successful in getting her blood sugar reading, did

2  you have any kind of problems with Janet Hahn in the

3  booking area of being angry, yelling, causing a

4  commotion, things of that nature?

5      A.   She was yelling some before I left the

6  shift that night, but most of it was just, you know,

7  her anger from being in jail.  She wasn't mad at us;

8  she was mad about the fact that she was there.

9      Q.   On June 15th, 2007, was your title shift

10 supervisor?

11     A.   I was a sergeant in charge of the shift at

12 that time; the shift supervisor would have been the

13 lieutenant.

14     Q.   Okay.  And in your capacity as the

15 sergeant in charge of the shift, did you have the

16 ability or responsibility to call 911 for an inmate

17 if you felt it was necessary?

18     A.   Yes, ma'am.

19     Q.   In June of 2007, under what circumstances

20 were you allowed to call 911 for an inmate?

21     A.   Well, I would say an emergency situation,

22 such as a heart attack, an inmate that's

23 unconscious, someone who is profusely bleeding that

24 we can't stop the bleeding, situations like that.

56

1      Q.   When I say the name Quentin Larry, do you

2   know who I'm talking about?

3           MR. SMITH:  Objection to relevance.

4           THE WITNESS:  Yes.

5   BY MS. REDWOOD:

6      Q.   And are you aware that Quentin Larry

7   collapsed at the jail in 2006 and then later died of

8   a heart attack secondary to cocaine intoxication?

9      A.   Yes.

10          MR. SMITH:  Objection to relevance.

11          THE WITNESS:  Yes, ma'am.

12  BY MS. REDWOOD:

13     Q.   What policies or procedures, if any, were

14  implemented at the Champaign County Sheriff's Office

15  after Quentin Larry's death?

16          MR. SMITH:  Objection to relevance.

17          THE WITNESS:  I don't believe there were

18  any new policies implemented specific to that

19  incident.

20  BY MS. REDWOOD:

21     Q.   Do you recall if any new policies were

22  implemented after that incident?

23          MR. SMITH:  Objection, asked and answered

24  and relevance.  You can answer.  I'm sorry.

57

1           THE WITNESS:  Oh, I'm sorry.

2           MR. SMITH:  That's okay.

3           THE WITNESS:  Can you repeat the question?

4           MS. REDWOOD:  Yes.  Please read it back.

5           (At this point in the proceedings, the

6           Court Reporter read aloud the aforesaid

7           question.)

8           MR. SMITH:  Same objections.  Go ahead.

9           THE WITNESS:  No, I don't believe so.

10  BY MS. REDWOOD:

11      Q.   After Quentin Larry's death, did you have

12  any training or meetings or discussions with the HPL

13  employees about when you as a supervisor should call

14  911?

15           MR. SMITH:  Objection to relevance.

16           THE WITNESS:  It's been discussed as part

17  of ongoing training, yes.

18  BY MS. REDWOOD:

19      Q.   In June 2007, was there any differences in

20  how the correction officers were required to monitor

21  a Type I diabetic as opposed to how the correction

22  officers were supposed to monitor a Type II

23  diabetic?

24      A.   No.

58

1          MS. REDWOOD:  Let's mark this --

2          MR. SMITH:  8.

3          MS. REDWOOD:  Thank you.

4          (At this point in the proceedings, Johnson

5          Exhibit Number 8 was marked for purposes

6          of identification.)

7    BY MS. REDWOOD:

8        Q.    You've been handed a document that's

9    labeled Exhibit Number 8; it's Bates Marked 52 and

10   it purports to be the Champaign County Sheriff & JDC

11   Aegis Public Safety System Questionnaire Listing.

12   Have you seen a document or a computer screen like

13   this before?

14       A.    Yes, ma'am.

15       Q.    Do you recall seeing this document or

16   computer screen for Janet Hahn?

17       A.    Before yesterday, no.

18       Q.    Okay.  So, this is not something that you

19   prepared; is that correct?

20       A.    That's correct.

21       Q.    Who would have prepared a document -- this

22   document?

23       A.    The intake officer.

24       Q.    And do you see on Number 8 there where it

MICHAEL JOHNSON

59

1   says, "Is detainee mentally deficient?"  And it's

2   marked, "Yes."

3        A.   Yes.

4        Q.   And do you know how that information would

5   have come to the intake officer on this inmate?

6             MR. SMITH:  Objection to form and

7   foundation.

8             THE WITNESS:  No.

9   BY MS. REDWOOD:

10       Q.   Did you have a talk with the intake

11  officer about this inmate and that question?

12       A.   No.

13       Q.   Have you ever been the intake officer and

14  filled out any forms like this?

15       A.   Yes.

16       Q.   And how would you have gotten any kind of

17  information about whether a detainee is mentally

18  deficient or not?

19            MR. SMITH:  Objection to the form of the

20  question.

21            THE WITNESS:  From the inmate.

22  BY MS. REDWOOD:

23       Q.   Okay.  Just say, "Are you mentally

24  deficient?"  You just ask them?

MICHAEL JOHNSON

60

1    A.    Just questions that we ask during the

2  intake, yes.

3    Q.    Okay.  So, is the determination that a

4  detainee is mentally deficient then a determination

5  that's made by the intake officer?

6    A.    Can you repeat that real quick?

7    Q.    Yeah.  Is that determination that the

8  detainee is mentally deficient made by the intake

9  officer?

10    A.    Based on the information they have at that

11  time, yes.

12    Q.    Okay.  If you would look, please, at

13  Exhibit Number 5, Exhibit Number 6 and Exhibit

14  Number 2, which includes two e-mails, and tell me

15  whose job is it at the Champaign County Sheriff's

16  Office to look at documents like these and make some

17  kind of a determination whether a diabetic inmate is

18  going into an emergency because they're refusing

19  meals, not getting Accu-Cheks and either suicidal or

20  mentally somehow challenged.

21        MR. SMITH:  Objection to form and

22  foundation and assumes facts not in evidence.  With

23  that being said, you can answer.

24        THE WITNESS:  The medical staff.

MICHAEL JOHNSON

61

BY MS. REDWOOD:

Q.    Were you aware on June 15th, 2007 that Janet Hahn had refused to sign releases for medical information?

A.    No.

Q.    Was there a question on the intake form asking the inmate to sign releases for medical information?

A.    There's a signature line that they usually sign at the bottom of the mental or the medical form that states that they authorize us to release all the information to the medical personnel for their treatment, yes.

Q.    And on June 15th, 2007, were you advised by anyone that Janet Hahn had refused to sign that?

A.    Yes.

Q.    Who advised you of that?

A.    The intake officer.

Q.    When you went and personally talked to Janet Hahn about taking her blood sugar, did you try to get her to sign that release?

A.    No, ma'am.

Q.    When you talked to Janet Hahn, did she say anything about signing releases or signing anything?

62

1     A.   No, ma'am.

2     Q.   Did you hear any other officer talk to

3  Janet Hahn about signing that release or signing

4  anything else?

5     A.   No, ma'am.

6     Q.   What training were you provided at

7  sheriff -- at Champaign County Sheriff's Department

8  before June of 2007 to give you information to

9  differentiate between normal sleep and diabetic

10 coma?

11          MR. SMITH:  Objection to foundation.

12          THE WITNESS:  Just normal annual training.

13 BY MS. REDWOOD:

14     Q.   And did your training include some kind of

15 training about how you could differentiate between

16 sleep and diabetic coma?

17     A.   I don't recall.

18     Q.   Was there an HPL doctor in the jail on

19 June 15th, 2007 during your shift?

20     A.   No, ma'am.

21     Q.   When an inmate is put on suicide watch,

22 such as Janet Hahn on June 15th, 2007, what exactly

23 is it that the correction officers are looking for

24 when they watch an inmate?

MICHAEL JOHNSON

63

1      A.   They're making sure that the inmate is not

2  doing anything to harm themselves any further.

3  That's the purpose of the green gown.

4      Q.   During the medical training that you

5  received at Champaign County Sheriff's Office, did

6  that include medical training for what to look for

7  on suicide watch?

8      A.   The mental health portion, yes.

9      Q.   Okay.  And did you get any training

10  through the Champaign County Sheriff's Office about

11  how to identify suicide by diabetes?

12          MR. SMITH:  Objection to the form.

13          THE WITNESS:  I don't recall.

14  BY MS. REDWOOD:

15      Q.   Do you agree that a person could commit

16  suicide by diabetes by refusing meals and refusing

17  medical treatment?

18          MR. SMITH:  Objection, form, calls for an

19  opinion.  Go ahead.

20          THE WITNESS:  Yes.

21  BY MS. REDWOOD:

22      Q.   Have you received in your training any

23  training or education from materials obtained from

24  the American Diabetes Association?

MICHAEL JOHNSON

64

1      A.    I couldn't say where the material that

2  we're trained on comes from, no.

3      Q.    Prior to June of 2007, were you -- did you

4  receive any training from a person from the American

5  Diabetes Association who actually came down to the

6  sheriff's department to give lectures or anything

7  regarding diabetics in jail?

8      A.    No.

9            MS. REDWOOD:  Mark that, please, as

10  Number 9.

11            (At this point in the proceedings, Johnson

12            Exhibit Number 9 was marked for purposes

13            of identification.)

14  BY MS. REDWOOD:

15      Q.    I'm showing you a poster which is pretty

16  much depicted in Exhibit Number 9 except you can see

17  on the one side there's no writing on the small

18  exhibit where it has it on the poster, so I'm going

19  to ask you to please read the poster to yourself.

20      A.    Okay.

21      Q.    Have you seen this poster before?

22      A.    Not before yesterday, no.

23      Q.    Do you believe that having this poster up

24  in the booking area would be helpful to you as a

MICHAEL JOHNSON

65

1  supervisor and the correction officers in the care

2  of diabetics?

3          MR. SMITH:  Objection to form.  You can

4  answer.

5          THE WITNESS:  Sure.

6  BY MS. REDWOOD:

7     Q.   Have you seen the American Diabetes

8  Association video that discusses diabetics in arrest

9  and jail situations?

10    A.   No, ma'am.

11    Q.   Do you as a supervisor have any standing

12 orders or rules in the department about what you're

13 supposed to do if a lawyer calls you to ask you

14 about some inmate's problem at the jail?

