10209-S1279
BMS/tlp

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | | |
|---|---|---|---|
| PATRICK HAHN and ERIK REDWOOD | ) | | |
| Administrator of the Estate of JANET | ) | | |
| LOUISE HAHN, Deceased, | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| vs. | ) | Law No.: | 09-2145 |
| | ) | | |
| DANIEL WALSH, DEPUTY MATTHEW | ) | | |
| MCCALLISTER,  JENNA THODE, KAREE | ) | | |
| VOGES, JEFFREY SHUMATE, ARNOLD | ) | | |
| MATHEWS, CARL BROWN, HEALTH | ) | | |
| PROFESSIONALS LTD., an Illinois | ) | | |
| Corporation, NURSE SUSAN SWAIN, | ) | | |
| COUNTY OF CHAMPAIGN, ILLINOIS, | ) | | |
| SYLVIA MORGAN, MATTHEW BAIN, | ) | | |
| ANGELA MENOCCI, CITY OF URBANA, | ) | | |
| ILLINOIS, a Municipal Corporation, | ) | | |
| | ) | | |
| Defendants. | ) | | |

<u>DEFENDANT HEALTH PROFESSIONALS, LTD.'S REPLY TO PLAINTIFFS' RESPONSE TO
HEALTH PROFESSIONALS, LTD.'S MOTION FOR SUMMARY JUDGMENT</u>

NOW COMES the Defendant, HEALTH PROFESSIONALS, LTD., by KEITH E. FRUEHLING

and BRIAN M. SMITH, of Heyl, Royster, Voelker & Allen, their attorneys, and for its Reply to the

Plaintiffs' Response to Health Professionals, LTD.'s Motion for Summary Judgment, states as

follows:

I.

<u>INTRODUCTION</u>

The Second Amended Complaint sets forth allegations that Health Professionals, Ltd.

("HPL") violated Janet Hahn's rights.  Specifically, Count IV alleges a *Monell* claim against HPL

asserting that it had a custom and policy of deliberate indifference and Count VI alleges that

HPL violated the ADA and Section 504 of the Rehabilitation Act.  Plaintiffs have not sued any individual nurse, doctor or mental health clinician who was employed by, or an agent of, HPL. Nurse Susan Swain's name appears in the caption; however, she was added to the caption after the statute of limitations, was never served, and Plaintiffs have acknowledged she is not a proper party defendant. (see d/e #116, p. 4, ¶ 18(a)).  In sum, the complaint is limited to a *Monell* claim.

In Response to HPL's Motion for Summary Judgment, Plaintiffs have conceded their Rehabilitation Act claim.  Likewise, Plaintiffs acknowledge their claim under the ADA fails as a matter of law, but argue that the law should be changed.  No such change is warranted.  What remains is Count IV, wherein Plaintiffs seek to assert a *Monell* claim against HPL for allegedly failing to develop and implement adequate policies and procedures to identify and handle pretrial detainees who have serious medical conditions and due to this failure the jail nurses, employed by HPL, allegedly failed or refused to take action to provide Janet Hahn with necessary medical and/or psychiatric care.

HPL is entitled to summary judgment.  There are many facts that have been offered by the parties, but there are no genuine issues of material fact.  The facts are simple and straightforward.  Hahn was identified as a diabetic with mental health issues.  She was set up on a diabetic protocol and seen by the mental health staff.  When Hahn accepted the care offered, Friday and Saturday, she was fine.  On Sunday, Hahn repeatedly refused.  Plaintiffs argument that the failure to document the refusals means the refusals did not happen is unavailing and does not create a question of material fact.  Treatment was not withheld.  Furthermore, there was a policy to address the balancing of Hahn's constitutionally protected right to refuse medical care and the duty to provide care for those incarcerated.

Plaintiffs' custom and policy of deliberate indifference claim, Count IV, fails.  Plaintiffs fail to identify a policy or custom that is itself unconstitutional.  Likewise, they fail to show a pattern or series of incidents of "bad acts" or unconstitutional conduct, which could give rise to an inference that HPL was aware of and condoned the misconduct of their employees.  In sum, Plaintiffs have failed to show that Hahn's constitutional rights were violated, much less that a HPL policy or custom was the moving force behind any deprivation.

Janet Hahn's death is tragic.  However, HPL is not liable for her death.  For the reasons set forth below and in its Motion for Summary Judgment, summary judgment should be granted in favor of HPL on all counts and all theories, thereby dismissing the case against HPL with prejudice and in its entirety.

II.
Reply to Plaintiffs' Additional Material Facts

171.   In 2007 the Champaign County Sheriff's Department received federal funds (Walsh Dep. 10:16-22); Mrs. Janet Hahn was qualified to receive medical care for her condition of diabetes without payment if she had no money. (Walsh Dep. 86:5-8)

RESPONSE:   This fact is undisputed, but immaterial.   Whether the Champaign County Sheriff's Department received federal funds, and whether Ms. Hahn was qualified to receive medical care for her condition of diabetes without payment if she had no money is immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference.  Plaintiffs have conceded their Rehabilitation Act claim against HPL, as HPL is not a direct recipient of federal funds. (d/e #144, p. 104).

172.    Janet Louise Hahn applied to the Social Security Administration for Supplemental Security Income, alleging disability, on July 28, 2004. (Social Security Administration -Fully favorable Decision is attached hereto and incorporated herein as Exhibit I). After the initial claim was denied, Mrs. Hahn requested a hearing, for which Mrs. Hahn appeared and testified on June 12, 2007 in Urbana, IL (Ex. I - page 1 of 6).

RESPONSE:    This fact is undisputed, but immaterial.  Whether Janet Hahn applied for Supplemental Security Income, whether the claim was denied or granted, or whether Mrs. Hahn testified, has no bearing on and is immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

173.    On September 21, 2007, Administrative Law Judge Alice Jordan issued a fully favorable decision on Mrs. Hahn's claim for S.S.I.-Disability and, based on "objective medical evidence and other evidence", found that "The claimant has the following severe combination of impairments: bipolar disorder', adjustment disorder, borderline intellectual functioning, and juvenile (type 1) diabetes" (Ex. I - page 3 of 6).

RESPONSE:    This fact is undisputed, but immaterial.  Whether Janet Hahn applied for Supplemental Security Income, whether the claim was denied or granted, and the Administrative Law Judge's findings from over three months after Janet Hahn's death, have no bearing on and are immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

174.    The record reviewed by A.L.J. Jordan shows a history of loose associations, flight of ideas, she is delusional, IQ score of 75, racing thoughts, pressured speech, cannot remember even simple tasks and great difficulty relating to others (Ex. I page 4 of 6).

RESPONSE:   It is undisputed that A.L.J. Jordan's decision states that the record reviewed includes the information ("history of loose associations," etc.) listed in AMF 174; however, the record reviewed by A.L.J. Jordan is not included in Ex. I, and therefore this Defendant cannot verify the Additional Material Fact as it is not supported by competent evidence.  AMF 174 is immaterial.  Whether Janet Hahn applied for Supplemental Security Income, whether the claim was denied or granted, and A.L.J. Jordan's decision, based upon her review of the record, from over three months after Janet Hahn's death, have no bearing on and are immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

175.    On June 15, 2007 Michael Johnson wrote an email to the HPL staff.  Copy of two Alyson Morris emails attached hereto and incorporated herein as Exhibit F1-F2 and the same note to the pass-on log (Johnson Dep. Ex. 1) about Mrs. Hahn, stating (in part) that she made "statements of self harm", "She has meds that were dropped off by the arresting agency. These are in the drawer in booking." "She is a psych patient".

RESPONSE:    This fact is undisputed and material.

176.    On June 16, 2007, Alyson Morris interviewed Mrs. Hahn and completed a 3-page Champaign County Sheriff's Office Initial Mental Health Screening and Assessment" form (a copy of the Initial Mental Health Screening Form is attached hereto and incorporated herein as Exhibit CC and is also Exhibit 3 to Morris Deposition), in which Morris noted that Mrs. Hahn was

currently receiving treatment by Dr. Yang at the Mental Health Clinic and had been taking Seroquel for a few months.

RESPONSE:   This fact is undisputed and material.

177.   There is no evidence in the record showing that Mrs. Hahn was given the meds that were in the drawer in Booking or that any HPL staff checked these meds or called the doctor whose name was on the bottle.

RESPONSE:   This fact is undisputed, but immaterial.  There is no evidence in the record showing what medications were in the drawer in Booking, or whether those medications were prescription or over-the-counter. Further, there is no evidence that Mrs. Hahn, at any time during her incarceration, needed any of the medications that were in Booking.  As there is no evidence that these were prescription medications, there is no basis to conclude that there was a doctor's name on any of the bottles.  Furthermore, Janet Hahn did not authorize the HPL staff or anyone at the Champaign County Correctional Center to contact her physicians and, therefore, any such contact would have violated privacy laws.  Further, whether Mrs. Hahn was given the medications in the drawer in Booking, or whether HPL staff checked these medications or called the doctor whose name may or may not have been on the bottle, assuming that the medications in the drawer were in a bottle, is immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

178.   Morris, who was not certified or licensed in any field, including any mental health field (Morris Dep. 9-10) somehow concluded that Mrs. Hahn was taking meds primarily for sleep. (Exhibit F2)

RESPONSE:   This fact is undisputed in part, but immaterial.  Ms. Morris did testify that she was not certified or licensed in June of 2007; however, she has a master's degree in counseling.  (Morris Dep., p. 8). The remainder of the Additional Material Fact

6

"somehow concluded that Mrs. Hahn was taking meds primarily for sleep" is argument and not fact.  A review of Exhibit F2, which Plaintiffs cite for the above-quoted proposition, makes it clear that Ms. Morris concluded that Mrs. Hahn was taking medication primarily for sleep by having interviewed Mrs. Hahn.  Further, Plaintiffs have not offered any evidence that Mrs. Hahn was not taking medications primarily for sleep. Whether and how Morris concluded, correctly or incorrectly, that Mrs. Hahn was taking medications primarily for sleep is immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

179.    Medications for bipolar disorder should be taken as directed.  Stopping medication treatment can have immediate consequences - you may become very depressed, feel    suicidal,    or    go    into    a    manic    or    hypomanic    episode. http://www.mayoclinic.com/health/bipolar-disorder/DS00356  (p 20)

RESPONSE:  This fact is undisputed, but immaterial.  Plaintiffs' Additional Material Facts do not offer evidence that Janet Hahn was taking medication(s) for bipolar disorder. Further, there is no evidence that Mrs. Hahn, at any time during her incarceration, needed or was prescribed any medications for bipolar disorder.  In addition, this fact is not supported by competent evidence.  Plaintiffs' citation to the web-site and the substance of the citation lacks the necessary documentary evidence/testimony required by Local Rule 7.1(D)(b)(2).  There is no other testimony or exhibit that supports this opinion offered as a "fact."  Thus, whether Mrs. Hahn should have been taking medications for bipolar disorder is immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

180.    Mrs. Hahn told Morris that she was being treated by psychiatrist Dr. Yang and that Becky at Mental Health was her case manager, but Morris did not attempt to contact Dr. Yang, (Morris Dep. 45:8-18), and she did not request any doctor to give Mrs. Hahn a prescription for any drug at all. (Morris Dep. 44:3-7)

RESPONSE:   This fact is undisputed, but immaterial.  Janet Hahn refused to sign medical releases/authorizations and, therefore, Ms. Morris could not contact Dr. Yang or Becky at Mental Health without violating Janet Hahn's privacy rights.  (Morris Dep., p. 93); *see e.g.* the Health Insurance Portability and Accountability Act and the Federal regulations enacted pursuant to said Act and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/1 *et. seq.*  Ms. Morris is not a defendant in this action.  This fact is immaterial to the Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

181.    Nurse Swain received emails from Morris about Mrs. Hahn, spoke in person with Morris about Mrs. Hahn on June 16, 2007 (Swain Dep. 84-85), remembered Mrs. Hahn from a May 2006 incarceration (Swain Dep. 92:1-23) and had written an email to Corrections stating that Mrs. Hahn was an insulin dependent diabetic, refused to disclose medical history, refused to sign releases and would not eat. (Exhibit E)

RESPONSE:   This fact is undisputed and material; however, the date "May 2006" appears to be a typographical error.  The proper date is "May 2007."

182.    Although Swain testified she "believed" she called Dr. Cullinan, she does not know when or what his orders were, in fact, she does not remember the call (Swain Dep. 48:7-23); Cullinan does not remember a call from her but the nurse is generally required to keep documentation of calls to the doctor. (Cullinan Dep. 124:1-24 & 125:1)

RESPONSE:   This fact is undisputed, but immaterial.  Whether Swain at her deposition, over four years after the incident, remembered whether she placed a call to

8

Dr. Cullinan is immaterial.  Further, Susan Swain is not a defendant in this matter.  Though her name appears in the caption, she has never been served, and is not a party defendant. Whether Swain can recall a telephone conversation from 2007 is immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

183.    There is no documentation in the record that Swain called Dr. Cullinan about Mrs. Hahn or her meds on the weekend of June 15-17, 2007 (Swain Dep. 52:16-24 & 53:1-8), and Swain did not report to ISP Cessna that she called a doctor, nor did Swain write in her report that she called a doctor or did anything with the meds. (Exhibit AA)

RESPONSE:    This fact is disputed in part, but immaterial.  It is unknown whether Illinois State Police Officer Kim Cessna inquired of Susan Swain regarding whether she called the doctor, and thus, it may not appear in Trooper Cessna's report for that reason. Furthermore, Susan Swain is not a defendant in this matter.  Though her name appears in the caption, she has never been served, and is not a party defendant.  Whether Swain did not report to ISP Cessna that she called a doctor or wrote in her report that she called a doctor is immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

184.    Other inmates complained about not receiving their medications. (Montgomery Dep 41:9-16)(Morrissey Dep. 109-110 and Ex, 1 & 2)

RESPONSE:    This fact is disputed insofar as it suggests Mr. Montgomery and Mr. Morrissey were not receiving medications prescribed by HPL employees or agents for Mr. Montgomery and Mr. Morrissey's respective incarcerations at the Champaign County Correctional Center. Mr. Montgomery complained that he did not receive Morphine shots for migraine headaches.  However, he was not prescribed Morphine for his headaches by any doctor working for HPL or at the Champaign County Correctional Center.

(Montgomery Dep., p. 41). Likewise, Mr. Morrissey complained of not receiving insulin when he independently decided he needed it.  However, Mr. Morrissey was provided insulin as prescribed to him by the HPL staff working at the Champaign County Correctional Center.  (Morrissey Dep., pp. 60-62).

185.    Louis E Philipson, M.D., Ph.D. the Plaintiffs' retained expert witness, reviewed Janet Hahn's medical records from 2006- June 18, 2007, including medical records from Carle Hospital, Carle Clinic, Champaign County Jail, Champaign County Coroner's Autopsy Reports and other materials, in order to form his opinions regarding Janet Louise Hahn in reference to June 2007. (Exhibit A).

RESPONSE:    This fact is undisputed and material.

186.    Janet Hahn was a 33 year old woman with type 1 diabetes mellitus for over 20 years who was on an intensive multi-dose insulin program taking insulin injections four times a day, (Exhibit A) although Dr. Philipson would recommend eight blood sugar checks a day, the minimum for Mrs. Hahn is four checks a day. (Philipson Dep. 60:15-22) Prior to this incarceration, Mrs. Hahn understood her diabetes, the kinds of insulin she needed and was more or less taking care of her own sugar. (Id, at 49:3-23)

RESPONSE:    This fact is disputed, but immaterial.  The fact is disputed insofar as Mrs. Hahn "was more or less taking care of her own sugar."  (See Additional Material Fact #187).  In Plaintiffs' Additional Material Fact #187, they affirmatively disprove the facts asserted here.  In #187, Plaintiffs state that in 2006 and 2007, Mrs. Hahn had numerous interactions with the local police, paramedics, and emergency room personnel, some related to hypoglycemia and others due to hyperglycemia.  Multiple emergency room visits due to hypoglycemia and hyperglycemia do not amount to more or less taking care of her own sugar.  Further, Plaintiffs' nurse expert opines that as a general matter, when a medical history cannot be established, e.g., the patient is refusing to provide information and/or will not sign medical releases, blood sugars should be checked at least once every

10

12 hours, and not 4 times a day.  (Adams Dep., pp. 46-47).

187.     In 2006-2007, Mrs. Hahn had numerous interactions with the local police, paramedics and emergency room personnel, some related to hypoglycemia and others due to hyperglycemia, both states not unusual in type 1 diabetes. (Ex. A).

RESPONSE:    This fact is disputed insofar as it is not supported by admissible evidence. See Fed. R. Civ. P. 56(c)(2).   Exhibit A is Dr. Philipson's expert report. Dr. Philipson has no personal knowledge of, and is therefore not competent to testify to, whether Mrs. Hahn had interactions with local police, paramedics and/or emergency room personnel in 2006 and 2007, and whether any such interactions concerned hypoglycemia and/or hyperglycemia. Further, the fact is immaterial.   Whether Mrs. Hahn had interactions with the local police, paramedics and emergency room personnel in 2006 and 2007 is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

188.     The HPL protocol for insulin administration in the jail was inappropriate for a patient with type 1 diabetes and their sliding scale approach, with blood sugars checked twice a day applies only to reasonably well-controlled type 2 diabetes and would be a disaster for type 1 diabetes. (Ex. A)

RESPONSE:    This fact is disputed and immaterial.  Plaintiffs' nurse expert opines that as a general matter, when a medical history cannot be established, e.g., the patient is refusing to provide information and/or will not sign medical releases, blood sugars should be checked at least once every 12 hours, and not 4 times a day.  (Adams Dep., pp. 46-47). Dr. Joseph Paris opined that the placement of Janet Hahn on diabetic protocol which included an insulin sliding scale and finger sticks for blood sugar testing twice a day was appropriate. "Upon entrance to a jail, diabetic patients as a rule exercise much less, thus decreasing metabolic needs, potentially increasing blood sugar levels and requiring more

insulin.  On the other hand, upon jail intake, some diabetic patients, like Hahn, eat poorly or not at all for awhile.  Decreases in calorie intake may decrease blood sugar levels, thus requiring less insulin than before.  These two opposite trends may make predictions of required insulin levels chancy.  Overdosing insulin may result in hypoglycemia and coma.  Underdosing insulin may result in high blood sugar levels and the possibility of developing diabetic ketoacidosis. A sliding scale provides temporarily a safe way to proceed, as all insulin injections follow an established blood sugar level.  In this manner, over or under-administration of insulin are avoided."  (HPL Ex. 23, expert report of Dr. Joseph E. Paris, p. 5).  Further, Dr. Philipson testified that had Janet Hahn's blood sugar been checked even one time on Sunday, she likely would have survived.  (Philipson Dep., p. 90).  Dr. Philipson further testified that had Janet Hahn followed the HPL protocol, "[h]er life could have been saved by two blood sugar checks on Sunday." (Philipson Dep., p. 93). Janet Hahn did not have her blood sugar checked because of her repeated refusals. (UMF ¶¶ 138, 146, 147, 151, 156).  She was offered blood sugar checks more than twice on Sunday, and refused them.  Id. Thus, the HPL protocol that blood sugars be checked twice a day and insulin administered per sliding scale, is immaterial as this protocol is not related in any way to her death.

189.    Neither the Urbana Police nor the Champaign County Jail took Mrs. Hahn to the hospital where she would have received appropriate care for her diabetes and her psychiatric conditions. (Ex. A)

RESPONSE:   This fact is disputed and immaterial.  This fact is not supported by admissible evidence.  See Fed. R. Civ. P. 56(c)(2).  Exhibit A is Dr. Philipson's expert report. Dr. Philipson has no personal knowledge of, and is therefore not competent to testify to, whether the Urbana Police or the Champaign County Jail took Mrs. Hahn to the hospital. Dr. Philipson's opinion that Mrs. Hahn would have received "appropriate care for her

diabetes and her psychiatric conditions" were she taken to a hospital, is pure speculation and Dr. Philipson acknowledged as much at his deposition.

> Q.    Well, let me ask you this.  You don't know whether she would have accepted – she would have allowed them to test her blood sugar at the hospital, do you?
>
> A.    I don't know that, but I think she didn't trust the people that she was talking to here in part because they didn't know the difference between regular insulin and any other kind of insulin.

(Philipson Dep., p. 69).

> Q.    But again, you don't know whether the hospital would have gotten her to eat, do you?
>
> A.    I don't know that.  I just know that it's – that where she was she died.
>
> Q.    She could have died at the hospital, could she not?
>
> A.    She could have and then we'd have a different problem.
>
> Q.    And you don't know whether she would have let them inject her with insulin at the hospital, do you?
>
> A.    I don't know that, but it's possible that if they asked her, because they are more knowledgeable in an emergency room, if they had said, 'Mrs. Hahn, do you take Lantus insulin, and she would have said, 'oh, yes, that's the insulin that I take,' that that alone <u>might</u> have changed the tenor of the conversation.  There's too many hypotheticals here.  I just know that if --

(Philipson Dep., p. 72). (Emphasis added).

> A.    ... So that's why I stated at the very outset, just like any other disaster, there were at least half a dozen times where a single intervention could have saved her life.  So yes, if there had been a blood sugar, if there had been an awareness that she could have type 1 diabetes and that she could no longer be cared for adequately in a detention environment, taking her to a hospital might have saved her life.  At least we wouldn't be here talking about this particular set of events.

Q.     Because she could have --

A.     She could have died in the hospital.

Q.     She could have continued on and refused at the hospital and –

A.     She might have, but I think that – I mean, look, we can discuss that until the cows come home.  A different environment, there <u>might</u> have been a different outcome.

(Philipson Dep., pp. 70-75). (Emphasis added).

Q.     Now, is it your opinion that if she – I think you used the word right setting?

A.     Sorry? Oh, if she was in the right setting, yes.

Q.     In the right setting, presumably in a hospital or somewhere else, that she would not have died?

A.     No, that's not my opinion.  My opinion is simply that she was in the wrong setting.  If she was in the right setting, she <u>might</u> not have died.

Q.     Ok.

A.     Or at least not at that moment.

(Philipson Dep., pp. 100-101). (Emphasis added).

Dr. Philipson has no way of knowing whether Mrs. Hahn would have cooperated with the care being offered at the hospital. She did not cooperate with the care being offered at the Champaign County Correctional Center, and there is no reason to think that she would have acted otherwise had she been taken to the hospital.  On Sunday afternoon, Susan Swain did not observe any signs or symptoms of physical or mental distress which would indicate that Janet Hahn needed to be taken to a hospital.  (UMF ¶¶ 149-150).  Further, whether the Urbana Police or the "Champaign County Jail" took Mrs. Hahn to the hospital is immaterial to the Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and

Rehabilitation Act claim against HPL.

