**E-FILED**
Thursday, 14 March, 2013  09:47:52 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **PATRICK HAHN and ERIK REDWOOD,** | ) | |
| **Administrator of the Estate of Janet Louise** | ) | |
| **Hahn, Deceased,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 09-CV-2145** |
| | ) | |
| **DANIEL WALSH, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#124) filed by Defendants City of Urbana, Sylvia Morgan, Matthew Bain and Angela Menocci (Urbana Defendants), the Motion for Summary Judgment (#130) filed by Defendants Daniel Walsh (Walsh) and County of Champaign, Illinois (Champaign County), the Motion for Summary Judgment (#133) filed by Defendant Health Professionals Ltd. (HPL), and related Motions to Strike (#138, #159, #161).  This court has carefully considered the arguments of the parties and the documents provided by the parties.  Following this careful and thorough review, this court rules as follows: (1) the Urbana Defendants' Motion to Strike (#138) is GRANTED in part and DENIED in part; (2) the Motions to Strike (#159, #161) filed by Plaintiffs, Patrick Hahn and Erik Redwood, Administrator of the Estate of Janet Louise Hahn, are DENIED; and (3) Defendants' Motions for Summary Judgment (#124, #130, #133) are GRANTED.

FACTS[1]

Janet Hahn (Janet) was a 33-year-old type 1 insulin-dependent diabetic who also suffered from mental health issues. She and Patrick Hahn (Patrick) were married in November 2006, although they had a lengthy relationship prior to the date of their marriage. They had a child together in June 2006 in Bloomington, Illinois. The child was removed from their care by the Illinois Department of Children and Family Services (DCFS) immediately after the child's birth. Janet and Patrick had visitation with the child and a service plan was in place which set out specific goals and tasks to be accomplished in order to obtain custody of the child. Janet and Patrick moved to Urbana the summer of 2006. At that time, Janelle Dobbin was working for Catholic Charities, a service provider for DCFS. In October 2006, Dobbin began working with Janet and Patrick. Dobbin testified that Janet and Patrick were making little or no progress in accomplishing the goals and tasks set out in their service plan. Dobbin testified that, in May 2007, she had written a report recommending the termination of Janet and Patrick's parental rights. Dobbin testified that, at that point, reunification with their child was unlikely if not impossible.

Janet had problems with control of her diabetes. In 2006 and 2007, calls were made to Metropolitan Computer Aided Dispatch (METCAD) on numerous occasions. The

---

[1] This court notes that the parties have filed voluminous briefs in this case and have provided this court with a mountain of documents. The parties have listed hundreds of facts as undisputed material facts. This court has not included all of the facts argued to be material by the parties. Instead, this court has included only facts which are material to the issues raised in Plaintiff's Second Amended Complaint (#42) and are adequately supported in the record. This court has also omitted statements which are actually opinions, legal conclusions or speculation. This court will discuss the opinions of the parties' retained experts during the analysis section of this Opinion to the extent that they are relevant to the legal issues in this case.

documentation shows that Janet was reported to be unconscious in many of these calls. Calls were also made to report domestic violence situations involving Janet and Patrick. Urbana police officers took Janet to the hospital for treatment of her diabetes following some of these calls. On February 25, 2007, Janet was involuntarily committed to a mental health facility. The documentation states that Janet reported taking too much insulin in an attempt to kill herself. The report was signed by Urbana Police Officer Alex Ruggieri. The documentation does not show when Janet was released from the mental health facility. However, it shows that METCAD was called on March 10, 2007, and a report was made that Janet was at her residence and was unconscious. Police officers responded to this call and other calls in March and Janet was again involuntarily committed on March 27, 2007. On April 13, 2007, Janet was observed walking in and out of traffic and laying in the road. The police were called and Janet was admitted to a mental health facility for a mental evaluation.

John Hawn, Janet and Patrick's landlord, testified that Janet was mentally slow. Hawn testified that, on approximately six occasions, Patrick had called on him to administer insulin injections to Janet because she had fallen unconscious.

Janet was arrested in May 2007 and was taken to the Champaign County jail. Susan Swain, a nurse who worked for HPL at the jail sent an email on May 6, 2007 regarding Janet which stated:

> Hi there! This young lady is quite a challenge to work with.
> She refuses to disclose any of her medical history or conditions
> except for the fact that she is insulin dependant diabetic. She

3

also refuses to sign any release of information and told me that
she will not tell me who her doctor is or where she seeks
treatment at.  She will be leaving tomorrow (05-07-07) and she
states that she will not eat while she is here.  She has pretty
much tied my hands as far as helping her goes.  Please bring her
to the infirmary to test her blood sugar tonight and tomorrow
morning BUT I am not at all sure that she will cooperate with
the test.  She can give herself insulin per sliding scale however
I am pretty sure that she will not do that either!  Thanks for your
assistance in this matter!!!!

The email was sent to "Corrections."

On June 15, 2007, Dobbin drove Janet to an appointment for a mental health
evaluation required as part of the service plan.  Dobbin testified that Janet was cooperative
and said she had some food with her in her purse.  Dobbin testified, however, that she did not
know if Janet had anything to eat that day or if Janet took any insulin.  Dobbin returned Janet
to her home late that afternoon.  Dobbin testified that Janet called her and left her a voice
mail message around 4:00 that afternoon.  Dobbin stated that Janet sounded agitated on the
voice mail.  Hawn testified that he was at the trailer park doing maintenance and saw Janet
yelling at Patrick, throwing things and chasing Patrick around the trailer park.  Hawn testified
that he called 911 before Janet caught Patrick.  Patrick testified that Janet chased him around
the trailer park with a knife and he ended up getting stabbed on the left side of his lower

4

back.

Around 5:36 p.m. that day, METCAD received a call involving a female chasing a male with a knife.  Urbana Police Officers Sylvia Morgan and Matthew Bain responded to the call.  Urbana Police Officer Angela Menocci[2] also responded to the call.  Menocci had previously responded to a call to Janet's residence.  Menocci saw Patrick lying on the ground.  She investigated Patrick's wound and determined that it was about one inch long and a quarter of an inch deep and did not appear life threatening.  Menocci went along with Patrick on his ambulance ride to the hospital.  At his deposition, taken August 26, 2010, Patrick testified that he did not remember whether he had an occasion to speak to the police and tell them anything about what had happened on June 15, 2007.

Menocci testified that she spoke to Hawn and Sherie Davis at the scene.  Davis, who was apparently a neighbor of Janet and Patrick's in the trailer park, stated in her Declaration that she was interviewed by an unnamed female Urbana police officer before Patrick was taken to the hospital in an ambulance.  Davis said she told the officer that Janet was a diabetic who needs insulin every day, that Janet had a really hard time controlling her diabetes, especially in summer, and that Janet kept insulin in Davis's refrigerator.  Davis said that she also told the officer that Janet had mental problems and had talked about killing herself.  Davis said she told the officer that the ambulance was always coming and taking Janet to the emergency room and Janet needed to be taken to the emergency room that day.

---

[2]  Her name is now Angela Vogt.

5

Davis stated that she offered to get Janet's insulin but the officer told her to go into her apartment and stay there.

Morgan was the commanding or supervising officer at the scene. Morgan testified that she asked the dispatcher to call for medical personnel. Morgan testified that she knew through other police officers that the police had been called to Janet and Patrick's address before because of domestic problems and that there was something wrong with Janet mentally. Janet had been seen entering her trailer after she stabbed Patrick. Bain kicked the door to Janet and Patrick's trailer and Bain and Morgan entered and found Janet inside lying on the couch with her eyes closed. Morgan ran her knuckles along Janet's sternum in an attempt to get a reaction from her. Janet did not react to the sternum rub. Morgan testified that they had to physically hold her up to put handcuffs on her. Morgan testified that they waited for the medical personnel to arrive. Two EMTs, Brian Nightlinger and Randy Hausle entered the trailer. Nightlinger testified that he had responded to a call at Janet's trailer on a prior occasion and knew she was a diabetic. Nightlinger checked her blood pressure, which was 130/84, and Hausle checked her blood sugar, which was 96, a reading within the normal range. Nightlinger testified that Janet had a decent blood sugar and a decent blood pressure. No other vital signs were taken by the EMTs. Nightlinger testified that paramedics arrived and used smelling salts and Janet responded. Morgan testified that Janet opened her eyes in response to the smelling salts. The paramedics thought Janet had been faking unconsciousness. Nightlinger and Hausle testified that Janet scored a 15 on the Glasgow coma scale, which Hausle testified was the highest rating on the scale and meant that the

6

person is "fully alert and there's nothing - - nothing wrong that would indicate any problem." Nightlinger testified that the score meant that "she had good contact, she had good motor skills and verbal, she was able to speak to us." Hausle testified that he witnessed that Janet was able to speak. Nightlinger testified that the paramedics determined that Janet was okay to be released for transport by the Urbana police.

Morgan testified that the medical personnel determined that Janet did not need to go to the hospital and that Janet agreed to walk out of the trailer on her own. Bain also testified that Janet walked out of the trailer. Hawn testified that he saw Janet being taken out of the trailer. He stated that Janet was upright but it did not look like she was walking and instead looked like three people were dragging her. Hawn testified that he told the officers that they should take Janet to the emergency room. Hawn testified that the officers told him "we don't go to the emergency room, we go to the jail." Janet was arrested for aggravated domestic battery and Bain transported her to the Champaign County satellite jail. Bain testified that Janet spoke to him and answered questions during transport. Bain turned Janet over to a correctional officer at the jail. Morgan testified that Officer Ruggieri was at the scene and she instructed him to recover some kitchen knives from the house of a neighbor and to take some pictures. Morgan did not recall Ruggieri informing her that he had been on the scene within the last few months when Janet was involuntarily committed to a mental health facility.