15         MR. SMITH:  Objection to form and

16 relevance.

17         THE WITNESS:  We are instructed we don't

18 speak to lawyers per policy.  We have to pass that

19 up the chain of command and the approval of us to

20 speak to attorneys is done through the sheriff.

21         MS. REDWOOD:  I have no other questions.

22         MR. SMALL:  I just have a couple actually,

23 believe it or not.  It's surprising.

24         MR. SMITH:  It is.

MICHAEL JOHNSON

66

1                     EXAMINATION

2   BY MR. SMALL:

3       Q.   Officer Johnson, take a look real briefly

4   at Exhibit 2 if you have that in front of you.

5       A.   Yes, sir, okay.

6       Q.   The bottom portion of that, the one that

7   you wrote on June 15th at 11:29 p.m., in part, it

8   states that, "She has meds that were dropped off by

9   the arresting agency.  These are in the drawer in

10  booking."  Is that correct?

11      A.   Yes, sir.

12      Q.   Do you have any independent recall as to

13  what meds those might have been?

14      A.   No, sir.

15      Q.   You don't know whether they were pills,

16  insulin or otherwise?

17      A.   They wouldn't be insulin.  Insulin

18  wouldn't be kept in the booking drawer; it would be

19  kept in the refrigerator in the infirmary.  So, it

20  would probably be pills or it could even be

21  over-the-counter medication.  I'm not sure.

22      Q.   Do you have any independent recall,

23  thinking back to that evening, as to what those meds

24  may have been or which officer may have dropped them

67

1  off?

2       A.   No, sir, I don't.

3       Q.   Do you even remember independently at this

4  time how you got that information that, in fact, the

5  arresting agency did, in fact, drop off some sort of

6  meds for Janet Hahn, how it came to your attention

7  even?

8       A.   I'm not sure.  It's been too long ago.

9       Q.   Okay.  Was there anything about her

10  condition that night so far as you could tell that

11  led you to believe she was in immediate need of any

12  particular medical attention?

13       A.   Not when I left, no, sir.

14       Q.   Okay.  And that would be between the hours

15  of 4:00 p.m. and 12:00 midnight on June 15th of '07?

16  That was your shift?

17       A.   Yes, sir.

18            MR. SMALL:  Those are all the questions I

19  have.  Thanks.

20            THE WITNESS:  No problem, sir.

21                      EXAMINATION

22  BY MR. SMITH:

23       Q.   I have a few.  Taking a look at this

24  poster, there's warning signs that require action

MICHAEL JOHNSON

68

1    and underneath there it says hypoglycemia and

2    hyperglycemia.  You've had an opportunity to review

3    this poster, correct?

4        A.   Yes.

5        Q.   Listed below, there's some bullet points

6    for signs and symptoms of hyper and hypoglycemia,

7    correct?

8        A.   Yes.

9        Q.   Are those signs and symptoms the same or

10   very similar to the signs and symptoms that you've

11   been taught through your annual training with the

12   medical staff?

13       A.   Yes.

14       Q.   You were asked some questions about the

15   difference, if any, in the care or observation of a

16   Type I diabetic versus a Type II diabetic from a

17   correctional standpoint.  Do you recall those

18   questions being asked?

19       A.   Yes, I do.

20       Q.   And is it fair to say that -- I believe

21   your answer was that you don't look at them

22   differently just because somebody is a Type I or a

23   Type II; is that correct?

24       A.   That's correct.

69

1    Q.   And that's because you're looking for

2  signs and symptoms of medical or mental distress

3  that you've been trained to look for through your

4  annual training and other training through the

5  sheriff's department and elsewhere, correct?

6    A.   Correct.

7    Q.   You were asked some questions about when

8  to call 911.  Do you remember those questions?

9    A.   Yes.

10    Q.   And you said that you were to call in the

11  case of an emergency, correct?

12    A.   Yes.

13    Q.   That principle is much the same as if you

14  were a citizen on the street, correct?  You're not

15  to call 911 for a cat in the tree --

16    A.   Correct.

17    Q.   -- but for what is an emergency?

18    A.   Correct.

19    Q.   And that's based on your judgment as to

20  what the emergency is, correct?

21    A.   Correct.

22    Q.   So, if you see an emergency and you feel

23  it needs to be called in, you call it in?

24    A.   Yes.

70

1    Q.    And there's no policy at the Champaign

2  County Sheriff's Office prohibiting a correctional

3  officer or other line officer from calling 911

4  themselves, correct?

5    A.    No, there is not.

6        MR. SMITH:  Oh, I thought you had

7  something.

8        MR. SMALL:  No, you're doing fine.

9  BY MR. SMITH:

10    Q.    When you have a medical situation, you

11  contact the medical staff, correct?

12    A.    Yes.

13    Q.    And if the staff is in the building, you

14  can either use radio, pick up the phone, walk down

15  there and talk to them or communicate via e-mail,

16  correct?

17    A.    Correct.

18    Q.    If there's no doctor or nurse on staff,

19  you have access 24/7 to an on-call nurse, correct?

20    A.    That's correct.

21    Q.    And you were asked some questions about

22  whether or not you can call the doctor directly.

23  The protocol there is you can call the nurse and

24  then the nurse can either advise you or decide that

71

1  they need to talk to the doctor, correct?

2      A.   That's correct.

3      Q.   And, again, if this is an emergency

4  situation, you can always call 911 and have an

5  ambulance show up, correct?

6      A.   That's correct.

7      Q.   I want to talk a little bit about Janet

8  flooding the cell and the water being turned off.  I

9  believe that you testified that you passed that

10 along verbally to the next shift supervisor; is that

11 accurate?

12     A.   That's correct.

13     Q.   And you also passed that information along

14 via the pass-on -- well, strike that.  You also

15 passed along via the pass-on log that she had

16 flooded the cell, correct?

17     A.   That's correct.

18     Q.   And is it your testimony that the standard

19 practice for an inmate who floods their cell is that

20 the water is shut off?

21     A.   That's correct.

22     Q.   And the shift supervisor who came on after

23 you would have known that, correct?

24     A.   Yes.

72

1       Q.   If an inmate who is in a cell doesn't have

2    drinking water, asks for a cup of water, is it the

3    policy of the sheriff's office to provide that?

4       A.   Yes.

5       Q.   You testified regarding a number of

6    policies and procedures at the Champaign County

7    Sheriff's Office this morning.

8            Is it fair to say that these policies that

9    you're discussing, that you don't have perfect

10   recall of word for word what might be in a written

11   policy, but these are to the best of your

12   recollection?

13      A.   That's correct.

14      Q.   And you didn't work on June 18th, 2007,

15   the date of this Mental Health/Medical Special Watch

16   Sheet marked as Exhibit 7, did you?

17      A.   No, sir.

18      Q.   Have you received training from time to

19   time through the Champaign County Sheriff's Office

20   where they will send you out for training?

21      A.   Yes.

22      Q.   On June 15th, 2007, you testified that you

23   spoke to a nurse with HPL; is that correct?

24      A.   Yes, Kendra Adams.

MICHAEL JOHNSON

73

1      Q.    Kendra Adams.   And the question there, if

2  I understand correctly, is Hahn was -- Janet Hahn

3  was consenting to having her blood sugar checked but

4  didn't want to perform the test herself; is that

5  correct?

6      A.    That's correct.

7      Q.    And so you were talking to Kendra Adams

8  about Janet Hahn's situation?

9      A.    Yes.

10     Q.    You advised her of what you knew up to

11 that point?

12     A.    Yes.

13     Q.    And any signs and symptoms that you had

14 seen, if any?

15     A.    Correct.

16     Q.    And you were wanting to know whether it

17 was okay for you to essentially prick her finger to

18 draw the blood?

19     A.    Correct.

20     Q.    And that was with the caveat that you had

21 Janet Hahn's express consent to do that, correct?

22     A.    Yes, sir.

23     Q.    If someone refuses to cooperate with their

24 medical care and in your dealing with an inmate who

MICHAEL JOHNSON

74

1  has some sort of mental health issues as well, would

2  it be your practice to notify both mental health and

3  medical of that situation?

4      A.    Yes.

5      Q.    I just want to clarify this.  You

6  testified that from when you started with the

7  Champaign County Sheriff's Office that you've been

8  receiving medical training on an ongoing basis,

9  correct?

10      A.    Yes.

11      Q.    And as you sit here today, do you know

12  whether there was training prior to your employment

13  with Champaign County Sheriff's Office?

14      A.    I can't speak to that, no.

15      Q.    Okay.  So, there may have been; there may

16  not have been?  You just don't know?

17      A.    I don't know before 2000.

18          MR. SMITH:  That's all I have.

19                    EXAMINATION

20  BY MS. REDWOOD:

21      Q.    In reference to Exhibit Number 2, you

22  wrote on there that the individual, Janet Hahn,

23  needs to be seen by mental health and medical.  Why

24  is it that you wrote she needs to be seen by

MICHAEL JOHNSON

75

1  medical?

2      A.    Because of her diabetes.

3      Q.    And that was self-reported; is that

4  correct?  She reported that?

5      A.    That she was diabetic?

6      Q.    Right.

7      A.    Yes.  Sorry.

8      Q.    You testified that it's standard practice

9  to shut the water off when the cell is flooded.  Is

10 there anything different about that standard

11 practice depending on the status of the inmate?

12          MR. SMITH:  Objection to the form of the

13 question.

14          THE WITNESS:  No.

15 BY MS. REDWOOD:

16     Q.    You testified that the sheriff's office

17 sent you out for training at some times.  What

18 training, if any, were you sent out for before June

19 of 2007?

20     A.    I've been to BAC school, blood alcohol

21 monitoring, air flight armed security, PTI, been to

22 a few other classes, leadership classes and things

23 like that.  I don't have a training schedule in

24 front of me, so I can't speak to all of them.

MICHAEL JOHNSON

76

1    Q.   Okay.  Before June of 2007, were you ever

2  sent to training specifically for diabetes?

3    A.   No, ma'am.

4    Q.   Before June of 2007, were you ever sent to

5  any class that was put on by the American Diabetes

6  Association?

7    A.   No, ma'am.

8         MS. REDWOOD:  I have no other questions.

9         MR. SMALL:  None.  Thank you.

10        MR. SMITH:  I'm good.  We can go off the

11  record for a second.