190.    Neither the Urbana Police nor the Champaign County Jail contacted Mrs. Hahn's husband to verify her medications. (Ex. A)

RESPONSE:    This fact is disputed only insofar as it is not supported by admissible evidence.    *See* Fed. R. Civ. P. 56(c)(2).    Exhibit A is Dr. Philipson's expert report. Dr. Philipson has no personal knowledge of, and is therefore not competent to testify to, whether the Urbana Police or the Champaign County Jail contacted Mrs. Hahn's husband to verify her medications.    Further, the term "Champaign County Jail" is vague and ambiguous, as it fails to describe the individuals it is referring to (HPL employees, Champaign County Sheriff's Office employees, or someone else).    Further, Additional Material Fact #190 is immaterial.    Janet Hahn was arrested for aggravated domestic battery after having stabbed her husband, Patrick Hahn, in the back.    She did not sign medical releases.    There were privacy law concerns with contacting Mrs. Hahn's husband to verify her medications; moreover, he had just been stabbed by Janet Hahn.    *See e.g.* the Health Insurance Portability and Accountability Act and the Federal regulations enacted pursuant to said Act and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/1 *et. seq.*    Further, whether the Urbana Police or the "Champaign County Jail" contacted Mrs. Hahn's husband to verify her medications is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

191.     Neither the Urbana Police nor the Champaign County Jail contacted Mrs. Hahn's doctors to verify her diagnosis and obtain the kinds and doses of her medications, (Ex. A) and no one contacted Mr. Hahn. (Exhibit EE)

RESPONSE:    This fact is disputed only insofar as it is not supported by admissible evidence.   See Fed. R. Civ. P. 56(c)(2).   Exhibit A is Dr. Philipson's expert report. Dr. Philipson has no personal knowledge of, and is therefore not competent to testify to, whether the Urbana Police or the Champaign County Jail contacted Mrs. Hahn's husband to verify her medications.  Further, the term "Champaign County Jail" is vague and ambiguous, as it fails to describe the individuals it is referring to (HPL employees, Champaign County Sheriff's Office employees, or someone else).   Further, Additional Material Fact #191 is immaterial.  Janet Hahn did not sign a medical release, and therefore for the Urbana Police or the "Champaign County Jail" to contact Mrs. Hahn's doctors or husband to verify her diagnosis would have violated Mrs. Hahn's privacy rights.  S*ee e.g.* the Health Insurance Portability and Accountability Act and the Federal regulations enacted pursuant to said Act and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/1 *et. seq.*  Further, whether the Urbana Police or Champaign County Jail contacted Mrs. Hahn's doctors or Mr. Hahn to verify her diagnosis and obtain the kinds and doses of her medications is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

192.    A normal blood sugar in the fasting state ranges from 70 to 100 milligrams per deciliter. In women, it's slightly lower. After meals, blood sugar levels can reach as high as 18o milligrams per deciliter. (Philipson Dep. 41:18-24)

RESPONSE:    This fact is disputed only insofar as it is inconsistent and disputed by Plaintiffs' Additional Material Fact #208 which claims that a normal blood sugar range is 80 to 120.  The fact is material.

193.    A type 1 diabetic needs insulin regardless of what the blood sugar level is. One can have diabetic ketoacidosis with a normal blood sugar. With a blood sugar of 100, a type 1 diabetic can still have ketones. (Philipson Dep. 56:12-18)

RESPONSE:    This fact is undisputed that a Type I diabetic may need insulin regardless of what the blood sugar level is but is and immaterial Dr. Philipson testified that had Janet Hahn's blood sugar been checked even one time on Sunday, she likely would have survived.  (Philipson Dep., p. 90).  Dr. Philipson further testified that had Janet Hahn followed the HPL protocol, "[h]er life could have been saved by two blood sugar checks on Sunday." (Philipson Dep., p. 93). Janet Hahn did not have her blood sugar checked because of her repeated refusals. (UMF ¶¶ 138, 146, 147, 151, 156).  She was offered blood sugar checks more than twice on Sunday, and refused them.  Id. Thus, this AMF regarding ketone testing is immaterial to Plaintiffs' claims in this case. Moreover, whether anyone would have been able to secure a urine sample from Mrs. Hahn is pure speculation and conjecture, especially given her refusals to provide even a simple blood sugar sample.

194.    The test of urine for ketones is probably the simplest medical test on the planet. A test strip is dipped in the urine and it turns colors and takes about 30 seconds to see if somebody has ketones. (Philipson Dep. 56:15-18) A test for ketones would have saved Mrs.

Hahn's life (Philipson Dep. 118-119)

RESPONSE:    This fact is disputed, insofar as it inaccurately cites the deposition of Dr. Philipson.  Page 56 of Dr. Philipson's deposition does not state that a test strip is dipped into the urine and turns color and takes 30 seconds to see if someone has ketones. Rather, this is found at page 118 of Dr. Philipson's deposition.   The remainder of Additional Material Fact #194 also inaccurately cites the deposition of Dr. Philipson.  Dr. Philipson opined that the test of the urine for ketones is probably the simplest test on the planet, other than smelling someone's breath for ketones. Dr. Philipson opined that had the nurse tried to smell Mrs. Hahn's breath to see if she had ketones would have saved her life; however, Dr. Philipson's opinion lacks foundation, as he is not aware of whether the nurse smelled for ketones on Mrs. Hahn's breath, and Dr. Philipson has acknowledged that whether her life would have been saved is speculative.  See Response to Additional Material Fact #189.  Further, whether Susan Swain tried to smell Janet Hahn's breath or test her urine to test for ketones is immaterial as she is not a defendant in this case. Whether Janet Hahn's urine was tested for ketones is therefore immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

195.    In 2007 there was no HPL policy to test a diabetic for ketones and HPL did not do a urine test for ketones. (Workman Dep. 52:8-1o)(Swain Dep. 77:9-18)

RESPONSE:    This fact is undisputed insofar as it is limited to these witnesses' knowledge, who work/worked for HPL at the CCCC, but is immaterial. (See Response to AMF #188).

196.    Even if a type 1 diabetic patient was fully compliant with HPL's procedures, they could still have a very negative outcome because their procedures were insufficient to deal with type 1 diabetes. (Philipson Dep. 62)

RESPONSE:    This fact is disputed insofar as it is speculative.  As to Janet Hahn, Dr. Philipson testified that had Janet Hahn's blood sugar been checked even one time on Sunday, she likely would have survived.  (Philipson Dep., p. 90).  Dr. Philipson further testified that had Janet Hahn followed the HPL protocol, "[h]er life could have been saved by two blood sugar checks on Sunday." (Philipson Dep., p. 93). Janet Hahn did not have her blood sugar checked because of her repeated refusals. (UMF ¶¶ 138, 146, 147, 151, 156).  She was offered blood sugar checks more than twice on Sunday, and refused them. Id. Thus, the HPL protocol that blood sugars be checked twice a day and insulin administered per sliding scale, is immaterial as this protocol is not related in any way to her death.

197.    Joey Morrissey has been a type 1 diabetic for 19 years who takes Regular insulin and Lantus insulin four times a day. (Deposition of Joey Morrissey is attached hereto and incorporated herein as Exhibit U at 42:2-22)

RESPONSE:    This fact is undisputed, but immaterial.  Joey Morrissey's diagnosis and prescriptions are not at issue, and are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL

198.    Joey Morrissey was a pretrial detainee at the Champaign County Satellite Jail (CCCC) from May 1, 2006 to June 9, 2006 and he almost died in there 20 times from lack of diabetes care. (Morrissey Dep. 36:1-22) He was bottomed out when he was booked in, he was belligerent and does not remember the booking process. (Morrissey Dep. 38:1-24)

RESPONSE:    This fact is disputed insofar as it is not supported by admissible evidence, and is otherwise immaterial.  It is undisputed that Joey Morrissey was a pretrial detainee at the Champaign County Satellite Jail in 2006; the remainder of this Additional

Material Fact lacks foundation and is conjecture on the part of Mr. Morrissey, who is not a medical doctor, nurse, or otherwise trained.  (Morrissey Dep., pp. 7-8).  "Almost died" is vague and ambiguous in the context of Additional Material Fact #197.  Further, Mr. Morrissey's detention is not at issue and is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

199.    Mr. Morrissey saw a nurse but he saw no doctor for at least a week and blood sugar testing was allowed only twice a day (Morrissey Dep. 50:1-22) blood sugar testing was not allowed in the afternoon, only one in the morning and one in the evening. (Morrissey Dep, 53:20-24)

RESPONSE:   This fact is disputed only insofar as Mr. Morrissey stated he had doubts whether he saw a doctor in the first week, and later in his deposition, testified he believes he saw a doctor on Monday or Tuesday.  (Morrissey Dep., p. 58).  May 1, 2006, was a Monday. Whether Mr. Morrissey saw a doctor for at least a week or tested his blood sugar in the afternoon is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

200.    At the CCCC, they would not follow Morrissey's own doctor's orders, they put him on their program. (Morrissey Dep. 56:8-11)

RESPONSE:   The phrase "they" and "their" are vague and ambiguous. Further, this fact is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

201.    Morrissey wrote a letter to Redwood Law Office in May 2006 because his blood sugar was not being controlled correctly. (Morrissey Dep. 67:1-13 & Dep. Ex. 1)

RESPONSE:   It is undisputed that Mr. Morrissey wrote a letter to the Redwood Law Office in May of 2006, and the stated reason for his letter was that he believed his blood sugar was not being controlled correctly.  Whether Mr. Morrissey's blood sugar was being controlled correctly is a statement not supported by any competent evidence or proper citation to the record, and therefore is inadmissible.  Mr. Morrissey is not a medical doctor, nurse or otherwise medically trained. (Morrissey Dep., pp. 7-8).  It is simply his opinion that his blood sugar was not being controlled correctly.   Further, whether Mr. Morrissey wrote a letter to the Redwood Law Office is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

202.    In CCCC Morrissey was not able to get insulin and sugar as needed because it was outside of his own control (Morrissey Dep. 109-110) it is very important for a type 1 diabetic to control his own testing schedule. (Id)

RESPONSE:   It is undisputed that Mr. Morrissey was not allowed to have medical testing equipment and/or insulin in his cell at the Champaign County Correctional Center. As to whether Mr. Morrissey was able to get the insulin and sugar he needed, this fact is disputed by Mr. Morrissey's own deposition testimony.  In his deposition, Mr. Morrissey testified as follows:

> Q.    And you don't have any event that you're not attended to in the jail?  In each occasion that your blood sugar dropped one way, shape, or form, you got the sugar that you needed and your blood sugar went back up, right?

A.     Eventually, yeah.

(Morrissey Dep., p. 86).

Mr. Morrissey testified:

Q.     And when you are taken to the infirmary, you'd test your blood sugar on those occasions where you describe you'd go to the infirmary, because you're telling the guards – the guards notice something and they'd test your blood sugar, and then if it was low, they'd give you something to eat, correct?

A.     Yeah.  But usually – I'd usually take care of it myself.
(Morrissey Dep., p. 86).

Mr. Morrissey is not a medical doctor, nurse, or otherwise medically trained (Morrissey Dep., pp. 7-8), and therefore, is not qualified to testify about whether it is very important for a Type I diabetic to control his own testing schedule.  Mr. Morrissey has not been disclosed as an expert, and his opinions are not supported by any competent evidence and, therefore, are inadmissible.  *See* Fed. R. Civ. P. 56(c).

Further, Mr. Morrissey's opinion is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

203.    In 2006 Mr. Morrissey wrote grievances about the lack of diabetic medical care and he never got responses. (Morrissey Dep. 118:2-22)

RESPONSE:   This fact is undisputed, but immaterial.   Whether Mr. Morrissey wrote grievances in 2006 about the lack of diabetic medical care and never got responses is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act

claim against HPL.  Plaintiffs have not established who the grievances were sent to or who received them.

204.    In 2006 Mr. Morrissey was bottomed out when he went to court and pled guilty; he did not remember what he did and he barely remembers even being in court. (Morrissey Dep. 126:2-24)

RESPONSE:    The phrase "bottomed out" is vague and ambiguous.   "Bottomed out" is Mr. Morrissey's phrase to explain when his blood sugar is low.  (Morrissey Dep., p. 108).  This fact is undisputed, but immaterial.  Whether Mr. Morrissey was "bottomed out" in 2006 when he went to court and pled guilty and did not remember what he did and barely remembers being in court is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

205.    In 2006 at CCCC, Mr. Morrissey went unconscious from diabetic seizure many times where he doesn't remember or unable to function. (Morrissey Dep. 128-129)

RESPONSE:    The term "diabetic seizure" is vague and ambiguous.  Mr. Morrissey defines a diabetic seizure as "lowering of your blood sugar to the state where you are unconscious and out of it," and where sometimes his "whole body locks up, muscles get stiff." (Morrissey Dep., pp. 106-107).  Further, Mr. Morrissey explained that if his blood sugar was low and he "bottomed out," he would either be taken to the infirmary, have his blood sugar tested, and if it was low, be provided something to eat, or he would eat food purchased from the commissary or provided to him by a cellmate or someone else. (Morrissey Dep., pp. 79; 82-83).

Further, whether Mr. Morrissey's blood sugar was low in 2006 is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL as low blood sugar is not an issues in this case.

206.    At CCCC in 2006, Mr. Morrissey had problems with both low blood sugar and high blood sugar and he was regularly denied access to blood sugar testing any more than twice a day. (Morrissey Dep. 131-135)

RESPONSE:    This fact is disputed insofar as Mr. Morrissey testified that on several occasions when he had low blood sugar, he was taken to the infirmary for additional blood sugar testing. (Morrissey Dep., p. 62).   Further, whether Mr. Morrissey had problems with both low blood sugar and high blood sugar and the number of times he tested his blood sugar while in the Champaign County Correctional Center in 2006 is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference.  To the extent that this fact illustrates that Mr. Morrissey (an inmate without any alleged mental disability) and Mrs. Hahn (an inmate with an alleged mental disability) received the same offer of medical treatment for Type 1 diabetes reflects that there was no discrimination by HPL in terms of its medical treatment of Mrs. Hahn.  In that sense, this AMF is material and militates against Plaintiffs' ADA and Rehabilitation Act claim against HPL.

207.    In 2006 the doctors and nurses at CCCC did not know enough about treating diabetics. (Morrissey Dep. 116-117)

RESPONSE:   This statement is not supported by any competent evidence, and is therefore inadmissible. *See* Fed. R. Civ. P. 56(c).  Mr. Morrissey is not a medical doctor, nurse or otherwise medically trained.  (Morrissey Dep., pp. 7-8).  Mr. Morrissey lacks foundation and knowledge of the training and treatment that doctors and nurses at the Champaign County Correctional Center received regarding the treatment of diabetes. Mr. Morrissey was an inmate at the Champaign County Correctional Center, and has simply offered his conjecture that the doctors and nurses did not know enough about treating diabetics.  Moreover, Mr. Morrissey has not been disclosed as an expert witness. What Mr. Morrissey's opinion is as to nurses and doctors' knowledge is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

208.    "Bottom out" is low blood sugar. Normal is 80-120. A diabetic can feel bottomed out without testing. You get shaky, light-headed, like on drugs, its hard to explain but a diabetic can feel it. (Morrissey Dep. 99:1-24)

RESPONSE:   This statement is not supported by any competent evidence, and is therefore inadmissible. *See* Fed. R. Civ. P. 56(c).  Mr. Morrissey is not a medical doctor, nurse, or otherwise medically trained (Morrissey Dep., pp. 7-8), and has not been identified as an expert witness on the issue of diabetes and the signs and symptoms of "bottoming out" or low blood sugar.  Rather, Mr. Morrissey in his deposition offered a narrative of his experience with diabetes, and his experience can be offered as evidence for nothing more than that. The phrase "bottomed out" is vague and ambiguous. "Bottomed out" is Mr. Morrissey's phrase to explain when his blood sugar is low.

(Morrissey Dep., p. 108).  Further, Mr. Morrissey did not testify that "a diabetic can feel bottomed out without testing," but rather that he, Mr. Morrissey, can tell when he is bottoming out without the need to have his blood sugar tested. In other words, Mr. Morrissey knows when his blood sugar is low.  Finally, to the extent that Additional Material Fact #208 is being offered as evidence that a normal blood sugar is between 80 and 120, this is in direct contradiction to Plaintiffs' Additional Material Fact #192, which states that a normal blood sugar in a fasting state ranges from 70 to 100 mg. per deciliter; in women, it is slightly lower.

Low blood sugar is not an issue in this case, and therefore is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

209.    When a diabetic bottoms out, mental processes are gone; you don't feel much of anything; you feel but your mind is gone; you don't realize what you are doing; your speech can get slurred or mumbling. (Morrissey Dep. 100:1-15)

RESPONSE:    This statement is not supported by any competent evidence, and is therefore inadmissible.  *See* Fed. R. Civ. P. 56(c).  Mr. Morrissey is not a medical doctor, nurse, or otherwise medically trained (Morrissey Dep., pp. 7-8), and has not been identified as an expert witness on the issue of diabetes and the signs and symptoms of "bottoming out" or low blood sugar.  Rather, Mr. Morrissey in his deposition offered a narrative of his experience with diabetes, and his experience can be offered as evidence for nothing more than that.  The phrase "bottomed out" is vague and ambiguous. "Bottomed out" is Mr. Morrissey's phrase to explain when his blood sugar is low.

(Morrissey Dep., p. 108).  Low blood sugar is not an issue in this case, and therefore is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

210.    At CCCC Mr. Morrissey was not taken to the infirmary when needed; it was almost impossible to get there and more often the cell mates helped him by giving him candy or food when his sugar was low. (Morrissey Dep. 101:6-24)

RESPONSE:   The statement "when needed" is an opinion not supported by any competent evidence and is therefore inadmissible.  *See* Fed. R. Civ. P. 56(c).  Mr. Morrissey is not a medical doctor, nurse, or otherwise medically trained.  (Morrissey Dep., pp. 7-8). Mr. Morrissey has not been identified as an expert on the issue of diabetes and lacks foundation and knowledge as to when an inmate needs to be taken to the infirmary.  Low blood sugar is not an issue in this case, and therefore is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

211.    On May 20, 2006, Attorney Redwood faxed and mailed a letter (FF3-FF4) to Sheriff Daniel Walsh (Copies of 2006 correspondence regarding Joey Morrissey is attached hereto and incorporated herein as Exhibit FF (FF1 - FF9) about Mr. Morrissey's complaints of an emergency nature.

RESPONSE:   This fact is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

212.    On May 20, 2006, Sheriff Daniel Walsh called the Redwood Law Office in regards to the letter faxed to his office (A copy of the Affidavit of Erik S. Redwood is attached hereto and incorporated herein as Exhibit HH) and Sheriff Walsh stated that he had spoken with the jail nurse and the jail doctor and that Mr. Morrissey was getting the correct insulin but was refusing to take it and the guards would watch Mr. Morrissey and send him to a hospital if he went into a coma. (Exhibit FF-8)

RESPONSE:   This fact is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

213.    In 2007 CCCC did not have a medical housing unit for females that was set up like an infirmary where inmates stayed due to their medical needs. (Deposition of Nancy Griffin is attached hereto and incorporated herein as Exhibit W at 22-23)

RESPONSE:   This fact is undisputed and immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.  This is not a conditions of confinement case.

214.    The stimulation in the booking area can be excessive with noise and movement. (Griffin Dep. 50:9-17)

RESPONSE:   The context of Additional Material Fact #214 "excessive" is vague and ambiguous.   This fact is otherwise undisputed and immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate

indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.  This is not a conditions of confinement case.

215.    There's no sleeping in Booking; it is so cold and there is no way to be comfortable on the concrete. (Carpenter Dep. 39:18-23) It's a very rough experience being in Booking (Id. 86:14-21)

RESPONSE:  This fact is disputed and immaterial.  Mr. Carpenter offered his opinion that there is "no sleeping in Booking," and offered a narrative of his experience in Booking.  Mr. Carpenter explained that as a general matter, he has trouble sleeping. (Carpenter Dep., pp. 93-94).  As a general statement of fact for all inmates in Booking, his testimony lacks foundation.  The statement is not supported by any competent evidence, and is therefore inadmissible.  Fed. R. Civ. P. 56(c).  People frequently sleep in Booking. For example, Mrs. Hahn was noticed sleeping in her cell by Jennifer Nichols on Sunday, June 17, 2007.  (Nichols Dep., pp. 19-20).  Further, this is not a conditions of confinement case, and therefore, these "facts" are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

216.    The cells in Booking are dirty and disgusting (Carpenter Dep. 67:4-10) Cell F-1 (Mrs. Hahn's cell) is the one where it sometimes happens that the toilet flushing next door comes up in the F-1 toilet. (Carpenter Dep. 66:5-13)

RESPONSE:   This fact is disputed and immaterial.  Mr. Carpenter is offering his opinion that the cells in Booking are "dirty and disgusting." Whether the toilet flushing next door comes up in the F-1 toilet, is immaterial.  Mr. Carpenter lacks foundation and

knowledge to know whether this was occurring during Mrs. Hahn's incarceration. Further, this is not a conditions of confinement case, and therefore, these "facts" are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

217.    Mrs. Hahn was clearly and correctly identified as suicidal (Exhibit B) and she remained in "green" until she was found unconscious. (Exhibit F-2)

RESPONSE:    This fact is undisputed and material.

218.    The "turtle suit" is the green gown you are put in when you're on suicide watch at CCCC. (Carpenter Dep. 63:20-24)

RESPONSE:    The phrase "turtle suit" is vague and ambiguous, and is a term used by Mr. Carpenter.  Otherwise, this fact is undisputed and material.

219.    The turtle suit doesn't fit very well, it goes just below the groin, it's open on the sides with straps because it's basically a front and a back and there are no sleeves; if you are lucky you get a blanket of the same material. (Carpenter Dep. 64:1-11)

RESPONSE:    Additional Material Fact #219 is not supported by any competent evidence, is therefore inadmissible.  *See* Fed. R. Civ. P. 56(c).  Further, this is not a conditions of confinement case and, therefore, these "facts" are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL. Mr. Carpenter's statements as to the "fit" cannot be generalized to everyone. "Fit" is dependent upon the size and shape of the person wearing the gown.  Moreover, "luck"

30

has nothing to do with whether a blanket is received, and Mr. Carpenter lacks knowledge about the criteria for who is administered what items.