Janet arrived at the Champaign County satellite jail at approximately 6:23 p.m. Chad Schweighart was working as a correctional officer and assisted Janet out of the Urbana police

7

car and into the jail.  Walsh is the Champaign County Sheriff and is responsible for the Corrections Division of the Champaign County Sheriff's Office, including the downtown jail and the satellite jail.  The Sheriff's Office contracts with HPL to provide medical care and mental health care for inmates in the jails.  HPL is a privately owned Illinois corporation engaged in administering medical and behavioral healthcare to correctional facilities.  HPL staffed the jails with an on-site doctor who came once per week, registered nurses and mental health personnel.  HPL staff were at the satellite jail seven days a week.  Correctional officers could call the on-call nurse anytime.  In June 2007, HPL had written policies, procedures and protocols in effect regarding the identification and handling of pretrial detainees suffering serious medical conditions, including mental illness and diabetes.  The protocol for diabetic inmates whose medical condition was unknown was for blood sugars to be checked twice daily, insulin to be delivered per sliding scale and an evening snack.

Walsh had no involvement with Janet during the time she was in the jail.  However, the Sheriff's Office had  written protocols regarding care of diabetic inmates.  It is the policy of the Sheriff's Office that all examinations, treatments and procedures affected by informed consent standards in the community are observed for inmate health care.  Therefore, it is the policy of the Sheriff's Office that if a person appears to make a knowing decision to refuse medical care, the Sheriff's Office will not force medical care upon an inmate.  When a diabetic inmate fails or refuses to have his or her blood sugar checked with Accu-Chek, supervisors are to report this occurrence to medical staff.  Per policy, if an inmate makes a knowing decision to refuse to use the Accu-Chek machine to check blood sugar or to refuse

meals, the Sheriff's Office does not force an inmate to use the Accu-Chek machine or eat. When a diabetic patient does not cooperate with medical care, the correctional officer is to notify the supervisor and an HPL nurse.  In June 2007, it was HPL policy that if a diabetic inmate refused treatment, the nurse was to attempt to have the inmate sign a refusal of care form.  Correctional officers were advised that medication could not be forced upon inmates.

In 2007, it was procedure that if an inmate refused a meal, the correctional officer distributing meals was to notify the supervisor.  If an inmate refused more than one meal, it was the normal practice for the correctional officer to report that information to the supervisor and the medical staff.  The medical staff and/or the mental health care staff would make the determination as to the appropriate course of care for an inmate who was refusing meals.  Correctional officers confronted with a situation where an inmate was non-compliant, whether the non-compliance involved a non-medical or medical issue, were to report the situation to their supervisor.  It is undisputed that it was the policy of the Champaign County Sheriff's office that METCAD or 911 would be called if an inmate was experiencing an "obvious/life-threatening acute/emergency situation."

It is undisputed that correctional officers at the jail received medical training at the Police Training institute for correctional officers.  Correctional officers also received follow-up medical and mental health training on an annual basis.  It is undisputed that this training included training about the care and monitoring of diabetic patients, including instruction about the warning signs for hypoglycemia (abnormally low blood sugar) and hyperglycemia (abnormally high blood sugar).  This training was performed by HPL.

9

When Janet entered the jail, Schweighart completed an intake form.  Schweighart testified that Janet was angry and uncooperative and "refus[ed] to do everything we ask[ed] her to do."  Schweighart asked Janet a series of routine intake questions.  He asked Janet if she was suicidal.  Initially she would not answer but later reported that she was diabetic and that she felt like hurting herself.  She otherwise refused to answer his questions.  It is undisputed that Janet refused to provide information about the type of insulin she was prescribed and refused to sign releases for medical information.  Schweighart documented that Janet was "not oriented for time and place" during booking and described her as "not being all there."  Schweighart called his supervisor, Michael Johnson, and advised him that Janet reported being suicidal and diabetic and otherwise refused to answer questions.

Janet was placed on suicide watch which called for correctional officers to personally observe her and check on her well-being every 15 minutes.  Correctional Officer Jenna Thode testified that, when doing the checks of inmates every 15 minutes, she would make sure there was movement, make sure they are breathing.  Janet was issued a suicide gown, or green gown, and a green blanket as a suicide precaution.  Both are made of non-tear material and designed in such a way that they cannot be easily fashioned into a tool of suicide because they cannot be torn into strips and fashioned into a noose.  Schweighart testified that, as the night went on, Janet was banging on the door of her cell and was yelling.

Joanne Lewis was a correctional officer and was on duty the evening of June 15, 2007.  At the beginning of her shift, she opened the door to the cell to speak to Janet.  She

later opened the door and gave Janet a meal.[3]  On both occasions, Janet was wearing the green gown.  Later, Janet stuffed the green blanket or gown into the toilet in the cell.  There is conflicting testimony regarding whether this caused flooding in the cell, but it is undisputed that the water to her cell was shut off.  It is undisputed that, when drinking water is shut off to an inmate's cell, water was provided upon request.  At some point, Janet was naked in her cell and Lewis went into the cell to convince her to get into the green gown and assisted her in putting it on.

Johnson spoke to Janet and discussed that she was a diabetic and discussed checking her blood sugar.  Initially Janet refused to check her blood sugar, and after extensive discussions, Johnson was able to convince her to have it checked.  However, Janet was unwilling to prick her own finger to test her blood sugar with the Accu-Chek machine.  Johnson conferred with Kendra Adams, the HPL nurse who was on-call.  Johnson discussed the propriety of pricking Janet's finger to gather blood for the Accu-Chek machine, given that Janet had consented and expressed a desire for him to do so.  At 9:40 p.m., Janet's blood sugar was taken and the reading was 160.  The blood sugar was recorded on a form called the "Blood Sugar and Insulin Tracking Sheet."  A normal blood sugar reading is 80-120 but no insulin was given to Janet.  According to Johnson, Adams advised him that the 160 reading was within an acceptable range.[4]

---

[3]  Lewis testified that some of the food was gone when she picked up the tray but that she did not see Janet eat and did not know if Janet ate anything.

[4]  Plaintiffs' expert, Dr. Daniel Hoffman, testified that a blood sugar reading of 160 is above what you'd like in an insulin dependent diabetic, but it is not life-threatening.

Johnson wrote an email to HPL staff that night and stated that Janet was in booking and needed to be seen.  He also stated that Janet was a "psych patient" and had meds in the drawer in booking.  He advised that Janet had a cut and stitches on her left hand and that the bandage was removed due to Janet making statements of self-harm.  He stated that Janet was unpredictable and had flooded the booking area by placing her gown and blanket in the toilet, and had remained naked for a period of time until he and Lewis were able to convince her to stay dressed.  He reported that her blood sugar was 160 and she was not given insulin. Johnson also used the pass-on log to pass information about Janet to others on duty and subsequent shifts.  Johnson included most of the same information and also stated that Janet had been very uncooperative.  Johnson also advised the following shift that the water in Janet's cell had been turned off.  A segregation log, a chart for noting information including meals, refusal of meals and comments, was started for Janet because she was housed alone on suicide watch.  Donald MacFarlane testified that he was an inmate at the jail during the time Janet was there in June 2007.  MacFarlane testified that, after about 9:00 on June 15, 2007, Janet was standing at the cell window for more than an hour yelling that she needed help and to call her doctor.

Karee Voges testified that she was a correctional officer and worked from 11:45 p.m. on June 15, 2007 to 8:15 a.m. on June 16, 2007.  She testified that she knew Janet was a Type 1 diabetic.  Voges testified that, although Janet was angry and uncooperative during her prior incarceration, she and Janet built a rapport over the course of that incarceration.  Throughout the night, Janet asked for cups of water which Voges brought to her.  Voges brought

12

breakfast to Janet around 6:30 a.m. and documented that Janet refused breakfast.

Alyson Morris worked for HPL as a mental health clinician in June 2007.[5]  Morris testified that she had a master's degree in counseling and received training through her employment, which including training regarding suicide prevention and risk factors related to suicide in a correctional environment.  Morris had a brief interaction with Janet before 10:00 a.m. on June 16, 2007.  Morris wrote an email to Johnson, and copied her co-worker Jennifer Nicholas and supervisor Greg Whicker.  Morris reported that Janet was still uncooperative and angry.  At approximately 9:30 a.m., Nurse Susan Swain arrived at the satellite jail.  Swain reviewed paperwork completed the night before by Schweighart.  Swain recalled that Janet had not cooperated with her medical care during her prior incarceration.  Swain checked Janet's medical records from her prior incarcerations and was aware that Janet was an insulin-dependent diabetic, had previously refused insulin and blood sugar checks and had endometriosis.

Generally, blood sugars were tested with an Accu-Chek machine twice a day, in the morning and late afternoon, in the infirmary of the jail.  Janet's blood sugar was checked at 9:57 a.m.[6]  Correctional Officer Carl Brown brought the Accu-Chek machine to her rather than forcing her to go to the infirmary.  Janet's blood sugar reading was 396.  This reading

---

[5]  Plaintiffs insist that Morris was not qualified to be a mental health professional because she testified that she was not certified or licensed in any mental health field.

[6]  MacFarlane testified that he observed an argument with correctional officers and Janet earlier that morning about which hand should be used to test her blood sugar.  This court agrees with Defendants that this testimony is immaterial because it is undisputed that Janet's blood sugar was tested that morning.

was documented on the Blood Sugar and Insulin Tracking Sheet.  Brown called Swain and advised her of the reading.  Swain visited Janet and attempted to take vital signs, perform other assessments and obtain a medical history.  Janet was not forthcoming with information. A way of obtaining information regarding an inmate's medical history is to contact the inmate's physician and/or health care providers in an attempt to obtain records and thereby provide the opportunity to establish continuity of care.  However, it is undisputed that this requires a signed release of information by the inmate.  Janet refused to sign any medical releases.  Swain testified that Janet was oriented to time and place and did not complain she was not feeling well.  Swain offered to take Janet to the infirmary for insulin.  Janet refused to go to the infirmary.  Swain offered to bring the insulin to Janet and Janet took 20 units of regular insulin, which was recorded on the Blood Sugar and Insulin Tracking Sheet.  Later that morning, Janet was in bond court.