12        10:54 a.m.  (At this point in the

13              proceedings, an off-the-record discussion

14              was had.)  10:54 a.m.

15        THE WITNESS:  I don't need to read it for

16  any reason.

17        MR. SMITH:  We'll show signature waived.

18     (The deposition was concluded at 10:54 a.m.)

19

20

21

22

23

24

77

1                    CERTIFICATION

2

3          I, JILL NICOLE STEVENS, Certified
Shorthand Reporter and Registered Professional
Reporter, do hereby certify that MICHAEL JOHNSON
4  came before me on SEPTEMBER 29TH, 2011, and swore
before me to testify to the truth, the whole truth
5  and nothing but the truth regarding his knowledge
touching upon the matter in controversy.

6

7          I do further certify that I did take
stenographic notes of the questions propounded to
said witness and his answers thereto and that said
8  notes were reduced to typewritten form under my
direction and supervision.

9

10         I do further certify that the attached and
foregoing is a true, correct and complete copy of my
notes and that said testimony is now herewith
11 returned.  I do further certify that said deposition
was taken at the Law Offices of Heyl, Royster,
12 Voelker & Allen, 102 East Main Street, Suite 300,
Urbana, Illinois.

13

14         I do further certify that I am not related
in any way to any of the parties involved in this
action and have no interest in the outcome thereof.
15 Dated at Villa Grove, Illinois, October 11, 2011.

16

17         _____

                 Jill Nicole Stevens, Reporter
18

19

20

21

22

23

24

MICHAEL JOHNSON

**A**

**ability** 55:16
**able** 18:5 22:16 47:2
  49:16
**access** 18:6 48:24
  49:16 70:19
**accurate** 71:11
**Accu-Chek** 14:3
**Accu-Cheks** 60:19
**action** 67:24 77:14
**Activity** 3:8 16:15
**Adams** 21:18 22:6,9
  72:24 73:1,7
**additional** 35:17
  36:13
**administrative** 42:15
  42:16,19
**Administrator** 1:4
**advise** 70:24
**advised** 45:1 61:14
  61:17 73:10
**Aegis** 3:13 58:11
**aforesaid** 13:1 21:13
  57:6
**age** 6:11
**agency** 66:9 67:5
**ago** 67:8
**agree** 63:15
**agreed** 4:4 26:19
**ahead** 54:12 57:8
  63:19
**aid** 9:7 10:18
**air** 75:21
**al** 1:8
**alcohol** 52:1 75:20
**alerted** 44:17
**Allen** 2:9 4:7 77:12
**allowed** 55:20
**aloud** 13:1 21:13 57:6
**Alyson** 21:22
**ambulance** 71:5
**American** 3:14 63:24
  64:4 65:7 76:5
**anger** 55:7
**angry** 23:4,6,7 54:24
  55:3

**annual** 10:21,22
  14:19 62:12 68:11
  69:4
**answer** 5:10,17,21
  12:2 13:4,17 14:13
  25:11 31:24 33:2
  38:3 50:23 51:2,6,7
  56:24 60:23 65:4
  68:21
**answered** 13:16
  41:13 56:23
**answering** 5:15,19
**answers** 6:1 77:7
**anybody** 33:5
**anyway** 28:8
**APPEARANCES** 2:2
**appears** 37:16
**approval** 65:19
**area** 1:19 18:19,23
  19:2 27:3,6,8 29:23
  39:16 41:4,19 42:6
  52:6 54:1 55:3
  64:24
**argumentative** 50:13
  50:15
**arm** 52:2
**armed** 75:21
**Arnold** 7:14
**arrest** 65:8
**arresting** 54:20 66:9
  67:5
**asked** 13:16 27:19
  41:13 56:23 68:14
  68:18 69:7 70:21
**asking** 5:9,11,18,19
  28:19 45:21 53:20
  61:7
**asks** 72:2
**assisted** 50:8
**associated** 14:9
**Association** 3:14
  63:24 64:5 65:8
  76:6
**assume** 5:17 20:4
**assumes** 60:22
**ate** 43:5

**attached** 77:9
**attack** 55:22 56:8
**attention** 40:24 67:6
  67:12
**attorneys** 2:4,9,14
  7:22 65:20
**Audrey** 21:22
**authored** 16:22 17:14
**authority** 46:14
**authorization** 37:11
**authorize** 61:11
**available** 17:13 18:1
  47:9
**Avenue** 2:15
**aware** 48:2,8 56:6
  61:2
**a.m** 1:15 5:1 76:12,14
  76:18

**B**

**B** 10:1
**BAC** 75:20
**back** 21:11 28:2
  40:24 57:4 66:23
**badge** 8:8 31:12
  35:11 37:18 45:12
**bandage** 23:8,11,12
  23:17,18
**bandages** 23:13,15
**based** 60:10 69:19
**basic** 9:7 10:1,2,18
**basis** 12:21 74:8
**Bates** 16:14 20:16
  24:2 28:16 29:3
  31:7 37:1 38:20
  58:9
**Bates-stamped** 28:20
**behavior** 51:21
**behaviors** 54:9
**believe** 10:15 12:13
  19:23 25:4 35:24
  40:13 48:21 49:10
  56:17 57:9 64:23
  65:23 67:11 68:20
  71:9
**benefit** 20:4
**best** 17:2 26:16 72:11

**bit** 71:7
**blanket** 18:21
**bleeding** 55:23,24
**Block** 29:15 30:17
**blood** 3:10 12:3 13:23
  14:2 22:14,15,17,21
  22:24 23:2 26:14,16
  26:22 31:8,17,21
  32:4,9,17,19,21
  33:6,8,15,17 34:6,7
  34:13,17 55:1 61:20
  73:3,18 75:20
**board** 52:18,21,24
  53:18,19
**booked** 24:17 25:19
  48:12,15
**booking** 3:12 18:19
  18:23 27:2,6,7
  29:20,23 38:22
  39:15 41:3,19 42:6
  52:5,18,21 53:6,17
  53:19 54:1 55:3
  64:24 66:10,18
**bottom** 37:11,20
  61:10 66:6
**box** 2:5 34:13
**branch** 8:18
**break** 5:15 6:4,5,7
**breakfast** 32:15
**Brian** 2:8 7:18
**briefing** 17:15
**briefings** 17:17
**briefly** 66:3
**broke** 26:21
**brought** 25:18 27:13
**bsmith@heylroyst...**
  2:11
**building** 70:13
**bullet** 68:5

**C**

**call** 13:10,12 19:6
  22:8 27:9 35:21,22
  36:2 40:24 47:2,10
  47:15 55:16,20
  57:13 69:8,10,15,23
  70:22,23 71:4

**called** 22:19 26:21
  27:12 47:6 69:23
**calling** 4:13 70:3
**calls** 63:18 65:13
**capacity** 24:9 55:14
**carbon** 21:21
**card** 44:22 53:9
**cards** 52:22
**care** 6:22 11:3 14:9
  14:22 16:2 26:3
  65:1 68:15 73:24
**caretaker** 7:2
**case** 5:7 13:12 69:11
**cast** 52:2
**cat** 69:15
**causing** 55:3
**caveat** 73:20
**CCSO** 3:12
**cell** 19:9,11,14 29:15
  29:20,22,23 30:17
  30:18,21 43:16 44:7
  44:8,16,18,21 45:18
  46:17,23 50:9,10
  52:23 71:8,16,19
  72:1 75:9
**Center** 36:24
**CENTRAL** 1:1
**CERTIFICATION**
  77:1
**Certified** 77:2
**certify** 77:3,6,9,11,13
**chain** 65:19
**challenged** 60:20
**Champaign** 1:20 2:7
  2:15 8:1,14 9:13
  11:6,11,16 12:10,19
  13:9,20 14:7 15:4,9
  15:23 34:22 36:7,24
  38:21 48:3,10 56:14
  58:10 60:15 62:7
  63:5,10 70:1 72:6
  72:19 74:7,13
**charge** 55:11,15
**check** 22:15 26:20,22
  32:18 33:5
**checked** 14:3 73:3

**checking** 22:14
**checks** 33:8
**circumstances** 55:19
**citizen** 69:14
**City** 2:12
**Clair** 10:10
**clarify** 74:5
**class** 76:5
**classes** 75:22,22
**classification** 42:16
**cleanup** 19:6
**close** 6:17
**cocaine** 56:8
**code** 30:7,10
**collapsed** 56:7
**column** 37:15 41:11
**coma** 62:10,16
**come** 41:3 59:5
**comes** 64:2
**command** 65:19
**commanding** 51:1
**comments** 38:1 40:6
**commit** 63:15
**commotion** 55:4
**communicate** 70:15
**communicating** 50:4
**communications** 9:1
**comp** 20:5
**complete** 77:10
**computer** 16:21 18:2
  18:6 35:10 39:8
  58:12,16
**computer-generated**
  48:23
**concerns** 47:12,14
**concluded** 76:18
**condition** 49:2 67:10
**Conferencing** 1:19
**confusing** 5:11,23 6:2
  48:6
**consciousness** 11:10
  11:14 12:17
**consent** 73:21
**consenting** 73:3
**consultation** 7:16
**contact** 33:22 70:11

**continue** 10:24
**CONTINUED** 3:1
**contractor** 8:15 9:9
**controversy** 77:5
**conversation** 26:18
  26:18 30:19
**conversations** 49:21
  49:23 54:4
**convey** 43:23
**convince** 22:16
**convinced** 50:9
**cooperate** 14:22 16:1
  73:23
**cooperating** 26:2
**cooperative** 50:13
**copy** 21:21 77:10
**Corps** 8:19
**correct** 17:1 18:12
  21:20 29:16 51:19
  52:11 58:19,20
  66:10 68:3,7,23,24
  69:5,6,11,14,16,18
  69:20,21 70:4,11,16
  70:17,19,20 71:1,2
  71:5,6,12,16,17,21
  71:23 72:13,23 73:5
  73:6,15,19,21 74:9
  75:4 77:10
**correction** 10:7 33:13
  34:1,4 49:24 50:18
  57:20,21 62:23 65:1
**correctional** 8:6
  36:24 68:17 70:2
**corrections** 24:7,11
**correctly** 36:1 73:2
**counsel** 6:6
**County** 2:7 8:1,14
  9:13 10:10 11:6,11
  11:16 12:10,19 13:9
  13:20 14:8 15:4,9
  15:23 34:23 36:7,24
  38:21 48:3,10 56:14
  58:10 60:15 62:7
  63:5,10 70:2 72:6
  72:19 74:7,13
**couple** 37:17 47:19