220.    On suicide watch, you get no underwear, no silverware - you scoop your food with a part of a styrofoam cup, toilet paper is usually not left in your cell, they are not allowed to give you anything. (Carpenter Dep. 65:9-24)

RESPONSE:    This fact is not supported by any competent evidence, and is therefore inadmissible.  *See* Fed. R. Civ. P. 56(c).  Mr. Carpenter lacks foundation and knowledge to testify to what an inmate is allowed to have while on suicide watch.  The term "they" is vague and ambiguous in the context of Additional Material Fact #220, and belied by Mr. Carpenter's deposition, wherein he testified that inmates are provided a suicide suit, depending on an inmate's condition, threats made, etc., a blanket, and a scoop for food.  It is undisputed and material that when an inmate is on suicide watch, certain items and property are removed from an inmate's cell in an effort to deny the inmate access to potential tools of suicide or self-harm.

221.    They usually isolate you when you're in greens. (Carpenter Dep. 22:11-15)

RESPONSE:    To the extent that "isolate" means that individuals on suicide watch are usually placed in an individual cell and "greens" means suicide prevention clothing, this fact is undisputed and material.

222.    It's easy to get depressed in that type of setting and there is not a lot of compassion from the guards, they have a lot to do and they detach themselves. (Carpenter Dep. 70:1-13)

RESPONSE:   This fact is not supported by any competent evidence, and is therefore inadmissible.  *See* Fed. R. Civ. P. 56(c).  Mr. Carpenter has not been identified as an expert/opinion witness.   He has not been disclosed as an expert in psychology or psychiatry, or otherwise qualified to testify about "depression."   This fact is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

223.    In Booking there are no windows to the outside; no clocks in the cells; there is no way to tell night from day and it's even hard to tell time by meals because they serve at different times. (Carpenter Dep. 84:16-24 & 85:1-13)

RESPONSE:   This fact is disputed in part.   Mr. Carpenter lacks foundation to testify that meals were served at different times if there are no clocks on the walls and no way to know night from day; further, Mr. Carpenter testified that meals were served at different times "depending on where you're at, you know, and in the Satellite Facility." This is vague and ambiguous.  (Carpenter Dep., p. 85).  This fact is otherwise undisputed, but immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

224.    Mrs. Hahn's record shows a history of loose associations, flight of ideas and she is delusional. She has a child in the custody of the state but denies having any such child and believes that the child she did have was "a whore" and is not hers because she was not allowed to breast feed it. (Exhibit I - page 4 of 6)

RESPONSE:   It is undisputed that Administrative Law Judge Jordan's decision regarding Janet Hahn's application for Supplemental Security Income states that the record reviewed includes the information ("history of loose associations," "flight of ideas," and "delusional") listed in Additional Material Fact #224; however, this is duplicative and redundant of Additional Material Fact #174.   Moreover, the record reviewed by A.L.J. Jordan is not included in Exhibit I, and therefore, this Defendant cannot verify the Additional Material Fact as it is not supported by competent evidence. What Janet Hahn may have told A.L.J. Jordan is inadmissible hearsay.   Further, Additional Material Fact #224 is immaterial.   Whether Janet Hahn applied for Social Security Income, whether the claim was granted or denied, statements that Janet Hahn may or may not have made to A.L.J. Jordan, and A.L.J. Jordan's decision, based upon her review of the record, issued over three months after Janet Hahn's death, have no bearing on and are immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

225.   Mrs. Hahn was hospitalized twice in 2007 for suicidal and homicidal actions. She has racing thoughts and pressured speech. (Exhibit I - page 4 of 6)

RESPONSE:   This fact is disputed only insofar as "she has racing thoughts and pressured speech" is vague and ambiguous as to when Mrs. Hahn's thoughts were racing and speech pressured (During the hospitalizations in 2007 for suicide and homicidal actions?  When she was before A.L.J. Jordan?  All the time?).   This fact is immaterial and

irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

226.     The ALJ gave little weight to the State agency medical opinions because evidence received at the hearing level showed that Mrs. Hahn was more limited than determined by the state agency consultants, who did not adequately consider the combined effect of Mrs. Hahn's different impairments. Mrs. Hahn cannot remember even simple tasks and has great difficulty relating to others. (Exhibit I - page 4 of 6)

RESPONSE:   The fact the ALJ gave little weight to the state agency medical options is undisputed.   However, what weight the ALJ gave to state agency medical opinions should have no bearing on this case and is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

227.     Mrs. Hahn was in jail for domestic battery-a stressful situation. When a diabetic's under stress, it throws insulin levels out of whack. (Lisa Adams Dep. 54ˉ55)

RESPONSE:   It is undisputed that Mrs. Hahn was in jail for domestic battery. Whether that is a stressful situation is a matter of personal opinion that Nurse Lisa Adams is not competent to testify to, nor disclosed to testify about, and depends from person to person.   Insulin levels being "out of whack" is vague and ambiguous.   This fact is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

228.     Mrs. Hahn seemed very disconnected from her baby and in some of her rants stated they cut her open and stole the child and - to cut off her emotion from the child - said its not my kid - and the trauma of having a child removed is like a death like she had distanced herself from the child emotionally. (Dobbins Dep. 43:21-24 & 44:1-7)

RESPONSE:   This fact is undisputed insofar as these are Janelle Dobbins' observations and opinions.  Janet Hahn's feelings about her child and the reasons she did not have a relationship with her are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

229.     Mrs. Hahn thought about the loss of her baby in June 2007 as she yelled out to CO Voges, "remember they took my baby from me?" (Voges Dep. 42:9-19) and reported to Alyson Morris that DCFS took my kid. (Exhibit CC)(See also Exhibit B at 2)

RESPONSE:    This fact is disputed insofar as it is not supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2). No one knows what Mrs. Hahn was thinking about, or whether she thought about the loss of her baby in June of 2007. Otherwise, this fact is undisputed, but immaterial. Whether Mrs. Hahn thought about the loss of her baby in June of 2007 is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

230.     Mrs. Hahn identified her husband as her primary support but was unable to have contact with him due to domestic battery charges (Morris Dep. 37:6-9) and being away from her

husband was a concern for Mrs. Hahn (Morris Dep. 42:15-22) because they did everything together, they made decisions together, they argued together. (Dobbins Dep. 57:24 & 57:1)

RESPONSE:   This fact is disputed in part insofar as it is not supported by competent and/or admissible evidence. *See* Fed. R. Civ. P. 56(c)(2).  It is undisputed that Mrs. Hahn identified her husband as her primary support, and that she was unable to contact him due to domestic battery charges.  Alyson Morris's notes indicate there was a concern about Mrs. Hahn being away from Patrick.   However, Janelle Dobbins is incompetent to testify that this concern was because Mrs. Hahn and Patrick did everything together, made decisions together, argued together, etc.  Ms. Dobbins did not evaluate Mrs. Hahn after her incarceration, and has no way of knowing the basis of Mrs. Hahn's concern.  This fact is immaterial. Whether Mrs. Hahn identified her husband as her primary support, was unable to have contact with him, or was concerned about being away from him, is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

231.   CO Voges recalled giving an interview to ISP Cessna, Voges had read the interview notes and testified that it was the truth. (Voges Dep. 60:3-14)

RESPONSE:   This fact is disputed only insofar as it is not supported by competent and/or admissible evidence.   *See* Fed. R. Civ. P. 56(c)(2). In the deposition cited by Plaintiffs, page 60 of Karee Voges' deposition, she was asked the following questions and provided the following answers:

> Q.   And you testified that you did read this report that Trooper Cessna
>       wrote about an interview, correct?

A.    Uh-huh, yes.

Q.    And is there – do you recall having read this interview before?

A.    No.

Q.    You recall giving the interview?

A.    I do.

Q.    And at that time you gave the interview, did you tell the truth?

A.    Yes.

Q.    So, if it says in here, 'Voges removed Hahn from her cell in order to check her blood sugar; Voges advised Hahn just stood in front of the machine holding her hand out; Voges wasn't sure if Hahn didn't know how to use the machine or if she was just acting like she didn't know how to use it,' would that have been true and correct at the time?

Mr. Smith:  Objection to form and foundation.

The Witness:  Yes, if that's what the report states, I would have testified, yes.

(Voges Dep., pp. 60-61).

Voges testified that she told the truth to the Illinois State Police officer who interviewed her, not that every word of the report was accurately taken down, and a true and correct statement of what Ms. Voges said.  Further, this fact is immaterial.  Whether Voges recalled giving an interview to the Illinois State Police, whether she read the notes from the interview, or testified that she told the truth to the interviewer, is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

232.     On June 16, 2007 CO Voges saw that Mrs. Hahn was bleeding from the vaginal area and provided a maxi pad but no underwear was allowed, about 45 minutes later, Voges observed that Mrs. Hahn had stuck the used maxi pad to the side of the concrete bench and because of Mrs. Hahn's "bizarre" behavior, Voges thought Mrs. Hahn may have been going through "withdrawals. (A copy of CO Voges interview report by ISDP Cessna is attached hereto and incorporated herein as Exhibit DD)

RESPONSE:   This fact is disputed in part only insofar as it is not supported by competent and/or admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2). It is undisputed that on June 16, CO Voges saw that Mrs. Hahn was bleeding from the vaginal area and provided a maxi pad and no underwear was allowed.  It is also undisputed that Voges observed that Mrs. Hahn had stuck the used maxi pad to the side of the concrete bench. Plaintiffs cite to a copy of Illinois State Trooper Cessna's report of her interview with CO Voges to support Additional Material Fact #232.   However, as noted in response to Additional Material Fact #231, Trooper Cessna's report is not properly authenticated or competent evidence.  Further, she was directly asked in her deposition about a portion of this report. Voges was asked the following questions and provided the following answers:

> Q.    In the report that was authored by Trooper Cessna, she writes
>         down, 'Voges thought because of Hahn's', and then she writes,
>         'bizarre behavior that Hahn possibly could be going through some
>         type of withdrawals.' Do you remember telling Trooper Voges (sic)
>         that statement?

Mr. Smith:  Asked and answered.

The Witness:  No, I don't recall specifically stating that to her, no.

(Voges Dep., p. 56).

Whether CO Voges believed that Mrs. Hahn's behavior was bizarre, or believed she may have been going through withdraws is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

233.    Photographs of Cell F-1, where Mrs. Hahn was left, show spots of blood on the floor (Exhibit X-5) and a bloodied maxi pad stuck to the wall. (Exhibit X-2)

RESPONSE:    This fact is disputed only insofar as it is not supported by competent and/or admissible evidence. *See* Fed. R. Civ. P. 56(c)(2).  The photographs referenced in Additional Material Fact #233, X-5 and X-2, do not, in and of themselves, support the fact alleged.  Photograph X-5 does show red spots on the floor; however, there is no evidence that these spots are blood.  Likewise, photograph X-2 does not, by itself, show a bloodied maxi pad stuck to the wall.  This fact is immaterial.  Whether Mrs. Hahn was menstruating is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

234.    Mrs. Hahn had a complex set of issues, including having had her child taken away and being in her menstrual cycle, which could have had other emotional ramifications. (Philipson Dep. 123:7-21)

RESPONSE:    "Complex set of issues" is vague and ambiguous.  It is undisputed that Mrs. Hahn's child was taken into protective custody, and at the time of her death she was in her menstrual cycle.  These facts are immaterial and irrelevant to Plaintiffs' *Monell*

claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

235.  People who have hypo or hyperglycemia can have altered mental status. (Philipson Dep. 17: 19-21) and Mrs. Hahn's abnormal mental state could by itself be indicative of diabetic ketoacidosis; was not further evaluated. (Philipson Dep. 62:21-24).

RESPONSE:  It is undisputed that people who have hypo or hyperglycemia can have altered mental status, and an abnormal mental state in a diabetic could, by itself, be indicative of diabetic ketoacidosis.  However, nothing in the sections of Dr. Philipson's deposition testimony cited by Plaintiffs in Additional Material Fact #235 stands for the proposition that Mrs. Hahn had an abnormal mental state. In fact, Dr. Philipson testified that he assumed her mental state was impaired, but acknowledged that he did not know Mrs. Hahn's mental state.  (Philipson 9/21/09 Dep., p. 48).  "Not further evaluated" is vague and ambiguous.  It is unclear to Defendants what the phrase "was not further evaluated" in Additional Material Fact #235 is referencing.  Consequently, this fact is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

236.    In June 2007 Fran Workman, R.N. was the HPL site manager which is the same as Director of Nursing (Workman Dep. 18:5-16) and Nurse Workman sent an email (Workman Dep. Ex. 1) to various jail staff on July 13, 2007, all of which she testified was true (Workman Dep. 8:7-24 & 9:1-4) and stated "I have been thinking about Ms. Hahn and I feel that whenever someone mentally challenged is brought into the jail a nurse needs to be called and

if it is 2nd or 3ʳᵈ shift an Email sent off to all 3 of us and a call to the on call RN. I am thinking that her mental condition is really the major factor that lead to her death." (Email from Fran Workman dated July 13, 2007 is attached hereto and incorporated herein as Exhibit J).

RESPONSE:   It is undisputed that Fran Workman sent an email on July 13, 2007, and Plaintiffs have correctly quoted from it; however, these opinions of Fran Workman, who was not on-site during Mrs. Hahn's incarceration, lack foundation and personal knowledge of the events in question.  Plaintiffs have not disclosed Fran Workman as an expert witness, and therefore, to the extent that Fran Workman's email is being used as an opinion regarding factor(s) that led to Mrs. Hahn's death, the opinion is inadmissible and should be stricken.  Further, any evidence of policy changes as a result of this incident are subsequent remedial measures, which must be excluded pursuant to Federal Rule of Evidence 407. Notably, the night Janet Hahn was incarcerated, the on-call RN was called and an email was sent to the mental health and nursing staff.  (UMF ¶¶ 78-79; 82-83; 84). This fact is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

237.   Without insulin injections, patients with type 1 diabetes *will go into a state known as diabetic ketoacidosis (DKA),* which has a high morbidity and mortality, if not promptly treated and can lead to death in a relatively short time. (Ex. A – p.1).

"Hypoglycemic unawareness is a state where the blood sugar drops to dangerously low levels, but the individual is literally unaware that their blood sugar is so low. That is a not an uncommon circumstance in type 1 diabetes, but anyone who takes insulin repeatedly and has low sugars will begin to lose the ability to sense a low blood sugar. What that means is that instead of having the usual symptoms of sweating, tachycardia' and associated palpitations, my personal

41

favorite is a sense of impending doom, that those things disappear and one is left with changes in what we call cognitive function, so brain function goes away. People can look drunk, they can have changes in personality or behavior, they can do or say things that they don't recall or will regret. They can regress, they can be aggressive, and they certainly don't act in their own interest in cases of hypoglycemia or neuro — what we call hypoglycemic unawareness and the associated state of what we call neuroglycopenia which is the brain is not getting enough glucose". (Philipson Dep. Ex. 2 (Philipson Dep of 9/21/09), 59: 4-24 & 60:1)

RESPONSE:  "Relatively short time" is vague and ambiguous. This fact is undisputed and material in part and immaterial in part.  It is an undisputed material fact that without insulin injections, patients with Type I diabetes will ultimately go into a state known as diabetic ketoacidosis, which has a high morbidity and mortality, and can lead to death.  However, the remaining quote from Dr. Philipson's deposition is immaterial as Janet Hahn did not suffer from hypoglycemia while at the Champaign County Correctional Center in June of 2007.

238.    In regards to diabetes, Dr. Louis Philipson is a standard of care. (Philipson Dep. 38: 1-15).

RESPONSE:   It is undisputed that Dr. Philipson is an endocrinologist. Whether he is a "standard of care" is a medical-legal inquiry and not a statement of fact.  This is not a medical malpractice case and, therefore, whether Dr. Philipson is a standard of care is immaterial.

### Friday, June 15, 2007

239.    The record suggests that on June 15, 2007, Mrs. Hahn had some possibly delusional or unrealistic concerns about her husband's fidelity and ended up running after him with a kitchen knife and inflicting a superficial surface wound. (Ex. A - p.1).

42

RESPONSE:   The statement that "Mrs. Hahn had some possibly delusional or unrealistic concerns about her husband's fidelity" lacks competent evidentiary support and therefore is inadmissible.  This Additional Material Fact is supported by Dr. Philipson's expert report.  Dr. Philipson has no personal knowledge, lacks foundation and expertise to opine about Patrick Hahn's fidelity and, therefore, cannot opine as to whether Janet Hahn's concerns were delusional or unrealistic, which is immaterial in any event.  The remainder of Additional Material Fact #239 is undisputed and material.

240.   In 2007, Mrs. Hahn was prescribed Seroquel, which is used to treat bipolar (Hoffman Dep. 101:1-14) and for her type 1 diabetes regimen she took Lantus Insulin 22 units in the evening, Novolog Insulin 8 units in the morning, 12 units in the afternoon and 8 units in the evening. (Exhibit C – p.1)

RESPONSE:    This fact is disputed in part.  Dr. Hoffman did testify that Seroquel is used for bipolar disorder, but he also testified that Seroquel is used for other purposes.  Dr. Hoffman did not testify why Mrs. Hahn was prescribed Seroquel.  It is undisputed that in 2007, Mrs. Hahn was prescribed medications for her diabetes, whether she "took" those medications and what consistency is not supported by competent and/or admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2).  Because Janet Hahn refused to provide information regarding her diabetes medications or authorize release of her medical information, her diabetes regimen in 2007 is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

241.   Mrs. Hahn was booked into the jail at 6:23 p.m. (Schweighart Dep. Ex. 2) at which time she was uncooperative in answering many of the booking questions but she did indicate that she was diabetic and that she felt like hurting herself. (Id.)

RESPONSE:    This fact is undisputed and material.

242.   CO Schweighart did not believe that Mrs. Hahn had been drinking but he reported to ISP Cessna, in a June 29, 2007 interview, which he testified was all true and correct (Schweighart Dep. 9:1-18) that Mrs. Hahn was acting like she was drunk and described her as "not being all there". (Schweighart Dep. - Ex. 1 at p.2)

RESPONSE:    Schweighart did testify that Mrs. Hahn was acting like she was drunk and described her as "not being all there"; however, he also described her as being "coherent". (Schweighart Dep., p. 26, and Ex. 1 attached thereto).  This fact is otherwise undisputed and material.

243.   CO Schweighart documented that Mrs. Hahn was "not oriented for time and place" at the booking procedure, (Schweighart Dep. - Ex. 2 at p.1)

RESPONSE:    This fact is undisputed and material.

244.   From his interactions with Mrs. Hahn, CO Schweighart had indications that she was mentally deficient. (Schweighart Dep. 35:13-16)

RESPONSE:    "Mentally deficient" is vague and ambiguous.  This fact is otherwise undisputed and material.

245.   CO Schweighart made a determination that Mrs. Hahn should be housed alone because she was in a suicide gown. (Schweighart Dep. 36:13-23)

RESPONSE:    This fact is undisputed and material.

246.   As the night went on, Mrs. Hahn was banging on the door and yelling. (Schweighart Dep. 24:2-3)

44

RESPONSE:   This fact is undisputed and material.

247.   CO Lewis testified that she opened the cell door and handed in a styrofoam tray of food and when CO Lewis later picked the tray up some of the food was gone but she did not know if Mrs. Hahn ate the food or put it in the toilet. (Lewis Dep. 59:2-12)

RESPONSE:   This fact is undisputed and material.

248.   Mrs. Hahn stuffed her green blanket into the toilet but no flooding actually occurred. (Lewis Dep. 68:3-19) This was in June 2007 when Mrs. Hahn had only been in the jail a couple of hours after being booked. (Lewis Dep. 57:1-12)

RESPONSE:   It is undisputed that Officer Lewis testified that no flooding occurred while Lewis was present; however, Chad Schweighart testified that Janet Hahn did flood her cell by stuffing the toilet.  (Schweighart Dep., p. 4).  It is undisputed that Mrs. Hahn stuffed the toilet.  Whether she stuffed the toilet and the extent of the flooding in her cell are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

249.   Mrs. Hahn was housed in F-1 on June 15, 2007 (Johnson Dep. Ex.1) Cell F-has its own drain. (Exhibit X1 -X5)

RESPONSE:   This fact is undisputed.  It is immaterial that Mrs. Hahn was housed in F-1 on June 15, 2007.  Whether Cell F-1 has its own drain is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

250.  Sgt. Johnson turned the water to Mrs. Cell off, passing on to the next shift that "She flooded the booking area" (Johnson Dep. - Ex. 1), but he was not able to recall how much of the booking area got "flooded", nor how deep the water was, and he did not need to call a clean-up crew. (Johnson Dep. 19:1-9)

RESPONSE:   This fact is undisputed.  Whether Sgt. Johnson turned the water off to Mrs. Hahn's cell, passed on to the next shift that Hahn had flooded the booking area, how much water was in the cell, and whether a cleanup crew was called, are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

251.  Sgt. Johnson does not recall how long the water to F-1 remained off (Johnson Dep. 19:14-16) and there is no evidence in the record that the water was turned back on at any time during Mrs. Hahn's incarceration in Cell F-1 and it was not passed on to the Sunday shift that Mrs. Han's water was shut off. (Alexander Dep. 24:9-24 & 25:1-5)

RESPONSE:   Additional Material Fact #251 is not supported, in its entirety, by competent and/or admissible evidence.  *See* Fed. R. Civ. P. 56(c).  Correctional Officer Alexander did not state that it was not passed on to the Sunday shift that Mrs. Hahn's water was shut off; rather, Correctional Officer Alexander testified that he did not remember it being passed on.   The remainder of Additional Material Fact #251 is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

252.  After about 9:00 p.m., Mrs. Hahn was standing at the cell window for more than an hour, constantly yelling that she needed help and to call her doctor, (MacFarlane Dep. 25:8-24 & 26:1-21)

253.