Morris conducted an in-person assessment of Janet and concluded that Janet was to remain on suicide watch and be reassessed in 24 to 48 hours.  Morris completed an Initial Mental Health Screening and Assessment Form and noted that Janet reported that she had been taking Seroquel for a few months and was receiving treatment from Dr. Yang at the Mental Health Clinic.  At 2:09 p.m., Morris communicated via email with the corrections staff, Nicholas and Whicker about her observations.  Morris stated that Janet was "mentally retarded and a poor historian" and that the information she was able to get indicated that Janet was taking meds primarily for sleep.  Morris stated that Janet was to remain on suicide watch for at least 72 hours and that mental health would reassess in 24 to 48 hours.  Morris

14

also informed Swain that Janet was uncooperative and angry and that Morris was trying to reenforce to Janet and impress upon her the need to cooperate with the medical staff regarding taking her insulin and Accu-Cheks regularly, eating and drinking. Janet was set up in a medical protocol to monitor and treat her diabetes which required blood sugar checks twice per day, insulin to be administered per the sliding scale established by HPL and an evening snack. There is no evidence that Janet did, or did not, receive an evening snack during her incarceration at the jail.

Brown informed Eric Ruff, who was working the subsequent shift, that Janet was diabetic and did not eat lunch. Jenna Thode was also aware that Janet was a diabetic. Thode escorted Janet to the infirmary around 4:00 p.m. for a blood sugar check. The reading was 107, which is a normal blood sugar. Thode testified that she initially wrote her badge number, 320, in the space for the blood sugar reading, scratched it out and wrote 107 on the Blood Sugar and Insulin Tracking Sheet. Officers documented that Janet refused dinner that evening. MacFarlane testified that Janet was standing at the window of her cell that night. He testified that she looked very sickly and pale and looked "really withdrawn and out of it."

Voges worked from 11:45 p.m. on June 16, 2007, to 8:15 a.m. on June 17, 2007. She brought Janet water on multiple occasions. Voges asked Janet to have her blood sugar checked in the morning. Voges testified that the Accu-Chek machine read "E." An additional attempt was made to check Janet's blood sugar and the machine again read "E." This was not documented on the Blood Sugar and Insulin Tracking Sheet. Terrance Alexander worked as a correctional officer between 8:00 a.m. and 4:00 p.m. that day. The

15

earlier shift informed his shift that Janet had refused to eat breakfast and that attempts were made to check Janet's blood sugar but the machine read "E.R." Alexander testified that Janet asked to have her blood sugar checked around 9:00 that morning.

Swain arrived at the jail around 10:00 a.m. Alexander informed her that Janet had not eaten breakfast and that unsuccessful attempts had been made to check her blood sugar. Swain testified that she checked on Janet and informed her that failure to check her blood sugar could jeopardize her health. Swain stated in her Declaration that Janet told Swain "she was not going to have her blood sugar checked." Although it was HPL policy that if a diabetic inmate refused treatment the nurse was to attempt to have the inmate sign a Refusal of Care Form, there is no evidence that Swain or anyone else asked Janet to sign this form. At approximately 11:00 a.m., Correctional Officer George Castor informed Swain that Janet had reported vomiting in her cell. Swain immediately went to Janet's cell to assess Janet and did not observe any vomitus. Swain testified that she talked to Janet and "made a visual assessment of her skin tone, any signs or symptoms that she would be showing, perspiration." Throughout that day, Alexander observed and interacted with Janet and communicated those observations to Swain. It is undisputed that Janet made no complaints to Alexander and Alexander did not observe any signs or symptoms of medical or mental distress during this time. Alexander testified that he asked Janet on repeated occasions if she would be willing to have her blood sugar taken and she consistently refused.

At about 3:00 that afternoon, Swain went back to Janet's cell to check on her. Swain stated in her Declaration that Janet spoke coherently and that Janet's interaction with her was

16

consistent with her prior interactions with Janet. At that time, Swain noticed that the segregation log stated that Janet had refused lunch. Swain testified that she did not see any signs and symptoms of diabetic ketoacidosis at that time.[7] It is undisputed that, if not treated in time, diabetic ketoacidosis is life threatening. Swain testified that she personally offered Janet Accu-Cheks that day. Swain testified that she spoke to Thode before she left that afternoon. Swain advised Thode that she had been to Janet's cell and offered her an Accu-Chek and encouraged Janet to comply with the Accu-Cheks and administration of insulin to herself, if needed. Swain advised Thode that she had told Janet that Thode would be by her cell between 4:00 and 4:30 p.m. to offer Janet an Accu-Chek. Swain told Thode to keep an eye on Janet and specifically advised that she was someone who needed to be watched. Thode spoke to Janet and told her that she needed to have her blood sugar checked. Thode testified that Janet refused to have her blood sugar checked, stating that she did not like their machine. That evening, Thode told Janet that she needed to eat but Janet nevertheless refused dinner on June 17, 2007. Janet told Thode she did not feel well and had been throwing up for a few days. Thode informed the correctional officers who came on duty to relieve her about her observations and interactions with Janet. Janet's refusals to have her blood sugar checked were not documented on the Blood Sugar and Insulin Tracking Sheet or the segregation log.

Between 3:00 p.m. on June 17, 2007 and 6:30 a.m. on June 18, 2007, correctional

---

[7] Swain testified that the signs and symptoms she and the correctional staff would have been looking for were shortness of breath, a fruity smell, flushed appearance, exhaustion, extreme thirst, excessive urination, confusion and changes in her level of consciousness.

officers performed 61 cell checks of the cells in the booking area at the jail, including the cell in which Janet was housed. Correctional Officer Arnold Mathews testified that he was on duty from just before midnight on June 17 to the morning of June 18, 2007. He testified that he checked on Janet during his shift and heard her grumbling, making sounds in her cell throughout the night. Mathews testified that Janet moved to different spots during the night and that he heard her hitting the door. Correctional Officer Matthew McCallister testified that, between 2:00 and 4:00 a.m. on June 18, 2007, he opened Janet's cell door because she had moved from the middle of the cell to right up against the door and he could not see her when he was doing his security check. McCallister testified that she moved back toward the middle of the cell when he opened the door. Two inmates at the jail that night, Lawrence Montgomery and Jared Carpenter, testified that they heard a female inmate stating that she did not feel well and wanted to see the nurse and that she needed her insulin. MacFarlane testified that, around 6:00 a.m., he saw a correctional officer who was doing cell checks glance into Janet's cell and say, "This one's not looking so good." At approximately 6:26 a.m. on June 18, 2007, Mathews observed Janet in her cell and found she was in medical distress. Mathews testified that her appearance did not look right to him so he called for medical assistance. Emergency medical services (911) was promptly contacted. An ambulance arrived and Janet was taken to the hospital where she died later that day. Medical tests performed when she was taken to the hospital showed that Janet had a blood sugar reading of 966, BUN of 62, creatinine of 3-4 and swelling in the brain as a result of diabetic ketoacidosis.

18

PROCEDURAL HISTORY

On June 18, 2009, Plaintiffs filed their original Complaint (#1) in this court.  On January 12, 2010, Plaintiffs filed a Second Amended Complaint (#42) against Walsh, Champaign County, HPL and the Urbana Defendants.  Plaintiffs also named Deputy Matthew McCallister, Jenna Thode, Karee Voges, Jeffrey Shumate, Arnold Mathews, Carl Brown and Nurse Susan Swain as Defendants.  However, the record shows that these Defendants have not been served in this action.  Accordingly, these Defendants are hereby terminated as parties to this action.

In Count I of their Second Amended Complaint (#42), Plaintiffs alleged that Defendants Walsh, Morgan, Bain and Menocci were deliberately indifferent to Janet's serious medical needs when they failed and refused to take Janet to a hospital emergency room and failed and refused to take action to provide Janet with necessary medical and/or psychiatric care.  Plaintiffs alleged that "Patrick Hahn, who is an epileptic, was unable, without Janet's assistance, to care for the child that had been born of his marriage to Janet . . . and Patrick's parental rights were terminated and the child was adopted by [an] unrelated party, thereby terminating forever Patrick's relationship" with the child, which was proximately caused by Defendants' actions as alleged.[8]

In Count II, Plaintiffs alleged that Walsh was "the supervisory official responsible for development and implementation of policies and procedures for the identification and

---

[8] This claim regarding Patrick's loss of custody of the child was repeated throughout Plaintiffs' Second Amended Complaint.

19

handling of pretrial detainees suffering serious medical conditions, including mental illness and diabetes."  Plaintiffs alleged that Walsh, acting with deliberate indifference, "failed to develop and implement adequate policies and procedures with the foreseeable result that pretrial detainees like Janet would not be identified and would not receive appropriate treatment and monitoring."  Plaintiffs alleged that "[d]ue to his failure to develop and implement the aforesaid adequate policies and procedures, the jail staff failed or refused to take action to provide Janet with necessary medical and/or psychiatric care, thereby proximately causing, in whole or in part, her conscious pain and suffering and her death." In Count III, Plaintiffs alleged that the City of Urbana acted with deliberate indifference when it "failed to develop and implement adequate policies and procedures of taking arrestees with serious medical conditions directly to a hospital emergency room instead of to the jail, with the foreseeable result that arrestees like Janet would not be identified and would not receive appropriate and necessary emergency medical treatment."  In Count IV, Plaintiffs alleged that HPL acted with deliberate indifference when it "failed to develop and implement adequate policies and procedures with the foreseeable result that pretrial detainees like Janet would not be identified and would not receive appropriate treatment and monitoring."  In Count V, which was titled "Failure to Train and Supervise," Plaintiffs alleged that Walsh "failed to develop and implement adequate policies and procedures, which enabled Champaign County jail deputies to engage in conduct that violates the constitutional rights of persons in custody, including Janet, without fear of reprimand, discipline or criminal prosecution, creating an atmosphere where such unconstitutional behavior is ratified,

20

tolerated, acquiesced or condoned." In Count VI, Plaintiffs alleged that Champaign County and HPL violated the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. Plaintiffs alleged that Champaign County and HPL failed to accommodate Janet's disabilities and denied her adequate medical and mental health services and programs available to others that would have prevented her death.

Following lengthy discovery, Motions for Summary Judgment were filed by the Urbana Defendants (#124), Walsh and Champaign County (#130) and HPL (#133). The Urbana Defendants and Plaintiffs have also filed Motions to Strike related to the Motions for Summary Judgment (#138, #159, #161). All of the pending motions are fully briefed and ready for ruling.