  65:22
**Court** 1:1 4:9,13 13:1
  21:13 57:6
**co-defendants** 42:14
**cramping** 11:14
**create** 39:8
**created** 39:8
**crew** 19:6
**cross** 39:5,9
**crossed** 39:2
**CSR** 1:18
**cup** 72:2
**custody** 30:11 42:12
**cut** 23:10

**D**
**daily** 12:21
**Dan** 2:7
**DANIEL** 1:8
**database** 49:6,11
**date** 16:16 17:18,20
  24:19 37:11,15 39:1
  39:8,9 48:10 50:19
  72:15
**dated** 17:23 38:23
  77:15
**dates** 8:20 9:19 25:3
  37:14
**day** 12:4 17:21 19:22
  20:1 32:10 39:11
**days** 20:6 47:19
**deal** 14:16 15:10
**dealing** 15:16 25:12
  73:24
**dealt** 15:13
**death** 56:15 57:11
**Deceased** 1:5
**decide** 70:24
**deep** 19:4
**Defendants** 1:9 2:7
  2:12
**deficiency** 54:10
**deficient** 59:1,18,24
  60:4,8
**definition** 12:9
**department** 7:22 8:5
  9:17 10:5,24 11:3

13:10 24:10 62:7 64:6 65:12 69:5
**depending** 12:17 75:11
**depicted** 64:16
**deposition** 1:14 4:5 6:5,8 7:10,13,14,17 76:18 77:11
**depositions** 4:10 5:8
**describe** 11:7,12,17 12:11,20 13:21
**DESCRIPTION** 3:7
**detainee** 59:1,17 60:4 60:8
**determination** 60:3,4 60:7,17
**determine** 51:10
**develop** 47:18
**device** 33:21
**diabetes** 3:14 7:3,5 26:2 29:18 53:15 63:11,16,24 64:5 65:7 75:2 76:2,5
**diabetic** 6:15,18 11:8 11:13,18,19,23 12:12,20 13:5,11,14 13:22 14:1 26:7 31:22 32:20 33:7 47:18,20 54:1 57:21 57:23 60:17 62:9,16 68:16,16 75:5
**diabetics** 6:23 11:4 32:9 64:7 65:2,8
**diary** 7:20
**die** 47:19
**died** 56:7
**difference** 11:17 68:15
**differences** 11:18 57:19
**different** 19:24 28:8 35:6 38:5 51:16 52:3 75:10
**differentiate** 62:9,15
**differently** 68:22
**digits** 8:11

**dinner** 32:15
**direction** 77:8
**directly** 47:3 70:22
**disabilities** 14:11,18 15:6,11
**disciplinary** 42:11,18
**discussed** 34:16 57:16
**discusses** 65:8
**discussing** 72:9
**discussion** 7:15 76:13
**discussions** 57:12
**disoriented** 11:9
**distress** 12:15 69:2
**DISTRICT** 1:1,1
**DIVISION** 1:2
**dizziness** 12:16
**dizzy** 11:9
**doctor** 26:9 47:3,4,6 47:10 62:18 70:18 70:22 71:1
**doctor's** 47:8
**document** 16:13,17 16:19,23 20:15 24:1 28:16 29:7 30:17 31:6,10,13 34:8 36:22 37:7 38:19 46:20,22 58:8,12,15 58:21,22
**documentation** 53:24
**documented** 34:1,24 46:1 52:5
**documenting** 32:17
**documents** 8:10 45:22,24 60:16
**doing** 63:2 70:8
**draw** 73:18
**drawer** 66:9,18
**drink** 45:3
**drinking** 43:21 72:2
**drop** 67:5
**dropped** 66:8,24
**drug** 40:11,14,17 52:1
**due** 23:11
**duly** 5:3

**duties** 8:22
**duty** 22:7 32:18

**E**

**earlier** 32:9 54:23
**East** 2:10,15 4:7 77:12
**eat** 13:6,22
**education** 63:23
**either** 7:21 14:6 22:2 34:15,16 41:10 48:23 52:24 60:19 70:14,24
**emergency** 12:12 13:13,15 55:21 60:18 69:11,17,20 69:22 71:3
**employed** 7:24 8:2,13
**employees** 57:13
**employment** 9:3,9 10:7 74:12
**EMT** 9:18,20,23 10:3
**encountered** 35:7
**Enemies** 42:14
**entailed** 15:20
**enter** 29:8 30:13
**entered** 29:1,5
**entering** 40:1,16,21
**entry** 16:20
**ERIK** 1:4
**error** 33:15,21,24 34:18
**escalate** 13:23
**essentially** 73:17
**Estate** 1:4
**et** 1:8
**evaluations** 49:12
**evening** 66:23
**eventually** 50:9
**evidence** 60:22
**exactly** 62:22
**EXAMINATION** 3:3 5:4 66:1 67:21 74:19
**exhibit** 16:10,14 20:12,16 21:6 23:22 24:2 28:1,11,14,15

31:3,7 34:2 36:19 36:23 38:16,20 40:18,22 41:1 45:10 52:9 53:6 58:5,9 60:13,13,13 64:12 64:16,18 66:4 72:16 74:21
**exhibits** 3:7 45:17
**explain** 43:14
**explained** 26:15
**express** 73:21
**EXPRESSLY** 4:3
**extensively** 22:16
**e-mail** 3:9 14:6 18:16 18:16 20:21 21:1,5 23:8 24:3,10,14,18 70:15
**e-mails** 3:9 20:17 60:14

**F**

**face** 22:2,2
**facility** 19:24 35:21
**fact** 55:8 67:4,5
**facts** 60:22
**fails** 14:2
**fair** 68:20 72:8
**falls** 17:18
**family** 6:17
**far** 23:19 25:24 67:10
**Federal** 4:9,9
**feel** 69:22
**felt** 35:17 55:17
**female** 50:7
**file** 48:22,23,23 49:4
**filled** 59:14
**fine** 9:20 70:8
**finger** 22:20 73:17
**fingerprints** 48:19
**finish** 5:20
**fire** 9:17 10:4
**first** 5:3 9:7 10:18,18 10:23 25:13 29:2 30:16 37:16
**flags** 53:8
**flat** 34:6
**flight** 75:21

**flooded** 18:19 19:2
  29:23 44:7 46:17,18
  71:16 75:9
**flooding** 19:8 45:4
  71:8
**floods** 71:19
**floor** 17:11
**flush** 45:3
**follow** 14:1
**follows** 5:3
**follow-up** 10:19
**food** 43:9,12 47:20
**force** 22:19
**foregoing** 77:10
**form** 14:12 15:17
  19:10 25:10 27:11
  27:20 29:9 30:14
  32:24 33:10 34:1,9
  36:9 38:2 40:2
  46:15 47:21 54:11
  59:6,19 60:21 61:6
  61:10 63:12,18 65:3
  65:15 75:12 77:8
**format** 37:1 38:23
**forms** 39:6 59:14
**foundation** 12:1 13:3
  31:23 33:9,10,19
  41:5 47:5 54:11
  59:7 60:22 62:11
**Fran** 21:18
**FREEMAN** 2:14
**Friday** 20:22
**friend** 6:18
**front** 45:17,22,24
  66:4 75:24
**further** 4:12 23:16
  45:4 63:2 77:6,9,11
  77:13
**future** 17:20
**F-1** 30:17,17 50:9

**G**
**gauze** 23:19
**gauze-type** 23:17
**generally** 8:24 32:12
**getting** 14:21 45:11
  55:1 60:19

**give** 43:20 62:8 64:6
**given** 33:6
**go** 28:8 54:12 57:8
  63:19 76:10
**going** 15:1 40:10,14
  60:18 64:18
**good** 76:10
**gotten** 15:1 59:16
**governing** 4:10
**gown** 18:20 30:22
  37:12,21 38:1 50:10
  51:14,17,20 52:16
  53:8 63:3
**Gown/Drug** 40:7
**grandmother** 6:21,24
  7:3,6
**green** 18:20,20 37:12
  37:21 38:1 40:7
  50:10 51:14,17,20
  52:16 53:8,8 63:3
**Greg** 21:21
**Grove** 77:15
**guarantee** 37:17
**guess** 9:22
**guidance** 35:18

**H**
**Hahn** 1:4,5 7:21 17:6
  18:19 21:7 22:11,13
  22:14,23 24:17,21
  25:8,19 26:6 27:10
  27:13 28:22 29:17
  29:22 30:18 31:9
  36:4 37:4 39:13,22
  40:10,14 41:17,22
  43:5,14,21,23 44:7
  48:2,9,12,15 49:22
  49:23 50:3,17 53:10
  54:1,4,7,9,18,24
  55:2 58:16 61:3,15
  61:20,23 62:3,22
  67:6 73:2,2 74:22
**Hahn's** 39:19 44:16
  44:16 45:18 46:7,12
  48:18 49:1 54:8
  73:8,21
**hand** 23:10

**handed** 16:13 20:15
  24:1 28:14 31:6
  36:22 38:19 58:8
**handwriting** 37:6,9
**happen** 13:21
**happening** 44:3
**happens** 51:12
**happy** 5:13
**harm** 23:12,16 63:2
**health** 14:19,24 15:4
  15:10,16 16:6 17:5
  21:3,7,23 38:8
  42:22 49:12,17 51:7
  54:18 63:8 74:1,2
  74:23
**Health/Medical** 3:12
  38:22 39:15 52:8
  72:15
**hear** 62:2
**heard** 12:8
**heart** 55:22 56:8
**held** 8:4
**helpful** 64:24
**herewith** 77:10
**Heyl** 2:9 4:6 77:11
**higher** 46:14
**History** 3:10 28:17
**honestly** 15:19
**hours** 31:20 67:14
**housed** 29:14,17
  30:18 41:23 42:6
**housing** 3:10 28:17
  29:8,10 52:22
**Howard** 2:13
**HPL** 2:8 47:3 57:12
  62:18 72:23
**huh-uhs** 6:2
**hws@smallandfree...**
  2:16
**hydrated** 13:7
**hyper** 12:18 68:6
**hyperglycemia** 11:13
  68:2
**hypo** 12:18
**hypoglycemia** 11:8
  68:1,6