RESPONSE:  This fact is not supported by admissible and/or competent evidence, and therefore is disputed.  *See* Fed. R. Civ. P. 56(c).  It is undisputed that around 9:00 p.m. Mrs. Hahn was standing at the cell door.  However, Janet Hahn's alleged statement offered by Mr. MacFarlane in his deposition testimony is inadmissible hearsay, and cannot be considered in response to HPL's Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56(c), and Federal Rules of Evidence 801, 802, 803 and 804.  Furthermore, Janet Hahn's statements, even if not excluded as inadmissible hearsay, are immaterial.  After 9:00 p.m., specifically at or about 9:40 p.m., after Sgt. Johnson had conferred with the on-call nurse, Kendra Adams, Janet Hahn's blood sugar was taken.  The blood sugar reading was 160. (UMF ¶¶ 78-80).  Sgt. Johnson then called Nurse Kendra Adams again and advised her of the Accu-Chek reading.  Kendra Adams advised Sgt. Johnson that Janet Hahn's blood sugar reading of 160 was within an acceptable range, and that Hahn did not need further diabetic medical attention that night.   (UMF ¶¶ 82-83). Thus, even if Janet Hahn's inadmissible hearsay statement was admitted into evidence, the evidence clearly shows that her medical needs were addressed after making these statements.  Further, whether Mrs. Hahn was yelling that she needed help and to call her doctor at a time when no HPL staff was at the Champaign County Satellite Jail is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

254.   Mrs. Hahn asked for help most when a guard was doing a check at her cell. She basically said "I'm a diabetic", "I need my doctor", "I need my medicine" and after a while she kept saying "Call my Doctor". (MacFarlane Dep. 27:20-24 & 28:1-9)

RESPONSE:  This fact is not supported by admissible and/or competent evidence, and therefore is disputed.  *See* Fed. R. Civ. P. 56(c).  It is undisputed that around 9:00 p.m. Mrs. Hahn was standing at the cell door.   However, Janet Hahn's alleged statement offered by Mr. MacFarlane in his deposition testimony is hearsay without an exception,

and cannot be considered in response to HPL's Motion for Summary Judgment. Furthermore, Janet Hahn's statements, even if not excluded as inadmissible hearsay, are immaterial.  *See* Fed. R. Civ. P. 56(c), and Federal Rules of Evidence 801, 802, 803 and 804. After 9:00 p.m., specifically at or about 9:40 p.m., after Sgt. Johnson had conferred with the on-call nurse, Kendra Adams, Janet Hahn's blood sugar was taken.  The blood sugar reading was 160.  (UMF ¶¶ 78-80).  Sgt. Johnson then called Nurse Kendra Adams again and advised her of the Accu-Chek reading.  Kendra Adams advised Sgt. Johnson that Janet Hahn's blood sugar reading of 160 was within an acceptable range, and that Hahn did not need further diabetic medical attention that night.  (UMF ¶¶ 82-83).  Thus, even if Janet Hahn's inadmissible hearsay statement was admitted into evidence, the evidence clearly shows that her medical needs were addressed after making these statements.  Further, whether Mrs. Hahn was yelling that she needed help and to call her doctor at a time when no HPL staff was at the Champaign County Satellite Jail is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

255.   No medical staff came there on Friday night. (MacFarlane Dep. 29:1-22)

RESPONSE:    "There" is vague and ambiguous.  It is undisputed that there was not medical staff physically at the Champaign County Satellite Jail on Friday night; however, Sergeant Johnson contacted the nurse on call that evening. (UMF ¶¶ 78-79, 82-83).

256.   On Friday night Mrs. Hahn clearly stated what she needed but there was no responses to her. (MacFarlane Dep. 81:1-12)

RESPONSE:   This fact is not support by competent evidence, and is therefore inadmissible.  *See* Fed. R. Civ. P. 56(c).  However, Janet Hahn's alleged statement offered by Mr. MacFarlane in his deposition testimony is inadmissible hearsay, and cannot be considered in response to HPL's Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56(c),

and Federal Rules of Evidence 801, 802, 803 and 804. Furthermore, Janet Hahn's statements, even if not excluded as inadmissible hearsay, are immaterial.  Furthermore, at or about 9:40 p.m., Janet Hahn's blood sugar was taken.  The blood sugar reading was 160.  (UMF ¶¶ 78-80; AMF 256-257). In other words, Plaintiffs have already conceded that Mrs. Hahn's request for assistance as noted by Mr. MacFarlane in Additional Material Facts #252 and #253, were answered that evening. Her blood sugar was taken, and a nurse was contacted on multiple occasions.  (UMF ¶¶ 78-83).

257.   Sgt. Johnson, Badge #345 (Johnson Dep. 8:10-12) tested Mrs. Hahn's blood sugar at 9:40 p.m. and entered reading of 16o on the tracking sheet. (Exhibit H)

RESPONSE:    This fact is undisputed and material.

258.   A blood sugar reading of 16o is above what you'd like in an insulin dependent diabetic, but not life-threatening. (Hoffman Dep. 66:7-12)

RESPONSE:    This fact is undisputed and material.

258.   A normal blood sugar in the fasting state ranges from 70 -100, slightly lower for women. (Philipson Dep. 41:18-20) In type 1 diabetes one needs insulin regardless of what the blood sugar level is. (Philipson Dep. 56:14-18) One can have diabetic ketoacidosis with a normal blood sugar and with a blood sugar of 100 you can still have ketones. (Id.)

RESPONSE:    This fact is repetitive and redundant of Additional Material Facts #192 and #193, and internally contradicts Additional Material Fact #208.

259.   On the weekend of June 15, 2007 to June 17, 2007, no police officers or deputies ever asked Patrick Hahn about Mrs. Hahn's insulin or any of her other medications or about her blood sugar testing equipment and no officers came to the Hahn home to get those things for Mrs. Hahn. (Affidavit of Patrick Hahn is attached hereto and incorporated herein as Exhibit EE)

RESPONSE:    This fact is undisputed, but immaterial.  Whether officers or deputies asked Patrick Hahn about Mrs. Hahn's insulin or other medications during the weekend

49

between June 15, 2007, and June 17, 2007, is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL. Further, Defendants' adopt Co-Defendants' Motion to Strike Affidavit of Patrick Hahn.  (d/e # 138).

260.  Since the patient was known to be mentally handicap, was despondent and suicidal, and could not have contact with her husband, medical personnel or others could have contacted her husband for this information and to sign appropriate releases to obtain medical information. (Exhibit D)

RESPONSE:  Additional Material Fact #260 is a legal conclusion, not a fact, and is not supported by competent and/or admissible evidence.  *See* Fed. R. Civ. P. 56(c). Whether medical personnel or others could have contacted Patrick Hahn to sign appropriate releases on behalf of Janet Hahn is a legal question.

261.  The American Diabetes Association video correctly points out that people with diabetes often have altered mental status. Anyone who interacts with the public, if confronted with someone with known diabetes and doesn't inquire further, one is taking a big risk and the diabetic could die as a result of that risk. (Philipson Dep. 46:10-120)

RESPONSE:  Dr. Philipson's opinion is conclusory and speculative.  Furthermore, the Undisputed Material Facts clearly establish that the corrections and security staff at the Champaign County Correctional Center repeatedly inquired into Janet Hahn's diabetic condition.  The American Diabetes Association video speaks for itself, but the video is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

262.   Mrs. Hahn was not given any insulin or other medication on Friday night. (Johnson Dep. -Ex.2)

RESPONSE:   This fact is undisputed and material to the extent that "on Friday night" refers to Mrs. Hahn's period of incarceration at the Champaign County Correctional Center.

263.   HPL diabetic protocol on the MAR was Accu-Chek twice a day, insulin after sugar checks per sliding scale and nighttime snack. (Swain Dep. 62-63)

RESPONSE:   It is undisputed that the diabetic protocol established for Janet Hahn, as documented on the MAR, was for her to have her blood sugar checked twice a day, i.e., Accu-Chek twice a day, insulin after sugar checks per sliding scale and nighttime snack. The wording of Additional Material Fact #263, "HPL diabetic protocol on the MAR," is vague and confusing.  This fact is material.

### Saturday, June 16, 2007

264.   Early Saturday morning Donald MacFarlane observed Mrs. Hahn standing at the booking counter arguing with officers regarding blood sugar testing. (MacFarlane Dep. 32-33) Mrs. Hahn was insisting on using her right hand, stating "I always use my right hand". (Id.) The officer insisted that she give her left hand. (Id.) When Mrs. Hahn finally said "No", the officer said "Just get back in your cell" and put her in the cell without checking blood sugar. (Id.)

RESPONSE:   It is undisputed that early Saturday morning, Donald MacFarlane observed Mrs. Hahn standing at the booking counter. However, Janet Hahn's alleged statement offered by Mr. MacFarlane in his deposition testimony is inadmissible hearsay, and cannot be considered in response to HPL's Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(c), and Federal Rules of Evidence 801, 802, 803 and 804.  Furthermore, Janet Hahn's statements and alleged conversation with an individual correctional officer, even if not excluded as inadmissible hearsay, are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or

51

Plaintiffs' ADA and Rehabilitation Act claim against HPL.

265.   Mr. MacFarlane was housed in the booking area from about 9:00 p.m. to 9:00 a.m. on Friday, Saturday and Sunday (MacFarlane Dep. 79:6-9) and left for the work release pod each day around 8:30-9:30 a.m. (MacFarlane Dep. 30:4-22)

RESPONSE:   This fact is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

266.   CO Voges brought Mrs. Hahn breakfast around 6:30 a.m. and she refused or did not eat, so Voges wrote "368" in a circle on the seg log which indicates a refusal of breakfast on Saturday morning. (Voges Dep. 24:1-13)

RESPONSE:   This fact is undisputed and material.

267.   CO Carl Brown, Badge #328, worked in booking on Saturday from 7:45 a.m. to 4:15 p.m. (Brown Dep. 16:16-24 & 17:1-5)

RESPONSE:   This fact is undisputed and material.

268.   CO Brown brought the Accu-Chek to Mrs. Hahn, who was cooperative but she wasn't sure how to use the Accu-Chek machine so he helped her and got a blood sugar reading of 396 at 9:57 a.m. (Brown Dep. 23-25) The nurse was not there so Brown called the nurse on the telephone. (Id.)

RESPONSE:   This fact is disputed only insofar as it is unknown and unknowable whether Janet Hahn wasn't sure how to use the Accu-Chek.  It is undisputed that this was CO Brown's impression.  Otherwise, this fact is undisputed and material.

269.   On Saturday Swain did not actually see the reading of 396 on the Accu-Chek (Swain Dep. 21-24 & 39:1-2) and eventually Mrs. Hahn was given 20 units of R (regular) insulin. (Swain Dep. 35:1-5)

RESPONSE:   This fact is undisputed.  Whether on Saturday Susan Swain  actually saw the Accu-Chek reading of 396 is immaterial and irrelevant to Plaintiffs' *Monell* claim

against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.  It is undisputed that the Acc-Chek reading was 396.  Otherwise, this fact is undisputed and material.

270.    Giving 20 units of R insulin to a type 1 diabetic at mid-morning makes no sense at all, you want to give it before a meal (Philipson Dep. 129:4-17), unless you know the patient's history, you are operating blind and to administer 20 units of regular insulin could have killed her on the spot (Philipson Dep. 65:16-22) with hypoglycemia. (Ex. A)

RESPONSE:   This fact is disputed and immaterial.  Whether 20 units of regular insulin was appropriate for Janet Hahn is a matter of medical judgment; "[s]uch matters are questions of tort, not constitutional law." *Snipes v. Detella*, 95 F.3d 586, 591 (7th Cir. 1996).  Dr. Joseph Paris opined that the dose given proved to be appropriate, since the next blood sugar charted at 107. (HPL Ex. 23, Dr. Paris' expert report, p. 4). Further, whether it could have killed her on the spot with hypoglycemia is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL. Janet Hahn was not injured in any way in the administration of 20 units of regular insulin, and did not have hypoglycemia.

271.   If the blood sugar reading was 396, the nurse should have verified this with another immediate reading (Exhibit D) and 15 units should have been administered per sliding scale protocol. (Id.) The nurse should have notified the physician at the reading of 396, this was not done. (Id.)

RESPONSE:   This fact is disputed insofar as the statement "this was not done" is not supported by competent and/or admissible evidence.  *See* Fed. R. Civ. P. 56(c). Exhibit D is Lisa Adams' expert report.  Lisa Adams has no personal knowledge of, and is therefore not competent to testify to, whether "this was not done."  Plaintiffs' only claim is a constitutional one, brought pursuant to *Monell*; this is not a case of medical

malpractice.  Whether the nurse should have verified the blood sugar reading with another test, and whether 15 units of insulin should have been administered, and whether the nurse should have notified the physicians, are questions of medical judgment; "[s]uch matters are questions of tort, not constitutional law." *Snipes v. Detella*, 95 F.3d at 591, and are, therefore, immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

272.  When the blood sugar reading was 396, the nurse, without receiving authority from the supervising physician, increased the patient's dose on her own authority which is a violation of protocol. (Exhibit C)

RESPONSE:   This fact lacks foundation and is not supported by competent evidence, and is therefore inadmissible.  *See* Fed. R. Civ. P. 56(c). Exhibit C is Dr. Hoffman's expert report.   Dr. Hoffman has no personal knowledge of, and is therefore not competent to testify to, whether the nurse, without receiving authority from the supervising physician, increased the patient's dose on her own authority.   Further, assuming the nurse increased the dose on her own authority and that was a violation of protocol, these are questions of medical judgment; "[s]uch matters are questions of tort, not constitutional law." *Snipes v. Detella*, 95 F.3d at 591, and are, therefore, immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

273.   Since R insulin is a short acting insulin, usually good for approximately 6 hours in the system, the patient's blood sugar should have been checked within 6 hours of administering the first dose. (Exhibit C)

RESPONSE:   It is undisputed that R insulin is a short-acting insulin.  When and how frequently blood sugars should be checked after administering a dose, is a matter of medical judgment, which varies between Plaintiffs' own experts and Defendants' experts (see HPL Ex. 23); "[s]uch matters are questions of tort, not constitutional law." *Snipes v. Detella*, 95 F.3d at 591. The period of time within which the dose should be checked is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL. Dr. Philipson opined that the HPL protocol, if complied with by Hahn, would have been sufficient.  (*See* Response to AMF ¶ 188).

274.   Officers documented that Mrs. Hahn refused lunch and dinner on Saturday. (Exhibit G)

RESPONSE:   This fact is undisputed and material.

275.   Mrs. Hahn was set up on a protocol to receive a nighttime snack at about 9:00 p.m. each night which it was the officers job to provide. (Swain Dep. 62:19-24 & 63:1-13) The requirement of a nighttime snack was never noted on Mrs. Hahn's seg sheet (Exhibit G) and there is no evidence in the record that a snack was ever provided.

RESPONSE:   This fact is undisputed and material.  Notably, there is no evidence in the record that a snack was not provided.

276.   The nighttime snack was noted on Mrs. Hahn's M.A.R. (Medication Administration Record) (Swain Dep. 62-65) which is kept in a drawer in the infirmary (Id.) and it is not a form that is used by officers. (Id.)

RESPONSE:    This fact is undisputed and material.

277.   A snack would have been a good thing, people who are getting long-acting insulin sometimes benefit from a snack at bedtime to prevent low blood sugar at night. (Philipson Dep. 83:12-16) Eating food and the right kinds of food is directly related to the treatment of a diabetic patient, (Adams Dep. 87:19-23 & 88:1-5)

RESPONSE:    This fact is undisputed and material.

278.   The documentation of Mrs. Hahn's blood sugar reading at 4:00 p.m. on Saturday is subject of contention (Philipson Dep. 85:2-6) and a violation of medical protocol and therefore is highly suspect. (Exhibit C) (Exhibit D) Lisa Adams, R.N. had no reason to believe that it was an honest mistake (Adams Dep. 62:2-3) and was skeptical that Mrs. Hahn's blood sugar dropped from 396 to 107 in five hours on Saturday. (Adams Dep. 56-57) The medical record was altered (Exhibit H) by scribbling out 320 and writing 107 above which violates medical guidelines. (Id. 57-60)

RESPONSE:    This fact is not an Additional Material Fact, but rather Plaintiffs' argument and conclusions.  Plaintiffs' experts, Dr. Philipson and Nurse Lisa Adams, did not have the benefit of Jenna Thode's deposition testimony which clearly explains the blood sugar and insulin tracking sheet for Janet Hahn.  Jenna Thode explained that she wrote her badge number down in the column for blood sugar, scribbled it out and wrote the correct blood sugar. (Thode Dep., pp. 39-40). This fact is not and cannot be disputed. The fact that Lisa Adams doesn't believe it was an honest mistake is neither here nor there.  Likewise, whether scribbling out the number or writing one line through the number is a violation of medical protocol, is immaterial.  A correctional officer, not medical staff, is the one who "scribbled" it out.  Furthermore, "[s]uch matters are questions of tort, not constitutional law." *Snipes v. DeteIIa*, 95 F.3d at 591.  Whether this

56

was a violation of medical protocol is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

279. When Mrs. Hahn demanded insulin at 4:00 p.m. Saturday, she absolutely needed insulin and was denied. (Exhibit A) Assuming Lantus was not available, she should have been given a very small dose of regular insulin every 4 to 6 hours and would have survived but she absolutely needed insulin before bed that night and that was not given nor attempted to be given. (Philipson Dep. 85:13-24 & 86:1) From the record, it is apparent that Mrs. Hahn had no trust in Swain who seemed to not know the difference between R insulin and other insulin, Mrs. Hahn argued about the dose, about the kind of insulin and when she wasn't given her own insulin, she then refused to have her blood sugar checked - this is not a relationship of trust. (Id. at 69-70)

RESPONSE: This fact lacks foundation and is not supported by competent evidence, and therefore is inadmissible. *See* Fed. R. Civ. P. 56(c). Dr. Philipson has no personal knowledge of the relationship between Mrs. Hahn and Susan Swain, and therefore cannot opine regarding the status of the trust in their relationship. Janet Hahn had a blood sugar reading of 107 at 4:00 p.m. on Saturday. Whether she had an absolute need for insulin is a question of medical judgment, and the experts disagree. (*See* HPL Ex. 23, Dr. Paris' expert report, p. 4). Pursuant to the sliding scale used by HPL, no insulin was required. Medical judgment disagreements of this nature are questions of tort, not constitutional law. *Snipes v. DetelIa*, 95 F.3d at 591. Further, this is belied by Dr. Philipson's own testimony. He testified that had Janet Hahn's blood sugar been checked even one time on Sunday, she likely would have survived. (Philipson Dep., p. 90). Dr. Philipson further testified that had Janet Hahn followed the HPL protocol, "[H]er life could have been saved by two blood sugar checks on Sunday." (Philipson Dep., p. 93).

Janet Hahn did not have her blood sugar checked because of her repeated refusals. (UMF ¶¶ 138, 146, 147, 151, 156).  She was offered blood sugar checks more than twice on Sunday, and refused them.  Id. Thus, the HPL protocol that blood sugars be checked twice a day and insulin administered per sliding scale, is immaterial as this protocol is not related in any way to her death.  Dr. Philipson's own testimony makes this very clear, as he testified that a single dose of insulin on Sunday would have been sufficient for Janet Hahn.

280.   Mrs. Hahn started looking very sickly on Saturday night and her skin was just very pale, (MacFarlane Dep. 84:2-11) and she was standing at the window looking really withdrawn and out of it. (Id. 35:2-24)

RESPONSE:    It is undisputed that these are Mr. MacFarlane's observations of Mrs. Hahn on Saturday night.  Mr. MacFarlane's observations of Janet Hahn on Saturday night are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.  HPL staff were not present at the Champaign County Correctional Center on Saturday night.  Moreover, this is not a case of individual liability for deliberate indifference to a serious medical need, but rather a *Monell* claim.  If an observation was made or an observation was missed, is immaterial and irrelevant to such a claim.

## Sunday, June 17, 2007

281.   On Sunday Mrs. Hahn refused breakfast and lunch (Alexander Dep. 22:18-24 & 19:1-12) and she refused dinner, (Exhibit G) with no documentation or testimony about nighttime snack. (Exhibit G)

RESPONSE:    "No documentation or testimony about nighttime snack" is vague and ambiguous.  To the extent that Plaintiffs are asserting that there is no documentation to confirm delivery and consumption of a nighttime snack, the fact is undisputed.

58

However, as noted above, a nighttime snack was ordered and there is no evidence it was not delivered and consumed. *See* AMF ¶¶ 275, 276, 277, and the responses to the same. This fact is undisputed and material.

282.    No blood sugar readings were obtained on Sunday. (Exhibit H)

RESPONSE:    This fact is undisputed and material.

283.    Around 8:00 a.m. Mrs. Hahn asked to see the nurse and said that she wanted her blood sugar checked because it was high (Alexander Dep. 61:20-24 & 62:1) (Alexander Dep. Ex. 1) and he told this to Swain on Sunday morning. (Alexander Dep. 33:2-11)

RESPONSE:    This fact is disputed only insofar as the time was 9:00 a.m. and not 8:00 a.m., and Janet Hahn believed that her blood sugar was high, but did not know it was high.  Otherwise, this fact is undisputed and material.

284.    Swain visited Mrs. Hahn Sunday and noticed from the seg log that Mrs. Hahn had refused meals Saturday and Sunday, (Swain Dep. 101:10-24 & 102:1-5)

RESPONSE:    This fact is undisputed and material.

285.    On Sunday Mrs. Hahn told Swain that her stomach hurt and she felt like she was going to throw up and CO Castor reported to Swain that Mrs. Hahn was nauseous and had thrown up. (Swain Dep. 86-87)

RESPONSE:    This fact misstates Ms. Swain's deposition testimony.  Mrs. Hahn told Swain that her stomach hurt, but not that she felt like she was going to throw up. Correctional Officer Castor reported to Swain that Mrs. Hahn had reported throwing up. This fact is otherwise undisputed and material.

286.    When Mrs. Hahn did not have insulin for 24 hours, she was in diabetic ketoacidosis and she was exhibiting the typical symptoms of DKA, including dry heaves which is vomiting with nothing coming up, abdominal pain, nausea, and she had not had blood sugars tested. (Philipson Dep. 74-75)

287.