ANALYSIS

I.  MOTIONS TO STRIKE

A.  THE URBANA DEFENDANTS' MOTION

On March 30, 2012, the Urbana Defendants filed a Motion to Strike (#138). They argued that exhibits Plaintiffs filed in support of their Response to the Urbana Defendants' Motion for Summary Judgment (#137) should be stricken and not considered by this court. On May 14, 2012, Plaintiffs filed their Response to Defendants' Motion to Strike (#150) and argued that this court should deny the Motion to Strike and consider all of the exhibits.

This court agrees with Plaintiffs that motions to strike are disfavored. See Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258, 688 F. Supp. 2d 815, 830 (C.D. Ill. 2010). The Seventh Circuit has expressed the opinion that motions to strike "are not only unnecessary

(from the parties' perspective) but also pointless (from the judiciary's)." <u>Custom Vehicles,</u>

<u>Inc. v. River Forest, Inc.</u>, 464 F.3d 725, 727-28 (7th Cir. 2006).  This court has noted that, as

a general matter, it "relies on its ability to consider only arguments and facts which are

properly presented and rarely grants motions to strike." <u>Nuzzi</u>, 688 F. Supp. 2d at 830.

However, "rarely" is not never and, because this court believes that Defendants have raised

some legitimate concerns and arguments, this court will consider Defendants' arguments

regarding the documents provided by Plaintiffs.

### 1.  EXHIBITS A, B, C, D, E, F, G, H, I, K

Defendants first argued that Plaintiffs' Exhibits A, B and C, which contained

documents showing emergency calls made regarding Janet and the response made by the

Urbana police department and other emergency responders, should be stricken as lacking in

foundation and irrelevant.  Plaintiffs responded that these exhibits document prior contacts

and emergencies related to Janet and are relevant to show the knowledge of the Urbana

police department about Janet and the names of the officers who responded to the calls.

Plaintiffs argued that the documents are admissible under Rule 803(8)(C) of the Federal

Rules of Evidence because they are governmental reports which are sufficiently reliable.

This court concludes that Defendants have not adequately shown that these exhibits should

be stricken.  This court has therefore considered these documents, to the extent that they are

material to Plaintiffs' claims, in ruling on the Urbana Defendants' Motion for Summary

Judgment.

Defendants next contended that Exhibits D, E and H, which are the expert reports of

22

one of Plaintiffs' experts, Dr. Louis Philipson, are hearsay documents which are inadmissible on their face and should not be considered. Defendants noted that Philipson's deposition was taken and the deposition transcript was offered by Defendants in support of their Motion for Summary Judgment. They argued that it is the deposition transcript which should be given consideration. Plaintiffs responded that the reports are relevant to show the facts and data relied on by Philipson in reaching his opinions and should be considered in ruling on the Motion for Summary Judgment. This court agrees with Plaintiffs that the reports appear to be admissible under Rule 703 of the Federal Rules of Evidence and should not be stricken. See Wallis v. Townsend Vision, Inc., 2009 WL 268824, at *3 (C.D. Ill. 2009).

Defendants have also argued that Exhibit F should be stricken because there is no foundation provided for the exhibit, it is hearsay and apparently inadmissible. Exhibit F is a DVD entitled "Treating Diabetes Emergencies: What Police Officers Need to Know" and is described as a "20 minute diabetes training video produced by the American Diabetes Association and the City of Philadelphia Police Department for training of police officers who may encounter a person with diabetes." Plaintiffs responded that Philipson has personal knowledge about the DVD and the truth of its contents and, therefore, the DVD is part of his expert witness testimony. This court concludes that the DVD, to the extent that it forms a basis for Philipson's opinions, may be considered by this court and will not be stricken.

Defendants next argued that Exhibit G, the transcript of John Hawn's "Statement under Oath" taken on October 23, 2007, should be stricken. Defendants noted that Hawn's deposition was taken and a transcript of the deposition was submitted by Defendants in

support of their Motion for Summary Judgment.  Defendants argued that Hawn's prior statement, taken at a time when he was not subject to cross-examination, should not be considered by this court.  Plaintiffs responded that there is nothing inadmissible about the statement taken under oath.  This court concludes, however, that Hawn's prior statement should be stricken.  Hawn's deposition was taken on October 11, 2010, as part of discovery in this case.  On that date, Hawn was subject to examination by Defendants' counsel and Plaintiffs' counsel and had a full opportunity to relate everything he knew about Janet and about the incident on June 15, 2007.  Plaintiffs have provided no explanation why Hawn's prior statement should also be considered in this case.  This court agrees with Defendants that it is the transcript of Hawn's deposition testimony which should be considered by this court in ruling on the Motion for Summary Judgment.  Therefore, the transcript of Hawn's October 23, 2007, statement under oath is STRICKEN and will not be considered.

Defendants also argued that Exhibit I, a written decision of the Social Security Administration dated September 21, 2007, should be stricken.  The decision stated that Janet had applied for disability benefits on July 28, 2004, and appeared for a hearing before an Administrative Law Judge (ALJ) on June 12, 2007.  In the decision, the ALJ found Janet disabled and eligible for social security disability benefits.  The decision stated that Janet had the following severe combination of impairments: "bipolar disorder, adjustment disorder, borderline intellectual functioning, and juvenile (type I) diabetes."  Defendants have asserted that this document is hearsay and should not be considered because it was issued and received months after the occurrence at issue in this case.  They argued that "there is no way

24

that these Defendants could have been aware of this document, and there is no way that the content of this document could have provided any of these Defendants with notice of any type as of the occurrence date." Plaintiffs responded that the exhibit should be considered because the decision is the "best description" of Janet's disabilities. Plaintiffs argued that the information upon which the finding was based was gathered before June 15, 2007 and accurately described Janet "up to just 3 days before she was arrested by Urbana defendants." This court will not strike the document, but concludes that it can have very little relevance to Plaintiffs' claims in this case because, as Defendants have pointed out, the document was issued after Janet had died and could not form the basis for any knowledge of Janet's condition by anyone involved in this case.

Defendants also argued that this court should strike Exhibit K, the Declaration of Sherie Davis, dated March 17, 2012. In her Declaration, Davis stated that Janet spent time visiting her in Hawn's trailer park. As noted previously, Davis stated that, on June 15, 2007, she was interviewed by a female Urbana police officer before Patrick was taken to the hospital in an ambulance. In her Declaration, Davis described what she told the officer about Janet. Davis said she told the officer that Janet needed to be taken to the emergency room that day and offered to get Janet's insulin. Defendants argued that Davis's opinions should be stricken because she is not a medical expert and because her statements are not relevant to determining Janet's condition on June 15, 2007. However, this court agrees with Plaintiffs that Davis's statements about what she related to the officer may be relevant and have been considered in ruling on the Urbana Defendants' Motion for Summary Judgment.

25

## 2. EXHIBIT J, DECLARATION OF PATRICK R. HAHN

Defendants next argued that Exhibit J, the Declaration of Patrick R. Hahn, dated March 17, 2012, must be stricken because it was filed well after the close of discovery in the case and because an affidavit may not be used to contradict a deposition in an attempt to avoid summary judgment. This court agrees.

Patrick's deposition was taken on August 26, 2010. At the beginning of the deposition, Patrick testified, under oath, that he was not on medications that would prevent him from being able to answer and understand questions and that he was "not intoxicated." Patrick was asked about his alcohol use and testified that he had "an occasional beer here and there just like everyone else." He testified that he did not consider himself an alcoholic and was not claiming a relapse into alcoholism because of the incident at issue in this case. During questioning by his counsel, Patrick admitted that his counsel considered him an alcoholic but again stated that he did not think that he had a drinking problem. During his deposition, Patrick clearly testified that he did not remember whether he had an occasion to speak to the police and tell them anything about what had happened on June 15, 2007. Patrick testified that, on June 15, 2007, Janet did not, to his observation, have any sort of apparent medical difficulty where he thought she needed medical assistance.

In responding to the Urbana Defendants' Motion for Summary Judgment, Plaintiffs submitted Patrick's Declaration as Exhibit J. In the Declaration, Patrick stated that, after Janet's death, he "used alcohol and drugs in excess to drown out [his] sorrow" and "was basically lost in drugs and alcohol for 4½ years." Patrick stated that he was not sober when

he appeared for his deposition and now realizes that he "was in a stupor because of [his] habitual intoxication." Patrick admitted that he testified at his deposition that he did not remember what he said to police on June 15, 2007. Patrick stated that he is now under doctors' care and is a recovering alcoholic. Patrick stated that he is "beginning to feel clear minded for the first time in years" and "can remember things from the past better." Patrick stated that he now remembers telling a female police officer "to help my wife and that my wife needs to go to the Emergency Room because her sugar levels are all messed up." Patrick stated that he also remembered telling the officer that his wife only acted like this when her sugar level was wrong, that his wife was diabetic and took insulin three to four times a day and that she kept her insulin in the refrigerator.

In response to Defendants' argument that the Declaration should be stricken, Plaintiffs argued that this court should not strike Patrick's Declaration because the discrepancies between his deposition testimony and Declaration are adequately explained.

It is well settled that litigants cannot manufacture issues of fact by submitting declarations that contradict the substance of their prior sworn testimony. See McCann v. Iroquois Mem'l Hosp., 622 F.3d 745, 750 (7th Cir. 2010); Ineichen v. Ameritech, 410 F.3d 956, 963 (7th Cir. 2005). This rule "is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised" and "applies when the change is incredible and unexplained." McCann, 622 F.3d at 750-51. To determine whether the Declaration is a "sham," a court "must examine the particular circumstances of a change in testimony to see whether it is plainly incredible or merely creates a credibility issue for the

27

jury." Patton v. MFS/Sun Life Fin. Distribs., Inc., 480 F.3d 478, 488 (7th Cir. 2007); see also Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles, 2012 WL 3686776, at *6 (N.D. Ill. 2012). The Seventh Circuit has held that a "party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject." Clark v. Takata Corp., 192 F.3d 750, 760 (7th Cir. 1999), quoting Unterreiner v. Volkswagen of Am., Inc., 8 F.3d 1206, 1210 (7th Cir. 1993).