**H-5** 29:15,15,20,22
  50:9

**I**
**identification** 16:11
  20:13 23:23 28:12
  31:4 36:20 38:17
  58:6 64:13
**identified** 51:23
**identifies** 53:2
**identify** 63:11
**identifying** 41:11
**IDOC** 30:3,8
**II** 11:18,20 57:22
  68:16,23
**Illinois** 1:1,14,20 2:5
  2:10,15 4:8 77:12
  77:15
**immediate** 67:11
**immediately** 51:9
**impeachment** 4:14
**implemented** 56:14
  56:18,22
**important** 5:20
**incarcerated** 25:2
  48:2,9
**incarceration** 25:9,13
**incarcerations** 24:23
  49:2
**incident** 56:19,22
**include** 10:13 14:8,20
  36:13 42:20,22
  62:14 63:6
**included** 10:17
**includes** 60:14
**independent** 66:12
  66:22
**independently** 67:3
**INDEX** 2:1 3:1
**indicate** 51:18
**indicated** 21:1 54:9
**indication** 44:2
**individual** 52:23
  74:22
**individuals** 22:3
**infirmary** 66:19
**information** 16:23

17:5,9,12 29:2,6,9
30:13 37:24 40:1,9
40:17,21 45:11,18
46:6,6,10,13 48:17
49:1,12 59:4,17
60:10 61:4,8,12
62:8 67:4 71:13
**informing** 47:18
**initial** 10:9 50:8,22
**initials** 31:12 41:2,10
**inmate** 3:10 15:24
17:5 27:19 28:17
32:20 33:7 34:5,6
34:17 36:4 41:18
42:1,5,10 43:1 47:3
47:13 51:5,12,23
52:4,14,24 53:3
55:16,20,22 59:5,11
59:21 60:17 61:7
62:21,24 63:1 71:19
72:1 73:24 75:11
**inmates** 14:10 22:19
23:13 31:22 45:2
46:18 54:5
**inmate's** 49:16 65:14
**input** 39:24 40:16,21
**instructed** 65:17
**insulin** 3:10 11:23
13:6 31:8 32:19
33:6,17 47:20 66:16
66:17,17
**insulin-dependent**
11:20,22
**intake** 27:12,18,21
40:23 49:6 50:8,22
51:6 58:23 59:5,10
59:13 60:2,5,8 61:6
61:18
**intellectual** 14:17
**interacting** 50:18
**interaction** 50:16
**interactions** 49:24
54:4,7
**interest** 26:16 77:14
**intoxication** 56:8
**involved** 9:1 77:14

**in-house** 8:10
**issue** 35:12
**issues** 15:10,13,16
42:12,13,20,23 74:1
**items** 23:13

**J**

**jail** 8:10 23:5 24:17
25:21 26:13 41:10
41:24 42:14 46:13
47:2 48:3,10 49:13
54:21 55:7 56:7
62:18 64:7 65:9,14
**jail's** 13:24
**Janet** 1:5 7:20 17:6
18:19 21:7 22:23
24:17,21 25:8,19
26:5 27:10 28:22
29:17,22 30:18 31:9
36:4 37:4 39:13,19
39:21 40:10,14
41:17,22 43:5,14,21
43:23 44:6,16,16
45:18 46:6,11 48:2
48:9,12,15,18 49:1
49:22,23 50:3,9,12
50:17 53:10 54:1,3
54:7,8,9,18,24 55:2
58:16 61:3,15,20,23
62:3,22 67:6 71:7
73:2,8,21 74:22
**January** 8:21,21
**JDC** 58:10
**Jennifer** 21:21
**Jerrolds** 21:22
**Jill** 1:18 77:2,17
**job** 33:5 60:15
**Johnson** 1:14 4:5 5:2
6:10 16:9 20:11,22
23:21 28:10 31:2
36:18 38:15 58:4
64:11 66:3 77:3
**Joseph** 2:5
**jot** 35:12
**Jude** 2:3 5:6
**judgment** 69:19
**June** 15:1,3,8,15,22

16:16,20 18:5,5,5,8
19:18,20 20:7,22
21:8 22:1 24:16,22
25:20 26:6,24 32:18
33:4,13 34:5,14
35:4,15,15 36:2
39:12,14 40:9,13,20
41:9,22 42:4,9 43:6
43:15,20,23 44:15
46:21 47:1,16 48:1
48:8,13,19,22 49:22
50:1 53:11,12 54:3
54:18 55:9,19 57:19
61:2,14 62:8,19,22
64:3 66:7 67:15
72:14,22 75:18 76:1
76:4

**K**

**keep** 50:10 52:22
**Keith** 7:18
**Kendra** 21:18 22:6,9
72:24 73:1,7
**kept** 66:18,19
**ketoacidosis** 12:7
47:19
**kind** 7:20 8:22 9:5,8
9:15 10:16 14:16
25:7 36:6 44:20
49:4 55:2 59:16
60:17 62:14
**knew** 25:22 73:10
**know** 5:12 6:6 9:23
10:16 12:6,8 19:4
20:3,5 23:14 25:1,3
25:18 26:1,15 41:6
43:11 51:10,11 52:2
52:6,19 55:6 56:2
59:4 66:15 73:16
74:11,16,17
**knowing** 45:16
**knowledge** 30:9
40:15 77:5
**known** 71:23

**L**

**labeled** 16:14 24:2

28:15 31:6 34:2
36:23 38:20 58:9
**lapse** 10:3
**Larry** 56:1,6
**Larry's** 56:15 57:11
**Law** 2:4,4,9,14,14 4:6
77:11
**lawyer** 65:13
**lawyers** 65:18
**leadership** 75:22
**learned** 6:22
**lectures** 64:6
**led** 67:11
**left** 23:10 55:5 67:13
**left-hand** 37:15
**Let's** 20:10 28:8 58:1
**level** 9:23 10:18
37:12,21,22 38:1,6
38:6,6 39:22
**levels** 38:5
**Lewis** 50:5,7,14,17
**license** 10:2
**licensed** 9:18,19,24
**lieutenant** 8:7 35:24
36:3 55:13
**line** 31:16 37:10 61:9
70:3
**listed** 52:23 68:5
**Listing** 3:13 58:11
**litigation** 28:8
**little** 48:6 54:13 71:7
**location** 37:10
**log** 3:8,11 16:15,21
18:16,17,18 36:24
37:3 41:1,3,17,18
41:22 42:1,5,10
43:3 44:6,11,13
46:16 71:15
**logbook** 35:10
**long** 8:2 19:14 67:8
**longer** 10:4
**look** 18:2 30:16 49:17
60:12,16 63:6 66:3
67:23 68:21 69:3
**looking** 62:23 69:1
**looks** 45:9

**loss** 11:9,14 12:17
**lot** 28:7
**loud** 6:1
**LOUISE** 1:5

**M**

**M** 2:8
**machine** 34:18
**mad** 55:7,8
**Main** 2:10 4:7 77:12
**Maintenance** 3:8
   16:16
**making** 23:11 63:1
**Marine** 8:19
**marital** 6:13
**mark** 20:10 27:23
   30:24 36:16 38:11
   58:1 64:9
**marked** 16:10 20:12
   20:16,16 23:22 24:2
   28:11 29:2 30:2,10
   31:3 36:19 37:1
   38:16,20 53:17 58:5
   58:9 59:2 64:12
   72:16
**marking** 32:16
**Married** 6:14
**material** 64:1
**materials** 63:23
**Mathews** 7:14
**matter** 77:5
**ma'am** 6:16 8:17
   9:10 10:12 16:18,24
   17:3 18:22 19:19,21
   20:9,24 21:15,24
   23:1 24:8,20,24
   25:6 26:8 27:17,22
   29:21,24 30:5,15,20
   30:23 31:11,14,19
   32:11 35:3,14,19
   36:5,15 37:2,5
   38:10,24 39:4,17,23
   40:8 42:3,21,24
   44:9,19,24 45:13,15
   46:3,9,24 47:11
   52:12,20 55:18
   56:11 58:14 61:22

62:1,5,20 65:10
   76:3,7
**meal** 43:5,8,12
**meals** 13:22 43:1
   60:19 63:16
**mean** 30:6 34:11
   37:21 42:13 51:15
**means** 30:7 37:23
   42:17 51:20
**Med** 39:22
**medical** 9:2,5,8,12,15
   10:13,16,21,22 14:3
   14:4,5,7,10,22 16:2
   33:11,22 36:13
   42:20 47:12,14,17
   49:1 51:8 52:2
   53:10 60:24 61:3,7
   61:10,12 63:4,6,17
   67:12 68:12 69:2
   70:10,11 73:24 74:3
   74:8,23 75:1
**medication** 11:21
   22:19 66:21
**meds** 66:8,13,23 67:6
**meetings** 57:12
**member** 6:17
**menstrual** 43:24
**mental** 3:12 12:15
   14:10,11,17,19,21
   14:24 15:4,5,10,11
   15:16 16:1,6 17:5
   21:2,7,23 38:8,21
   39:14 42:22 49:12
   49:17 51:7 52:8
   54:10,18 61:10 63:8
   69:2 72:15 74:1,2
   74:23
**mentally** 59:1,17,23
   60:4,8,20
**mention** 5:14
**mentioned** 18:15,18
   25:23
**Michael** 1:14 4:5 5:2
   6:10 20:22 77:3
**midnight** 39:7 67:15
**military** 8:16,23 9:3

**moments** 20:18 24:4
**monitor** 11:3 57:20
   57:22
**monitoring** 75:21
**morning** 32:14 72:7
**Morris** 21:22
**moving** 50:8

**N**

**naked** 50:11
**name** 5:6 6:9 20:17
   24:21 25:17,18
   37:10 39:19 53:1
   56:1
**named** 31:9 37:4
**nature** 55:4
**necessary** 45:3 55:17
**necessity** 4:13
**neck** 23:14
**need** 6:4 11:23 13:5,6
   13:7 67:11 71:1
   76:15
**needed** 35:17 47:3,10
   49:17
**needs** 12:21 69:23
   74:23,24
**never** 47:6
**new** 17:21 49:5,8,11
   56:18,21
**Nicholas** 21:22
**Nicole** 1:18 77:2,17
**night** 32:15 55:6
   67:10
**normal** 32:3 54:14
   62:9,12
**notations** 7:20
**note** 27:24
**notebook** 35:10
**notes** 7:8,19,19 77:7
   77:8,10
**notice** 54:8,14
**notified** 21:2,7 54:18
**notify** 74:2
**number** 8:8 16:8,10
   16:14 20:10,12
   23:20,22 28:11,15
   29:3 31:1,3,7,12