59

RESPONSE:   This fact is not supported by competent evidence, and is therefore inadmissible. *See* Fed. R. Civ. P. 56(c).  Dr. Philipson offered no affirmative evidence that Janet Hahn was in diabetic ketoacidosis after 24 hours without insulin.  Fact #288 is a more accurate statement of Dr. Philipson's testimony in that it is unknown whether Mrs. Hahn was in diabetic ketoacidosis; however, her nausea on Sunday morning suggested that she was. Furthermore, it is immaterial because at most, suggests that there were signs and symptoms of diabetic ketoacidosis that were missed on Sunday.  Whether signs and symptoms of diabetic ketoacidosis were missed are questions of tort, not constitutional law.  Furthermore, whether signs and symptoms were missed are issues of individual, not *Monell* liability.  Therefore, these "facts" are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

288.   Nurse Swain's statement that she had a normal conversation with Mrs. Hahn on Sunday is highly suspect, especially since the nurse did not document her interactions with the patient and there are no quotations from Mrs. Hahn, (Philipson Dep. 90:1-24) Nurse Swain did not even document whether she smelled the patient's breath to see if she had ketones, that would have saved her life. (Philipson Dep. 119:2-5)

RESPONSE:   This fact is not a statement of fact, but rather conjecture, speculation, argument and opinion. Dr. Philipson is not an expert in evaluating a witness's veracity and he cannot properly opine about whether Swain was telling the truth.  His disbelief that Susan Swain had a normal conversation with Mrs. Hahn on Sunday afternoon is without factual support, and is merely his lay opinion; he has no reason to know or disbelieve Susan Swain's statement.  Further, it is inconceivable that smelling someone's breath could save their life.  Presumably, Additional Material Fact #286 is suggesting that had Susan Swain smelled Janet Hahn's breath and noticed a fruity scent indicative of ketones, steps could have been taken to administer insulin.  However, this is

60

a series of speculation not supported by facts, and therefore inadmissible and inappropriate to defeat HPL's Motion for Summary Judgment.  Further, whether Susan Swain smelled or should have smelled Janet Hahn's breath, is a matter of medical judgment; "[s]uch matters are questions of tort, not constitutional law." *Snipes v. Detella*, 95 F.3d at 591. Susan Swain is not a defendant and this is not a negligence claim, and, therefore, this Additional Material Fact is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

289.   Mrs. Hahn was dying on Sunday and she should have been taken to the hospital. (Philipson Dep. 69:11-16) It is clear that Mrs. Hahn's blood sugars were rising all day and all night (Exhibit A) and her nausea on Sunday morning suggests that she was already in DKA (diabetic ketoacidosis) on Sunday morning. (Exhibit A)(Philipson Dep. 130:4-15)

RESPONSE:   This fact is disputed insofar as it is based on speculation and inadmissible evidence.  *See* Fed. R. Civ. P. 56(c).  Furthermore, it is immaterial because at most, suggests that there were signs and symptoms of diabetic ketoacidosis that were missed on Sunday.  Whether signs and symptoms of diabetic ketoacidosis were missed are questions of tort, not constitutional law.  Furthermore, whether signs and symptoms were missed are issues of individual, not *Monell* liability.   Therefore, these "facts" are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

289.   No blood sugar checks for 30 hours (Saturday at 4pm-Sunday at 8pm) and no insulin for 36 hours (Saturday at l0am-Sunday at 10pm) on a type 1 diabetic certainly raises some kind of a red flag. (Cullinan Dep. 121:1-10)

RESPONSE:   This fact is undisputed and material.

290.   If not treated in time, diabetic ketoacidosis is life threatening. (Cullinan Dep. 125:21-24)

RESPONSE:   This fact is undisputed and material.

291.   No competent R.N. Could have believed that it was fine to leave Mrs. Hahn only in the care of correctional officers on Sunday afternoon, (Adams Dep. 1og:12-23) There were no written instructions left for these guards and if instructions are left, they should be documented in the medical records. (Adams Dep. 134:1-13)

RESPONSE:   This fact is not supported by competent and/or admissible evidence. *See* Fed. R. Civ. P. 56(c).  Ms. Adams is incompetent to testify as to what someone else "could have believed."   Whether Swain, who assessed and conversed with Hahn and noticed no signs or symptoms of any mental or medical distress, felt that it was "fine to leave Mrs. Hahn only in the care of correctional officers," and remained on-call and available by phone, is a question of medical judgment and not constitutional concern. *See Snipes*, 95 F.3d at 951.  Further, Susan Swain is not a defendant in this matter, and Additional Material Fact #291 is therefore immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

292.   On Sunday, June 17, 2007, inmate Lawrence Montgomery, who was housed in booking (Montgomery Dep. 16-22) heard a female inmate hollering and banging on the door stating that she did not feel well and wanted to see the nurse. (Id. at 27:15-23) a male voice said "well quit banging on the door and we'll get the nurse and we'll let you see the nurse". (Id, at 30:6-9) He noticed that the female was quiet for about an hour and a half. (Id. at 32:1-23) Then she started banging again and hollering that she did not feel well and needs the nurse (Id. at 33:20-23) and no one responded. (Id. at 34:14-21)

RESPONSE:   This fact is disputed insofar as "no one responded." When the "banging and hollering" started up again, Lawrence Montgomery was not housed within

62

eyeshot of the Booking area where he heard a female inmate "hollering and banging" about an hour and a half before.  He testified he doesn't know if it was the same woman he heard on both occasions.  (Montgomery Dep., p. 35).  He also testified that he was not aware of a response, not that no one responded.   (Montgomery Dep., pp. 32-35). Lawrence Montgomery's testimony about what he heard a female inmate say and a male voice respond cannot be offered for the truth of the matter asserted, as this is inadmissible hearsay.  *See* Fed. R. Civ. P. 56(c), and Federal Rules of Evidence 801, 802, 803 and 804.  This fact is further immaterial as the female inmate is not identified, and it is not clear whether it was Mrs. Hahn or someone else, what requests were made and whether those requests were responded to.

293.   CO Thode worked Sunday on the 4:00 p.m., to midnight shift. (Thode Dep. 21:12-15) Swain left CO Thode in charge of Mrs. Hahn (Swain Dep. 109:2-4), at 3:30 pm with no written directions or written notices of what to look for. (Swain Dep. 140-141)

RESPONSE:   This fact misstates the evidence cited.  Jenna Thode did work the 4:00 p.m. to midnight shift on Sunday, June 17.  Susan Swain had a conversation with Jenna Thode and together they discussed Janet Hahn and her care.  Specifically, Swain advised Correctional Officer Thode that Swain had been to Janet Hahn's cell and offered her an AccuChek and encouraged Janet Hahn to comply with the Accu-Cheks and administer insulin to herself, if needed.  Up that point, Mrs. Hahn had not yet complied with the medical recommendations and treatments she had been offered that day.  Swain further advised Officer Thode that she told Janet Hahn that Officer Thode would be by her cell between 4:00 p.m. and 4:30 p.m. to offer Janet Hahn an Accu-Chek.  (UMF ¶ 153). Susan Swain told Officer Thode to keep an eye on Janet Hahn, and  specifically advised that she was someone who needed to be watched.  (UMF ¶ 159).  However, Jenna Thode

63

was not left "in charge" of Janet Hahn. Rather, Jenna Thode was a correctional officer and had supervisory staff at the Champaign County Correctional Center during her shift on June 17, 2007.  Whether written directions were given to Jenna Thode is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

294.   In June 2007, Thode had not yet been to the PTI (Police Training Institute)(Thode Dep. 12:4-10) and does not recall if she had any medical training (Id. at 11-12) at all. Prior to and in June 2007, Thode did not know any of the following: the signs and symptoms of hyperglycemia, of hypoglycemia, what the warning signs of diabetic ketoacidosis were, what diabetic ketoacidosis was, what a type 1 diabetic needed on a daily basis (Id. at 14:3-23) and she did not know if she would be able to recognize a diabetic emergency if she saw it. (Id. at 14:24 & 15:1-3)

RESPONSE:   This fact is undisputed, but immaterial.  Jenna Thode was not the only correctional officer working at the Champaign County Satellite Jail on June 17, 2007. Furthermore, Jenna Thode is not a defendant in this case, and whether she knew the terms "hyperglycemia," "hypoglycemia" or the warning signs of diabetic ketoacidosis, etc., are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

295.   Thode testified that Mrs. Hahn refused to test for blood sugar, stating that she didn't like their machine. (Thode Dep. 48:7-15) Mrs. Hahn told CO Thode that she did not feel well and had been throwing up for a few days. (Id. at 48:16-19)

RESPONSE:   This fact is undisputed and material.

296.   Mrs. Hahn began moaning at about 8:00 p.m. on Sunday night with a painful moan (Thode Dep. 51:6-9) and Thode thought she might be going through withdrawals (Id. at 51:23-24 & 52:1-2) and does not recall giving Mrs. Hahn any water that night. (Id. At 54:22-23)

RESPONSE:   This fact is undisputed.   What Thode thought is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

297.   Jared Carpenter pled guilty on June 13, 2007 and was housed in booking (Carpenter Dep. 10:18-20) and saw the plaintiff on Sunday night, (Id. At 22:16-23) she was in her 3o's and she looked worn down, tired and very distraught. (Id. at 24-26)

RESPONSE:   It is undisputed that these are Jared Carpenter's observations of Mrs. Hahn on Sunday night; however, the remaining fact is immaterial.

298.   Before the shift change at midnight, Mrs. Hahn called out more than three times and up to ten times, stating that she needed insulin. He testified that her words were "I need my F'ing insulin!" (Carpenter Dep. 30-38) and one of the CO's responded to Mrs. Hahn "one of the nurses took your blood sugar and it was fine and the nurses are gone now and you just have to wait for the morning until the nurses show up so sit down and be quiet." (Id.)

RESPONSE:   This fact is not supported by admissible and/or competent evidence, and therefore is disputed.   *See* Fed. R. Civ. P. 56(c).   Janet Hahn's alleged statement offered by Mr. Carpenter in his deposition testimony is inadmissible hearsay, and cannot be considered in response to HPL's Motion for Summary Judgment.   *See* Fed. R. Civ. P. 56(c), and Federal Rules of Evidence 801, 802, 803 and 804.   Furthermore, the statements made by Janet Hahn to correctional officers are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

299.  Mrs. Hahn sounded agitated and continued calling out for her insulin every time the CO's went by her door and they just seemed to block her out. Then, after being so loud and adamant, Mrs. Hahn just suddenly became quiet (Carpenter Dep. 36:23-24 & 37:1-21) and when that happened, no one checked on her. (Id. at 76:6-13)

RESPONSE:  This fact is disputed insofar as it misstates the testimony of Jared Carpenter.  Mr. Carpenter did not testify that Mrs. Hahn "suddenly" became quiet, and further did not testify that no one checked on her. Rather, Mr. Carpenter testified that correctional officers continued to perform cell checks, which included checking on Hahn every 15 minutes. (Carpenter Dep., p. 76). Further, this fact is not supported by admissible and/or competent evidence. *See* Fed. R. Civ. P. 56(c).  Janet Hahn's alleged statement offered by Mr. Carpenter in his deposition testimony is inadmissible hearsay, and cannot be considered in response to HPL's Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56(c), and Federal Rules of Evidence 801, 802, 803 and 804.  Furthermore, the statements made by Janet Hahn to correctional officers are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

300.  Several hours after Mrs. Hahn suddenly became quiet, her cell door was open and at least one CO was in there (Carpenter Dep. 40:2-8) and when the EMTs wheeled Mrs. Hahn past his cell door, she was blue-her complexion and her lips were blue. (Carpenter Dep. 49:1-8).

RESPONSE:  This fact is disputed insofar as the fact that Janet Hahn "suddenly" became quiet is not supported by competent evidence.  *See* Fed. R. Civ. P. 56(c). (Response to AMF ¶ 299).  Otherwise, this fact is undisputed and material.

301.  On Sunday, Father's Day, there was a crazy woman in the cell right next to Donald MacFarlane and she was talking dirty to the CO's and singing Whitney Houston songs. (MacFarlane Dep, 40-41)

RESPONSE:  This fact is disputed only insofar as it is not supported by any admissible and/or competent evidence.  *See* Fed. R. Civ. P. 56(c).  Nothing on pages 40 through 41 of MacFarlane's deposition discusses a woman singing on Sunday, Father's Day.  "Crazy woman" and "talking dirty" are vague and ambiguous.  In any event, these facts are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

302.  The crazy woman kept on waking him up with her noise and she finally woke him up for good at 5:00 a.m., on Monday and he was at the window asking the CO's to make her be quiet. (MacFarlane Dep. 43:1-23)

RESPONSE:  "Crazy woman" is vague and ambiguous.  Otherwise, this fact is undisputed.  Whether a "crazy woman" woke up Donald MacFarlane at 5:00 a.m. on Monday morning and whether he asked correctional officers to make her be quiet is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

303.  At around 6:00 a.m. the CO was doing the cell checks and glanced down into Mrs. Hahn's cell and stated "This one's not looking so good" and then the CO quickly went around and did the rest of the checks and was over by the counter asking the crazy lady to sing "Rollin down the river". MacFarlane Dep. 50:10-24)

RESPONSE:  This fact is undisputed; however, a correctional officer's unspecified observations and subsequent actions are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

304.    At about 6:30 a.m. the CO opened Mrs. Hahn's cell and her legs came out of the door. (MacFarlane Dep. 45:1-24)

RESPONSE:    This fact is undisputed and material.

305.    Two CO's were trying to find Mrs. Hahn's pulse and they fumbled around with the equipment and did not want to do mouth-to-mouth on her (MacFarlane Dep. 45-49) then Sgt. Johnson came in and told MacFarlane to "sit down and shut the fuck up" and they hooked up the machine and waited for the EMTs. (Id.)

RESPONSE:    This fact is disputed insofar as it mischaracterizes Mr. MacFarlane's testimony.  Mr. MacFarlane does not know, and has not way of knowing, whether two correctional officers did or did not want to do mouth-to-mouth on Janet Hahn. His testimony is clear, these two officers were responding to her needs and gathering equipment they believed necessary.  Correctional officers used an AED which advised against shocking.   (UMF ¶ 163). Mr. MacFarlane did not testify that Sgt. Johnson was present, but rather stated, "And somewhere in there a sergeant, I don't remember his name, I can picture him if I saw him, came up out of nowhere, I was looking this way watching what's going on, looking off to my left at what's going on, and to my right there is a banging – he bangs on my window and tells me to sit down and shut the F up." (Donald MacFarlane Dep., p. 47).   Otherwise, this fact is undisputed.  The CO's first response and statements made by a sergeant are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

306.    Mrs. Hahn was taken to Carle Foundation Hospital and medical test results showed that Mrs. Hahn had a blood sugar reading of 966, BUN of 62 and Creatinine of 3.4 and

swelling in the brain as a result of Diabetic Ketoacidosis. (Exhibit C) All of these are impressive for the degree of derangement; strongly consistent with many hours of lack of insulin, food and water. (Exhibit A)

RESPONSE:   The first sentence of this fact is undisputed and material.   In the second sentence, the word "impressive" is vague and ambiguous, but is otherwise undisputed and material.

307.   I flat out do not believe that Mrs. Hahn went from OK to in extremis in 15 minutes (Philipson Dep. 98:20-24) I do not believe that she was suddenly unresponsive in 15 minutes and then by the time she gets to the hospital, her blood pH is 6.6, her blood sugar is over 900 - that just does not happen in 15 minutes (Philipson Dep. 73-74) so she was dying in front of people's eyes on Sunday with foment of diabetic ketoacidosis and no blood sugar checks-she was left to die in the jail cell on Sunday (Philipson Dep. 71:9-10).

RESPONSE:   This "fact" is testified to by Dr. Philipson in his deposition; however, Dr. Philipson's "flat out" beliefs and conclusions that she was "left to die" and "she was dying in front of people's eyes," are speculation and argument, and not statements of fact.  What is material is whether HPL had policies, practices or customs of deliberate indifference to serious medical needs for diabetic inmates at the Champaign County Correctional Center.  Dr. Philipson's disbelief that a correctional officer could observe Mrs. Hahn in her cell and conclude that she was fine, then 15 minutes later find her *in extremis*, is inadmissible opinion testimony.  Dr. Philipson's testimony cannot be used to challenge the veracity of correctional officers.  Moreover, there are no correctional officers who are defendants in this lawsuit, and even if there were, if they made 15 minute cell checks and failed to observe signs and symptoms that Janet Hahn may have been exhibiting, does not amount to deliberate indifference, but rather, at best, negligence.  Also, Dr. Philipson acknowledged that making the distinction between sleep and a coma could be a difficult observation to make.  (Philipson Dep., p. 100). All of these facts are immaterial and

irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

308.   On June 18, 2007, officers came to Patrick Hahn's home and kept asking him what illegal drugs Mrs. Hahn was on. (Dobbins 51:4-7) CO Ruff told Mr. MacFarlane that Mrs. Hahn was just a druggy. (MacFarlane Dep.61:4-24)

RESPONSE:   The first sentence of this fact lacks competent evidentiary support, and is therefore inadmissible.  *See* Fed. R. Civ. P. 56(c).  Ms. Dobbins was not with Patrick Hahn when officers came to his home and, therefore, has no personal knowledge of the questions they may have asked Patrick Hahn, and Ms. Dobbins cannot offer Patrick Hahn's retelling of what officers asked him for the truth of the matter asserted as this is hearsay without an exception.  *See* Fed. R. Civ. P. 56(c), and Federal Rules of Evidence 801, 802, 803 and 804.   Furthermore, Janelle Dobbins' deposition testimony makes no reference to "illegal" drugs.  The cited section states:

> A.    And he said, 'the police have been here all afternoon, you know, asking me what kind of drugs Janet's on', this, that and the other, and he was just tangential, he was talking dah, dah, dah. . .

(Dobbins Dep., p. 51:4-7).

The remainder of this fact is undisputed.   Whether unnamed officers from unnamed jurisdictions came to Patrick Hahn's home and asked him questions about his wife, and what a correctional officer may have told Mr. MacFarlane are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

309.   Mr. MacFarlane wrote two requests to Captain Young to talk about what he witnessed in regards to Mrs. Hahn and his requests were never answered and no one ever came to talk with him or to get his witness statements. (MacFarlane Dep. 94:6-13)

310.

RESPONSE:  This fact is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

310. Neither Trooper Cessna, nor any other ISP officer, interviewed any of the inmates who were housed in the booking area that weekend. (MacFarlane Dep. 103:4-12) (Carpenter Dep. 88-89) (See Exhibit BB)

RESPONSE:  This fact is undisputed insofar as MacFarlane and Carpenter were not interviewed by Trooper Cessna or any other ISP officer.  There is no foundation to state that no other inmates were interviewed at any time.  Whether and who the Illinois State Police decided to interview is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

Policies

311. CCSO had no policy, practice or procedure for an inmate who is diabetic and who refuses to eat or take insulin. (Thomas Dep. 68:1-8) HPL had no protocol for when a diabetic is refusing care and there was absolutely no supervision of this nurse (Philipson Dep. 103-104) she was accepting more responsibility than her knowledge should have allowed her to do. (Id. at 127:4-21)

RESPONSE:  This Additional Material Fact contains a series of facts and conclusions.  As to the first sentence, it is disputed.  CCSO had a policy, practice and procedure for an inmate who was diabetic and who refuses to eat or take insulin. When an inmate refused to eat or take insulin, it was to be noted and communicated to the supervisor and/or medical staff.  The fact that there is not a specific policy dealing with each individual illness, i.e, diabetes, HIV, hypertension, etc., is immaterial and inconsequential.  The policy, practice and procedure remains the same, which is to notify the supervisor and/or medical staff.  (See UMF ¶¶ 17, 19, 20).  Plaintiffs have agreed that

71

Undisputed Material Facts 19 and 20 are undisputed and material.  Further, the Champaign County Sheriff's Office's policy, practice and procedure are immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

As for Dr. Philipson's opinion that HPL had no protocol for when a diabetic is refusing care is without foundation.  Dr. Philipson testified that he did not review all HPL policies, procedures or protocols in coming to his opinions.  (Philipson Dep., pp. 81-83).

Likewise, Dr. Philipson does not have any knowledge about the supervision provided to the nurse working at the Champaign County Correctional Center. Dr. Philipson was asked the following question and provided the following answer:

> Q.    Are you aware of what training or supervision is provided to the nurses that are employed by HPL?

> A.    I am not.  I mean, keep in mind that I was asked to look at what happened from a diabetic point-of-view.  So the questions that you're asking me are in a sense outside of what I was asked to comment on.  If you want my comments, which apparently you do, I am willing to go beyond that, but this is not my expertise.  I am not – I am not trained to evaluate correctional procedures or training in a correctional facility.  What I am concerned about is that this particular patient wasn't cared for properly, and if that is an institutional failure, then everybody is at fault at every level.

(Philipson Dep., pp. 104-105).

Simply put, Dr. Philipson has acknowledged that he did not review any policies and procedures concerning training and supervision and candidly acknowledged that he is not an expert in such areas and could not offer a competent opinion if called upon to do so.

Finally, whether Susan Swain was accepting more responsibility than her knowledge should have allowed her to do, is a question of medical practice, which is

beyond the purview of constitutional law, and cannot properly be characterized as a policy, practice or custom. *See Snipes,* 95 F.3d at 591.

312.   There was not a policy which defines how communications to supervisors and/or medical or mental health is supposed to happen. (Thomas Dep. 73:13-18)

RESPONSE:   This fact is undisputed, but immaterial.  It is undisputed that there is a policy that communications to supervisors and/or medical or mental health is to happen.  (UMF ¶¶ 19, 20).  How that happens, i.e., through email, fax, phone call, face-to-face meeting, is inconsequential.

313.   There is not a policy for CO's to document all interactions with inmates (Thomas Dep. 74:7-16), in violation of HPL Suicide Prevention Protocol - Section G which requires 15 minute checks of inmates on suicide watch with a notation by guards of the inmate's behavior or speech. (HPL-245 - part of Exhibit 25 filed under seal)

RESPONSE:   This Additional Material Fact misstates the evidence provided in support.   Rhonda Thomas testified that there is a policy, practice or procedure for documenting interactions with inmates, but not a policy, practice or procedure to document ALL interactions with inmates.   (Thomas Dep., pp. 74-75).   HPL's suicide prevention protocol requires 15 minute checks of inmates on suicide watch, and RECOMMENDS a notation by guards of the inmate's behavior or speech.

314. The medical training given to corrections officers was just given by the nurse on duty and these nurses are not certified to train another person in medical training and CCSO did not have anyone who was certified to give medical training to the corrections officers. (Thomas Dep. 95:5-12) Rhonda Thomas was in charge of training for 8 of her 14 years at CCSO and she was very familiar with training issues. (Thomas Dep. 94:16-21)

RESPONSE:   This fact is undisputed.  Additional Material Fact #314 does not offer or otherwise suggest what certification a nurse should have in order to train another

person in "medical training."  For instance, Susan Swain is a registered nurse and has been so licensed since May of 2005. (UMF ¶ 35).  Whether a trained nurse needs specific certification to train correctional officers in "medical training" is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.  Plaintiffs do not have a failure to train and supervise claim against HPL.  Further, Plaintiffs have not established that the training offered is deficient in any way, or that the nurses who were training correctional officers should have been certified.