As noted, Patrick clearly testified at his deposition that he did not remember speaking to the police on June 15, 2007. Patrick's explanation for now recalling detailed information about a conversation with a police officer on that date is that he was actually intoxicated and in a "stupor" on the date of his deposition. This court concludes that this explanation is incredible and not worthy of belief. This court notes that Patrick participated in a lengthy deposition and answered a wide variety of questions, something a person in a "stupor" could not do. Therefore, because there is no credible explanation for Patrick's belated recollection of details he could not remember at his deposition, Patrick's Declaration must be stricken. See Purepecha Enters., 2012 WL 3686776, at *7.

This court further notes that discovery is an important part of the litigation process. When a party appears for a deposition, he or she has the opportunity to provide all of the information the party possesses relating to the claim or claims at issue. The opposing side must be able to rely on the information obtained at the deposition unless there is a very good explanation for a change in the party's story. Patrick's explanation is that he was not truthful at his deposition when he was directly asked whether he was intoxicated. Plaintiffs are

28

arguing that, because of this explanation, Patrick should now be able to change his testimony on a point Plaintiffs believe is important.  This court concludes that accepting this kind of an explanation would undermine the importance of taking a party's deposition during the discovery process.[9]

For all of the reasons stated, Patrick's Declaration is STRICKEN.

### B.  PLAINTIFFS' MOTIONS

On October 1, 2012, Plaintiffs filed two Motions to Strike Declaration of Dr. Joseph Paris (#159, #161) and Memoranda in Support (#160, #162).  Defendants Walsh and Champaign County and Defendant HPL filed Responses (#163, #164).

In their Motions, Plaintiffs stated that Paris, who was disclosed as an expert by Defendants, has died.  Plaintiffs stated that there is no deposition testimony of Paris in this case.  Plaintiffs argued that Paris is unavailable to testify at trial and, therefore, his Declaration and Expert Witness Report, provided by Defendants Walsh and Champaign County and by Defendant HPL in support of their Motions for Summary Judgment, are hearsay and inadmissible and cannot be considered in ruling on the Motions for Summary Judgment.  Defendants argued in response that, under applicable Seventh Circuit case law, Paris's Declaration and Expert Witness Report can be considered by this court in ruling on the Motions for Summary Judgment.  This court agrees.

---

[9] It is not hard to imagine the types of explanations parties could attempt to use to avoid the consequences of unhelpful deposition testimony, such as being under the influence of any number of substances.  When a party is asked at the deposition if he or she is under the influence of anything that could interfere with understanding and answering questions and says "no," that testimony must be conclusive on the issue in almost every situation.

In Oto v. Metro. Life Ins. Co., 224 F.3d 601 (7th Cir. 2000), the Seventh Circuit decided the precise issue raised by Plaintiffs.  The Seventh Circuit concluded that the district court could properly consider an affidavit submitted in support of a motion for summary judgment even though the affiant had died and was not available to testify at trial.  Oto, 224 F.3d at 604-05.  After careful consideration and based upon Oto, Plaintiffs' Motions to Strike (#159, #161) are DENIED.

This court notes, however, that it has relied very little on the expert reports provided by the parties in the case.  The real issue before this court is whether, based upon the facts established by the record and the applicable case law, there is a genuine issue of material fact as to any of Plaintiffs' claims which needs to be submitted to a jury.

## II.  MOTIONS FOR SUMMARY JUDGMENT

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).   In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Gordon v. FedEx Freight, Inc.,

30

674 F.3d 769, 772 (7th Cir. 2012).  However, a court's favor toward the nonmoving party does not extend to drawing inferences supported by only speculation or conjecture.  Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012).

The moving party may meet its burden of showing the absence of disputed material facts by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.  Once the movant satisfies this initial burden, the nonmovant may not rest upon the mere allegations or denials of the pleadings, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Serednyi v. Beverly Healthcare, LLC, 656 F.3d 540, 547 (7th Cir. 2011), quoting Anderson, 477 U.S. at 250.  As Plaintiffs have noted, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003).  In § 1983 cases, "the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment."  Padula v. Leimbach, 656 F.3d 595, 600 (7th Cir. 2011), quoting McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).

## B.  URBANA DEFENDANTS' MOTION

### 1.  DELIBERATE INDIFFERENCE BY MENOCCI, MORGAN AND BAIN

The Urbana Defendants first argued that they are entitled to summary judgment because Plaintiffs failed to establish that Menocci, Morgan or Bain were deliberately

31

indifferent to any serious medical need of Janet at the time of her arrest and transport to jail on June 15, 2007. Defendants argued that the evidence showed that Menocci had no involvement in the decision to transport Janet to jail. Defendants also argued that Janet was in stable medical condition at the time of her arrest and transport and was taken to the Champaign County jail which had a medical provider to administer to the medical and mental health needs of inmates. Defendants argued that, therefore, Morgan and Bain were not deliberately indifferent to Janet's serious medical needs.

In their lengthy Response, Plaintiffs argued that Menocci was deliberately indifferent to Janet's serious medical needs because she did not communicate to Morgan the information she received about Janet from Patrick and Davis. Plaintiffs also argued that Morgan and Bain were deliberately indifferent to Janet's serious medical needs because they decided to take Janet to jail rather than the hospital. Plaintiffs relied, in part, on the opinion of one of their retained experts, Dr. Philipson. Philipson testified that it was his opinion that the on-scene evaluation of Janet's condition was not adequate. Philipson discussed some tests which were not done at the scene and explained why these tests were important and could have provided important information. Philipson testified that the decision to take Janet to jail rather than the hospital was the first step in her demise. Plaintiffs also argued that Morgan could not have relied on paramedics at the scene because "[t]here was no paramedic report listing any names or signed by any paramedic." Plaintiffs also argued that it was deliberately indifferent for the officers at the scene to fail to obtain information about Janet's history of serious medical and mental health issues, including involuntary admissions to a

32

mental health facility.[10]

"The Supreme Court has interpreted the Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated by the Fourteenth Amendment, to impose a duty on states 'to provide adequate medical care to incarcerated individuals.'" Holloway v. Delaware County Sheriff, 700 F.3d 1063, 1072 (7th Cir. 2012), quoting Boyce v. Moore, 314 F.3d 844, 888-89 (7th Cir. 2002) (citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)). Therefore, police must provide care for the serious medical conditions of persons in custody. Paine v. Cason, 678 F.3d 500, 506 (7th Cir. 2012). They violate this proscription when they act with deliberate indifference to the serious medical needs of an arrestee. See Holloway, 700 F.3d at 1072. "To succeed on a deliberate indifference claim, a plaintiff must (1) demonstrate that his medical condition is 'objectively, sufficiently serious,' and (2) demonstrate that the defendant acted with a 'sufficiently culpable state of mind.'" Holloway, 700 F.3d at 1072, quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994).

To demonstrate that a defendant acted with a "sufficiently culpable state of mind," a plaintiff must put forth evidence that the defendant knew of a serious risk to the plaintiff's health and consciously disregarded that risk. Holloway, 700 F.3d at 1073, quoting Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006). "This subjective standard requires more

---

[10] This court notes that Plaintiffs also argued that Defendants violated Janet's Fourth Amendment rights. Defendants are correct, however, that Plaintiffs filed a Motion to Amend and attempted to amend their Second Amended Complaint to add this claim. On January 12, 2012, Magistrate Judge David G. Bernthal entered an Order (#122) and denied Plaintiffs' Motion to Amend as untimely. Accordingly, this claim cannot be considered by this court. In any case, this court concludes that the evidence shows that the conduct of the Urbana Defendants at the scene was reasonable under the circumstances and did not violate Janet's constitutional rights.

than negligence and it approaches intentional wrongdoing." Holloway, 700 F.3d at 1073,

citing Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir. 1998). The Supreme

Court has compared the deliberate indifference standard to that of criminal recklessness.

Farmer, 511 U.S. at 837. The Seventh Circuit has "characterized the standard as imposing

a high hurdle on plaintiffs because it requires a 'showing of something approaching a total

unconcern for the prisoner's welfare in the face of serious risks." Rosario v. Brawn, 670

F.3d 816, 821 (7th Cir. 2012), quoting Collins v. Seeman, 462 F.3d 757, 762 (7th Cir. 2006);

see also Smith v. Dart, 2013 WL 315742, at *8 (N.D. Ill 2013). Even if officials are aware

of a substantial risk of serious harm, they are not liable if they "responded reasonably to the

risk, even if the harm ultimately was not averted." Jackson v. Ill. Medi-Car, Inc., 300 F.3d

760, 765 (7th Cir. 2002), quoting Farmer, 511 U.S. at 843; see also Rosario, 670 F.3d at 822.

Moreover, individuals are not liable under § 1983 unless they caused or participated in the

alleged constitutional deprivation. Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996).

In this case, there is no dispute that Janet had a serious medical condition. Therefore,

the question is whether Plaintiffs have presented sufficient evidence of deliberate

indifference to survive a motion for summary judgment. See Holloway, 700 F.3d at 1072.

This court concludes that there is no genuine issue of material fact regarding whether

Menocci caused or participated in a constitutional deprivation. It is undisputed that Menocci

was not involved with Janet at the scene of her arrest. Plaintiffs have nonetheless argued that

Menocci was deliberately indifferent when she did not communicate to Morgan the

information she received from Patrick and Davis about Janet's medical condition. First of

34

all, Patrick's Declaration has been stricken, so there is no evidence that Patrick provided any information to Menocci.  As far as the information Davis stated she provided regarding Janet's diabetes and talk of killing herself, this court notes that Plaintiffs have not cited any case law suggesting that Menocci, who had no contact with Janet at the scene, was deliberately indifferent to Janet's serious medical needs by failing to pass along this information.  Furthermore, the evidence shows that Janet was assessed at the scene by medical personnel who were aware she was diabetic and, when Janet was taken to the Champaign County jail, she was determined to be suicidal and was placed on suicide watch. Davis's information would have added nothing to the information known by those providing care to Janet.