34:16,18 35:11
   36:17,19,23 37:18
   38:12,13,14,16 39:2
   39:5 40:18 41:1,11
   45:12 47:9 53:6
   58:5,9,24 60:13,13
   60:14 64:10,12,16
   72:5 74:21
**numerous** 51:24
**nurse** 22:19 26:21
   41:12 47:15 70:18
   70:19,23,24 72:23
**nurses** 21:19 41:2,10

**O**

**oath** 5:10
**Objection** 12:1 13:3
   14:12 15:17 19:10
   25:10 27:11 31:23
   32:24 33:9,19 36:9
   38:2 40:2 41:5,13
   46:15 47:5,21 49:18
   54:11 56:3,10,16,23
   57:15 59:6,19 60:21
   62:11 63:12,18 65:3
   65:15 75:12
**objections** 57:8
**observation** 68:15
**observe** 49:23 50:3,6
   50:17,21 54:3
**observed** 50:12
**obtained** 63:23
**occurred** 18:24
**October** 77:15
**offer** 43:8
**offered** 22:20 43:12
**office** 2:4 8:1,14 9:13
   10:5,20 11:7,12,17
   12:11,20 13:21 14:8
   15:5,9,23 27:2,7
   34:23 36:7 38:21
   47:17 56:14 60:16
   63:5,10 70:2 72:3,7
   72:19 74:7,13 75:16
**officer** 8:6 10:7 18:4
   27:9 29:10 33:16
   34:1,8,18,20 35:11

35:16 36:3 40:23
50:5,7,7,14,17,18
50:20,22,24 51:1,5
54:21 58:23 59:5,11
59:13 60:5,9 61:18
62:2 66:3,24 70:3,3
**officers** 17:10,13
33:14 34:4,14 35:6
44:17 45:1 49:24
52:6 57:20,22 62:23
65:1
**Offices** 2:14 4:6
77:11
**off-the-record** 76:13
**Oh** 12:3 27:24 28:3
57:1 70:6
**okay** 9:23 10:2 17:16
17:22 18:4,18 20:20
22:21,23 23:20 24:6
25:4,15,19 26:1
27:9,23 28:6 29:1
33:4 39:12 42:19
45:5 51:15,17 52:4
52:10 55:14 57:2
58:18 59:23 60:3,12
63:9 64:20 66:5
67:9,14 73:17 74:15
76:1
**once** 5:22 53:1
**ongoing** 57:17 74:8
**on-call** 47:15 70:19
**on-the-job** 36:10
**opinion** 63:19
**opportunity** 68:2
**opposed** 57:21
**oral** 11:21
**ordered** 14:3
**orders** 65:12
**ordinary** 54:15
**outcome** 77:14
**over-the-counter**
66:21

**P**

**page** 3:3,7 28:20 29:2
29:12 30:16
**Pale** 11:9

**paleness** 12:16
**paper** 48:23
**part** 21:6 57:16 66:7
**particular** 28:18,21
32:20 67:12
**parties** 4:4 77:14
**pass** 44:7 45:5 46:13
65:18
**passed** 17:4 44:6,11
45:19 46:5,7 71:9
71:13,15
**passing** 46:10
**pass-on** 16:20 18:16
18:17,18 44:5,10,13
46:16 71:14,15
**patient** 31:9
**PATRICK** 1:4
**people** 5:22 14:17,21
15:11 25:17,21,22
54:14
**perfect** 72:9
**perform** 73:4
**period** 43:24
**periodically** 45:2
**permanent** 18:3 49:5
**permission** 26:22
**person** 7:16 16:22
20:23 27:19 29:1,5
30:7 35:20 37:14
40:20 52:6 63:15
64:4
**personal** 7:19
**personally** 22:2 43:10
61:19
**personnel** 61:12
**persons** 7:16 40:20
**phone** 47:8 70:14
**photograph** 48:18
**photos** 53:19
**physical** 12:15
**pick** 70:14
**picture** 53:1
**pills** 66:15,20
**place** 34:22 35:5
44:15 46:20 47:8
49:15

**placed** 37:12 51:9,12
51:14 52:4,11,15
**Plaintiffs** 1:6 2:3 5:7
**please** 6:8 16:8 20:18
21:9 23:20 24:4
27:23 31:1 36:16
38:11 39:14 57:4
60:12 64:9,19
**point** 12:24 16:9
20:11 21:12 23:21
28:7,10 31:2 36:18
38:15 57:5 58:4
64:11 73:11 76:12
**points** 68:5
**Police** 2:13
**policies** 56:13,18,21
72:6,8
**policy** 41:7,9,14,24
42:4 44:20 47:1
51:4 65:18 70:1
72:3,11
**portion** 63:8 66:6
**positions** 8:4
**postdated** 17:20
**poster** 64:15,18,19,21
64:23 67:24 68:3
**Post-It** 53:8
**practice** 46:17 71:19
74:2 75:8,11
**precautions** 37:22
**preparation** 7:17
**prepare** 7:9
**prepared** 58:19,21
**present** 23:6
**pretty** 8:24 64:15
**prevent** 45:4
**previous** 24:22 25:8
49:2,6
**previously** 22:18 25:1
**prick** 73:17
**principle** 69:13
**print** 17:21,24
**printed** 39:6
**prior** 15:1,3,8 47:16
48:10 64:3 74:12
**prisoner** 37:4 41:4

**probably** 66:20
**problem** 25:23 35:12
65:14 67:20
**problems** 14:9 25:7
34:16 35:6,17 55:2
**procedure** 4:10 14:1
33:16 46:12 51:4
**procedures** 56:13
72:6
**proceedings** 12:24
16:9 20:11 21:12
23:21 28:10 31:2
36:18 38:15 57:5
58:4 64:11 76:13
**processed** 53:1
**professional** 38:9
77:3
**professionals** 16:7
**profusely** 55:23
**program** 35:10
**prohibiting** 70:2
**proper** 32:21 33:16
47:20
**propounded** 77:7
**protective** 42:11
**protocol** 70:23
**provide** 72:3
**provided** 52:9 62:6
**PTI** 10:11 75:21
**Public** 3:13 58:11
**purports** 16:15 20:17
24:3 28:17 31:8
38:20 58:10
**purpose** 63:3
**purposes** 4:14 16:10
20:12 23:22 28:11
31:3 36:19 38:16
58:5 64:12
**pursuant** 4:8
**put** 27:20 37:24
39:10 41:2,10 44:22
45:22 53:8 62:21
76:5
**p.m** 20:23 66:7 67:15
**P.O** 2:5

**Q**

**Quentin** 56:1,6,15
  57:11
**question** 5:10,15,17
  5:18,19,21 12:23
  13:2 14:13 15:2,18
  21:9,14 38:3 40:3
  48:5 53:20 57:3,7
  59:11,20 61:6 73:1
  75:13
**Questionnaire** 3:13
  58:11
**questions** 5:9,14
  27:20 50:23 51:2,6
  51:8,8 60:1 65:21
  67:18 68:14,18 69:7
  69:8 70:21 76:8
  77:7
**quick** 60:6
**quickly** 5:8

**R**
**radio** 70:14
**ran** 34:15
**read** 7:8,12 13:1
  20:18 21:10,13 24:4
  33:15 34:6,7 57:4,6
  64:19 76:15
**reading** 31:17 33:15
  33:21,24 55:1
**readings** 31:21 32:4
**real** 60:6 66:3
**realized** 24:16
**really** 11:15
**reason** 30:1 39:21
  40:1 41:21 43:2
  44:21 54:17 76:16
**reasons** 42:8 54:17
**recall** 14:23 15:7,12
  15:14,19 19:3,16
  23:19 24:13,18
  25:12 26:4,17,18
  36:1 39:18,20 41:14
  43:5,19 44:14 45:9
  47:22 53:22 54:2
  56:21 58:15 62:17
  63:13 66:12,22
  68:17 72:10

**receive** 10:6 36:6
  64:4
**received** 17:8 24:14
  63:5,22 72:18
**receiving** 74:8
**recognize** 13:15 15:5
  16:17 31:10 37:1,6
  38:23
**recollection** 17:2
  72:12
**record** 5:23 6:2 18:3
  76:11
**records** 49:16
**Red** 11:14
**redness** 12:17
**reduced** 77:8
**Redwood** 1:4 2:3,4
  3:4,5 5:5,6 12:5
  13:8,19 14:15 15:21
  16:8,12 19:13 20:10
  20:14 21:10,16
  23:20,24 25:14
  27:14,23 28:6,13,21
  28:24 30:24 31:5
  32:3 33:3,12,23
  36:11,16,21 38:7,11
  38:14,18 40:5 41:8
  41:15 45:23 46:19
  47:7,24 48:6,7
  49:20 54:16 56:5,12
  56:20 57:4,10,18
  58:1,3,7 59:9,22
  61:1 62:13 63:14,21
  64:9,14 65:6,21
  74:20 75:15 76:8
**redwoodlaw42@h...**
  2:6
**reference** 74:21
**refrigerator** 66:19
**refusal** 34:8,17
**refuse** 51:7
**refused** 34:7,12 50:23
  51:1 61:3,15
**refuses** 13:22 14:2
  16:1 43:1 51:6
  73:23