315.   The normal times that diabetics were taken for blood sugar readings is 6:oo -6:30 a.m. and between 4:15 to 4:45 p.m., in 2007. (Brown Dep. 20:9-18), but the nurse arrived for work at 9:30 a.m. and left at 3:00 p.m. (Swain Dep. 100:21-24 & 101:1)

RESPONSE:   The first sentence is undisputed and material; however, the statement "but the nurse arrived for work at 9:30 a.m. and left at 3:00 p.m." is inaccurate.  On June 17, 2007, Swain arrived at the Champaign County Correctional Center Satellite Jail between approximately 9:30 and 10:30 a.m., and left at approximately 3:00 p.m.  However, she was working at the Downtown Jail before and after these times; moreover, she did not testify that these were her typical times. (Swain Dep., pp. 100-102). The nursing staff's schedule is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

316.   HPL did not have anyone on-call for mental health, so CO's had to call a nurse or just deal with it or leave a note for the next day (Thomas Dep. 117-118), and the employees who were called mental health workers were completely un-certified and unlicensed for any mental health field, (Morris Dep. 9:9-11)(Morris Dep. 18:1-4)(Nicholas Dep. 11:12-15)(Nicholas Dep. 11:16-24) (Nicholas Dep. 10:3-6)

RESPONSE:   Additional Material Fact #316 is disputed and immaterial. Alyson Morris was on call at various times and there was a psychiatrist on call.  (Morris Dep., pp. 17, 19-20). Ms. Thomas testified that in her experience, she did not come across many situations where an inmate's mental health needed immediate on-call attention, and in those circumstances which it did, a nurse was available. (Thomas Dep., pp. 117-118).  It is undisputed that Alyson Morris and Jennifer Nicholas were not certified or licensed; however, they were trained as mental health clinicians and Morris has a master's degree in counseling. (UMF ¶¶ 28-32); (Morris Dep., p. 8). There is no evidence that the care received from Alyson Morris was deficient in any way. Even if she were deficient, she is not a defendant, and questions regarding a course of treatment are beyond the constitutional purview. *Snipes*, 95 F. 3d at 591.

317.    Corrections Officers had no training about what signs and symptoms to watch for on diabetics. (Thomas Dep. 133:16-21)

RESPONSE:   This fact is disputed insofar as it inaccurately summarizes Rhonda Thomas' deposition testimony.   Rhonda Thomas specifically testified that there was training on the care of diabetes.  (Thomas Dep., p. 133). Thomas also testified that, as a component of the training she and other correctional officers received as a part of the annual Sheriff's Office sponsored medical and mental health training, there is a power point presentation that the nurses provided. This presentation specifically addressed, among other things, diabetic patients.  When Thomas was asked the following questions, she provided the following answers:

> Q.    Ok.  And did they – is it – you indicated that they did not train ever on the issue of what a sign and symptom of distress would be for a diabetic.  And my question – I think that was that you said.  Is that   true? That's what you said?

A.    Yes.

Q.    And my question to you, is it possible that they did articulate in the power point concerns regarding sweating, fruity smell of the breath, confusion, other symptoms that they might not have said    'This is a sign or symptom of distress for a diabetic,' but it was clear    that    these were physical symptoms that you would be looking for in connection with the diabetic?  Is it possible that they did that and you just don't remember that?

A.    Yes.

(Thomas Dep., pp. 154-155).

In Co-Defendants Daniel Walsh and the County of Champaign's Motion for Summary Judgment (d/e #130), Undisputed Material Facts 68 and 72, which were not disputed by Plaintiffs, provide as follows:

68.    In addition to medical training at the police training institute, correctional officers receive follow-up medical and mental health training at the CCSO on an annual basis.  This training includes training about the care and monitoring of diabetic patients.  (Michael Johnson Dep., Ex. 6, pp. 10-12, 14-15; 69).

72.    In 2006 and 2007, part of the medical training, including instruction about the warning signs for hypoglycemia and hyperglycemia. (Joann Lewis Dep., Ex. 5, pp. 81-82); (Michael Johnson Dep., Ex. 6, pp. 10-12); (Michael Johnson Declaration, Ex. 4, ¶ 20, and Ex. A attached hereto, 2006 training materials).

Simply put, correctional officers were trained about signs and symptoms to watch for in diabetics.  Further, Plaintiffs do not have a failure to train claim against HPL, and therefore this Additional Material Fact is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

318.    In the once a year medical training for CO's there was no training to alert us that type 1 diabetics needs to eat meals; No training about what to do if a type diabetic refuses meals; No training that type 1 diabetics need regular water and exercise; No training

on how long a type 1 diabetic can stay alive without meals and insulin; (Thomas Dep. 141:4-21) no training about what to do when a diabetic inmate won't cooperate with medical treatment (Id. at 142:9-12); and correctional officers are trained that there are no differences in how they treat type 1 diabetics and type 2 diabetics. (Castor Dep. 33:24 & 34:1-2)

RESPONSE:    This fact is vague and ambiguous as "us" is undefined.  Further, this Additional Material Fact misstates Castor's deposition testimony; he was asked the following questions and provided the following answers:

> Q.    What are the differences in how you as a correction officer are required to care for and monitor a type 1 diabetic as opposed to a   type 2 diabetic?

> Mr. Smith:  Objection to foundation.

> A.    I'm sorry, could you read that question again, please?

> Ms. Redwood:  Could you read it back please, June? (Requested portion of the deposition was read back by the court reporter).

> A.    I'm not aware that there was any differences.

> Q.    Are you are of any HPL policy regarding differences in the care of a type 1 diabetic as opposed to a type 2 diabetic?

> A.    No, I am not.

This fact is also disputed insofar as it inaccurately summarizes Rhonda Thomas' deposition testimony.  Rhonda Thomas specifically stated that there was training on the care of diabetes.  (Thomas Dep., p. 133); (see Response to AMF ¶ 317).

It is undisputed that when a diabetic inmate does not cooperate with their medical care by refusing to take insulin or use an Accu-Chek machine, it is the Champaign County Sheriff's Office policy and procedure for the correctional officer to notify their supervisor and then an HPL nurse is notified.  (UMF ¶ 19).  Similarly, in 2007,

it was the Champaign County Sheriff's Office procedure that if an inmate refused a meal, the correctional officer distributing meals was to notify their supervisor.  If an inmate continued to refuse meals, the correctional officer was to notify the supervisor and the nursing staff was also to be advised.  (UMF ¶ 20).

Whether correctional officers were trained about signs and symptoms to watch for on diabetics is irrelevant and immaterial as there is no failure to train or supervise claim alleged against HPL.  This fact is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

319.    In 1999 CO Thomas was in charge of accreditation through the ACA (American Correctional Association) which is an agency which monitors jails and prisons and has a strict set of standards to meet. (Thomas Dep. 142-143)

RESPONSE:   This fact is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

320. The ACA had standards for medical care and mental health care for inmates and a certification requirement for the medical health provider. (Thomas Dep. 145-146)

RESPONSE:   This fact is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

321.    When Sheriff Walsh took over, he decided to stop ACA accreditation, stating it was because of budget reasons. (Thomas Dep. 144:4-19)

322.

RESPONSE:   This fact is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

323.   After quitting the ACA, CCSO staff started getting lazy about doing routine things like filling out the seg sheet properly. (Thomas Dep. 146:15-24 &147:1-4)

RESPONSE:   Thomas testified that it was her perception that the CCSO staff got "a little bit more lazy;" however, she also testified that when CCSO staff were identified as having failed to follow policy, practice or procedure, they were reprimanded and disciplined for the infraction.  (Thomas Dep., pp. 149-150).  How CCSO staff responded after the decision to stop ACA accreditation is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

324.   In June 2007, it was CCSO policy for both the nurse and mental health to initial the seg sheet. (Thomas Dep. 138:14-24)

RESPONSE:   This fact is undisputed.  CCSO policy regarding initialing a seg sheet is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

325.   There was no protocol for when a patient is refusing care; there was no supervision of this nurse; this particular patient not being cared for is an institutional failure and everybody is at fault.(Philipson Dep.103-105)It was ultimately Sheriff Walsh's responsibility to make sure that the team (correctional officers, medical, mental health) effort, to make sure that Mrs. Hahn was safe, was functioning. (Walsh Dep. 128:1-13) Nurse Adams criticisms at pages 5-6 of her expert report criticize the sheriff, the county, the guards and HPL. (Lisa Adams Dep. 93-94)

RESPONSE:   This Additional Material Fact is argument and not fact.   As for Dr. Philipson's opinion that HPL had no protocol for when a diabetic is refusing care is without foundation.   Dr. Philipson testified that he did not review all HPL policies, procedures or protocols in coming to his opinions.   (Philipson Dep., pp. 81-83).

Likewise, Dr. Philipson does not have any knowledge about the supervision provided to the nurse working at the Champaign County Correctional Center. Dr. Philipson was asked the following question and provided the following answer:

> Q.     Are you aware of what training or supervision is provided to the nurses that are employed by HPL?
>
> A.     I am not.  I mean, keep in mind that I was asked to look at what happened from a diabetic point-of-view.  So the   questions that you're asking me are in a sense outside of   what I was asked to comment on.  If you want my comments, which apparently you do, I am willing to go beyond that, but this is not my expertise.  I am not – I am not trained to evaluate correctional procedures or training in a correctional facility.  What I am concerned about is that this particular patient wasn't cared for properly, and if that is an institutional failure, then everybody is at fault at every level.

(Philipson Dep., pp. 104-105).

Simply put, Dr. Philipson has acknowledged that he did not review any policies and procedures concerning training and supervision and candidly acknowledged that he is not an expert in such areas and could not offer a competent opinion if called upon to do so.

Additional Material Fact #324 also mischaracterizes Sheriff Walsh's testimony. Sheriff Walsh did testify that it was ultimately his responsibility to make sure that the team effort was functioning; however, he did not testify that he was personally involved with Janet Hahn's incarceration.   The fact that Nurse Adams criticizes the Sheriff, the County, the guards and HPL in her expert report is not a statement of fact.

325.  This nurse was untrained. Swain had no training about dealing with the particular problems associated with mentally ill inmates who also have a serious medical problem, (Swain Dep. 23:15-20) The nurse does not even have a rudimentary awareness that things may not be what they seem and her indifference to the possibilities she was facing suggests recklessness; she did not have a broad enough understanding of diabetes and it may not have been her fault if she had not been trained properly. (Philipson Dep. 119-120) The nurse responsible for the care of Mrs. Hahn exhibited incompetence in her care of the patient and in her maintenance of important medical records. (Exhibit D) The nurse did not know enough about treatment of type 1 diabetes. (Morrissey Dep. 116-118)

RESPONSE:   This fact is disputed insofar as it is not supported by competent and/or admissible evidence.  *See* Fed. R. Civ. P. 56(c).  Susan Swain is a licensed registered nurse and has a degree in nursing.  (UMF ¶ 35).  Thus, any claim she is untrained fails as a matter of law.   Susan Swain in her deposition provided an answer to the following question:  "In your on-the-job training at the Champaign County Sheriff's Office through HPL, did you deal at all with the particular problems that are associated with mentally ill inmates who also have a serious medical need?  Answer: Not specifically that I remember." (Swain Dep., p. 23). This does not support the purported fact in the second sentence of AMF ¶ 325.

Dr. Philipson's  and Lisa Adams' opinions lack foundation as to what training Susan Swain had, and what her awareness of diabetes and understanding of diabetes was.  Plaintiffs' expert reports offered to show the inadequacy of Swain's training and competency are too unreliable to be admitted as expert opinions under Federal Rule of Evidence 702 and therefore must be excluded.  Philipson and Adams have not cited any medical standards or principals in support of their conclusions; "To be admissible under Rule 702, the expert's opinion must offer more than a 'bottom line.'"  See *Minix v. Canarecci*, 597 F.3d 824, 834 (7th Cir. 2010) (citation omitted).  Morrissey has no medical

training and is incompetent to testify as to whether "the nurse" did not know enough about treatment of Type I diabetes, and it is further not clear to whom, i.e., which nurse, he is referring to by "the nurse." (Morrissey Dep., pp. 7-8). More importantly, AMF is couched in negligence; [s]uch matters are questions of tort, not constitutional law. *Snipes*, 95 F.3d at 591.  Plaintiffs do not have a failure to train and supervise claim against HPL. Therefore, AMF ¶ 325 is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

326.   The sliding scale for insulin administration cannot be used for all diabetic patients, no matter what their situation. (Adams Dep. 131-132) (Philipson Dep. 147-152) (Hoffman Dep. 94-95) Here, it resulted in Mrs. Hahn's death. (Philipson Dep. 86:2-6)

RESPONSE:   This fact is disputed insofar as the statement "it resulted in Mrs. Hahn's death" is contrary to Dr. Philipson's deposition testimony.  Dr. Philipson testified that had Janet Hahn's blood sugar been checked even one time on Sunday, she likely would have survived.  (Philipson Dep., p. 90).  Dr. Philipson further testified that had Janet Hahn followed the HPL protocol, "[h]er life could have been saved by two blood sugar checks on Sunday." (Philipson Dep., p. 93). Janet Hahn did not have her blood sugar checked because of her repeated refusals. (UMF ¶¶ 138, 146, 147, 151, 156).  She was offered blood sugar checks more than twice on Sunday, and refused them.  *Id.* Thus, the HPL protocol that blood sugars be checked twice a day and insulin administered per sliding scale, is immaterial as this protocol is not related in any way to her death.

327.   Many of the corrections officers had not been trained to know what diabetic ketoacidosis is. (Brown Dep. 12:7-10) (Voges Dep. 16:8-11) (Alexander Dep. 15:16-21) (Castor Dep. 17:6-9) (Shumate Dep. 16:18-21) (McCallister Dep. 15:14-16) (Lewis Dep. 22:20-24 & 23:1)

RESPONSE:   This fact is undisputed, but immaterial.   Whether a correctional officer knows the term "diabetic ketoacidosis" is immaterial and irrelevant to Plaintiffs'

*Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL. Correctional officers are trained to look signs and symptoms of medical and mental distress. Knowledge of the specific medical term and specific situation such as diabetic ketoacidosis is immaterial.  Furthermore, Plaintiffs do not have a failure to train and supervise claim against HPL.

328.  In June 2007, there was only one Accu-Chek machine at the Satellite Jail. (Workman Dep. 68:15-23) (Voges Dep. 70:20-24 & 71:11-9)

RESPONSE:    This fact is disputed, only insofar as the deposition testimony offered by Plaintiffs creates a fact question on the topic.  Workman says there was one machine; Voges says there was a backup.   Whether there was one or multiple machines is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

329. In 2007 it was HPL policy to check blood sugar of a type 1 diabetic 2 times per day (Workman Dep. 66:7-10), which violates NCCHC standards adopted by HPL.

RESPONSE:   This fact is disputed insofar as it misstates the NCCHC standards adopted by HPL.  The NCCHC standards state that blood sugars can be checked "up to three to four times a day," but do not mandate more than two. Whether the NCCHC standard was violated or not is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

330. NCCHC Standards for Chronic Diabetes Care states "Self-monitored blood glucose (finger-stick blood glucose) should be performed up to 3 to 4 times a day, or more if needed, for type 1 diabetes in accordance with the individual's treatment plan, and as medically indicated for type 2 diabetes." and HPL -137, under "medications" states: "Insulin: Management of insulin-requiring diabetes stresses as near normal glycemic control as can be achieved safely. For type 1 diabetics this will require frequent finger-stick glucose monitoring with multiple (more than twice a day) insulin injections," (Exhibit 22 - HPL 135 - filed under seal)

RESPONSE:   This fact is undisputed; however, it should be cited to Exhibit 25, not 22.   However, the number of blood sugar checks and insulin injections per day is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.  The Undisputed Material Facts are that Janet Hahn was repeatedly offered blood sugar checks on Sunday, June 17, 2007, but she refused.  Dr. Philipson testified that had Janet Hahn's blood sugar been checked even one time on Sunday, she likely would have survived.  (Philipson Dep., p. 90).  Dr. Philipson further testified that had Janet Hahn followed the HPL protocol, "[h]er life could have been saved by two blood sugar checks on Sunday." (Philipson Dep., p. 93). Janet Hahn did not have her blood sugar checked because of her repeated refusals. (UMF ¶¶ 138, 146, 147, 151, 156). She was offered blood sugar checks more than twice on Sunday, and refused them.  Id. Thus, the HPL protocol that blood sugars be checked twice a day and insulin administered per sliding scale, is immaterial as this protocol is not related in any way to her death.

331.   In June 2007, HPL at Champaign County Jail had no protocol to do a urine test for ketones. (Swain Dep. 77:9-14) HPL Medical Protocols, signed by Stephen Cullinan and

designated HPL-141 requires a urine dip for glucose and protein. (Exhibit 22 HPL 141 - filed under seal)

RESPONSE:    This fact is undisputed, but immaterial; however, the proper citation is to Exhibit 25, not 22.  Whether there was a protocol for ketone testing is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

332.   In June 2007 no medical doctor ever personally looked at Mrs. Hahn at CCCC. (Cullinan Dep. 139:5-8) HPL Medical Protocols, signed by Stephen Cullinan and designated HPL-142 states: "Physician referral: a. Refer all diabetics to physician when admitted; b. If the fasting Accu-Chek is below 100 or above 300; c. If the inmate is experiencing visual disturbances; d. for any non-healing lesions." (Exhibit 22 - HPL 135 - filed under seal)

RESPONSE:    This fact is undisputed, but immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL; however, the proper citation is to Exhibit 25, not 22.  In further responding, Plaintiffs have not claimed that a referral was not made.

333.   In June 2007, when Mrs. Hahn was incarcerated, there was not a policy under which high-risk inmates were somehow identified and there was not a specific person or supervisor who had the job to identify inmates with high-risk medical problems. (Walsh Dep. 63-65) (Thomas Dep. 130:22-24 & 131:1-16)

RESPONSE:    This fact is immaterial, but disputed as it misstates the evidence cited.  Rhonda Thomas testified that a medical high-risk form was later created. (*See* AMF ¶ 334).  However, in June of 2007, there was a policy to identify high-risk inmates.  (*See*,

e.g., UMF ¶¶ 8, 23, 24, 41, 46).  Hahn was identified as a diabetic and suicidal.  Referrals were made to the medical and mental health staff. (UMF ¶¶ 67-68, 70, 84).  Whether a high-risk form existed is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

334. After Janet Hahn died a new form was made as a reactive measure to what had happened to her, which was called a medical high-risk form and that form was made specifically for people that were either diabetic or had high-risk pregnancy or high risk medical situations. (Thomas Dep, 130:22-24 & 131:1-16)

RESPONSE:  This fact is undisputed, but immaterial.  Further, any evidence of policy changes as a result of this incident are subsequent remedial measures which must be excluded pursuant to Federal Rule of Evidence 407.

335.  This case demonstrates that HPL has a very strange approach to diabetes management which is hard to understand: the care is insufficient, there is poor documentation, they violate their own guidelines on the amount of insulin to give, the dose of insulin was not related to a meal, there is a strange cross-out and change on the medical record without any explanation and then no blood sugar checks or insulin after Saturday meaning the patient absolutely has diabetic ketoacidosis by Sunday morning, (Philipson Dep. 128-130)

RESPONSE:  This fact is argument and not fact, and therefore immaterial, and is duplicative and redundant of Additional Material Facts set forth above.

336.  In June 2007 there was no policy to alert CO's that an inmate was to get a nighttime snack and no policy to document whether the snack had been provided and eaten or refused. (Voges Dep. 74-76)

RESPONSE:  This fact is immaterial, but disputed in part as it misstates the evidence cited.  Karee Voges testified there was no policy to document whether a

nighttime snack had been provided, eaten or refused.  However, she did not testify that there was no policy or procedure whereby a CO was alerted that an inmate was to get a nighttime snack.  In any event, these facts are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

<u>Right To Refuse Medical Care</u>

337.   In June 2007 HPL had a policy that the patient had a right to refuse care and treatment if the patient knew what they were doing and knew what they were saying. (Cullinan Dep. 132:10-17)

RESPONSE:    This fact is undisputed and material.

338.   Given the fact that Mrs. Hahn had not eaten since Friday, had no insulin since Saturday and was mentally challenged, the patient's responses on Sunday afternoon were not reliable at all. (L. Adams Dep. 98-99)

RESPONSE:    This fact is not supported by competent and/or admissible evidence. *See* Fed. R. Civ. P. 56(c).  Lisa Adams is not a psychiatrist and did not evaluate Janet Hahn, and therefore lacks foundation (factual and expertise). Further, whether Janet Hahn's "responses" on Sunday, June 17, 2007, were reliable is a matter of medical judgment, and thus not a question of constitutional law.  *See Snipes*, 95 F.3d at 591.  This is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

339.   Mrs. Hahn was correctly recognized to be intellectually impaired, her judgment was considered "very poor", she was classified as emotionally unstable and she was clearly and correctly identified as suicidal, (Exhibit B at 2).  When Mrs. Hahn behaved in a self-destructive way, this was not recognized as self-destructive but merely considered

uncooperative. (Exhibit B at 2). Mrs. Hahn's behavior was suicidal in intent and suicidal in effect but it was ignored which caused or contributed to her death. (Exhibit B at 2-3)

RESPONSE:   This fact is immaterial and disputed only insofar as it incorrectly and/or incompletely cites to Dr. Osview's expert report.  Dr. Osview did opine, without factual foundation, that Mrs. Hahn's self-destructive behavior was not recognized as self-destructive.  However, as to his opinion regarding whether Mrs. Hahn was considered to be uncooperative is as follows:

> "Her intellectual impairment and poor judgment were documented but the consequent impairments and communication skills and in emotional and behavioral self-control were not recognized; she was considered merely 'uncooperative.'"

Exhibit B at 2.

The second sentence of Additional Material Fact ¶ 339 is speculative, lacks foundation, and is an incomplete description of Dr. Osview's opinion.  In his report, Dr. Osview stated, "her behavior – including refusing blood tests, refusing to eat, and requesting extra insulin or refusing to take insulin, was suicidal in intent and suicidal in effect."  (Exhibit B at 2).

Elsewhere in Plaintiffs' Response to HPL's Motion for Summary Judgment, they have attempted to dispute that Mrs. Hahn refused blood tests and refused to take insulin. As outlined below, there is no genuine issue of material fact regarding Janet Hahn's refusals; she did refuse.  However, Plaintiffs have argued that these refusals did not occur; Plaintiffs at the same time rely on the opinions of Dr. Osview which are predicated upon these refusals.  The remainder of Additional Material Fact ¶ 339 states that, "It was ignored which caused or contributed to her death," this is unsupported by Dr. Osview's opinion.  Dr. Osview has no personal knowledge of whether these behaviors were ignored,

and the Undisputed Material Facts and many of the Additional Material Facts asserted here, establish as a matter of law that Janet Hahn's refusals were not ignored.  To the extent Dr. Osview is substituting the word "ignored" for "overlooked" or "unnoticed," such matters are questions of tort and not constitutional law.  *See Snipes*, 95 F.3d at 951. Whether self-destructive behavior was observed and/or ignored, are questions of individual liability and not questions of policy, practice or custom, and thus are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.  This is especially so when the Plaintiffs' have admitted that there were policies to deal with suicide identification and prevention but no corresponding  prior event or events establishing a pattern that any Type 1 diabetic inmate would deny themselves insulin in an effort to commit suicide.