This court also concludes that there is no genuine issue of material fact regarding whether Morgan and Bain were deliberately indifferent to Janet's serious medial needs. This court agrees with Defendants that the record clearly establishes that paramedics were on the scene.  Defendants have pointed out that the last page of the EMT Report provided in this case indicates there were actually two ambulance (medic) units at the scene, one which treated Patrick, the patient in the road, and one which treated Janet, the patient in the house. Moreover, both EMTs, Nightlinger and Hausle, testified to the presence of ambulance personnel and paramedics at the scene, as did Morgan and Bain.  This court concludes that Morgan and Bain were entitled to defer to the judgment of the paramedics and EMTs on the scene.  See King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012).  While Philipson has criticized the way Janet's arrest was handled and has the opinion that Janet should have been

taken to the hospital rather than the jail, Defendants' expert, Dr. Barbara Bellar, concluded that there was no indication that Janet had a serious medical need for which imminent medical care was required at the time of her arrest and transport to the jail.[11]  See Cirilla v. Kankakee County Jail, 438 F. Supp. 2d 937, 945-46 (C.D. Ill. 2006) (summary judgment appropriate for defendants where there was no evidence that the plaintiff required immediate medical treatment).

The evidence shows that Janet had a normal blood sugar, had no external or obvious signs of injury and that medical personnel determined she was stable and able to be transported to jail.  Further, Bain testified that Janet spoke to him and answered questions on the way to the jail.  Based on this evidence, this court concludes that Morgan and Bain were not deliberately indifferent in making the decision to transport Janet to jail.  See Jackson, 300 F.3d at 765-66 (transport driver who took the plaintiff, who had swallowed a bottle of pills, to the police station rather than the hospital was not deliberately indifferent to the plaintiff's serious medical needs where the plaintiff "was alert, sitting up straight and speaking in full sentences"); Brownell v. Figel, 950 F.2d 1285, 1291-92 (7th Cir. 1991) (police officers' failure to seek additional medical treatment based upon the plaintiff's lethargic behavior did not rise to the level of deliberate indifference); Salazar v. City of Chicago, 940 F.2d 233, 241 (7th Cir. 1991) (police officers not deliberately indifferent when they took driver arrested for DUI after an automobile accident to jail rather than the hospital because there was no

---

[11]  Plaintiffs have argued that Bellar's Affidavit should be stricken as incompetent and inadmissible.  However, this court agrees with Defendants that the opinion this court has relied on is adequately supported and admissible.

evidence the officers knew the driver faced a serious risk of death or other grievous harm absent further medical attention).

Plaintiffs have also claimed that the officers were deliberately indifferent for failing to obtain Janet's insulin and transport it to jail. This court does not agree. Plaintiffs have provided no pertinent authority for this assertion and the record shows there was insulin available at the jail. Plaintiffs have also argued that the officers should have checked the records regarding prior calls to Janet's residence and should have determined that she had previously been taken to the hospital for treatment of her diabetes and had been involuntarily committed to a mental health facility. According to Plaintiffs, if the officers had checked the records about the prior calls, they would have known Janet needed to go to the hospital for treatment of her diabetes and mental health issues. This court agrees with Defendants that no case law was cited by Plaintiffs to support the imposition of such an obligation. This court concludes that the officers could make a decision based upon their observations and the evaluation conducted by medical personnel. This court additionally notes that Janet was obviously discharged after her hospitalizations, presumably following a determination that she was stable and capable of caring for herself. Therefore, the fact that she had previously been treated at a hospital and had previously been involuntarily committed does not mean that this was necessary on the date of her arrest.

## 2. CITY OF URBANA

The Urbana Defendants next argued that the City of Urbana is entitled to summary judgment because Plaintiffs failed to establish any official municipal policy which was a

cause of any injury or damage to Plaintiffs.  In response, Plaintiffs argued that the City of

Urbana is liable because its failure to even minimally train officers about how to deal with

diabetes emergencies was a policy of deliberate indifference to serious medical needs, citing

Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).  Plaintiffs also argued that the City's

"custom or usage of non-review" of the suspect's prior records amounts to deliberate

indifference to serious medical needs.

"Plaintiffs who seek to impose liability on local governments under § 1983 must prove

that 'action pursuant to official municipal policy' caused their injury."  Connick, 131 S. Ct.

at 1359, quoting Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 691 (1978).

In this case, this court has concluded that Janet's condition was stable at the time of her arrest

and Janet's constitutional rights were not violated when the police officers on the scene

decided to take her to jail rather than the hospital.  Therefore, the City's alleged failure to

train the officers about how to deal with a diabetic emergency could not have been the cause

of any injury.  See Jackson, 300 F.3d at 766 (failure to prove the existence of a constitutional

violation precludes determination of municipal liability).  This court also notes that it agrees

with Defendants that there is no case law which would suggest that a municipal entity has

a duty to provide this kind of medical training to its officers, especially where, as in this case,

medical personnel were available to come to the scene to do a medical evaluation.

As far as Plaintiffs' argument that there was a "custom" of not reviewing a suspect's

prior records, this court agrees with Defendants that no such custom or usage has been

established; "all that has been established is that in this particular instance, for whatever

reason, the officers did not do 'computer research' during their brief encounter with [Janet]." Municipal liability cannot be based on "an isolated incident." See Holloway, 700 F.3d at 1071. Most importantly, the evidence shows that Janet was assessed on the scene and taken to jail in stable condition. As noted previously, the fact that Janet had been taken to the hospital or involuntarily committed on prior occasions did not mean it was necessary on the date of her arrest. Accordingly, Plaintiffs have not shown that Janet's constitutional rights were violated and Plaintiffs likewise cannot show that any "custom" caused a constitutional deprivation. See Jackson, 300 F.3d at 766.

### C. SHERIFF WALSH AND CHAMPAIGN COUNTY'S MOTION

#### 1. SHERIFF WALSH

In the Motion for Summary Judgment filed by Walsh and Champaign County, Walsh argued that he is entitled to summary judgment on Plaintiffs' claims against him. He first argued that he is entitled to summary judgment on Plaintiffs' claim that he was deliberately indifferent to Janet's serious medical needs because the undisputed material facts in this case clearly show that he was not personally present and had no interaction whatsoever with Janet during her incarceration at the jail. In response, Plaintiffs argued that Walsh is liable because he had subjective knowledge of the risk of harm to Janet because: (1) seven inmates previously died in the jail, including Quentin Larry, who Plaintiffs contend died because of deficiencies in the intake process at the jail; (2) Swain's email regarding the problems with Janet during her May 2007 incarceration was sent to "Corrections" so Walsh should have received it; (3) Walsh was personally notified by letter, fax and a telephone conversation with

Plaintiffs' counsel in May 2006 about complaints a diabetic inmate, Joey Morrissey, had about how treatment for his diabetes was handled at the jail, to which Walsh responded following an investigation; (4) Walsh entered into a contract with HPL to provide mental health services at the jail instead of Mental Health of Champaign County; and (5) Walsh decided to discontinue the jail's annual certification by the American Correctional Association (ACA).

Section 1983 creates a cause of action based on personal liability and predicated on fault; individuals thus are not liable under §1983 unless they caused or participated in the alleged constitutional violation. Vance, 97 F.3d at 991; Castellano v. Chicago P.D., 129 F. Supp. 2d 1184, 1189 (N.D. Ill. 2001). To be deliberately indifferent, defendants "must know the serious risk to the prisoner's health, i.e., the serious medical need at issue, and they must also consciously disregard that risk/need so as to inflict cruel and unusual punishment upon the prisoner." Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006). This court agrees with Walsh that there is no evidence that Walsh knew of the serious risk to Janet's health and consciously disregarded that risk. The evidence that Walsh may have been informed about problems with Janet during an earlier incarceration and responded to a different inmate's complaints about the treatment of his diabetes does not show that he had any knowledge about any problems with Janet from June 15, 2007 to June 18, 2007. In addition, this court agrees with Walsh that Plaintiffs have not provided any evidence that any of the seven deaths at the jail involved medical care provided to an inmate, much less that the medical care

40

provided involved an inmate with diabetes.[12]  Finally, Plaintiffs have no evidence that

Walsh's decisions about HPL and ACA certification had any adverse effect on Janet.  They

have only presented opinion, speculation and conjecture.

The law is clear that "[a]bsent vicarious liability, each Government official, his or her

title notwithstanding, is only liable for his or her own misconduct."  Ashcroft v. Iqbal, 556

U.S. 662, 677 (2009).  In the Seventh Circuit, it is clear that Walsh "cannot be held liable on

the basis of respondeat superior; to be liable, he must be personally liable for [Janet's]

injury."  Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011), citing Iqbal, 556 U.S. at 676.

This court concludes Plaintiffs have not shown any basis for imposing personal liability on

Walsh.

Walsh next argued that he is entitled to summary judgment on Plaintiffs' claims

against him in his official capacity, which is in reality a suit against the Champaign County

Sheriff's Department.  See Franklin v. Zaruba, 150 F.3d 682, 684 n.2, 685 (7th Cir. 1998).

These claims are based upon policies or customs–including the failure to train the

---

[12]  This court agrees with Walsh that Plaintiffs' reliance on the Quentin Larry case is
misplaced.  Plaintiffs' counsel filed a lawsuit in this court regarding Larry's death, a lawsuit
which was dismissed with prejudice following a settlement.  See Winfrey v. Walsh, Case No. 07-
cv-2093.  Walsh is correct that the record in the Winfrey case includes no finding or admission of
liability on Walsh's part.  In addition, the documentation provided by Plaintiffs shows that Larry
was arrested and taken to the jail and it was later determined that he had swallowed a bag with a
significant amount of cocaine in it.  Larry did not tell anyone at the jail that he had swallowed a
bag of cocaine.  The bag ruptured while he was in the jail, causing massive cocaine intoxication
and Larry's death.  A coroner's jury ruled his death accidental, but recommended a review of the
way inmates are processed at the jail, specifically "more extended searches for hidden materials."
This court therefore agrees with Walsh that the Larry case cannot serve as "competent evidence
that Walsh knew about any unconstitutional conduct relevant to this case at all."  This court also
agrees that this case does not involve a problem with the "intake process."  Janet was properly
identified at intake as a type 1 diabetic and suicidal.  In fact, Plaintiffs have admitted in their
argument that Janet's diabetes and mental and emotional disorders were "immediately
recognized" at the jail.

correctional officers to deal appropriately with mental illness and diabetes–which Plaintiffs believe contributed to Janet's death.  See Rice ex rel. Rice v. Correctional Med. Servs., 675 F.3d 650, 673 (7th Cir. 2012).  Walsh argued that there was no policy of custom, or lack thereof, which was the moving force behind a violation of Janet's constitutional rights.  Plaintiffs have responded with a lengthy, convoluted argument complaining that things were not done properly or could have been done better at the jail.  Similar to the court's conclusion in Rice, this court concludes that Plaintiffs have included a "laundry list" of perceived failures and omissions which occurred at the Champaign County jail "without in most instances making even a rudimentary attempt to identify a policy or practice which was the moving force" behind a constitutional harm that Janet suffered.  See Rice, 675 F.3d at 677.