**refusing** 22:14 60:18
  63:16,16
**regard** 33:17 36:4
**regarding** 11:3 64:7
  72:5 77:5
**regards** 7:3 9:9 15:9
**regimen** 47:20
**Registered** 77:3
**regular** 7:2 19:22
**related** 14:8 77:13
**relationship** 6:23
**release** 30:1,7,10
  61:11,21 62:3
**releases** 61:3,7,24
**relevance** 49:18 56:3
  56:10,16,24 57:15
  65:16
**remain** 19:14
**remember** 24:22 25:8
  26:11 67:3 69:8
**remembered** 25:15
  25:17
**removed** 23:9,11,12
**repeat** 12:22 21:9
  48:4 57:3 60:6
**rephrase** 5:12 15:2
**report** 3:10 14:4,5
  28:17,18,21 34:19
  34:24 35:2,17 50:24
**reported** 16:6 75:4
**reporter** 4:13 5:22
  13:1 21:13 57:6
  77:3,3,17
**Reporting** 1:19
**reports** 7:8 35:5
**represent** 5:6
**require** 67:24
**required** 33:8 41:2
  46:22 47:13 57:20
**respond** 43:18
**responder** 10:18
**responsibility** 55:16
**result** 19:8
**retardation** 14:10,21
  16:1
**retarded** 54:10

**returned** 77:11
**review** 68:2
**right** 32:6,21 42:20
  51:22 53:5,13,21
  75:6
**risk** 37:23
**Royster** 2:9 4:7 77:11
**rules** 4:8,9 5:7 65:12
**run** 5:8,14

**S**
**Safety** 3:13 58:11
**Sanders** 35:24 36:3
**saw** 24:21,21 28:5
**saying** 26:12
**says** 20:21 21:17 23:8
  23:10 30:1,2,3,17
  39:2,21 40:6 41:12
  44:22 59:1 68:1
**schedule** 75:23
**school** 75:20
**Schweighart** 50:20
  50:24
**Scott** 45:10
**screen** 58:12,16
**second** 20:21 21:5
  29:12 30:2 76:11
**secondary** 56:8
**security** 75:21
**see** 18:21 24:7 26:9
  29:11,11 30:1 37:18
  39:1,21 40:6 41:4
  47:4 58:24 64:16
  69:22
**seeing** 58:15
**seen** 28:18,20 37:3
  58:12 64:21 65:7
  73:14 74:23,24
**seg** 42:16
**segregation** 3:11
  36:24 37:3 41:1,3
  41:17,18,22 42:1,5
  42:10,15,19 43:3
**self** 9:9 23:12,16
**self-employed** 8:15
**self-harm** 51:10
**self-harming** 51:20

**self-reported** 75:3
**send** 72:20
**sent** 20:22,23 24:3,7
  24:11 30:3 75:17,18
  76:2,4
**sentenced** 30:8
**separation** 42:12,13
**SEPTEMBER** 1:15
  4:6 77:4
**sergeant** 8:6 45:10
  55:11,15
**sheet** 3:11,12 30:2
  31:9 32:16,19 33:6
  33:18 38:4,22 39:13
  39:15 40:17,22 52:9
  52:11 53:6 72:16
**sheets** 49:6
**sheriff** 2:7 58:10 62:7
  65:20
**sheriff's** 7:22 8:1,5,14
  9:13 10:5,20,23
  11:2,7,12,17 12:10
  12:20 13:10,21 14:8
  15:4,9,23 24:10
  34:23 36:7 38:21
  47:17 56:14 60:15
  62:7 63:5,10 64:6
  69:5 70:2 72:3,7,19
  74:7,13 75:16
**shift** 17:13,15,17 18:8
  18:10 19:17,20 20:7
  27:1,6 31:21 32:4,6
  39:7,7,18 43:6,11
  44:6,12 45:7,8 46:5
  46:8,11 48:12,15,19
  50:19 55:6,9,11,12
  55:15 62:19 67:16
  71:10,22
**shifts** 45:19
**Shorthand** 77:3
**show** 71:5 76:17
**showed** 46:16
**showing** 12:14 64:15
**shut** 19:12 43:15 44:8
  44:18,21,24 45:19
  46:7,12,18,23 71:20

75:9
**side** 64:17
**sign** 61:3,7,10,15,21
**signature** 61:9 76:17
**signing** 61:24,24 62:3
  62:3
**signs** 3:14 11:7,12
  12:11,13,15 13:18
  15:5 67:24 68:6,9
  68:10 69:2 73:13
**similar** 68:10
**sir** 66:5,11,14 67:2,13
  67:17,20 72:17
  73:22
**sit** 24:13 74:11
**situated** 27:5
**situation** 16:5 55:21
  70:10 71:4 73:8
  74:3
**situations** 35:6 55:24
  65:9
**skin** 11:14
**sleep** 62:9,16
**slower** 54:13
**small** 2:13,14 3:4
  28:3,5 64:17 65:22
  66:2 67:18 70:8
  76:9
**Smith** 2:8 3:5 12:1,22
  13:3,16 14:12 15:17
  19:10 25:10 27:11
  28:19 31:23 32:24
  33:2,9,19 36:9 38:2
  40:2 41:5,13 45:21
  46:15 47:5,21 48:4
  49:18 54:11 56:3,10
  56:16,23 57:2,8,15
  58:2 59:6,19 60:21
  62:11 63:12,18 65:3
  65:15,24 67:22 70:6
  70:9 74:18 75:12
  76:10,17
**snack** 43:8,12
**somebody** 12:14
  68:22
**someplace** 27:2

**sorry** 12:22 23:9 48:4
  56:24 57:1 75:7
**sort** 67:5 74:1
**speak** 22:1,9 65:18
  65:20 74:14 75:24
**special** 3:12 14:9
  38:22 39:15 40:21
  52:8 72:15
**specific** 56:18
**specifically** 47:23
  76:2
**speech** 54:8
**spoke** 54:13,23 72:23
**St** 2:5 10:10
**staff** 33:11,22 60:24
  68:12 70:11,13,18
**Stamped** 16:15 28:16
  31:7
**standard** 38:5 46:17
  71:18 75:8,10
**standing** 65:11
**standpoint** 68:17
**stands** 33:2
**start** 10:22 23:9
  41:24 42:5 43:2
**started** 9:12 10:23
  37:11 41:16,18,21
  74:6
**starting** 42:9
**starts** 32:6
**state** 6:9 51:11
**statements** 7:9 23:11
  54:20
**states** 1:1 61:11 66:8
**status** 6:13 51:9,11
  51:13,15,23 52:5,7
  53:7 75:11
**statuses** 51:16
**stay** 13:7
**stenographic** 77:7
**Stevens** 1:18 77:2,17
**STIPULATED** 4:3
  4:12
**STIPULATION** 4:1
**stitches** 23:10
**stop** 55:24

**stored** 49:7
**strangle** 23:14
**street** 1:20 2:10 4:7
  69:14 77:12
**strike** 39:13 52:14
  53:4 71:14
**strip** 23:18
**stuck** 22:21
**stuffed** 30:21
**stuffing** 18:19
**subsequent** 17:17
  45:19 46:8
**successful** 55:1
**Sue** 7:13
**sugar** 3:10 12:3 13:23
  14:2 22:14,15,17,22
  22:24 23:3 26:14,16
  26:22 31:8,17,21
  32:4,9,17,19,21
  33:6,8,15,17 34:6,7
  34:13,17 55:1 61:20
  73:3
**suicidal** 54:22 60:19
**suicide** 30:22 37:22
  37:23 41:23 42:1
  51:15,19 62:21 63:7
  63:11,16
**Suite** 2:10,15 4:8
  77:12
**superior** 35:16 36:3
**supervised** 34:5
**supervising** 33:14
  34:15,19 51:5
**supervision** 77:8
**supervisor** 13:12,24
  15:24 16:5 18:11,14
  32:18 34:24 35:4
  36:8,12 45:7,8
  46:11,22 47:2,13
  48:24 49:15 55:10
  55:12 57:13 65:1,11
  71:10,22
**supervisors** 17:10
  46:14
**supervisor's** 27:1,7
**supposed** 13:10 16:4

32:13 33:24 34:8,11
34:19 57:22 65:13
**sure** 22:20 32:20 33:7
63:1 65:5 66:21
67:8
**surprises** 28:7
**surprising** 65:23
**Susan** 3:9 21:18 24:4
**Swain** 7:13 21:18
24:4
**sweating** 12:16
**swore** 77:4
**sworn** 5:3
**symptoms** 11:7,12
12:14,15 13:18 68:6
68:9,10 69:2 73:13
**system** 3:13 49:8
58:11
**s-e-n-t** 30:3

**T**

**tag** 52:24 53:2
**tags** 52:23
**take** 6:4,5 20:18
22:16,17,21 23:2,15
24:4 26:16 33:14
34:17 66:3 77:6
**taken** 4:5 31:22 32:4
32:9,17,21 48:19
77:11
**talk** 6:6,7 7:15 15:1
27:10 38:8 59:10
62:2 70:15 71:1,7
**talked** 22:15,23 26:5
26:14 29:18 61:19
61:23
**talking** 22:13 26:19
52:19 56:2 73:7
**taught** 68:11
**teach** 15:5,10
**telephone** 22:2
**tell** 26:6 29:7 60:14
67:10
**telling** 26:11
**term** 12:8
**test** 73:4
**testified** 5:3 9:11 26:5

31:18 32:8 36:14
41:16 44:5 45:20
46:4 49:21 53:23
54:23 71:9 72:5,22
74:6 75:8,16
**testify** 77:4
**testimony** 6:8 21:2
51:18 52:13,14
71:18 77:10
**Thank** 58:3 76:9
**Thanks** 67:19
**thereof** 77:14
**thereto** 77:7
**things** 52:1,3 55:4
75:22
**think** 9:21 11:15 23:4
28:1
**thinking** 66:23
**thought** 47:3,9 70:6
**three** 8:11 38:5
**tie** 23:13
**time** 5:16 6:5 15:13
20:4,5 27:19 31:20
31:20 34:23 46:22
55:12 60:11 67:4
72:18,19
**times** 32:3,8,12,22
48:1,9 75:17
**title** 55:9
**today** 6:8 24:13
74:11
**toilet** 18:20 30:22
45:3
**told** 22:18
**top** 37:10
**touching** 77:5
**Tracking** 3:10 31:8
32:19 33:6,17
**trained** 64:2 69:3
**training** 9:2,5,8,12
9:15 10:6,9,13,14
10:16,19,21,22 11:2
11:6,11,16,24 12:6
12:11,19 13:9,20
14:7,8,16,19,20,24
15:3,8,12,15,20,23