340.  Mrs. Hahn was emotionally distraught and not planning carefully; She may have been so disorganized by her emotional distress that she simply could not take care of herself adequately. (Osview Dep. 69:1-14) Type 1 Diabetes is a complex illness and to manage it you have to take into account the patient's intellectual limitations and emotional lability. (Osview Dep. 82:4-12) From the records, since the patient appeared to unmanageable emotionally, she should have been transported to the hospital. (Exhibit C at 3)

RESPONSE:  It is undisputed that Type I diabetes is a complex illness, and to manage it you have to take into account the patient's intellectual limitations and emotional ability.  Plaintiffs have offered no evidence that Mrs. Hahn's intellectual limitations or emotional ability impacted her ability to take care of her Type I diabetes, but rather have argued that she was prior to her incarceration, maintaining and properly caring for her diabetes.  (*See* AMF ¶ 186).

As to the first sentence of Additional Material Fact ¶ 340, this mischaracterizes the testimony of Dr. Osview who was asked the following questions and provided the following answers:

Q.    So if I understand you correctly, you're saying that her actions were suicidal in intent and suicidal in effect, but whether you want to deem that as a suicide or not you're going to leave that alone?

A.    Yes.

Q.    On what facts do you base this opinion?

A.    Well, I don't think those facts are particularly controversial.  The fact that she wished to die and had suicidal intentions documented by the jail authorities who put her in greens because they considered her to be suicidal.  The fact that she died is certainly not in doubt.

Q.    What about the fact that her refusals for blood sugar testing, refusals to eat, refusing insulin or taking extra insulin, what causes you to believe to a degree of medical certainty that that was suicidal and intent?

A.    I believe that because I am persuaded by the notes of her diabetes doctors that she understood these basic facts about diabetes, and by the record of the police officers who believed that her similar actions were suicidal in intent leading to her psychiatric hospitalization.

Q.    Anything else?

A.    No. I think that's the basis of my opinion.

Q.    Do you think there are any other possible explanations for why she did those things?

A.    I think she may have been so upset at her personal situation and at her incarceration that she wasn't planning very carefully at all.  She was emotional distraught and simply not able to care for herself.   How conscious a suicidal intent was I can't know.  No one could know.  It may have been that she was so disorganized by her emotional distress that she simply couldn't take care of herself adequately, and therefore died under the care of others.

(Osview Dep., pp. 67-69).

In sum, the first sentence of Additional Material Fact ¶ 340 is Dr. Osview's offerings of potential other reasons for why Janet Hahn refused to have her blood sugar tested, refused to eat, and refused insulin.

Finally, the third sentence of Additional Material Fact ¶ 340 is speculative and lacks foundation.  Furthermore, whether the patient appeared to be emotionally unmanageable is a question of medical judgment, and thus not a question of constitutional law.  *See Snipes*, 95 F.3d at 591.  Moreover, it is a question of individual liability, which is not at issue here.  Thus, these facts are immaterial and irrelevant to  Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

341.   People with diabetes often have altered mental status (Philipson Dep. 46:12-13); from the records provided Mrs. Hahn may have been impaired from her diabetes and since there were questions about her state of mind, she should have been taken to an emergency room. (Philipson Dep. 47:7-14) Mrs. Hahn's refusal to sign a release, alone, should have prompted further investigation into why she was not acting in her own best interest; her inability to assist in her own care in the presence of diabetes suggests that there was something wrong with her decision-making. (Id. at 52-53)

RESPONSE:    It is undisputed that people with diabetes often have altered mental states.  Dr. Philipson is not a psychiatrist and is not competent to and did not testify that Janet Hahn's mental status was altered or that she was otherwise impaired. (Philipson Dep., p. 47). Dr. Philipson offered that she <u>may</u> have been impaired. Whether she was impaired, had altered mental status, or should have been taken to the emergency room, are questions of medical judgment, such as whether one course of treatment is preferable

to another, and are thus not questions of constitutional law.  *See Snipes*, 95 F.3d at 591.

Further, these are questions of individual liability, which is not at issue here. Thus, these

facts are immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it

had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation

Act claim against HPL.

 342.  When a diabetic goes into hypoglycemic unawareness there are changes in

cognitive function and brain function goes away, a person can look drunk, they can do or say

things they don't recall or will regret, they can regress or be aggressive and they can act in

ways that are not in their own best interest in cases of neuroglycopenia which is the brain is

not getting enough glucose. (Philipson Dep. 59-60)

 RESPONSE:  This fact is undisputed, but immaterial.  Hypoglycemia is not an issue

in this case.  Janet Hahn had high blood sugar, not low blood sugar.  Thus, it is immaterial

to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of

deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

 343. If a medical professional thinks that a patient is refusing care in order to accelerate

her own demise, in a suicide gesture, you cannot manage that patient in a detention center and

should send her to a hospital. (Philipson Dep. 68:2-13)

 RESPONSE:  This fact is not supported by any competent evidence, and is

therefore inadmissible.  *See* Fed. R. Civ. P. 56(c).  Dr. Philipson has never worked in a

detention center, has not reviewed the policies, protocols and procedures of HPL or the

Champaign County Sheriff's Office, and does not know what the infirmary contains for

supplies or staffing. (Philipson Dep., pp. 11-13, 37, 44, 68, 81-83).  Therefore, his opinion

that a patient who is refusing care to accelerate her own demise cannot be managed in a

detention center is without foundation.  Further, this fact is immaterial as there is no

evidence offered by Plaintiffs that any medical professional who was working at the

Champaign County Correctional Center in June of 2007, who believed that Janet Hahn was refusing care in order to accelerate her own demise.

344. A registered nurse is not allowed to let somebody die under a diabetic emergency, like Swain did, especially a mentally challenged person. (L. Adams Dep. 115)

RESPONSE:  This fact is not a fact, but argument which lacks foundation and mischaracterizes the hypothetical posed to Lisa Adams in her deposition.  Further, it is immaterial as Susan Swain is not a defendant in this lawsuit, and immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

345.  The medical staff should have gone against Mrs. Hahn's wishes and disregarded the fact that she did not want to sign a release of information. (Philipson Dep. 53:15-24 & 54:1-5) If Mrs. Hahn did demand 40 units of insulin, she should have been taken to the psychiatry ward and evaluated for suicidal ideation and not left to die of diabetic ketoacidosis in the jail. (Id. at 78:6-24)

RESPONSE:   This fact is disputed insofar as it is argumentative, conclusory and lacks proper foundation.  "Free people who are sane have a liberty interest in refusing life-saving medical treatment and likewise in refusing to eat."  *Freeman v. Berge*, 441 F.3d 543, 546 (7th Cir. 2006)(citations omitted).  Whether Mrs. Hahn's wishes and refusals should have been disregarded is a question of medical judgment. Similarly, whether Janet Hahn should have been taken to a psychiatry ward when she demanded 40 units of insulin is a question of medical judgment and not constitutional tort.  *See Snipes*, 95 F.3d at 591. Furthermore, Dr. Philipson acknowledged on page 78 of his deposition that his opinion regarding taking Hahn to the psychiatry ward lacks foundation as he is not trained in psychiatry.  The exercise of medical judgment by individual medical providers, who are not defendants here, is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and

Rehabilitation Act claim against HPL.

346.   On Sunday Mrs. Hahn was going into DKA because she was a type 1 diabetic and she had no insulin for 24 hours, so she should have been taken to the hospital and her life might have been saved. (Philipson Dep. 74-75) Potentially live-saving treatment could have been instituted without her consent (Id. at 117:8-17) and if she was already unconscious, consent would not have been an issue. (Id. at 117:18-20)

RESPONSE:   The first sentence of this fact is repetitive and redundant of Additional Material Facts set forth above.  Whether Mrs. Hahn was going into DKA on Sunday, and when on Sunday, has not been established.  As to whether Janet Hahn should have been taken to the hospital, and whether her life would have been saved, Dr. Philipson admits that this is pure speculation and that she could have refused in the hospital and died there.  Dr. Philipson was asked the following questions and provided the following answers:

> Q.   Well, let me ask you this.  You don't know whether she would have accepted – she would have allowed them to test her blood sugar at the hospital, do you?
>
> A.   I don't know that, but I think she didn't trust the people that she was talking to here in part because they didn't know the difference between regular insulin and any other kind of insulin.

(Philipson Dep., p. 69).

> Q.   But again, you don't know whether the hospital could have gotten her to eat, do you?
>
> A.   I don't know that.  I just know that it's – that where she was died.
>
> Q.   She could have died at the hospital, could she not?
>
> A.   She could have and then we'd have a different problem.
>
> Q.   And you don't know whether she would have let them inject her

with insulin at the hospital, do you?

> A.    I don't know that, but it's possible that if they asked her, because they're more knowledgeable in an emergency room, if they had said, Mrs. Hahn, do you take Lantus insulin and she would have said, oh, yes, that's the insulin that I take, that that alone might have changed the tenor of the conversation.  So there's too many hypotheticals here.  I just know that if --

(Philipson Dep., p. 72).

Whether Mrs. Hahn should have been taken to the hospital on Sunday is a question of medical judgment, and not constitutional tort, *Snipes*, 95 F.3d at 591, and the exercise of medical judgment by the individual medical providers, who are not defendants here, is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

It is undisputed and material that potential life-saving treatment could have been instituted without Mrs. Hahn's consent if she was already unconscious.  This is in fact what happened with Mrs. Hahn.  She was given treatment involuntarily when she was found unresponsive in her cell.

347.  If a patient refuses to give medical information or sign a release, she gets admitted to the emergency room. (Hoffman Dep. 54:1-23) Medical professionals are not ethically allowed to assist someone in their own death who is refusing to cooperate with medical care. (Id. At 103:5-14) This nurse should have contacted the doctor immediately as soon as she dealt with this patient. (Id. at 103:15-19)

RESPONSE:   It is undisputed, but immaterial, that medical professionals are not ethically allowed to assist someone in their own death; however, it is equally true that medical professionals are ethically required to abide by a patient's wishes to refuse care, and medical care cannot be forced against a patient's consent under most circumstances. It is not a statement of fact that "if a patient refuses to give medical information or sign a

95

release, she gets admitted to the emergency room." This is Dr. Hoffman's practice. In the cited deposition testimony, he specifically noted that this is what he would have done, if Hahn was his patient. Whether the nurse should have contacted the doctor immediately as soon as she dealt with this patient and whether she should have been sent to the emergency room are immaterial, as these are questions of medical judgment, and thus, beyond the constitutional purview. *Snipes*, 95 F.3d at 591. The exercise of medical judgment by individual medical providers who are not defendants here, is immaterial to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

348.   A physician is obligated to act on behalf of their patient, even without the patient's consent in an emergency, The touchstone is imminent risk. (Osview Dep. 56:19) In this case, Mrs. Hahn exhibited self-destructive behaviors of 1) apparently self-inflicted wound, 2) refusing blood sugar monitoring, 3) refusing to eat, (Id. at 59:1-11) At that point, the medical professionals should have monitored her blood sugar against her will and used a feeding tube or IV feeding against her will, if they had the facilities, or taken her to the hospital. (Id. at 60:9-24 & 61:1-14)

RESPONSE:   This Additional Material Fact is immaterial as it speaks solely to a physician's obligations, which may concern matters of medical ethics and/or tort, but not the constitution. It is undisputed that a physician under some circumstances is obligated to act on the behalf of their patient, even without the patient's consent. Dr. Osview opines that this obligation is triggered when there is an emergency, which he has defined as "imminent risk." However, "imminent risk" is not defined and therefore, the Defendant is not capable of disputing the Additional Material Fact or conceding it is undisputed. As set forth below, the touchstone for the involuntary administration of medical testing and/or medication in the constitutional context, is whether signs and symptoms of physical or mental distress are observed that are of an emergency or

imminently life threatening nature.   (See Section III.C. below).   Without more, an apparently self inflicted wound, refusing blood sugar monitoring and refusing to eat, do not rise to the level of an emergency or imminently life threatening nature.   With the benefit of hindsight and the ability to review an aggregate constellation of facts that were not necessarily available to any individual actor in this case, in Dr. Osview's professional judgment, the proper course of action was to, against Janet Hahn's will, monitor her blood sugar and force feed her with a feeding tube or an IV.   However, the medical staff at the jail did not observe any signs or symptoms of physical or mental distress, much less signs or symptoms of an emergency or of a life threatening nature, associated with Hahn's refusal to have her blood sugar check/administer insulin.   (UMF ¶149); (See Section III. C. below).   Questions of medical judgment, such as whether the course of treatment is preferable to another, are not questions of constitutional law. *Snipes*, 95 F.3d at 591.   The fact that individual medical providers, who are not defendants here, exercised different medical judgment is immaterial.   What judgment a medical professional should make, given a specific set of facts, is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

349.   Mrs. Hahn should have been placed in a venue where a doctor could decide to provide involuntary diabetes care. If her blood sugars were taken and she recognized it as high, she may have then cooperated, but if she had been taken to a hospital before jail, her management would have been quite different. (Osview Dep. 69-72)

RESPONSE:   This fact is speculative and lacks foundation.   Dr. Osview does not and cannot have known whether Janet Hahn would have responded differently at a hospital rather than jail.   This speculation is premised on the hope that the hospital, unlike the jail, would have disregarded Mrs. Hahn's wishes to not have her blood sugar checked. These are questions of medical judgment. Questions of medical judgment, such as

whether the course of treatment is preferable to another, are not questions of constitutional law. *Snipes,* 95 F.3d at 591. The fact that individual medical providers, who are not defendants here, exercised different medical judgment is immaterial. What judgment a medical professional should make, given a specific set of facts, is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

350. On Sunday, the nurse should have absolutely forced Mrs. Hahn to have her blood sugar checked or at least called the doctor on Sunday and report that her sugars are not stable, she's refusing testing and she's not eating, I'd rather defend forcing her to prick her finger for blood sugar then letting her die. (L. Adams Dep. 75-77)

RESPONSE: This fact is vague and confusing, as it is stated in the first person. Nurse Lisa Adams acknowledges that pricking Janet Hahn's finger against her will could be medical battery, but states that she would rather defend a medical battery claim than a wrongful death claim. However, the facts are that on Sunday afternoon, June 17, 2007, Nurse Susan Swain met with Janet Hahn and did not notice any signs or symptoms of medical distress had a coherent conversation with Mrs. Hahn at that time, and advised her that she should have her blood sugar checked later that afternoon when the correctional officers came. Given these facts, forced blood sugar testing and, if necessary, forced insulin injections, did not seem the prudent course to Susan Swain; this illustrates that two medical professionals can reach different conclusions and medical judgments, and shows the immateriality of Additional Material Fact #350. Questions of medical judgment, such as whether the course of treatment is preferable to another, are not questions of

constitutional law.  *Snipes,* 95 F.3d at 591.  The fact that individual medical providers, who are not defendants here, exercised different medical judgment is immaterial.  What judgment a medical professional should make, given a specific set of facts, is immaterial and irrelevant to Plaintiffs' *Monell* claim against HPL asserting that it had a custom and policy of deliberate indifference or Plaintiffs' ADA and Rehabilitation Act claim against HPL.

III.
ARGUMENT

The Seventh Circuit refers to the summary judgment stage as "the put up or shut up moment in a lawsuit."  *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (citations omitted).  The Plaintiffs' Response presents arguments couched in terms of negligence and individual liability. Plaintiffs have failed to show that HPL had a policy or custom of failing to do something in spite of its awareness, whether actual or imputed, and that the likely consequences of that failure would be a violation of Janet Hahn's rights.  (*See* d/e #34, p. 7); *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985); *Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir. 1986).  There are no individual or negligence claims at issue, and since *respondeat superior* cannot be used to impose liability upon HPL in a Section 1983 claim, there is no question of material fact precluding the entry of summary judgment in favor of HPL.

A.    There Are No Genuine Issues of Material Fact

Plaintiffs "dispute" many of the facts asserted by HPL.  The local rules do not contemplate a fact-by-fact reply to the Plaintiffs' Response to each claimed disputed fact; HPL will gladly supplement its response if the Court believes this would be beneficial for the resolution of the Motion.  Many of the "disputes" are inconsequential (*see e.g.* Responses to

UMF ¶¶ 13 and 75).  How much, if any, water flooded Hahn's cell is of no consequence to the claim against HPL.  Other "disputes" are non-responsive.  (*see e.g.* Responses to UMF ¶¶ 41 and 42).  The fact that a CO is to document a refusal or error message does not in any way call into question the fact that refusals to eat, comply with blood sugar checks or insulin administration are to be reported to a supervisor and the medical staff.

Plaintiffs have "disputed" many facts that are supported by direct testimony because the facts are not additionally collaborated with documentation.  (*see e.g.* Response to UMF ¶¶ 41, -42, 131-133, 135, 137, 138, 142, 146-147, 151, 156, 165).  For example, Plaintiffs dispute whether there was an error reading on the Accu-Chek machine on Sunday June 17th and whether Hahn refused to have her blood sugar checked throughout that day on the basis that the error and the refusals were not written down.  "A 'metaphysical doubt' regarding the existence of an genuine fact issue is not enough to stave off summary judgment."  *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).  To create a genuine issue of material fact, the plaintiffs' must present affirmative evidence; a lack of documentation, even if such documentation was generally required, has, at best, impeachment value, but is insufficient to defeat summary judgment.[1]  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998); *Bruner-McMahon v. Hinshaw*, 10-1064, 2012 WL 138607 at *16 (D. Kan. Jan. 18, 2012).[2]  A review of Plaintiffs' Responses to HPL's Undisputed Material Facts reveals there are no genuine issues of fact.

---

[1] Ironically, many of Plaintiffs' arguments, *e.g.* that a second Accu-Chek machine should be available at the jail (d/e #144, p. 98), and Plaintiffs' expert opinions, *e.g.* Dr. Osview's opinion that Hahn's refusing blood sugar monitoring was self-destructive behavior (see AMF ¶ 348), are predicated on the very facts that Plaintiffs are now attempting to dispute.

[2] This case is instructive because, as in this case, the Plaintiffs in *Hinshaw* created a long, laundry list of alleged deficiencies in training, supervision, policies and customs, including issues involving inmate health

The Additional Material Facts are by and large unsupported by competent evidence, argumentative or duplicative of the information already present in Defendants' Undisputed Material Facts. Plaintiffs' focus is not on the policies and customs which are the subject of this lawsuit, but rather whether individuals were deliberately indifferent to Janet Hahn's serious medical needs on that weekend. That is not the question here.

B.      Plaintiffs' Custom and Policy of Deliberate Indifference Claim Fails

To prevail on their deliberate indifference claim against HPL, Plaintiffs must show that a policy, practice or procedure either adopted or condoned by HPL caused Hahn to receive constitutionally inadequate care. *Minix v. Canarecci,* 597 F.3d 824, 834 (7th Cir. 2010) (citing *Novack v. County of Wood,* 226 F.3d 525, 530 (7th Cir. 2000)). The "policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation, which a plaintiff may show directly by demonstrating that the policy is itself unconstitutional." *Id.* at 832 (citation omitted). "If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through a 'series of bad acts' creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Id.* (citation omitted); (*see* d/e #34, p. 7 and cases cited therein).

Plaintiffs have failed to show that Hahn's constitutional rights were violated and thus, their *Monell* claim against HPL fails at the outset. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Even had Plaintiffs shown a violation of Hahn's rights, they have failed to show that a HPL

---

and safety; how to recognize specific behaviors that are signs and symptoms of injuries/infections; and inmate's failure to eat, etc. in support of their supervisory liability and *Monell* claims against the Sheriffs, the Sheriff's Office and the jail's medical care providers. The Court granted summary judgment on all of those claims on behalf of the Sheriff, the Sheriff's Office and ConMed, the jail's medical care provider and against the Plaintiff finding no supervisory liability and no *Monell* liability under similar facts.

policy or custom was the moving force behind the deprivation.  See *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997).  Plaintiffs fail to (1) identify a policy or custom that is itself unconstitutional or (2) show a pattern or series of incidents of unconstitutional conduct and thus, have failed to show deliberate indifference.

Plaintiffs have not sued any individual nurse, doctor, or mental health clinician employed by HPL.  As to HPL, the only question to be resolved is a *Monell* claim, Count IV of the Second Amended Complaint.  Specifically, the question is whether HPL, despite its knowledge of the need, failed to develop and implement adequate policies and procedures to identify and handle pretrial detainees suffering medical conditions, including mental illness and diabetes, and whether due to this failure, the jail nurses, employed by HPL, failed or refused to take action to provide Janet Hahn with necessary medical and/or psychiatric care.  (d/e #42, ¶¶ 35-38).  It is undisputed that HPL had and implemented policies and procedures to identify pretrial detainees with medical and mental health conditions.  (*See e.g.* UMF ¶¶ 8, 9, 16, 18, 19-24, 43-44, 46-50, 66, 110).  Janet Hahn was in fact identified as a Type 1 diabetic with mental health concerns.  (*See e.g.* UMF ¶¶ 68-70, 102-103).  Hahn was treated for her diabetes and her mental health issues were addressed.  (See e.g. UMF ¶¶ 77-81, 84, 97-98, 100-103, 105-109, 112, 114, 117-121, 140-141).  On these undisputed material facts, HPL is entitled to summary judgment.

Plaintiffs' devout much of their Response to criticize the diabetic protocol prescribed for Hahn (blood sugar checks twice a day and insulin per a sliding scale) and ketone testing.  (d/e #144, pp. 90-93).  These criticisms are non-starters.  Plaintiffs' expert, Dr. Philipson, has acknowledged that had Hahn accepted the care offered, she more likely than not, would have suffered no harm.  (*See* Response to AMF ¶ 326).  In other words, the diabetic protocol could

never be the "moving force" behind a violation of Hahn's constitutional rights.[3]  Dr. Philipson speculated that "[e]ven if a type 1 diabetic was fully compliant with HPL's protocol, they could still have a very negative outcome."  (AMF ¶ 196) (emphasis added).  This speculation is hardly enough to establish deliberate indifference.  Particularly, when Plaintiffs have not presented evidence, much less a series or pattern, of negative outcomes stemming from the use of this or similar protocols at the CCCC or elsewhere.  None of the HPL policies "caused jail personnel to be deliberately indifferent . . . ."  *Novack v. County of Wood*, 226 F.3d 525, 532 (7th Cir. 2000).