"[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by municipal policymakers.  Rice, 675 F.3d at 675, quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989).  "An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation."  Rice, 675 F.3d at 675.  Plaintiffs must also show a direct causal connection between the policy or practice and the injury, in other words that the policy or custom was the "moving force [behind] the constitutional violation."  Rice, 675 F.3d at 675, quoting Harris, 489 U.S. at 389; see also King, 680 F.3d at 1020.  This court concludes that Plaintiffs have not identified evidence

42

sufficient for the factfinder to conclude that Walsh maintained a policy or custom evincing deliberate indifference to the needs of mentally ill or diabetic inmates that resulted in harm to Janet.  See Rice, 675 F.3d at 675.

Plaintiffs first argued that Walsh had a policy to staff the jail with unqualified mental health personnel, which resulted in Janet being denied Seroquel, which had been prescribed for bipolar disorder.  Plaintiffs have not, however, offered any evidence that Janet had been prescribed Seroquel for bi-polar disorder.  This court agrees with Walsh that Plaintiffs have not presented any evidence that Janet's prescription for Seroquel was for anything other than a sleep aid, as noted by Morris during her initial evaluation of Janet.  This court agrees with Walsh that the evidence shows that Morris had mental health training and was, in fact, qualified to provide mental health care.  In addition, Plaintiffs have provided no competent evidence that shows that the quality of mental health care at the jail suffered after Walsh made the decision to contract with HPL to provide mental health personnel.  See Minix v. Canarecci, 597 F.3d 824, 834 (7th Cir. 2010).

Plaintiffs next complained about the harshness of the suicide policy at the jail, which resulted in a bare cell, lights always on and nothing but a green gown to wear.  Plaintiffs argued that these conditions fostered and worsened her serious medical conditions.  This court agrees with Walsh that this could more accurately be described as a conditions of confinement claim, a claim that has not been made by Plaintiffs.  This court further agrees that Janet was placed on suicide watch because she was properly identified as a suicide risk. "Suicide is a 'serious harm' and prison officials must take reasonable preventative steps

43

when they are aware that there is a substantial risk that an inmate may attempt to take his own life." Estate of Novack v. County of Wood, 226 F.3d 525, 529 (7th Cir. 2000). Janet was identified as a suicide risk and therefore was placed on suicide watch, which included the removal of common tools of suicide, such as clothing that can be easily torn, eating utensils and cell furniture that could be used to inflict harm. It is clear in this case that Janet was placed on suicide watch for her own protection. In fact, not placing Janet on suicide watch would have been deliberately indifferent to a substantial suicide risk. See Sanville v. McCaughtry, 266 F.3d 724, 740-41 (7th Cir. 2001).

Plaintiffs next complained that the water to Janet's cell was turned off, arguing that "[t]here was no policy at the jail about shutting off the water to a diabetic's cell." Plaintiffs have not clearly explained how this argument supports their Monell "policy or custom" claim against Walsh. In any case, this court agrees with Walsh that there is no evidence or legal precedent to show that it is a violation of an inmate's constitutional rights to shut off the water to the cell when the inmate is stuffing clothing into the cell's toilet. Most importantly, it is undisputed that Janet was provided with drinking water during her two and one-half day stay at the jail.

Plaintiffs next argued that Walsh cannot claim that Janet refused care which was offered because there is a total lack of documentation of any refusals of medical care. Plaintiffs then proceeded to make the completely contradictory argument, in the same paragraph, that Walsh had no policy, practice or procedure for an inmate who is diabetic and refuses to take insulin or refuses medical care. This court concludes that ample testimonial

44

evidence has been provided that Janet refused to comply with blood sugar tests on June 17, 2007, despite the fact that the refusals were not documented.  This court concludes that there is no evidence that blood sugar tests were withheld from Janet.  This court will therefore consider Plaintiffs' argument that the policy at the jail to take no action other than notifying a supervisor and the nurse regarding refusals of medical care and refusals to eat by a diabetic inmate caused a violation of her constitutional rights.

This court agrees with Walsh that the question is whether the constitution required Walsh to develop and implement a policy and procedure to involuntarily/forcibly check blood sugars and administer insulin to diabetic inmates despite the inmate's refusal of treatment. The United States Supreme Court has recognized that there is a general liberty interest in refusing medical treatment.  See Cruzan by Cruzan v. Director, Mo. Dep't of Health, 497 U.S. 261, 278-79 (1990).  The Supreme Court has also recognized that prisoners maintain a liberty interest in their own medical care.  See Washington v. Harper, 494 U.S. 210, 221-22 (1990) (prisoners possess significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment). Because prisoners have the right to refuse medical treatment and the right to refuse meals, courts have held that a plaintiff "cannot refuse treatment and food and then complain that defendants were deliberately indifferent to (her) medical and nutritional needs."  Offutt v. Cahill-Masching, 2007 WL 4379416, at *5 (C.D. Ill. 2007), quoting Grant v. O'Leary, 1996 WL 377173, at *5 (N.D. Ill. 1996); see also Thomas v. Gish, 64 F.3d 323, 326 (7th Cir. 1995); Howe v. Polunsky Unit, 2010 WL 2640804, at *8 (E.D. Tex. 2010); Williams v.

Fishburn, 1998 WL 748285, at *5 (N.D. Ill. 1998).  Plaintiffs have insisted that Janet was not competent to make decisions about her own health care and should not have been allowed to refuse blood sugar tests and meals.  However, while Janet certainly had mental health issues, Plaintiffs have not pointed to any evidence that Janet had been determined to be incompetent during the time she spent at the jail.  Cf. Estate of Allen v. City of Rockford, 349 F.3d 1015, 1020-21 (7th Cir. 2003) (no right for arrestee to refuse medical treatment where doctor found her incompetent to make decisions about her medical treatment).

This court agrees with Plaintiffs that, at some point, a refusal to eat and a refusal of treatment might turn suicidal and require intervention by the jail.  See Rodriguez v. Briley, 403 F.3d 952, 953 (7th Cir. 2005), citing Sanville, 266 F.3d at 729-34.  In addition, at some point, a jail may have to force feed a prisoner to prevent the inmate from seriously endangering his or her health or force feed an insane inmate if the insanity causes the prisoner to refuse food.  Freeman v. Berge, 441 F.3d 543, 546 (7th Cir. 2006), citing Sanville, 266 F.3d at 733-34.  This court notes that Plaintiffs' expert, Dr. Fred Osview, a psychiatrist, testified that blood sugar tests should have been forcefully performed and a feeding tube should have been used to give Janet nutrition.

In Freeman, the court noted that the prison had a policy of requiring a prisoner who skipped all his meals for three consecutive days to be inspected by employees of the prison's health service to make sure he wasn't seriously endangering his health.  Freeman, 441 F.3d at 547.  In this case, Janet refused food for approximately two days and refused to have her blood sugar checked for one day.  Swain testified that Janet spoke coherently and was not

46

exhibiting signs of diabetic ketoacidosis when Swain spoke to her at 3:00 p.m. the day before she died.  It is undisputed that, throughout that day, Janet made no complaints to Correctional Officer Alexander and Alexander did not observe any signs or symptoms of medical or mental distress during this time.  Janet was seen making noises and moving in her cell that night.  This court agrees that to suggest that Walsh (or HPL) was required by the constitution to have a policy which would have required correctional officers to forcibly withdraw blood from Janet against her will and, depending on the reading, forcibly administer insulin against her will when she was arguably not showing signs or symptoms of medical distress is a standard not supported by the constitution.  The policy at the jail was to balance Janet's constitutionally protected right to refuse medical care against the duty to provide care and prevent suicide.  Whether intervention was necessary before the morning of June 18, 2007 was a question  of professional judgment and beyond the purview of the constitution.  See Snipes v. Detella, 95 F.3d 586, 591 (7th Cir. 1996).

Plaintiffs next argued that the 15-minute check policy was ineffective because correctional officers did not spend enough time and did not document their observations during the checks.  Plaintiffs contended that a jury could conclude that the checks were not even done.  This court agrees with Walsh that there is no evidence in the record of any pattern or series of prior incidents that establishes or even suggests that correctional officers did not follow the monitoring policy.  In fact, Plaintiffs did not dispute that 61 cell checks were performed by correctional officers between 3:00 p.m. on June 17, 2007 and 6:30 a.m. on June 18, 2007.  The evidence shows that officers checked on Janet throughout the night

and into the morning of June 18, 2007, heard her make sounds and saw her moving around in her cell.[13]

Plaintiffs next complained about the policy that a correctional officer can call 911 when necessary and send an inmate to the hospital "anytime there is a life-threatening, acute emergency." Plaintiffs argued that this policy was faulty because there was no clear definition of "life-threatening, acute emergency" in the policy which would include diabetic ketoacidosis. Plaintiff argued that the "fact is that [Janet] presented with a life-threatening acute emergency on [June 18, 2007] and no one sent her to the hospital or called 911." Walsh has responded that there was no constitutional violation because the constitution does not require the policy to include a detailed list of every conceivable emergency which could require taking an inmate to the hospital. This court agrees with Walsh that the policy to call 911 and take inmates to the hospital when there is a life-threatening, acute emergency does not violate the constitution.