36:6,10,12,13 47:17
57:12,17 62:6,12,14
62:15 63:4,6,9,22
63:23 64:4 68:11
69:4,4 72:18,20
74:8,12 75:17,18,23
76:2
**treatment** 61:13
63:17
**tree** 69:15
**tried** 33:14
**trouble** 5:22
**true** 17:1 21:17 77:10
**truth** 77:4,4,5
**try** 33:20 61:20
**turn** 45:2
**turned** 7:21 71:8
**twice** 12:3 32:10
33:22
**two** 5:13,22 20:6,17
34:16 60:14
**two-page** 28:15
**type** 7:5,7 11:8,13,18
11:18,20,20,23
12:20 13:5,11,14,22
14:1 43:9 47:18
57:21,22 68:16,16
68:22,23
**typewritten** 77:8
**typically** 29:8

**U**

**Uh-huh** 28:4 29:13
**uh-huhs** 6:2
**unconscious** 55:23
**uncooperative** 25:24
26:2 27:16
**underneath** 68:1
**understand** 5:11,13
73:2
**understanding** 33:4
**understood** 5:18
**UNITED** 1:1
**University** 2:15
**upset** 26:13
**Urbana** 1:2,14 2:10
2:12,12 4:8 77:12

**use** 6:1 8:11 17:15
23:13,15 27:24 28:1
49:5,8 70:14
**usual** 31:20 32:3
**usually** 61:9

**V**

**vacation** 20:5
**verbal** 35:2
**verbally** 14:6 44:12
45:5 46:11 71:10
**verbatim** 26:17
**versus** 68:16
**video** 1:19 65:8
**Villa** 77:15
**Voelker** 2:9 4:7 77:12
**volunteer** 9:17
**vs** 1:7

**W**

**W** 2:13
**wait** 5:20
**waived** 4:14 76:17
**walk** 70:14
**Walsh** 1:8 2:8
**want** 5:23,24 23:2
26:15,20 28:2 71:7
73:4 74:5
**wanted** 18:6 22:17
48:24
**wanting** 73:16
**warning** 3:14 12:11
67:24
**wasn't** 50:10 55:7
**watch** 3:12 37:13
38:4,22 39:15 40:22
41:23 42:2 51:9,13
51:15,16,23,24 52:4
52:7,9,10,15,15
53:3,7,10 62:21,24
63:7 72:15
**water** 19:4,11,14
43:15,20 44:8,18,21
44:23,24 45:2,6,18
46:7,12,18,23 47:20
71:8,20 72:2,2 75:9
**way** 17:4 21:6 45:16

46:1 54:10,21 77:14
**went** 29:18 61:19
**weren't** 20:3
**West** 1:20
**We'll** 76:17
**we're** 64:2
**Whichever** 29:10
**Whicker** 21:21
**White** 1:20
**Wide** 1:19
**withdrawal** 40:7,11
40:14,17 52:1,1
**witness** 12:3 13:5,18
14:14 15:19 19:11
21:15 25:12 27:12
28:4,23 32:1 33:1
33:11,20 36:10 38:4
38:13 40:4 41:6,14
46:16 47:6,22 49:19
54:13 56:4,11,17
57:1,3,9,16 59:8,21
60:24 62:12 63:13
63:20 65:5,17 67:20
75:14 76:15 77:7
**word** 72:10,10
**words** 35:9
**work** 19:17,20,24
20:5,7 72:14
**worked** 17:10 26:24
53:13
**workers** 21:23
**working** 9:13 10:5,23
18:8 20:3 46:8
**Workman** 21:18
**world** 6:7 49:5,8,11
**wouldn't** 25:3 66:17
66:18
**wrap** 23:19
**write** 34:12
**writing** 64:17
**written** 39:3 44:10
72:10
**wrote** 35:5 37:14,16
37:17 44:17 66:7
74:22,24

**Y**

**Yeah** 9:21 21:10 28:1
28:6 60:7
**year** 8:3 10:24 25:5
**yearly** 15:15
**Years** 9:20
**yelling** 55:3,5
**yesterday** 58:17
64:22

**0**

**002448** 24:2
**002553** 20:16
**002709** 28:16 29:3
**002710** 28:16
**07** 19:18,20 20:8 24:9
26:24 36:1 38:23
67:15
**084-004212** 1:18
**09-2145** 1:7

**1**

**1** 3:8 16:8,10,14
31:16 34:16 38:6
**10:54** 76:12,14,18
**102** 2:10 4:7 77:12
**11** 77:15
**11:29** 20:23 66:7
**12th** 8:3
**12:00** 67:15
**15th** 16:16,20 17:23
17:24 18:5,8,12,14
20:22 21:8 22:1
26:6,24 35:15 36:2
39:12,14 40:9,13
41:22 43:6,15,20,23
44:15 48:1,8,13,19
48:22 49:22 50:1
53:11,12 54:3,18
55:9 61:2,14 62:19
62:22 66:7 67:15
72:22
**16** 3:8
**16th** 18:2,5 19:18,20
**1600** 32:6
**1630** 32:7
**17th** 18:5 20:7 39:9
39:10

**18** 39:3
**18th** 39:10 72:14
**1984** 8:21
**1990** 8:21

**2**

**2** 3:9 20:10,12,16
21:6 34:18 37:12,21
37:22 38:1,6 39:22
39:22 60:14 66:4
74:21
**20** 3:9
**2000** 74:17
**2002** 9:21 10:2
**2006** 56:7
**2007** 15:2,3,8,15,20
15:22 16:16,21 18:9
20:23 21:8 22:1
24:3,16,22 25:5,20
26:6 32:18 33:5,13
34:5,14 35:4,15
36:2 39:12,14 40:10
40:13,20 41:9,22
42:4,9 43:6,15,20
42:23 44:15 46:21
47:1,16 48:1,8,13
48:20,22 49:9,22
50:1 53:11 54:3,19
55:9,19 57:19 61:2
61:14 62:8,19,22
64:3 72:14,22 75:19
76:1,4
**2011** 1:15 4:6 77:4,15
**2140** 31:20
**217** 2:6,11,16
**23** 3:9
**24/7** 70:19
**2710** 29:14 30:2
**28** 3:10
**280** 16:15
**29TH** 1:15 4:6 77:4

**3**

**3** 3:9 23:20,22 24:2
38:6
**3D** 2:15
**3-4-5** 8:11

**300** 2:10 4:8 77:12
**301** 1:20
**31** 3:10
**344-0060** 2:11
**345** 8:12
**354** 45:14
**36** 3:11
**38** 3:12

**4**

**4** 3:10 28:11,15
**4:00** 32:15 67:15
**4:00-to-midnight**
18:10 19:17 27:1
**4:00-to-12:00** 39:7
**4:30** 32:15
**41** 2:15
**46** 6:12
**469-9194** 2:6

**5**

**5** 3:4,10 31:1,3,7 34:2
60:13
**5/6/07** 3:9
**52** 58:9
**53** 38:20
**5345** 8:9
**57** 37:1
**58** 3:13 31:7

**6**

**6** 3:11 36:17,19,23
38:12 41:1 45:10
60:13
**6th** 24:3
**6/15/07** 3:9
**6/16/07** 3:9
**6/18** 38:23
**6/18/07** 39:2
**6:00** 32:14
**6:30** 32:14
**61803-0129** 2:10
**61820** 1:20
**61824-1337** 2:15
**61873-0864** 2:5
**64** 3:14
**66** 3:4

**67** 3:5

---

**7**

**7** 3:12 38:13,14,16,20
40:18,22 52:9 53:6
72:16
**74** 3:5
**747-6789** 1:21

---

**8**

**8** 3:13 58:2,5,9,24
**800** 1:21
**864** 2:5

---

**9**

**9** 3:14 64:10,12,16
**9:00** 1:15
**9:20** 5:1
**911** 13:11,12 55:16
55:20 57:14 69:8,15
70:3 71:4
**954-0635** 2:16
**98** 9:21

01-14854 CF

## Activity Log Maintenance

File  Edit  Help

ORI #   IL0100000      CCSO

Activity Date/Time   06/15/2007      23:18:52   Entered By   Johnson

Facility   CCSO  ▼  CCSO           Activity   PL  ▼  PASSONLOG

Description

Hahn, Janet:  This female is in F-1.  She was very uncooperative when
she arrived at the jail.  She then made statements of self harm and
was placed in the green gown.  She then flooded the booking area by
stuffing the green gown in the toilet along with the green blanket.
She then decided she was not going to remain dressed.  After Officer
Lewis got her to put the green gown on we were able to convince her
to at least stay dressed.  She has meds in booking and the nursing
staff has been notified.  She also had a bandage on her hand that was
removed due to her being suicidal.  Mental Health and the nursing
staff have both been notified to see her tomorrow.
Her B/S was check due to her being diabetic and she is fine for now.

OK



EXHIBIT
*Johnson*
*NO.1*
*IMS 9/29/11*

## Nicole Bolt

From:       Michael Johnson
Sent:       Thursday, October 14, 2010 8:48 AM
To:         Teresa Schleinz
Subject:    FW: Hahn,Janet

---

**From:** Alyson Morris
**Sent:** Saturday, June 16, 2007 9:59 AM
**To:** Michael Johnson
**Cc:** Greg Whicker; Jennifer Nicholas
**Subject:** Hahn,Janet

As of this writing she is still uncooperative and quite angry. MH has a file on her and she has been in green before. I will attempt to assess before I leave today; however, she will remain in green for at least 72 hrs. Thanks.

---

**From:** Michael Johnson
**Sent:** Friday, June 15, 2007 11:29 PM
**To:** Fran Workman; Kendra Adams; Susan Swain
**Cc:** Greg Whicker; Audrey Jerrolds; Alyson Morris; Jennifer Nicholas
**Subject:** Hahn,Janet

This individual is in booking and needs to be seen by MH and Medical. She stabbed her husband tonight. She has a cut and stitches on her left hand. The bandage was removed due to her making statements of self harm. She has meds that were dropped off by the Arresting Agency. These are in the drawer in booking. She is a Psych patient and is very unpredictable. She flooded the booking area by placing her gown and blanket in the toilet. She then remained naked for a period of time until Officer Lewis and I were able to convince her to stay dressed. Her B/S was checked and the log is in the infirmary. Her B/S was 160 and she was not given anything at this time. Thanks for your time.

Sgt. Michael K. Johnson



EXHIBIT
Johnson
No. 2
JN 5 9/29/11