Plaintiffs point to one incident in May of 2006, where an inmate, Joey Morrissey, who was not compliant with the HPL protocol prescribed to him for the treatment of his diabetes, complained of negative outcomes. (*See* AMF ¶ 212).[4]  "One incident cannot be bootstrapped into a pattern."  *Harris v. City of Marion, Ind.*, 79 F.3d 56, 59 (7th Cir. 1996).  Plaintiffs do not point to a single incident, much less a pattern or series of incidents, (1) where an inmate who complied with HPL's diabetic protocol suffered any harm or (2) of unconstitutional conduct creating an inference that HPL was aware of or condoned the misconduct of its employees and/or agents.  Not only have Plaintiffs failed to produce any evidence of a series of bad acts or

---

[3] Plaintiffs argument that the diabetic protocol is such a substantial departure from accepted professional judgment, practice or standards that it demonstrates no judgment was exercised and thus evinces deliberate indifference, also fails. (*See* d/e #144, p. 91). The Plaintiffs' experts and the Defendants' experts disagree about whether the diabetic protocol was properly prescribed to Hahn, how frequently blood sugars should be checked and how insulin dosing should occur. (See Responses to AMF ¶¶ 186, 188 and 273). Notably, Mr. Morrissey testified that in or around June of 2006, the Illinois Department of Corrections was also prescribing Accu-Cheks twice a day to type 1 diabetic inmates. (Morrissey Dep., pp. 84-85, 93). These disagreements about the proper treatment, at times between the Plaintiffs' own experts (*see* Responses to AMF ¶¶ 186, 188), clearly show this is not a substantial departure from accepted professional judgment, practice or standards, but rather that these are questions of medical judgment. "Such matters are questions of tort, not constitutional law." *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).

[4] Not only was Joey Morrissey not compliant with the HPL diabetic protocol, (AMF ¶ 212); (Morrissey dep., p. 64), after his sentencing and transport to the Illinois Department of Corrections he was prescribed Accu-Cheks twice a day, just as he was while in jail. (Morrissey dep., pp. 84-85, 93).

that a Type I diabetic who is compliant with HPL's protocol has had a negative outcome, here, one month before Janet Hahn's death, she was at the Champaign County Correctional Center. At that time, she was not compliant with the HPL protocol, and did not have a negative outcome on that visit.  (UMF ¶¶ 101-103).[5]

Plaintiffs also argue that Hahn was not referred to the doctor, but should have been pursuant to HPL policy.  (d/e #144, pp. 93-94).  This argument hinges on unsupported additional material facts 182 and 183; Plaintiffs have not presented evidence that Hahn was not referred. (See Response to AMF 182-183); (Swain Dep., p. 70).  Ultimately, this is immaterial.  Plaintiffs acknowledge that the referral policy is a good one.  Plaintiffs have not presented any evidence that HPL personnel regularly ignored the referral policy or that the failure to refer in itself is a constitutional violation.  "Because the plaintiffs have not presented evidence of a 'series' of constitutional violations, or of any constitutional violations at all, there is no 'bad acts' evidence from which [HPL] liability may be inferred under *Monell*."  *Novack*, 226 F.3d at 532, n. 3.

Plaintiffs' argument that Nurse Susan Swain was untrained and incompetent misses the mark.  (d/e #144, p. 94).  As in *Minix*, Plaintiffs' expert reports offered to show the inadequacy of Swain's training and competency are too unreliable to be admitted as expert opinions under Federal Rule of Evidence 702.  *See Minix*, 597 F.3d at 834-35 and Response to AMF ¶ 325.  More importantly, "[w]ithout more evidence that [HPL] was aware either that its employees were routinely providing inadequate care or that [Swain] in particular was unqualified, [HPL's] decision to send [Swain] to the jail is not enough for municipal liability."  *Id.* at 832.  Likewise, Plaintiffs

---

[5] Plaintiffs argue that the prior incarceration made HPL aware of the specific risks presented by Janet Hahn.  The prior interactions with Hahn did not result in deliberate indifference, but rather provided a source of medical history and information that otherwise would not have been available.  (*See* UMF ¶¶ 68-69; 101-103).

argue that the Mental Health Professionals were incompetent on the basis that they were not certified or licensed.  (d/e #144, pp. 95-96).  *Minix*, is directly on point.  There, Plaintiffs argued that the vendor that provided mental health care to inmates acted with deliberate indifference because the mental health provider was, in plaintiffs' mind, unqualified as she lacked a license or certificate.  *Minix*, 597 F.3d at 832.  The Seventh Circuit flatly rejected this argument, "without evidence that [the vendor] was on notice of inadequate inmate care by [the individual mental health provider], we do not see how the full scope of [the individual mental health provider's] qualification is relevant to establishing [vendor's] deliberate indifference."  *Id.*  There is no evidence that HPL's mental health staff were routinely, if ever, providing inadequate care.[6]

Plaintiffs' criticisms of the suicide policies at the Champaign County Correctional Center are perplexing. (d/e #144, pp. 96-98).  It is not clear whether Plaintiffs are directing these criticisms to HPL, the Sheriff's Office or both.  Many of the criticisms of the suicide policies are more accurately described as criticisms regarding Hahn's conditions of confinement.  To date, Plaintiff has made no such claim and the constitution does not require that the Jail be rebuilt with a female infirmary, windows and without concrete; nor does HPL have the ability to make that happen.  The Seventh Circuit instructs, that once aware that an inmate imminently seeks to take his own life, "reasonable steps to prevent the inmate from performing this act" are to be taken.  *Novack*, 226 F.3d at 529.  Hahn was identified as a suicide risk and therefore was placed

---

[6] While neither here nor there to HPL's liability it is worthy of note that there is no evidence that Alyson Morris provided inadequate care to Janet Hahn.  She identified Janet Hahn as a suicide risk and recommended she remain on suicide watch.  Plaintiffs make much of the fact that Hahn was previously prescribed Seroquel. Plaintiffs have not offered any evidence that Hahn was prescribed Seroquel for bipolar disorder. In fact, Plaintiffs have not presented any evidence that Hahn's prescription for Seroquel was for anything other than sleep, as noted by Morris during her initial evaluation/conversation with Hahn. Furthermore, Morris has a master's degree in counseling. (Morris Dep., p. 8). It is also noteworthy, that mental health clinicians were on call and there was a psychiatrist on call at the time in question.  (*See* Morris Dep., pp. 17, 19-20).

on suicide watch, which included the removal of common tools of suicide (e.g. clothing that can be easily torn, eating utensils, etc.).  There is no evidence whatsoever that Hahn was placed in a suicide garment, not allowed utensils, etc., as punishment; rather, this was done for her own protection.

Plaintiffs' next appear to argue that Janet Hahn committed "suicide by diabetes;" i.e. she refused to eat and receive insulin as a method of committing suicide.  (d/e #144, pp. 99-100). Plaintiffs' acknowledge that the jail, under HPL, has never had a "suicide by diabetes." (d/e #144, p. 99).  Then, Plaintiffs cite to *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006), for the proposition that plaintiffs' failure to introduce evidence of any similar suicide did not doom their efforts to prove a custom or practice as the defendant does not get a "one free suicide pass."   (d/e #144, p. 100).

*Davis* is inapposite of the instant case.  There, the Seventh Circuit found that there was a disputed issue of material fact as to whether Cook County had a widespread practice of failing to provide timely methadone treatment.  *Davis*, 452 F.3d at 692.  Here, Plaintiffs have not presented any competent evidence tending to show a general pattern of repeated behavior (i.e. something greater than a mere isolated incident).  *See Davis*, 452 F.3d at 694.

HPL does not contend it is entitled to "one free suicide."  This language, quoted by the Seventh Circuit in *Davis*, comes from *Woodward v. Correctional Medical Services of Illinois*, Inc., 368 F.3d 917 (7th Cir. 2004).  In *Woodward*, the Seventh Circuit concluded there was a direct link between Correctional Medical Services' policies and the Plaintiff's decedent's suicide. Specifically, the Seventh Circuit concluded there was evidence of repeated failures to ensure the

Plaintiff's decedent's safety and a culture that permitted and condoned violations of policies that were designed to protect inmates like plaintiff's decedent. *Woodward*, 368 F.3d at 929.

Here, there is no evidence of repeated failures or a culture that permitted and condoned violations of policies designed to protect inmates like Janet Hahn. As outlined above, suicide precautions were implemented for Hahn. Also, she was set up on a diabetic protocol. Food and diabetic care were offered and, on Sunday, she refused both. Plaintiffs suggest that through these refusals, Hahn committed suicide and therefore, HPL and/or the CCSO had the obligation to ignore the refusals and force feed and/or medicate her. As set forth below in Section III. C., there was a policy to address the balancing of Hahn's constitutionally protected right to refuse food and medical care (i.e. blood sugar testing and insulin) and the duty to provide care/take steps to prevent suicide for those incarcerated. The medical staff did not observe any signs or symptoms of physical or mental distress, much less signs or symptoms of an emergency or of a life threatening nature, suggesting that Hahn's refusals should be overridden. HPL did not have a policy or custom of deliberate indifference towards suicidal inmates.

Many of the remaining criticisms sound solely in negligence and/or individual liability.[7] Whether 15 units of regular insulin or 20 units of regular insulin should have been administered, and the alleged failings of the nurses and/or mental health staff to appreciate Hahn's medical and mental situation are questions of negligence and not constitutional law. *See Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001). Plaintiffs fail to offer any evidence that these

---

[7] Other criticisms are completely irrelevant and immaterial. Whether other inmates have sued HPL is not in itself indicative of anything, much less a widespread policy of unconcern for the medical care of inmates. Whether Dr. Cullinan remembers those lawsuits is neither here nor there as he is not a defendant and his memory of the names of prior lawsuits is not indicative of deliberate indifference. Plaintiffs assert that four cases were filed against HPL relating to the Champaign County Jail (d/e #144, p. 98), but fail to articulate how any of these cases had merit or otherwise exhibited deliberate indifference, much less deliberate indifference on the part of HPL as it relates to Janet Hahn.

alleged shortcomings are anything more than isolated incidents and therefore cannot support a *Monell* claim against HPL.

Other criticisms are not properly brought against HPL.  HPL's contract did not call for 24/7 on-site doctors and nurses at the Champaign County Correctional Center; though, staff was on-call 24 hours a day.  CO Thode was not "left in charge" of Hahn on Sunday night.  Plaintiffs' attempt to turn the nurse's request that a correctional officer, who had built a rapport with Hahn, keep an eye on her into an indictment about leaving correctional officers to provide medical care to inmates is disingenuous.  (UMF ¶ 154).  There is no evidence that the nurse was asking CO Thode to provide medical care independent of the care that the licensed health care providers had arranged, or that the nurse, through her request, excluded other correctional officers then on duty from making cell checks or observations of Hahn; this request cannot be construed as a policy or custom of deliberate indifference.  Likewise, the 15-minute cell checks are performed by correctional officers, and thus, Plaintiff's criticisms fall short when asserted against HPL (notably, they also fall short when asserted against the Sheriff's Office).

Finally, the remaining criticisms are what may best be described as suggestions for improvement at the Champaign County Satellite Jail, but do not come anywhere close to describing a policy or custom of deliberate indifference.  These suggestions do not constitute a "pattern of conduct or a series of acts violative of constitutional rights."  *Novack*, 226 F.3d at 532, n. 3 (quotation omitted).  This category includes Plaintiffs' suggestion that there be a second Accu-Chek machine at the Satellite Jail, a column on the segregation sheet to document the nighttime snack for diabetics, such as the one prescribed to Janet Hahn, documentation of all interactions with inmates on suicide watch, a special high-risk form such as the one now in place

at the Champaign County Correctional Center[8], posting an American Diabetes Association poster at the jail, and having the blood sugar checks should be performed when nurses are present.[9]

In sum, HPL is entitled to summary judgment on Plaintiffs' custom and policy of deliberate indifference claim.

### C.    Janet Hahn Had a Right to Refuse Medication

As outlined above, there is no dispute that Janet Hahn repeatedly refused blood sugar testing on Sunday June 17, 2007.  Likewise, there is no dispute that Hahn was mentally competent and had the capacity to refuse treatment.  (UMF ¶ 166).[10]  The failure to document refusals does not create a genuine issue of material fact, nor is it a constitutional concern.  (*See* Section III. A. above); *Novack*, 226 F.3d at 532, n.3.

Plaintiffs also argue that Hahn's alleged periodic requests throughout the weekend call into question the refusals (d/e #144, pp. 101-103); they do not.  Plaintiffs offer inadmissible

---

[8] Any evidence of policy changes as a result of this incident are subsequent remedial measures must be excluded pursuant to Federal Rule of Evidence 407.

[9] Despite the fact that a blood sugar test is something that the inmate was to perform on themselves, and something that Janet Hahn had herself performed, according to Plaintiffs, on hundreds and hundreds of occasions.

[10] Plaintiffs attempt to dispute this fact; however, they fail to do so.  The fact that Hahn was mentally retarded, intellectually impaired, suicidal, judgment impaired and emotionally unstable does not, in and of itself, make one incompetent and Plaintiffs' experts have not so opined.  Nor does the fact that she "*may* have been impaired from her diabetes. . . ." (Pl.'s Resp. to UMF ¶166). In sum, Plaintiffs offer no evidence to refute the fact that Hahn was competent.  Ultimately, whether she was or was not competent is a question of medical and/or legal judgment.  What is critical to the analysis here, is that no HPL employee who observed her on Sunday believed she was incompetent, impaired or showing signs and symptoms of medical or mental distress.  *Sanville,* 266 F.3d at 735 ("Not noticing that an inmate exhibits a serious medical need does not violate the Constitution because not noticing that a need exists is not considered 'punishment' under relevant Supreme Court precedent.").  While Plaintiff may argue, with the benefit of hindsight, that there were signs and symptoms that were missed, the fact remains that those providing care to Hahn observed nothing that would allow, much less mandate, that they forcibly withdraw blood to check Hahn's blood sugar and/or forcibly inject her with insulin.  The policy to allow Hahn the right to refuse was properly followed.

hearsay about Hahn's requests for medical care on Friday night.  (*See* Responses to AMF ¶¶ 252-255).  These facts, even if accepted as true, are immaterial.  That night, after the alleged requests, Hahn had her blood sugar checked and the on-call nurse was contacted.  (UMF ¶¶ 78-80; 82-83).  Likewise, Plaintiffs offer inadmissible hearsay about Hahn's alleged request on Saturday morning.  (*See* Response to AMF ¶ 264).  More importantly, that morning her blood sugar was checked and she received insulin; her blood sugar was checked again that afternoon.  (UMF ¶¶ 105-107, 115, 127).  On Sunday morning, Hahn wanted to have blood sugar checked. (AMF ¶ 283).  Attempts were made, but the machine read error and later she refused to have her blood sugar checked.  (UMF ¶¶ 132-133, 138, 146).  Plaintiffs argue that on Sunday night, officers did not respond to Hahn and offer inadmissible hearsay statements about Hahn's alleged requests. (*See* Responses to AMF ¶¶ 297-298).  These requests on Sunday night, even if accepted as true, are immaterial.  Whether a request was heard, went unanswered or was ignored, is a question of individual liability, and thus inapplicable here.

HPL had a protocol for diabetic patients who were not forthcoming with information about their condition:  blood sugar checks twice a day, insulin administration per a sliding scale and a nighttime snack.  Hahn was offered this care and refused it.  On Sunday, had Hahn accepted the care offered, per Plaintiffs' own expert, she more likely than not, would have suffered no harm.  (*See* Response to AMF ¶ 326).  "Plaintiff cannot refuse treatment and food then complain that defendants were deliberately indifferent to his medical and nutritional needs. Such an 'exotic' theory of liability has been flatly rejected."  *Grant v. O'Leary*, No. 95 C 50140, 1996 WL 377173, at *5 (N.D. Ill. June 19, 1996) (citing *Thomas v. Gish*, 64 F.3d 323, 326 (7th Cir.

1995); *see also Offutt v. Cahill-Masching*, No. 04-1231, 2007 WL 4379416, at *5 (C.D. Ill. Dec. 12, 2007); *Williams v. Fishburn*, No. 96 C 1578, 1998 WL 748285 (N.D. Ill. Sept. 25, 1998).[11]

An inmate's right to refuse medical treatment is well established.  *(see* d/e #133, pp. 41-53); ABA Standards for Criminal Justice § 23.5-5 (1986); U.S. Dept. of Justice, Correctional Health Care, Guidelines for the Management of an Adequate Delivery System, 2001 Ed., pp. 56, 72-74). Plaintiffs argue that at some point prison officials must intervene, ignore an inmate's refusals and force feed and/or medicate an inmate.  (d/e #144, pp. 102-103).  HPL has acknowledged that *at some point*, if an inmate/pre-trial detainee begins to show signs and symptoms of medical distress or that the inmate is seriously endangering his health, the prison may have a duty and certainly a right to force feed the inmate.  (S*ee* d/e #133, pp. 47-48).  Here, the medical staff did not observe any signs or symptoms of physical or mental distress, much less signs or symptoms of an emergency or of a life threatening nature, associated with Hahn's refusal to have her blood sugar check/administer insulin.  (UMF ¶ 149).[12]  Thus, the question becomes: Does the Constitution require[13] HPL and/or the Champaign County Sheriff's Office to develop and implement a policy and procedure to involuntarily/forcibly check blood sugars and administer insulin to diabetic inmates despite the inmate's refusal of treatment and regardless of

---

[11] Plaintiffs have offered no meaningful distinction between the case at hand and the refusal cases cited by HPL on pages 42 and 43 of its' Motion.   However, Plaintiffs do correctly note that HPL inadvertently failed to provide a complete citation for *Johnson v. Yirko*, No. 08-cv-10442, 2009 WL 891717, at *11 (E.D. Mich. Mar. 31, 2009).

[12] Plaintiffs attempt to dispute that Susan Swain did not observe any signs or symptoms of physical or mental distress that caused her to conclude that diabetic ketoacidosis, high blood sugar levels, or any other medical problem was being exhibited by Janet Hahn on Sunday, June 17, 2007.  Plaintiffs' Response to UMF ¶149 does not dispute whether Swain did not observe any signs or symptoms.  Rather, the Response, at best, describes the signs and symptoms Plaintiffs argue should have been observed, which is not actionable here.  *See Sanville*, 266 F.3d at 735.

[13] And presumably thereby immunize HPL and the Champaign County Sheriff's Office from any liability from medical battery or Due Process/Liberty Interest claims that may be brought by inmates based on forced testing/medication.

whether signs or symptoms of medical distress have been observed?  And if so, when must this policy be implemented?  After the first refusal?, the second?, after a certain number of hours since the inmate's last check (6 hours?, 12 hours?, 24 hours?, 48 hours?)?, or after a certain number of hours since the inmate's last insulin injection?  There is no, nor should there be any, such requirement under the Constitution.  These are questions of professional judgment and beyond the purview of the Constitution.  *See Snipes v. Detella,* 95 F.3d 586, 591 (7th Cir. 1996).

   D.  HPL is Not a Public Entity, and Therefore is Entitled to Summary Judgment on Plaintiffs' ADA Claim; a Change in the Law is Not Warranted

  Plaintiffs have conceded their Rehabilitation Act claim against HPL.  Further, they have conceded that the ADA is inapplicable because HPL is not a "public entity," but argue for a good faith change in the law.  No such change is warranted.  In fact, as outlined in HPL's Motion for Summary Judgment, the *Minneci* case, which is a natural extension of the Supreme Court's ruling in *Correctional Services Corporation v. Malesko*, 534 U.S. 61, 122 S.Ct. 515 (2001), calls for a reanalysis of whether independently contracted medical providers, such as HPL, can be considered state actors in Section 1983 claims. *See Minneci v. Pollard*, 132 S.Ct. 617 (2012). Plaintiffs correctly point out that *Minneci* is a *Bivens* action; however, the reasoning in *Minneci* and *Malesko* is applicable here. These cases stand for the proposition that employment status is the proper focus of an analysis for a state action, and not the actions or functions performed by the defendant.  Consequently, the reasoning in *Minneci* and *Malesko* should be extended to bar Plaintiffs' federal claims against Defendant HPL for parallel activity on the state level.  HPL acknowledges that the impact of the application of these cases would mark a change in the law, i.e., the "public function" analysis used in *West v. Atkins,* 487 U.S. 42, 56 (1988), and *Rodriquez v. Plymouth Ambulance Service*, 577 F.3d 816, 826 (7th Cir. 2009), is no longer valid.  For these

reasons, HPL should not be considered a state actor for purposes of Section 1983; likewise, the definition of "public entity" under the ADA should not be extended.

WHEREFORE, the Defendant, HEALTH PROFESSIONALS, LTD, respectfully request that this Court enter an Order granting summary judgment in its favor on all counts and theories and thereby terminating the case against HPL in its entirety, and against Plaintiffs, PATRICK HAHN and ERIK REDWOOD, Administrator of the Estate of JANET LOUISE HAHN, Deceased, together with such relief as the Court deems appropriate and just.

HEALTH PROFESSIONALS, LTD., Defendant

s/ Keith E. Fruehling
Attorney for Defendants
ARDC #6216098
HEYL, ROYSTER, VOELKER & ALLEN
Suite 300
102 E. Main St.
Urbana, IL  61801
217-344-0060 Phone
217-344-9295 Facsimile
kfruehling@heylroyster.com

113

<u>TYPE VOLUME CERTIFICATION</u>

Pursuant to CDIL-LR 7.1(B)(4)(c), KEITH E. FRUEHLING certifies that this Motion for Summary Judgment complies with the type volume limitation, as it contains 5,020 words or 31,470 characters with spaces, inclusive of only those contained in the Argument section. Pursuant to the local rule, counsel relied on the word count of Microsoft Word 2007.

<u>s/ Keith E. Fruehling</u>
**Attorney for Defendants**
**ARDC #6216098**
**HEYL, ROYSTER, VOELKER & ALLEN**
**Suite 300**
**102 E. Main St.**
**Urbana, IL  61801**
**217-344-0060 Phone**
**217-344-9295 Facsimile**
kfruehling@heylroyster.com

PROOF OF SERVICE

I hereby certify that on July 30, 2012, I electronically filed the foregoing DEFENDANT HEALTH PROFESSIONALS, LTD.'S REPLY TO PLAINTIFFS' RESPONSE TO HEALTH PROFESSIONALS, LTD.'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mrs. Jude Redwood                          Mr. Howard Small
Redwood Law Office                         Law Office of Small & Freeman, Ltd.
P.O. Box 864                               Suite 3D
St. Joseph, IL  61873                      41 E. University Ave.
                                           P.O. Box 1337
                                           Champaign, IL  61824-1337

I hereby certify that I have mailed by U.S. Mail the document to the following non-CM/ECF participants:

None

                              s/ Keith E. Fruehling
                              Attorney for Defendants
                              ARDC #6216098
                              HEYL, ROYSTER, VOELKER & ALLEN
                              Suite 300
                              102 E. Main St.
                              Urbana, IL  61801
                              217-344-0060 Phone
                              217-344-9295 Facsimile
                              kfruehling@heylroyster.com

18698437_4.DOCX