This court further concludes that what Plaintiffs are really arguing is that correctional officers at the jail who were doing checks on Janet the evening of June 17, 2007, and the early morning hours of June 18, 2007, should have realized that she was having a life-threatening, acute emergency before June 18, 2007, at 6:26 a.m., when it was too late. Plaintiffs have argued that Janet was slowly dying of diabetic ketoacidosis before the

---

[13] Plaintiffs next argued that there was no policy to document whether an evening snack was provided, eaten or refused at the jail. This court agrees with Walsh that it is unclear what point Plaintiffs are making and further agrees that this argument is irrelevant to the Monell claim against Walsh.

officers' eyes and nothing was done to help her.  Plaintiffs have pointed out in their response that the officers testified that Janet was mumbling or moaning during the night and that other inmates testified that they heard a female inmate asking for help.  The problem with this argument is that Plaintiffs did not serve any of these officers and they are not parties. Whether the officers were deliberately indifferent to Janet's serious medical needs is not an issue in this case.

Throughout their Response, Plaintiffs included scattered complaints about the training provided at the jail.  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizen's rights may rise to the level of an official government policy for purposes of § 1983."  Connick, 131 S. Ct. at 1359. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Id. at 1359.  A "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  Id. at 1359, quoting Canton, 489 U.S. at 388. "Only then 'can such a shortcoming be properly thought of as a [municipal] 'policy or custom' that is actionable under § 1983.'"  Id. at 1359-60, quoting Canton, 489 U.S. at 389.

Plaintiffs's scattered arguments complain about the correctional officers' lack of training regarding mental health issues and diabetes, including the symptoms of diabetic ketoacidosis.  However, it is undisputed that the correctional officers received medical and mental health training and this training included training about the care and monitoring of diabetic patients, including instruction about the warning signs for hypoglycemia and

hyperglycemia. Plaintiffs have argued that this training was inadequate. However, '[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick, 131 S. Ct. at 1360. Therefore, failure to train claims ordinarily require a pattern of similar constitutional violations by untrained employees. Id. at 1360; see also Hawkins v. City of Champaign, Ill., 2011 WL 2446312, at *4 (C.D. Ill. 2011). Merely showing that additional training would have been helpful does not establish municipal liability. Connick, 131 S. Ct. 1363. Plaintiffs have pointed to Joey Morrissey's complaints about the treatment of his diabetes at the jail in 2006. First of all, Morrissey is not a medical expert and his belief that his diabetes was not treated correctly does not establish that there were any problems with his treatment. Moreover, the record shows that, after an investigation, Walsh concluded that Morrissey's problems were caused by his refusal to comply with blood sugar checks. Plaintiffs have also discussed Swain's email in May 2007 about Janet's refusal to eat and do blood sugar checks during her prior incarceration at the jail. However, there is no evidence that Janet had any kind of a negative outcome during her earlier incarceration. This court agrees with Walsh that Plaintiffs have not pointed to a single incident, much less a pattern or series of incidents, where an inmate who complied with the diabetic protocol at the jail suffered any harm. This court concludes that Walsh was not on actual or constructive notice that a particular omission in his training caused his employees to violate the constitutional rights of inmates.

2.  ADA AND REHABILITATION ACT CLAIMS AGAINST CHAMPAIGN COUNTY

Champaign County argued that it is entitled to summary judgment on Plaintiffs' claims against it for a violation of the ADA and the Rehabilitation Act.  Champaign County argued that it is not the proper party defendant and, even if Plaintiffs' claims were considered, Janet was not denied any benefit because of her alleged disabilities and was not intentionally discriminated against.

This court agrees that Champaign County is not the proper party to sue for these claims.  See Brandon v. Smith, 2008 WL 879444, at *5 (C.D. Ill. 2008).  However, even if this court considered Plaintiffs' claims, it would find no liability.  To establish a claim under the ADA or Rehabilitation Act, Plaintiffs must show (1) that Janet was a qualified individual with a disability; (2) that she was excluded from participating in, or denied the benefits of a public entity's services, programs or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of her disability.  Belbachir v. County of McHenry, 2012 WL 4594023, at *5 (N.D. Ill. 2012), citing Kiman v. New Hampshire Dep't of Corrections, 451 F.3d 274, 283 (1st Cir. 2006).  Plaintiffs have acknowledged that compensatory damages are available under the ADA only upon a showing of intentional discrimination based upon disability.  Hildreth v. Cook County, 2010 WL 1656810, at *3 (N.D. Ill. 2010).  Plaintiffs' claim, however, is not that Janet was discriminated against because of her mental illness and diabetes, her claim actually is that she was not properly treated for these conditions.  Such a claim is not actionable under the ADA or Rehabilitation Act.  Belbachir, 2012 WL 4594023, at *5, citing Kiman, 451 F.3d at 284;

51

see also Bryant v. Madigan, 84 F.3d 246, 249 (7ᵗʰ Cir. 1996) ("[T]he [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners.").

### D.  HPL'S MOTION

#### 1.  MONELL CLAIM AGAINST HPL

In its Motion for Summary Judgment, HPL argued that it was entitled to summary judgment on Plaintiffs' claim against it under Monell.  HPL argued that there is no policy or custom, or lack thereof, which was the moving force behind a violation of Janet's constitutional rights.  In their response, Plaintiffs have argued that HPL did not have a policy or protocol for proper management of type 1 diabetes and this lack of a proper policy or protocol resulted in Janet's death.

Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices.  Rice, 675 F.3d at 675, citing Monell, 436 U.S. at 690-91.  "In order to recover against a municipal or corporate defendant under section 1983, it is not enough for the plaintiff to show that an employee of the municipality or corporation violated his constitutional rights; he must show that his injury was the result of the municipality's or corporation's official policy or custom."  Rice, 675 F.3d at 675, citing Pembaur v. City of Cincinnati, 475 U.S. 469, 479-80 (1986).  Moreover, the policy must have been the "moving force" behind the constitutional violations.  Sercye v. Wexford Health Sources, 2012 WL 4740740, at *3 (C.D. Ill. 2012).

In arguing that HPL's protocol was inadequate, Plaintiffs have relied heavily on the

opinions of Dr. Philipson.  Philipson was critical of the protocol because it provided for testing blood sugar only twice per day and it called for using regular insulin based upon a sliding scale.  In Philipson's opinion, blood sugar should be checked 4 - 8 times per day. Philipson also criticized the use of regular insulin and the failure to have a policy to follow up with a blood test within 6 hours of giving short-acting regular insulin.  Plaintiffs pointed out that Dr. Hoffman and Nurse Lisa Adams, other experts retained by Plaintiffs, also criticized the use of a sliding scale.  In addition, Plaintiffs' experts had the opinion that it was inappropriate to give Janet 20 units of regular insulin on June 16, 2007.  Plaintiffs' experts were also critical of the protocol's failure to provide for testing of ketones.  Plaintiffs argued that their experts agree that the HPL protocol "was a substantial departure from accepted medical standards for a type 1 diabetic."  Plaintiffs also complained that no doctor saw Janet while she was at the jail, that HPL did not provide competent mental health professionals[14] and that medical care was left to corrections officers when no nurse or doctor was present.

In contrast, HPL's experts, Dr. James Cavanaugh and Dr. Paris, rendered opinions that HPL's policies were appropriate.  HPL has pointed out that Philipson acknowledged that, had Janet accepted the care offered, she more likely than not would have suffered no harm. While Philipson believed that blood sugar should be checked more than twice per day, he testified that Janet's life could have been saved by two blood sugar checks on June 17, 2007.

This court concludes that this dispute over medical protocol and medical decisions is

---

[14]  This claim is a non-starter.  "[W]ithout evidence that [HPL] was on notice of inadequate inmate care by [Morris]," the full scope of Morris's qualifications in not relevant to HPL's liability.  See Minix, 597 F.3d at 832.

a question of tort, not constitutional law.  See Snipes, 95 F.3d at 591.  The constitution is not a vehicle for bringing claims of medical malpractice.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  "Medical decisions that may be characterized as 'classic example[s] of matter[s] for medical judgment,' . . . such as whether one course of treatment is preferable to another, are beyond the [constitution's] purview."  Snipes, 95 F.3d at 591, quoting Estelle, 429 U.S. at 107.  And, to the extent that Plaintiffs are claiming that Morris and Swain were deliberately indifferent to Janet's serious medical needs, HPL is correct that they were not made defendants in this action.  This court concludes that, based upon the evidence in this case, the medical protocol Janet was prescribed was not the moving force behind any constitutional violation.

Plaintiffs have also again made their contradictory arguments that Janet did not refuse medical care (because the refusals were not documented) and that Janet should not have been allowed to refuse care and meals.  This court thoroughly discussed these arguments in ruling on Walsh's Motion for Summary Judgment and reaches the same conclusion as to HPL.

## 2.  ADA AND REHABILITATION ACT CLAIMS

Plaintiffs have conceded that the district court in Brandon held that a private healthcare corporation is not a public entity for purposes of the ADA, but asked this court to rule differently.  This court, however, agrees with the district court in Brandon.  See Brandon, 2008 WL 879444, at *9.  Plaintiffs have also conceded that HPL is not a direct recipient of federal funds and, therefore, cannot be liable under § 504 of the Rehabilitation Act.

## E.  CONCLUSION

This court notes that Janet was a very troubled young woman, and it is likely that everyone involved in her arrest and incarceration at the Champaign County jail regrets that they were not able to forestall her death.  "But the fact that more measures, or different measures, might have been undertaken, and that those measures might have been successful (though even this is not certain) is not enough to support liability under the Constitution against any of the defendants" before this court.  See Miller v. Harbaugh, 698 F.3d 956, 964-65 (7th Cir. 2012).  Accordingly, the Motions for Summary Judgment must be granted.

IT IS THEREFORE ORDERED THAT

(1) Defendants Deputy Matthew McCallister, Jenna Thode, Karee Voges, Jeffrey Shumate, Arnold Mathews, Carl Brown and Nurse Susan Swain are terminated as parties.

(2) The Urbana Defendants' Motion to Strike (#138) is GRANTED in part and DENIED in part.  Exhibit G and Exhibit J, attached to Plaintiffs' Response to Motion for Summary Judgment (#137), are hereby STRICKEN.

(3) Plaintiffs' Motions to Strike (#159, #161) are DENIED.

(4) Defendants' Motions for Summary Judgment (#124, #130, #133) are GRANTED and Judgment is entered in favor of Defendants and against Plaintiffs.

(5) This case is terminated.

ENTERED this 14th day of March, 2013
**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
U.S. DISTRICT JUDGE